**OR**i**GINAL**

**THE LAW OFFICE OF MYCHAL WILSON**
Mychal Wilson SBN 236189
401 Wilshire Blvd., 12th Floor
Santa Monica, CA 90401
Telephone: (424) 252-4232
Facsimile: (310) 424-7116
E-mail: mychal@mychalwilsonesq.com



# IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA
and
ARKANSAS, CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, FLORIDA, GEORGIA, HAWAII, ILLINOIS, INDIANA, IOWA, LOUISIANA, MARYLAND, MASSACHUSETTS, MICHIGAN, MINNESOTA, MISSOURI, MONTANA, NEVADA, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH CAROLINA, OKLAHOMA, RHODE ISLAND, TENNESSEE, TEXAS, VERMONT, VIRGINIA, WASHINGTON, AND THE DISTRICT OF COLUMBIA

ex rel. JANE DOE NUMBER ONE and JANE DOE NUMBER TWO

**UNDER SEAL**

Case No. **CV18-09368**-SVW(MRWx)

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

**TO BE FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730**

**DO NOT ENTER INTO PACER**

**DO NOT PLACE IN PRESS BOX**

BY FAX



v.

REGENERON

PHARMACEUTICALS, INC.,

REGENERON HEALTHCARE

SOLUTIONS, INC., and SANOFI

AVENTIS US, LLC

Defendants.

## **INTRODUCTION**

1.     Relators JANE DOE NUMBER ONE and JANE DOE NUMBER TWO are informed and believe, and thereon allege the following Complaint against the Defendants REGENERON PHARMACEUTICALS, INC., REGENERON HEALTHCARE SOLUTIONS, INC., and SANOFI AVENTIS US, LLC.

2.     Regeneron is a pharmaceutical company that produces, markets, sells, and distributes pharmaceutical and biological products in the areas of areas of macular degeneration, atopic dermatitis, and cholesterol lowering among others. Regeneron manufactures, sells and promotes the prescription drug EYLEA, in the United States, which generated $3.7 billion in revenue for the company in 2017. Regeneron also markets, sells, and distributes the drugs Dupixent ($256 million in 2017), Praluent ($196 million in 2017), Zaltrap ($84 million in 2017), Arcalyst ($16 million in 2017), and Kevzara ($13 million in 2017) in the United States of America.

3.     Defendant Sanofi Aventis US, LLC co-promotes the drugs Dupixent, Kevzara, and Praluent with Regeneron.

4.     For several years now, Regeneron has been running a nationwide fraud scheme that has sixteen (16) components:

       a.  Employ and manage sales representatives to create quid pro quo arrangements in which physicians were paid millions of dollars in speaking, advisory board, steering committee, clinical study, and other fees and sent to exotic vacation destinations such as

3

Paris, Brazil, Barcelona, Rome, Amsterdam, Las Vegas, and

Hawaii to gain their trust and to create loyalty to Regeneron's

products;

b. Pay physicians millions of dollars as consultants

("Consultants"), advisory board members ("Advisory Board" /

"Advisory Board Members"), clinical study investigators and

consultants ("Studies"), and as paid speakers ("Speakers") to

create quid pro quo arrangements with high-prescribing

physician customers, who the sales representatives and sales

managers called "big writers" or "whales";

c. Place physician customers on lucrative hourly "Consulting

Services" contracts, which paid them exorbitant hourly wages

and annually paid them exorbitant fees for vague "consulting"

and "advising" services;

d. Regeneron sales, marketing, clinical, and medical staff and

managers concealed information about their high expenses for

paying physicians and healthcare institutions from their own

compliance oversight office, and in turn attempted to hide the

information from the Federal government's oversight;

4

e.  Regeneron failed to control speaker honoraria payments and travel payments to physicians from the various sales and marketing teams on restaurant and in-office meals, Sunshine Act reporting had a high compliance error rate, there was a lack of proper documentation for the meals and entertainment provided by the Praluent sales representatives, sign-in sheets for customer meals were not used, or were missing, or were illegible, and expense and payment information was not properly recorded;

f.  Regeneron paid excessive "preparation" fees to physicians to prepare slides and other materials for meetings as an inducement to use their products;

g.  Regeneron paid excessive travel funds to physicians who were otherwise paid to attend speaker meetings, Advisory Board meetings, Steering committee meetings, and other meetings, often at vastly inflated rates that covered not only the physician's travel, but also paid the physicians an excessive hourly rate to sit on an airplane or for other modes in which they were transported;

5

h.  Regeneron used third party vendors to make many of the kickback payments, allowed vendors to create "needs assessment" and other paperwork to justify payments to physicians, and ensured that its own internal compliance department was unable to exert control over vendor payments to physicians;

i.   Regeneron established a system in which clinical, medical, marketing and sales offices had control of their own payments and expenses to pay for the activities of healthcare professional ("HCPs"). Each office engaged their own third-party vendors for these payments, and budgeting for expenses, payments, and events occurred internally within that office, and receipt of invoice and payment occurred without review from outside that office. The payment information was uploaded to Regeneron's MarkView payment database (and/or the Concur database), and ultimately the compliance office and/or internal audit would review after the fact in which both offices reviewed samples of payments and expenses after as much as a year had passed after the payment had been made;

j.  Regeneron sales, marketing, clinical, and medical personnel filled out invoices for physician expenses and requests for payment, instead of the physicians themselves. Physicians frequently negotiated for additional payments beyond the Regeneron contracted or budgeted rates for traveling to participate in Regeneron meetings. When physicians wanted more money than was budgeted, Regeneron sales, marketing, clinical, and medical department personnel filled out "Payment exception forms" in order to get them as much as they wanted;

k.  Defendants Regeneron and Sanofi established a method of avoiding compliance oversight over payments to physicians by various means, including the establishment of a "payment exception form" which was widely abused to pay and reimburse physicians without prior review, to pay physicians for larger than budgeted or allowed amounts, and to pay physicians for extraordinary "preparation" and travel fees, such as thousands of dollars for sitting on an airplane (or other modes of travel) to travel to one of Regeneron's events; and

l.  Starting in 2015, travel stipends for physicians increased from more of a flat fee of approximately $1,000 for a few hours

7

travel for a physician customer to attend a Regeneron paid travel event, to a very high hourly rate of several hundred dollars per hour for sitting in a plane seat or other mode of transport. There was no control over the Regeneron sales, marketing, clinical and medical departments that paid for travel for their HCPs, as they often allowed the HCPs to book their own travel and to use 3rd party vendors other than the approved Regeneron travel vendor (Carlton Waggonlit and other 3rd party travel vendors);

m. Regeneron sought out physician customers and proffered kickbacks to them in return for participating in clinical studies and showing loyalty to Regeneron's drugs, sometimes adding research payments into the mix of other payments such as speaker and consulting fees that were paid out as inducements to high prescribing physician customers;

n. No one within the company tracked how the different physicians were utilized throughout the company, causing overutilization of speakers and consultants, and sometimes booking physician customers on back-to-back paid consulting activities that overlapped in time such that they could not attend

8

both. In addition, in their rush to sign up physician customers to attend paid events, sometimes Regeneron sales, marketing, clinical and medical personnel would agree to pay an HCP without a contract, as long as they were under contract with marketing partner Sanofi pharmaceutical company;

o.  Regeneron sales representatives fed false data directly into the insurance/payor prior authorization system in order to get prescriptions of Praluent and other Defendants' drugs paid for by Medicaid and insurers

p.  Defendants' unlawful conduct, in particular its unlawful inducements to physicians, extends beyond the United States. As is described below, Defendants' unlawful conduct implicates the Foreign Corrupt Practices Act ("FCPA"), 15 U.S.C. § 78dd-1, et seq. The company's scheme to bribe physicians through consulting and clinical study payments, trips, meals, and expenses with the purpose and intent to increase sales, tainted the company's sales and marketing activities on an international scale, including in Canada, England, and Europe; and

5.   On November 18, 2011, the FDA originally approved EYLEA as a treatment

of patients with Neovascular (Wet) Age-Related Macular Degeneration (AMD). The FDA gave EYLEA a warning for risk of endophthalmitis and retinal detachments following intravitral injections, as well as increases in intraocular pressure after injection. The drug was contraindicated for patients with ocular or periocular infection, with active intraocular inflammation, or with hypersensitivity.

6.    Consistent with its scheme to provide illegal incentives to physicians who prescribed EYLEA, Regeneron also gave millions in kickbacks to physicians while providing the physicians with lavish meals and honoraria as Consultants, Advisory Board Members, and Speakers in order to gain their agreement to promote and prescribe EYLEA and other Regeneron drugs. Regeneron flew physician customers to exotic vacation destinations such as Paris, Brazil, Barcelona, Rome, Amsterdam and Hawaii, and encouraged the physicians' acceptance of the honoraria as a form of quid pro quo for increased sales of EYLEA and other Regeneron drugs.

7.    EYLEA is a very expensive injectable drug, costing on average $1,850 per patient per dose, and approximately $16,000 per year. Defendants' schemes to promote broad use of EYLEA and other Regeneron drugs and to influence physicians to prescribe these drugs is very costly to Medicaid, Medicare, Tricare, and other government healthcare programs.

8.    Regeneron's market share is inherently limited, because the company's drugs are approved for use only in patients with very narrow indications. To overcome these problems and gain a larger market for these drugs, Regeneron created a plan to illegally market EYLEA, Dupixent, Praluent, Zaltrap, Arcalyst, and Kevzara, and Regeneron's other drug products to gain market share and formulary status in different territories.

10

9.      In order to increase sales of EYLEA, Dupixent, Praluent, Zaltrap, Arcalyst, and Kevzara, and Regeneron's other drug products, Defendants illegally provided monetary and other incentives for physicians who were willing to prescribe the drugs. Defendants trained and instructed sale representatives, business and marketing managers, and other executives to offer physicians expensive meals and honoraria as Consultants, Advisory Board Members, and Speakers as kickbacks in exchange for the physicians' agreement to prescribe EYLEA, Dupixent, Praluent, Zaltrap, Arcalyst, and Kevzara, and Regeneron's other drug products.

10.      Had the United States and the several States known that Defendants caused procurement of EYLEA, Dupixent, Praluent, Zaltrap, Arcalyst, and Kevzara through the provision of kickbacks, they would not have provided reimbursement for such prescriptions. This course of conduct violates the False Claims Act, 31 U.S.C. §§ 3729 et seq. and equivalent state statutes.

11.      Federal laws and regulations governing Medicaid and Medicare and similar state statutes prohibit pharmaceutical manufacturers from providing kickbacks to physicians and medical care providers. Specifically, the federal healthcare program anti-kickback provision, 42 U.S.C. § 1320a-7b(b) (2)(B), provides:

> [W]hoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person . . . to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

12.      The Medicare and Medicaid anti-kickback laws, 42 U.S.C. 1320a-7b(b), et

11

seq., regulate drug and device marketing in order to prevent over-utilization of medical care, medication, and medical drugs. Under the anti-kickback laws, companies may not offer or pay any remuneration, in cash or kind, to induce physicians or others to order or recommend drugs or devices which may be paid for by a federal healthcare program such as Medicare or Medicaid. These regulations not only prohibit outright bribes and rebate schemes, but prohibit any payment, remuneration, gratuities, and other benefits paid by a company to a physician which has as one of its purposes inducing the physician to use the company's products.

13.     In addition to the anti-kickback laws, §1877 of the Social Security Act, often referred to as the "Stark law," provides that a physician cannot (1) refer patients to an entity (2) for the furnishing of DHS (designated health services) (3) if there is a direct or indirect financial relationship between the referring physician (or an immediate family member of the referring physician) and the entity, (4) unless the financial relationship fits within one of the specific exceptions in the statute or regulations. See 42 U.S.C. §1395nn. Unlike the Medicare Anti-Kickback Statute, which is a criminal statute requiring at least some measure of criminal intent, the Stark Statute is a civil statute requiring strict compliance. Intent to violate or substantial compliance has no bearing on whether an activity is or is not legal. Violation, no matter how unintentional or technical, is sufficient to invoke the Stark Statute. Lastly, if a prohibited referral occurs under Stark, the DHS entity may not file or cause to be filed a claim under Medicare or Medicaid or a bill to any individual, third party payer, or other entity for the designated health services provided.

14.     Had the United States and the several States known that EYLEA, Dupixent,

Praluent, Zaltrap, Arcalyst, and Kevzara, and Regeneron's other drug products were being used by facilities because physicians in those facilities had accepted kickbacks from Defendants, the United States and the several States would not have funded these illegal kickbacks after the fact by providing reimbursement for Regeneron's drugs.

15.     Moreover, the kickbacks described in this Complaint are strictly illegal and have had the direct effect of greatly increasing the amount of EYLEA, Dupixent, Praluent, Zaltrap, Arcalyst, and Kevzara, and Regeneron's other drug products that have been paid for and reimbursed by state and federal governments. Accordingly, the kickbacks have had the indirect effect of increasing the amount of money spent by the federal government and the States for payments and reimbursements covered by Medicaid, Medicare, and the Tricare health care system for members of the military and their families. Defendants' kickbacks to physicians represent the inducement of payment from the government through a pattern of fraudulent conduct, constituting false claims within the meaning of 31 U.S.C. § 3729 and the relevant provisions of the state false claims and Medicaid fraud statutes.

16.     Relators also allege violations by Defendants of the California Insurance Frauds Prevention Act ("CIFPA"), Cal. Ins. Code § 1871, et seq.; and the Illinois Insurance Claims Fraud Prevention Act ("ILCFPA"), 740 Ill. Comp. Stat. § 92/1, et seq.

17.     Both California and Illinois have qui tam statutes that permit relators to raise allegations of fraud by individuals or entities against private insurance companies. The statutes operate similarly to the federal and state FCAs and are written to prevent fraud occurring in the private health care insurance market.

18.     Upon information and belief, Defendants receive significant revenues from

private insurers in California and Illinois.

19.     Upon information and belief, Defendants are paid by private insurers that cover California- and Illinois-based patients who have been referred for treatment as a result of Regeneron's scheme.

20.     Upon information and belief, private healthcare insurance companies in California and Illinois require the same conditions of payment and prohibitions kickbacks and off-label marketing found in the Medicare and Medicaid programs.

21.     The CIFPA prohibits as unlawful the following:

> ...It is unlawful to knowingly employ runners, cappers, steerers, or other persons...to procure clients or patients to perform or obtain services or benefits under a contract of insurance or that will be the basis for a claim against an insured individual or his or her insurer.

22.     The Defendants' kickback scheme also violates Section 1871.7(a) of the CIFPA, Cal. Ins. Code 1871.7(a), and Section 92/5(a) of the ILCFPA 740 Ill. Comp. Stat. § 92/5(a). The Defendants have entered into illegal arrangements with physicians that provide financial incentives for the use of their drug prescribing services, resulting in inappropriate claims submitted to private insurers.

23.     Ca. Ins. Code § 1871.7(a). Any person or entity found in violation of this section or specifically identified corollary criminal code sections is subject to civil penalties ranging from $5,000.00 to $10,000.00 per false claim plus three times the amount of each false claim for compensation from an insurer. Cal. Ins. Code § 1871.7(b).

24.     Under the CIFPA, any interested person may bring a sealed civil action for a violation of Section 187.7 on behalf of the State of California, Cal. Ins. Code §

14

1871.7(e)(1), (2). If the relators are ultimately successful and the District Attorney intervenes in the lawsuit, the relators are entitled to the recovery of fees, expenses, and a relator's share of between 30% and 40% according to the priority specified in the statute. Cal. Ins. Code § 1871.7(g)(1)(A)(iii)(I), (IV). If neither the District Attorney nor the Insurance Commissioner intervene and the relators are successful in settling their lawsuit or attaining final judgment, the relators may receive between 40% and 50% of the proceeds plus costs and expenses. Cal. Ins. Code § 1871.7(g)(2)(A).

25.    The Illinois Insurance Claims Fraud Prevention Act ("ILCFPA") is similar to the CIFPA. In Section 92/5(a), the ILCFPA prohibits kickbacks and states:

> ... [I]t is unlawful to knowingly offer or pay any remuneration directly or indirectly, in case or in kind, to induce any person to procure clients or patients to obtain services or benefits under a contract of insurance or that will be the basis for a claim against an insured person or the person's insurer.

26.    740 Ill. Comp. Stat. § 92/5(a). If a defendant is in violation of Section 92/5(a) or specifically identified corollary criminal code sections, he/she must reimburse three times the amount of money defrauded as well as civil penalties ranging from $5,000.00 to $10,000,00 per fraudulent claim. 740 Ill, Comp. Stat. § 92/5(b).

27.    Pursuant to Section 15 of the ILCFPA Section 15, an interested person may bring a sealed civil action for a violation of the ILCFPA on behalf of him/herself and the State of Illinois. 740 Ill. Comp, Stat. § 92/15(a), (b). If the State's Attorney and/or the Attorney General intervene in the qui tam action, and it is ultimately successful, the relators are entitled to at least 30% of the recovery. 740 Ill, Comp.

State § 92/25(a). If neither government entity intervenes and the relators successfully pursues the lawsuit on their own, the relators are entitled to recover not less than 40% of the proceeds. 740 Ill. Comp. Stat. § 92/25(b).

28.     Relators here are the original source of the allegations under the CIFPA and ILCFPA.

## JURISDICTION AND VENUE

29.     The Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732 and supplemental jurisdiction over the counts related to the State False Claims Acts and other applicable state laws pursuant to 28 U.S.C. § 1367.

30.     This Court has personal jurisdiction over the Defendants and subject matter jurisdiction over this action pursuant to 31 U.S.C. § 3732(a) because Defendants transact the business that is the subject matter of this lawsuit in California and numerous acts proscribed by 31 U.S.C. § 3729 occurred in California.

31.     Venue is proper in this Court pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391 because the acts proscribed by 31 U.S.C. §§ 3729 et seq. and corresponding state statutes and complained of herein occurred in this District, and the Defendants transacted business in this District.

## PARTIES

32.     Relator JANE DOE NUMBER ONE began working for Regeneron in October 2015, in the Commercial Operations Department as a Senior Commercial Contracts Associate, and was promoted to Associate Manager of Commercial Contracts in September 2016. Relator separated from the company for a new job

with another pharmaceutical company in September 2018. Relator worked at the company's US headquarters in Tarrytown, New York. Relator worked on the accounts for multiple prescription drugs for Regeneron, including those contained in this disclosure.

33.     Relator JANE DOE NUMBER TWO first began working for Regeneron in May 2015, as a Field Access Specialist, and left the company in August 2015.  Her sales territory was in the downtown Los Angeles/Beverly Hills area.

34.     Relators are citizens of the United States. Relators have been employed by Regeneron and have inside knowledge that is independent of and materially adds to publicly disclosed information regarding Regeneron's business related to pharmaceutical products.

35.     The Relators became aware of the Defendants' false claim scheme alleged herein due to Relators' positions as original source. The Relators commenced this qui tam action against the Defendants for the pharmaceutical products at issue based upon Relators' personal experiences and industry insider information. Relators, as employees of Regeneron, had access to pricing, marketing and reimbursement information such as proprietary Regeneron's computer files revealing the marketing schemes, prices, and volume of sales by Regeneron. Relators, as industry insiders, discovered huge profit spreads on the drugs at issue and that the drugs at issue were reimbursed by Medicare and Medicaid for illegal marketing schemes. Relators directly witnessed and observed the Defendants' sale and introduction of the drugs into the stream of commerce. Relators were aware that Medicare and Medicaid intended to reimburse Defendants for drugs based on a belief that the drugs were legitimately marketed and that the drugs were not encumbered by illegal Regeneron kickback and off-label marketing schemes at the

Government's expense.

36.     Defendant Regeneron Pharmaceuticals, Inc. is a corporation organized under the laws of the State of New York with its principal place of business at 777 Old Saw Mill River Road, Tarrytown, New York 10591. On information and belief, Defendants Healthcare, Inc. is a wholly owned subsidiary of Regeneron Pharmaceuticals, Inc., also with its principal place of business at 777 Old Saw Mill River Road, Tarrytown, New York 10591 (collectively, "Regeneron").

37.     Defendant Sanofi-Aventis US LLC ("Sanofi") is a Delaware corporation with its principal place of business in Bridgewater, New Jersey. Sanofi-Aventis U.S. LLC is a wholly owned subsidiary of Sanofi, a corporation organized and existing under the laws of France, having its principal place of business in Paris. Sanofi co-promotes the drugs Dupixent, Kevzara, and Praluent with Defendant Regeneron.

## KICKBACKS TO PHYSICIANS

38.     Defendants used illegal kickbacks and quid pro quo arrangements to ensure that physicians would continue to prescribe Regeneron's drugs. Defendants paid physicians millions of dollars in speaking, advisory board, steering committee, clinical study, and other fees and sent to exotic vacation destinations such as Paris, Brazil, Barcelona, Rome, Amsterdam and Hawaii to gain their trust and to create loyalty to Regeneron's products. None of these incentives have anything to do with true scientific or medical research or with the safety of patients. These incentives include exotic vacation travel, numerous catered meals, lavish dinners, honoraria payments for speakers, consultants and advisory board members, as well as the other activities described herein.

39.     Advisory Boards were completely overseen by Defendants' sales and marketing teams and the clinical and medical affairs offices. These offices would invite the speakers and nominate the members of the Advisory Boards. For example, with its drug EYLEA, Regeneron's Advisory Boards met at least three (3) times a year, normally in tourist destinations around the country. Physician's travel fee was paid, travel expenses were reimbursed, and they were paid honoraria for participating, at least $300, and as much as $16,420. Over ninety percent (90%) of attendees received more than $2,000 to attend, and over fifty percent (50%) of attendees received in excess of $3,500 to attend.

40.     For example, Defendant's December 2017 spreadsheet called Regeneron Activity Tracker, shows that the company engaged its physician customers as paid consultants to attend Advisory Board meetings in Amsterdam; Barcelona, Spain; Berlin, Germany; Boston; Brazil; Chicago; Dallas; Denmark; Denver; Frankfurt, Germany; London, England; Los Angeles; Las Vegas; New York City; Newark; Orlando; Phoenix; Rome, Italy; San Francisco; Turnberry Isle Miami; and Vermont.

41.     For example, on July 22, 2017, Regeneron spent a budget of $76,000 on payments to eleven (11) healthcare professionals plus travel expenses for them to attend an advisory board on the company's drug Dupixent in Las Vegas.

42.     For Example, in just twenty-seven (27) months between September 2015, and December 2017, Defendant contracted to pay $1,488,460 in advisory panel fees and travel expenses to the following physicians to promote Regeneron drugs on three hundred and ninety-five (395) occasions, including many physician customers that were paid to travel to exotic or vacation destinations, such as Brazil, Italy, Germany, Amsterdam, London, Barcelona, and Denmark:

19

| Meeting Date | Name | Product/Therapeutic area | City | Amount |
|---|---|---|---|---|
| November 4-5, 2016 | James T. Rosenbaum | Immune & Inflammation | NYC Area | $ 16,420 |
| November 4-5, 2016 | Eric L. Simpson | Immune & Inflammation | NYC Area | $ 14,460 |
| November 4-5, 2016 | Emma Guttman-Yassky | Immune & Inflammation | NYC Area | $ 13,560 |
| November 4-5, 2016 | Terry Kim | Immune & Inflammation | NYC Area | $ 12,920 |
| November 4-5, 2016 | Esen K. Akpek | Immune & Inflammation | NYC Area | $ 12,620 |
| November 4-5, 2016 | Penny A. Asbell | Immune & Inflammation | NYC Area | $ 12,320 |
| 09/12/2016 to 09/12/2016 | Prof. Dr. Max S. Topp; M. D. | REGN 1979 | New York, NY | $ 11,858 |
| July 22, 2017 | Daniel J. Clauw | Immune & Inflammation | NY Area - TBD as per facility availability | $ 9,324 |
| July 22, 2017 | Neil K. Singla | Immune & Inflammation | NY Area - TBD as per facility availability | $ 9,324 |
| 09/12/2016 to 09/12/2016 | Rajat Bannerji M.D., Ph.D. | REGN 1979 | New York, NY | $ 9,020 |
| 09/12/2016 to 09/12/2016 | Jon E. Arnason, M.D. M.Sc. | REGN 1979 | New York, NY | $ 8,736 |
| July 22, 2017 | Steven Paul Cohen | Immune & Inflammation | NY Area - TBD as per facility availability | $ 8,724 |
| July 22, 2017 | Moses V. Chao | Immune & Inflammation | NY Area - TBD as per facility availability | $ 8,274 |
| 09/12/2016 to 09/12/2016 | John Leonard | REGN 1979 | New York, NY | $ 7,546 |
| Feb. 11, 2017 | Klaus Ley | Muscle & Metabolism | Berlin, Germany | $ 6,876 |
| Oct. 22, 2016 | Edward Keystone | Muscle & Metabolism | Barcelona, Spain | $ 6,500 |
| December 9, 2016 | Kenneth L. Schaecher | Immune & Inflammation | New York/New Jersey | $ 6,360 |

20

| Meeting Date | Name | Product/Therapeutic area | City | Amount |
|---|---|---|---|---|
| July 22, 2017 | Anne-Marie Aline Michel Maifait | Immune & Inflammation | NY Area - TBD as per facility availability | $ 6,060 |
| July 22, 2017 | Siba P. Raychaudhuri | Immune & Inflammation | NY Area - TBD as per facility availability | $ 6,060 |
| July 22, 2017 | Thomas J. Schnitzer | Immune & Inflammation | NY Area - TBD as per facility availability | $ 6,060 |
| December 14, 2016 | Joaquin Borras Blasco | Immune & Inflammation | Face to Face Advisory Board in Frankfurt, Germany | $ 6,012 |
| December 14, 2016 | Josep Darba | Immune & Inflammation | Face to Face Advisory Board in Frankfurt, Germany | $ 6,012 |
| Sept 17, 2016 | John C. Marshall | CV/Renal | New York, NY 10001 | $ 5,856 |
| May 2, 2017 | Seth J Baum | REGN 1500 | Chicago, IL | $ 5,600 |
| October 29, 2016 | Eugene Roland Bleecker | Immune & Inflammation | Park Plaza Victoria Amsterdam, Netherlands | $ 5,596 |
| October 29th, 2016 | Jeffrey Weinberg | Immune & Inflammation | Denver, Colorado | $ 5,528 |
| October 29th, 2016 | Henry Wong | Immune & Inflammation | Denver, Colorado | $ 5,528 |
| October 29th, 2016 | Laura Ferris | Immune & Inflammation | Denver, Colorado | $ 5,528 |
| September 30, 2016 | Randall T. Curnow | Skeletal Diseases | Los Angeles, CA - Intercontinental Hotel (Face to Face Advisory Board) | $ 5,470 |
| September 30, 2016 | Roger Muller | Skeletal Diseases | Los Angeles, CA - Intercontinental Hotel (Face to Face Advisory Board) | $ 5,470 |

21

| Meeting Date | Name | Product/Therapeutic area | City | Amount |
|---|---|---|---|---|
| September 30, 2016 | Kenneth Schaecher | Skeletal Diseases | Los Angeles, CA - Intercontinental Hotel (Face to Face Advisory Board) | $ 5,470 |
| September 30, 2016 | Prentiss Taylor Jr | Skeletal Diseases | Los Angeles, CA - Intercontinental Hotel (Face to Face Advisory Board) | $ 5,470 |
| 12/01/2015 to 12/13/2015 | Mark Boguniewicz | Immune & Inflammation | Italy | $ 5,469 |
| 12/01/2015 to 12/13/2015 | Eric Simpson | Immune & Inflammation | Italy | $ 5,469 |
| May 5, 2017 | Barry Bertolet | PRALUENT® (alirocumab) Injection | TBD | $ 5,373 |
| May 5, 2017 | Irving Loh | PRALUENT® (alirocumab) Injection | TBD | $ 5,373 |
| May 5, 2017 | Kwan Lee | PRALUENT® (alirocumab) Injection | TBD | $ 5,373 |
| May 5, 2017 | Linda Hemphill | PRALUENT® (alirocumab) Injection | TBD | $ 5,373 |
| December 9, 2016 | Michael J. Fine | Immune & Inflammation | New York/New Jersey | $ 5,200 |
| 12/09/2015 to 12/16/2015 | Harry Genant | Pain, Addiction & Neurology | Newark, NJ | $ 5,106 |
| July 22, 2017 | Thomas Graven-Nielsen | Immune & Inflammation | NY Area - TBD as per facility availability | $ 5,071 |
| 06/24/2016 to 07/23/2016 | Paul Gurbel | PRALUENT® (alirocumab) Injection | California | $ 5,007 |
| 06/24/2016 to 07/23/2016 | Daniel Friedman | PRALUENT® (alirocumab) Injection | California | $ 5,007 |

| Meeting Date | Name | Product/Therapeutic area | City | Amount | |
|---|---|---|---|---|---|
| 06/24/2016 to 07/23/2016 | John Tan | PRALUENT® (alirocumab) Injection | California | $ | 5,007 |
| 06/24/2016 to 07/23/2016 | Eugene Yang | PRALUENT® (alirocumab) Injection | California | $ | 5,007 |
| 06/24/2016 to 07/23/2016 | Khurram Nasir | PRALUENT® (alirocumab) Injection | California | $ | 5,007 |
| Feb. 11, 2017 | Edward Keystone | Muscle & Metabolism | Berlin, Germany | $ | 4,936 |
| July 22, 2017 | Hee-Jeong Im Sampen | Immune & Inflammation | NY Area - TBD as per facility availability | $ | 4,920 |
| May 2, 2017 | Stephen Peake | REGN 1500 | Chicago, IL | $ | 4,900 |
| May 2, 2017 | Michael Blaha | REGN 1500 | Chicago, IL | $ | 4,900 |
| November 4-5, 2016 | Andreas Wollenberg | Immune & Inflammation | NYC Area | $ | 4,880 |
| 05/20/2016 to 05/21/2016 | George Murakawa | Immune & Inflammation | Phoenix, AZ | $ | 4,869 |
| 05/20/2016 to 05/21/2016 | Caitroina Ryan | Immune & Inflammation | Phoenix, AZ | $ | 4,869 |
| 05/20/2016 to 05/21/2016 | Animesh Sinha | Immune & Inflammation | Phoenix, AZ | $ | 4,869 |
| 05/20/2016 to 05/21/2016 | John C. Browning | Immune & Inflammation | Phoenix, AZ | $ | 4,869 |
| 05/20/2016 to 05/21/2016 | Kevin Belasco | Immune & Inflammation | Phoenix, AZ | $ | 4,869 |
| December 3 | Maria Lopes | Immune & Inflammation | Live Meeting -Dallas, TX | $ | 4,800 |
| December 3 | Fredrick May | Immune & Inflammation | Live Meeting -Dallas, TX | $ | 4,800 |

23

| Meeting Date | Name | Product/Therapeutic area | City | Amount |
|---|---|---|---|---|
| December 3 | George Kitchens | Immune & Inflammation | Live Meeting -Dallas, TX | $ 4,800 |
| December 3 | Michael J. Fine | Immune & Inflammation | Live Meeting -Dallas, TX | $ 4,800 |
| 24 February 2017 | Terho Heikkinen | Infectious Diseases | NYC - TBD as per facility availability | $ 4,782 |
| October 29, 2016 | Michael E. Wechsler | Immune & Inflammation | Park Plaza Victoria Amsterdam, Netherlands | $ 4,772 |
| October 29th, 2016 | Benjamin Lockshin | Immune & Inflammation | Denver, Colorado | $ 4,728 |
| July 22, 2017 | Rocky Sung-Chi Tuan | Immune & Inflammation | NY Area - TBD as per facility availability | $ 4,716 |
| May 2, 2017 | Richard Gajdowski | REGN 1500 | Chicago, IL | $ 4,676 |
| May 5, 2017 | Greg Pokrywka | PRALUENT® (alirocumab) Injection | TBD | $ 4,617 |
| May 5, 2017 | Kari Uusinarkaus | PRALUENT® (alirocumab) Injection | TBD | $ 4,617 |
| October 29, 2016 | Nicola Hanania | Immune & Inflammation | Park Plaza Victoria Amsterdam, Netherlands | $ 4,588 |
| October 29th, 2016 | Miguel J. Lanz | Immune & Inflammation | Denver, Colorado | $ 4,576 |
| October 22, 2016 | Robert J. Pignolo | Muscle & Metabolism | Boston, MA | $ 4,568 |
| October 29, 2016 | Santiago Quirce | Immune & Inflammation | Park Plaza Victoria Amsterdam, Netherlands | $ 4,552 |
| December 9, 2016 | John Leonard Fox | Immune & Inflammation | New York/New Jersey | $ 4,550 |
| November 4-5, 2016 | Errol P. Prens | Immune & Inflammation | NYC Area | $ 4,540 |
| May 5, 2017 | Adam Feldman | PRALUENT® (alirocumab) Injection | TBD | $ 4,536 |

24

| Meeting Date | Name | Product/Therapeutic area | City | Amount |
|---|---|---|---|---|
| May 5, 2017 | Brett Nowlan | PRALUENT® (alirocumab) Injection | TBD | $ 4,536 |
| March 18, 2017 | Yousaf Ali | Sarilumab | Los Angeles, CA | $ 4,440 |
| March 18, 2017 | Gary Solomon | Sarilumab | Los Angeles, CA | $ 4,440 |
| December 3 | Bruce Martin Niebylski | Immune & Inflammation | Live Meeting -Dallas, TX | $ 4,404 |
| December 9, 2016 | Timothy P. Colligan | Immune & Inflammation | New York/New Jersey | $ 4,380 |
| December 9, 2016 | Sonya J. Lewis | Immune & Inflammation | New York/New Jersey | $ 4,380 |
| 12/01/2015 to 12/13/2015 | Melinda J. Gooderham | Immune & Inflammation | Italy | $ 4,350 |
| 12/01/2015 to 12/13/2015 | Kim Papp | Immune & Inflammation | Italy | $ 4,350 |
| Sept 17, 2016 | Greg Martin, MD Msc | CV/Renal | New York, NY 10001 | $ 4,344 |
| Sept 17, 2016 | Gordon Bernard | CV/Renal | New York, NY 10001 | $ 4,344 |
| October 7, 2016 | Erin E. Boh | Immune & Inflammation | Chicago, IL | $ 4,287 |
| October 7, 2016 | Jamie D. Weisman | Immune & Inflammation | Chicago, IL | $ 4,287 |
| December 9, 2016 | Richard Gajdowski | Immune & Inflammation | New York/New Jersey | $ 4,280 |
| 06/24/2016 to 06/24/2016 | Bradley Chipps | Immune & Inflammation | Chicago, IL | $ 4,224 |
| 05/14/2016 to 05/14/2016 | Elliot Israel | Immune & Inflammation | San Francisco, CA | $ 4,224 |
| 05/14/2016 to 05/14/2016 | Klaus Rabe | Immune & Inflammation | San Francisco, CA | $ 4,224 |
| 05/14/2016 to 05/14/2016 | Guy Brusselle | Immune & Inflammation | San Francisco, CA | $ 4,224 |

| Meeting Date | Name | Product/Therapeutic area | City | Amount |
|---|---|---|---|---|
| 05/14/2016  to  05/14/2016 | Pascal Chanez | Immune & Inflammation | San Francisco, CA | $ 4,224 |
| 05/14/2016 to 05/14/2016 | Michael Wechsler | Immune & Inflammation | San Francisco, CA | $ 4,224 |
| 05/14/2016 to 05/14/2016 | Elliot Israel | Immune & Inflammation | San Francisco, CA | $ 4,224 |
| 05/14/2016 to 05/14/2016 | Eugene Roland Bleecker | Immune & Inflammation | San Francisco, CA | $ 4,224 |
| 05/20/2016  to  05/21/2016 | Luz Fonacier | Immune & Inflammation | Phoenix, AZ | $ 4,224 |
| October 29, 2016 | Kenneth R. Chapman | Immune & Inflammation | Park Plaza Victoria Amsterdam, Netherlands | $ 4,216 |
| September 30, 2016 | Allan Morton | Skeletal Diseases | Los Angeles, CA - Intercontinental Hotel (Face to Face Advisory Board) | $ 4,200 |
| 05/14/2016  to  05/14/2016 | Michael Wechsler | Immune & Inflammation | San Francisco, CA | $ 4,197 |
| 05/14/2016 to 05/14/2016 | Sally Wenzel | Immune & Inflammation | San Francisco, CA | $ 4,197 |
| 05/14/2016  to  05/14/2016 | Eugene Roland Bleecker | Immune & Inflammation | San Francisco, CA | $ 4,197 |
| July 22, 2017 | Victoria Chapman | Immune & Inflammation | NY Area - TBD as per facility availability | $ 4,188 |
| October 14, 2016 | Robert S. Zeiger | Immune & Inflammation | Chicago, IL | $ 4,154 |
| 06/24/2016 to 07/23/2016 | Robert Heining | PRALUENT® (alirocumab) Injection | California | $ 4,152 |
| 06/24/2016 to 07/23/2016 | David Robertson | PRALUENT® (alirocumab) Injection | California | $ 4,152 |

| Meeting Date | Name | Product/Therapeutic area | City | Amount |
|---|---|---|---|---|
| 24 February 2017 | Flor Munoz | Infectious Diseases | NYC - TBD as per facility availability | $ 4,125 |
| July 22, 2017 | Lorne M. Mendell | Immune & Inflammation | NY Area - TBD as per facility availability | $ 4,116 |
| December 3 | Sonya J. Lewis | Immune & Inflammation | Live Meeting -Dallas, TX | $ 4,062 |
| December 3 | Kenneth Mishler | Immune & Inflammation | Live Meeting -Dallas, TX | $ 4,062 |
| December 3 | Kim P. Tonkavich | Immune & Inflammation | Live Meeting -Dallas, TX | $ 4,062 |
| December 3 | Cheryl Larson | Immune & Inflammation | Live Meeting -Dallas, TX | $ 4,062 |
| December 3 | Marcia A. Palmer | Immune & Inflammation | Live Meeting -Dallas, TX | $ 4,062 |
| December 3 | Sheila M. Arquette | Immune & Inflammation | Live Meeting -Dallas, TX | $ 4,062 |
| December 14, 2016 | Christopher Edwards | Immune & Inflammation | Face to Face Advisory Board in Frankfurt, Germany | $ 4,008 |
| December 14, 2016 | Miles Ayling | Immune & Inflammation | Face to Face Advisory Board in Frankfurt, Germany | $ 4,008 |
| December 14, 2016 | Ben van Hout | Immune & Inflammation | Face to Face Advisory Board in Frankfurt, Germany | $ 4,008 |
| 06/24/2016  to 06/24/2016 | David Pearlman | Immune & Inflammation | Chicago, IL | $ 3,924 |

27

| Meeting Date | Name | Product/Therapeutic area | City | Amount | |
|---|---|---|---|---|---|
| 06/24/2016 to 06/24/2016 | Nicola Hanania | Immune & Inflammation | Chicago, IL | $ | 3,924 |
| 06/24/2016 to 06/24/2016 | Elliot Israel | Immune & Inflammation | Chicago, IL | $ | 3,924 |
| 06/24/2016 to 06/24/2016 | William Calhoun | Immune & Inflammation | Chicago, IL | $ | 3,924 |
| 06/24/2016 to 06/24/2016 | Reynold Panitieri | Immune & Inflammation | Chicago, IL | $ | 3,924 |
| 05/20/2016 to 05/21/2016 | Philip C. Halverson | Immune & Inflammation | Phoenix, AZ | $ | 3,924 |
| 05/20/2016 to 05/21/2016 | Anna De Benedetto | Immune & Inflammation | Phoenix, AZ | $ | 3,924 |
| 05/20/2016 to 05/21/2016 | Jennifer Soung | Immune & Inflammation | Phoenix, AZ | $ | 3,924 |
| 05/20/2016 to 05/21/2016 | Bob Geng | Immune & Inflammation | Phoenix, AZ | $ | 3,924 |
| 05/20/2016 to 05/21/2016 | Weily Soong | Immune & Inflammation | Phoenix, AZ | $ | 3,924 |
| 05/20/2016 to 05/21/2016 | Steven Meltzer | Immune & Inflammation | Phoenix, AZ | $ | 3,924 |
| 05/20/2016 to 05/21/2016 | Jan Bernhisel-Broadbent | Immune & Inflammation | Phoenix, AZ | $ | 3,924 |
| 11/21/2015 to 11/21/2015 | Daniel Arkfeld | Immune & Inflammation | Dallas, Texas | $ | 3,900 |
| 11/21/2015 to 11/21/2015 | Ernie Brahn | Immune & Inflammation | Dallas, Texas | $ | 3,900 |
| 11/21/2015 to 11/21/2015 | Christina Charles-Schoeman | Immune & Inflammation | Dallas, Texas | $ | 3,900 |
| 11/21/2015 to 11/21/2015 | Petros Efthimiou | Immune & Inflammation | Dallas, Texas | $ | 3,900 |

28

| Meeting Date | Name | Product/Therapeutic area | City | Amount |
|---|---|---|---|---|
| 11/21/2015 to 11/21/2015 | George Karpouzas | Immune & Inflammation | Dallas, Texas | $ 3,900 |
| 11/21/2015 to 11/21/2015 | Jeffrey Kaine | Immune & Inflammation | Dallas, Texas | $ 3,900 |
| 11/21/2015 to 11/21/2015 | Alan Kivitz | Immune & Inflammation | Dallas, Texas | $ 3,900 |
| 11/21/2015 to 11/21/2015 | Nancy E. Lane | Immune & Inflammation | Dallas, Texas | $ 3,900 |
| 11/21/2015 to 11/21/2015 | Andreas Reiff | Immune & Inflammation | Dallas, Texas | $ 3,900 |
| 11/21/2015 to 11/21/2015 | James O'Dell | Immune & Inflammation | Dallas, Texas | $ 3,900 |
| 12/09/2015 to 12/16/2015 | Marc Hochberg | Pain, Addiction & Neurology | Newark, NJ | $ 3,900 |
| 10/09/2015 to 10/09/2015 | Keith Pearson | Immune & Inflammation | Germany | $ 3,900 |
| 10/09/2015 to 10/09/2015 | Martin Lee | Immune & Inflammation | Germany | $ 3,900 |
| October 29th, 2016 | Dareen D. Siri | Immune & Inflammation | Denver, Colorado | $ 3,888 |
| October 29th, 2016 | Nathan Segall | Immune & Inflammation | Denver, Colorado | $ 3,888 |
| 10/02/2015 to 10/02/2015 | Jeffrey Kaine | Immune & Inflammation | Chicago, IL | $ 3,855 |
| 10/02/2015 to 10/02/2015 | Joseph Markenson | Immune & Inflammation | Chicago, IL | $ 3,855 |
| 10/02/2015 to 10/02/2015 | Prabha Ranganathan | Immune & Inflammation | Chicago, IL | $ 3,855 |
| 09/26/2015 to 09/26/2015 | John Tesser | Immune & Inflammation | Chicago, IL | $ 3,855 |
| 09/26/2015 to 09/26/2015 | Richard Jimenez | Immune & Inflammation | Chicago, IL | $ 3,855 |
| 09/26/2015 to 09/26/2015 | Elena Massoritti | Immune & Inflammation | Chicago, IL | $ 3,855 |
| 09/12/2015 to 09/12/2015 | Joan McTigue | Immune & Inflammation | Chicago, IL | $ 3,855 |
| 09/12/2015 to 09/12/2015 | Randy Jay | Immune & Inflammation | Chicago, IL | $ 3,855 |
| 09/12/2015 to 09/12/2015 | Andrea Landon | Immune & Inflammation | Chicago, IL | $ 3,855 |
| 09/12/2015 to 09/12/2015 | Jacqueline Fritz | Immune & Inflammation | Chicago, IL | $ 3,855 |
| 12/09/2015 to 12/16/2015 | Thomas J. Schnitzer | Pain, Addiction & Neurology | Newark, NJ | $ 3,828 |
| 24 February 2017 | Ruth Karron | Infectious Diseases | NYC - TBD as per facility availability | $ 3,825 |
| 24 February 2017 | James Gern | Infectious Diseases | NYC - TBD as per facility availability | $ 3,819 |

| Meeting Date | Name | Product/Therapeutic area | City | Amount |
|---|---|---|---|---|
| December 9, 2016 | Daniel P. Kus | Immune & Inflammation | New York/New Jersey | $ 3,800 |
| September 30, 2016 | Daniel P. Kus | Skeletal Diseases | Los Angeles, CA - Intercontinental Hotel (Face to Face Advisory Board) | $ 3,800 |
| September 30, 2016 | Steve R. Nolan | Skeletal Diseases | Los Angeles, CA - Intercontinental Hotel (Face to Face Advisory Board) | $ 3,800 |
| September 30, 2016 | Marcia A. Palmer | Skeletal Diseases | Los Angeles, CA - Intercontinental Hotel (Face to Face Advisory Board) | $ 3,800 |
| September 30, 2016 | Hugh Fatodu | Skeletal Diseases | Los Angeles, CA - Intercontinental Hotel (Face to Face Advisory Board) | $ 3,800 |
| September 30, 2016 | Lucinda Forrer | Skeletal Diseases | Los Angeles, CA - Intercontinental Hotel (Face to Face Advisory Board) | $ 3,800 |
| September 30, 2016 | David Keener | Skeletal Diseases | Los Angeles, CA - Intercontinental Hotel (Face to Face Advisory Board) | $ 3,800 |
| December 9, 2016 | Louis S. Christos | Immune & Inflammation | New York/New Jersey | $ 3,780 |
| 10/09/2015 to 10/09/2015 | Anthony Brzezicki | Immune & Inflammation | Germany | $ 3,774 |

30

| Meeting Date | Name | Product/Therapeutic area | City | Amount |
|---|---|---|---|---|
| March 18, 2017 | Jeffrey Kaine | Sarilumab | Los Angeles, CA | $ 3,720 |
| 10/24/2015 to 10/24/2015 | Antonio Domingo Gomez Centeno | Immune & Inflammation | Germany | $ 3,711 |
| 10/09/2015 to 10/09/2015 | Francisco Martinez Granados | Immune & Inflammation | Germany | $ 3,711 |
| 10/09/2015 to 10/09/2015 | Sola Morales Oriol | Immune & Inflammation | Germany | $ 3,711 |
| Feb. 11, 2017 | Ernest Choy | Muscle & Metabolism | Berlin, Germany | $ 3,696 |
| May 5, 2017 | Joseph Arulandu | PRALUENT® (alirocumab) Injection | TBD | $ 3,690 |
| October 7, 2016 | Kevin Belasco | Immune & Inflammation | Chicago, IL | $ 3,650 |
| October 7, 2016 | Douglas W. Johnson | Immune & Inflammation | Chicago, IL | $ 3,650 |
| October 7, 2016 | Brett A. King | Immune & Inflammation | Chicago, IL | $ 3,650 |
| October 7, 2016 | James Libecco | Immune & Inflammation | Chicago, IL | $ 3,650 |
| October 7, 2016 | Clive M. Liu | Immune & Inflammation | Chicago, IL | $ 3,650 |
| October 7, 2016 | Russell W. Cohen | Immune & Inflammation | Chicago, IL | $ 3,650 |
| October 7, 2016 | Adolfo C. Fernandez-Obregon | Immune & Inflammation | Chicago, IL | $ 3,650 |
| October 7, 2016 | John C. Browning | Immune & Inflammation | Chicago, IL | $ 3,650 |
| December 9, 2016 | Allen Becker | Immune & Inflammation | New York/New Jersey | $ 3,640 |
| Sept 17, 2016 | Boyd Taylor Thompson | CV/Renal | New York, NY 10001 | $ 3,636 |
| December 14, 2016 | Ulf Persson | Immune & Inflammation | Face to Face Advisory Board in Frankfurt, Germany | $ 3,612 |

31

| Meeting Date | Name | Product/Therapeutic area | City | Amount | |
|---|---|---|---|---|---|
| December 14, 2016 | Lars-Åke Levin | Immune & Inflammation | Face to Face Advisory Board in Frankfurt, Germany | $ | 3,612 |
| December 3 | Johnathan Hjelm | Immune & Inflammation | Live Meeting -Dallas, TX | $ | 3,594 |
| 12/09/2015 to 12/16/2015 | Jacques Brown | Pain, Addiction & Neurology | Newark, NJ | $ | 3,557 |
| 09/26/2015 to 09/26/2015 | Allen Anadarajah | Immune & Inflammation | Chicago, IL | $ | 3,555 |
| 09/26/2015 to 09/26/2015 | Robert Tierney | Immune & Inflammation | Chicago, IL | $ | 3,555 |
| 09/26/2015 to 09/26/2015 | Jeffrey Greenberg | Immune & Inflammation | Chicago, IL | $ | 3,555 |
| 09/12/2015 to 09/12/2015 | Joyce Kortan | Immune & Inflammation | Chicago, IL | $ | 3,555 |
| 09/12/2015 to 09/12/2015 | Richard Pope | Immune & Inflammation | Chicago, IL | $ | 3,555 |
| 09/12/2015 to 09/12/2015 | Elizabeth Kirchner | Immune & Inflammation | Chicago, IL | $ | 3,555 |
| 09/12/2015 to 09/12/2015 | Victoria Ruffing | Immune & Inflammation | Chicago, IL | $ | 3,555 |
| 09/12/2015 to 09/12/2015 | Michael Rudzinski | Immune & Inflammation | Chicago, IL | $ | 3,555 |
| 09/12/2015 to 09/12/2015 | Sheree Carter | Immune & Inflammation | Chicago, IL | $ | 3,555 |
| 09/12/2015 to 09/12/2015 | Christine Stamatos | Immune & Inflammation | Chicago, IL | $ | 3,555 |
| October 14, 2016 | Steven Mark Meltzer | Immune & Inflammation | Chicago, IL | $ | 3,552 |
| October 14, 2016 | Frank S. Virant | Immune & Inflammation | Chicago, IL | $ | 3,552 |
| October 14, 2016 | Ricardo Antonio Tan | Immune & Inflammation | Chicago, IL | $ | 3,552 |
| September 30, 2016 | Amy Christensen | Skeletal Diseases | Los Angeles, CA - Intercontinental Hotel (Face to Face Advisory Board) | $ | 3,550 |
| 11/05/2016 | Pete Antonopoulos | CV/Renal | New York, NY | $ | 3,520 |
| 11/05/2016 | Michael  Dorsch | CV/Renal | New York, NY | $ | 3,520 |

32

| Meeting Date | Name | Product/Therapeutic area | City | Amount |
|---|---|---|---|---|
| December 9, 2016 | Bruce Martin Niebylski | Immune & Inflammation | New York/New Jersey | $ 3,520 |
| 09/26/2015 to 09/26/2015 | Ewa Olech | Immune & Inflammation | Chicago, IL | $ 3,504 |
| December 3 | Matthew Palmgren | Immune & Inflammation | Live Meeting -Dallas, TX | $ 3,468 |
| December 14, 2016 | Marco Marchetti | Immune & Inflammation | Face to Face Advisory Board in Frankfurt, Germany | $ 3,444 |
| 24 February 2017 | Peter Sly | Infectious Diseases | NYC - TBD as per facility availability | $ 3,396 |
| July 22, 2017 | Tonia L. Vincent | Immune & Inflammation | NY Area - TBD as per facility availability | $ 3,382 |
| 09/12/2016 to 09/12/2016 | Eric D. Jacobsen, MD | REGN 1979 | New York, NY | $ 3,360 |
| 09/12/2016 to 09/12/2016 | Anthony Mato | REGN 1979 | New York, NY | $ 3,360 |
| 12/09/2015 to 12/16/2015 | Stanley Cohen | Pain, Addiction & Neurology | Newark, NJ | $ 3,360 |
| April 25, 2017 | Azfar Zaman | REGN 1500 | London, England | $ 3,350 |
| 11/05/2016 | Cheryl Stone | CV/Renal | New York, NY | $ 3,330 |
| 11/05/2016 | Eric Shoup | CV/Renal | New York, NY | $ 3,330 |
| 10/09/2015 to 10/09/2015 | Andrew Walker | Immune & Inflammation | Germany | $ 3,315 |
| October 29th, 2016 | Joshua Jacobs | Immune & Inflammation | Denver, Colorado | $ 3,312 |
| October 29th, 2016 | David Patterson | Immune & Inflammation | Denver, Colorado | $ 3,312 |
| 11/05/2016 | Nicole Ciffone | CV/Renal | New York, NY | $ 3,290 |
| 10/02/2015 to 10/02/2015 | Gary Johnson | Immune & Inflammation | Chicago, IL | $ 3,288 |
| 10/02/2015 to 10/02/2015 | Matthew Mitchell | Immune & Inflammation | Chicago, IL | $ 3,279 |
| 10/02/2015 to 10/02/2015 | Dan Kus | Immune & Inflammation | Chicago, IL | $ 3,279 |
| 10/02/2015 to 10/02/2015 | Kristy Pezzino | Immune & Inflammation | Chicago, IL | $ 3,279 |

33

| Meeting Date | Name | Product/Therapeutic area | City | Amount |
|---|---|---|---|---|
| 10/02/2015 to 10/02/2015 | Marcia A. Palmer | Immune & Inflammation | Chicago, IL | $ 3,279 |
| 10/02/2015 to 10/02/2015 | Robert Schoenhaus | Immune & Inflammation | Chicago, IL | $ 3,279 |
| 10/02/2015 to 10/02/2015 | Floyd Sweet | Immune & Inflammation | Chicago, IL | $ 3,279 |
| 10/02/2015 to 10/02/2015 | James Mackay | Immune & Inflammation | Chicago, IL | $ 3,279 |
| 09/12/2015 to 09/12/2015 | Antiono Giannelli | Immune & Inflammation | Chicago, IL | $ 3,255 |
| 09/12/2015 to 09/12/2015 | Iris Zink | Immune & Inflammation | Chicago, IL | $ 3,255 |
| October 14, 2016 | Philip C. Halverson | Immune & Inflammation | Chicago, IL | $ 3,252 |
| May 5, 2017 | Tobin Fisher | PRALUENT® (alirocumab) Injection | TBD | $ 3,123 |
| 10/24/2015 to 10/24/2015 | Patrick Kiely | Immune & Inflammation | Germany | $ 3,090 |
| October 29, 2016 | Ian Douglas Pavord | Immune & Inflammation | Park Plaza Victoria Amsterdam, Netherlands | $ 3,072 |
| October 29, 2016 | Christopher E. Brightling | Immune & Inflammation | Park Plaza Victoria Amsterdam, Netherlands | $ 3,072 |
| October 14, 2016 | Neal Jain | Immune & Inflammation | Chicago, IL | $ 3,048 |
| October 14, 2016 | Nina C. Ramirez | Immune & Inflammation | Chicago, IL | $ 3,048 |
| October 14, 2016 | Autumn Burnette | Immune & Inflammation | Chicago, IL | $ 3,048 |
| May 2, 2017 | Prashant Patel | REGN 1500 | Chicago, IL | $ 3,038 |
| 05/14/2016 to 05/14/2016 | Sally Wenzel | Immune & Inflammation | San Francisco, CA | $ 3,024 |
| 11/05/2016 | Andrew Ramirez | CV/Renal | New York, NY | $ 3,000 |
| April 25, 2017 | Paul Miller | REGN 1500 | London, England | $ 3,000 |
| April 25, 2017 | Inken Barth | REGN 1500 | London, England | $ 3,000 |
| 12/01/2015 to 12/13/2015 | Mette Deleuran | Immune & Inflammation | Italy | $ 3,000 |
| 11/05/2016 | Debra Friedrich | CV/Renal | New York, NY | $ 2,990 |
| April 25, 2017 | Ulrich Schwabe | REGN 1500 | London, England | $ 2,990 |

| Meeting Date | Name | Product/Therapeutic area | City | Amount |
|---|---|---|---|---|
| Feb. 11, 2017 | Thomas W J Huizinga | Muscle & Metabolism | Berlin, Germany | $ 2,968 |
| 10/09/2015 to 10/09/2015 | Pier Cannonico | Immune & Inflammation | Germany | $ 2,964 |
| 10/09/2015 to 10/09/2015 | Giuseppe Turchetti | Immune & Inflammation | Germany | $ 2,964 |
| 09/26/2015 to 09/26/2015 | Kurt Oelke | Immune & Inflammation | Chicago, IL | $ 2,955 |
| 09/12/2015 to 09/12/2015 | Amanda Sell | Immune & Inflammation | Chicago, IL | $ 2,955 |
| October 14, 2016 | Dareen D. Siri | Immune & Inflammation | Chicago, IL | $ 2,952 |
| 11/05/2016 | Krista Havlin | CV/Renal | New York, NY | $ 2,950 |
| 11/05/2016 | Elizabeth Jackson | CV/Renal | New York, NY | $ 2,950 |
| 11/05/2016 | Gina Lathey | CV/Renal | New York, NY | $ 2,950 |
| 12/09/2015 to 12/16/2015 | Stefan Lohmander | Pain, Addiction & Neurology | Newark, NJ | $ 2,949 |
| 12/09/2015 to 12/16/2015 | Sita Bierma-Zeinstra | Pain, Addiction & Neurology | Newark, NJ | $ 2,933 |
| 10/24/2015 to 10/24/2015 | Bent Deleuran | Immune & Inflammation | Germany | $ 2,916 |
| 10/02/2015 to 10/02/2015 | Erica Clark | Immune & Inflammation | Chicago, IL | $ 2,901 |
| 10/02/2015 to 10/02/2015 | Christina Barrington | Immune & Inflammation | Chicago, IL | $ 2,901 |
| 12/01/2015 to 12/13/2015 | Michael Cork | Immune & Inflammation | Italy | $ 2,892 |
| 05/14/2016  to 05/14/2016 | Eric Bateman | Immune & Inflammation | San Francisco, CA | $ 2,880 |
| 05/14/2016 to 05/14/2016 | David Price | Immune & Inflammation | San Francisco, CA | $ 2,880 |
| 05/14/2016 to 05/14/2016 | Klaus Rabe | Immune & Inflammation | San Francisco, CA | $ 2,874 |
| February 11, 2017 | Paul A. Bunn | REGN 2810 | Turnberry Isle Miami, 19999 West Country Club Drive, Miami FL, 33180 | $ 2,874 |
| February 11, 2017 | Karen Kelly | REGN 2810 | Turnberry Isle Miami, 19999 West Country | $ 2,874 |

| Meeting Date | Name | Product/Therapeutic area | City | Amount |
|---|---|---|---|---|
| | | | Club Drive, Miami FL, 33180 | |
| February 11, 2017 | Roy S. Herbst | REGN 2810 | Turnberry Isle Miami, 19999 West Country Club Drive, Miami FL, 33180 | $ 2,874 |
| 10/06/2015 to 10/06/2015 | Martin Steinhoff | Immune & Inflammation | | $ 2,870 |
| 05/14/2016 to 05/14/2016 | David Price | Immune & Inflammation | San Francisco, CA | $ 2,865 |
| 10/09/2015 to 10/09/2015 | Jan Geldmacher | Immune & Inflammation | Germany | $ 2,856 |
| 10/09/2015 to 10/09/2015 | Eva Dietrich | Immune & Inflammation | Germany | $ 2,856 |
| 12/09/2015 to 12/16/2015 | Timothy McAlindon | Pain, Addiction & Neurology | Newark, NJ | $ 2,850 |
| March 18, 2017 | George A. Karpouzas | Sarilumab | Los Angeles, CA | $ 2,820 |
| December 14, 2016 | Aleksandra Torbica | Immune & Inflammation | Face to Face Advisory Board in Frankfurt, Germany | $ 2,808 |
| Oct. 22, 2016 | Thomas W J Huizinga | Muscle & Metabolism | Barcelona, Spain | $ 2,800 |
| 10/24/2015 to 10/24/2015 | Marwan Bukhari | Immune & Inflammation | Germany | $ 2,790 |
| April 25, 2017 | Robin Choudhury | REGN 1500 | London, England | $ 2,770 |
| October 29, 2016 | Giorgio Walter Canonica | Immune & Inflammation | Park Plaza Victoria Amsterdam, Netherlands | $ 2,768 |
| 10/31/2015 to 10/31/2015 | Monique Rose Chalem | Immune & Inflammation | Brazil | $ 2,757 |
| 10/31/2015 to 10/31/2015 | Carlo Caballero | Immune & Inflammation | Brazil | $ 2,757 |
| October 7, 2016 | Edmund C. Chow | Immune & Inflammation | Chicago, IL | $ 2,750 |

| Meeting Date | Name | Product/Therapeutic area | City | Amount |
|---|---|---|---|---|
| 10/31/2015 to 10/31/2015 | Sebastiao Radominski | Immune & Inflammation | Brazil | $ 2,721 |
| December 14, 2016 | Michael Schlander | Immune & Inflammation | Face to Face Advisory Board in Frankfurt, Germany | $ 2,712 |
| 10/09/2015 to 10/09/2015 | Olivier Blin | Immune & Inflammation | Germany | $ 2,712 |
| October 29, 2016 | Guy Brusselle | Immune & Inflammation | Park Plaza Victoria Amsterdam, Netherlands | $ 2,692 |
| 11/05/2016 | Adina Gutstein | CV/Renal | New York, NY | $ 2,690 |
| 12/01/2015 to 12/13/2015 | Diamant Thaci | Immune & Inflammation | Italy | $ 2,685 |
| October 29, 2016 | Johann Christian Virchow Jr. | Immune & Inflammation | Park Plaza Victoria Amsterdam, Netherlands | $ 2,680 |
| March 18, 2017 | Christina Charles-Schoeman | Sarilumab | Los Angeles, CA | $ 2,670 |
| 10/24/2015 to 10/24/2015 | Angelo Manfredi | Immune & Inflammation | Germany | $ 2,664 |
| 11/05/2016 | Tina Davis | CV/Renal | New York, NY | $ 2,650 |
| 10/06/2015 to 10/06/2015 | Malcolm Rustin | Immune & Inflammation | Denmark | $ 2,632 |
| May 2, 2017 | Allen W. Becker | REGN 1500 | Chicago, IL | $ 2,604 |
| 10/06/2015 to 10/06/2015 | Luis Puig | Immune & Inflammation | Denmark | $ 2,594 |
| 10/31/2015 to 10/31/2015 | Sergio Gutierrez Urena | Immune & Inflammation | Brazil | $ 2,577 |
| 10/31/2015 to 10/31/2015 | Carlos Javier Pineda Villasenor | Immune & Inflammation | Brazil | $ 2,577 |
| 10/13/2016 | Kristin Yockus | Ophthalmology | Chicago, IL | $ 2,550 |
| February 11, 2017 | Naiyer Rizvi | REGN 2810 | Turnberry Isle Miami, 19999 West Country | $ 2,534 |

| Meeting Date | Name | Product/Therapeutic area | City | Amount |
|---|---|---|---|---|
| | | | Club Drive, Miami FL, 33180 | |
| February 11, 2017 | Roy H. Decker | REGN 2810 | Turnberry Isle Miami, 19999 West Country Club Drive, Miami FL, 33180 | $ 2,534 |
| February 11, 2017 | Corey J. Langer | REGN 2810 | Turnberry Isle Miami, 19999 West Country Club Drive, Miami FL, 33180 | $ 2,534 |
| February 11, 2017 | Mark A. Socinski | REGN 2810 | Turnberry Isle Miami, 19999 West Country Club Drive, Miami FL, 33180 | $ 2,534 |
| February 11, 2017 | Rogerio C. Lilenbaum | REGN 2810 | Turnberry Isle Miami, 19999 West Country Club Drive, Miami FL, 33180 | $ 2,534 |
| February 11, 2017 | Thomas E. Stinchcombe | REGN 2810 | Turnberry Isle Miami, 19999 West Country Club Drive, Miami FL, 33180 | $ 2,534 |
| February 11, 2017 | Eric Vallieres | REGN 2810 | Turnberry Isle Miami, 19999 West Country Club Drive, Miami FL, 33180 | $ 2,534 |
| Feb. 11, 2017 | Syvlie Chollet-Martin | Muscle & Metabolism | Berlin, Germany | $ 2,528 |

| Meeting Date | Name | Product/Therapeutic area | City | Amount |
|---|---|---|---|---|
| May 2, 2017 | James E. Ballenger II | REGN 1500 | Chicago, IL | $ 2,506 |
| 10/31/2015 to 10/31/2015 | Luis Catoggio | Immune & Inflammation | Brazil | $ 2,334 |
| April 25, 2017 | Gerald Klose | REGN 1500 | London, England | $ 2,310 |
| 10/24/2015 to 10/24/2015 | Martin Aringer | Immune & Inflammation | Germany | $ 2,256 |
| 10/13/2016 | Warren Laurita | Ophthalmology | Chicago, IL | $ 2,250 |
| 10/13/2016 | Sean Goodale | Ophthalmology | Chicago, IL | $ 2,250 |
| October 29, 2016 | Philippe Gevaert | Immune & Inflammation | Park Plaza Victoria Amsterdam, Netherlands | $ 2,244 |
| April 25, 2017 | Klaus Parhofer | REGN 1500 | London, England | $ 2,190 |
| April 25, 2017 | Robert Cramb | REGN 1500 | London, England | $ 2,190 |
| April 25, 2017 | Ioanna Gouni-Berthold | REGN 1500 | London, England | $ 2,190 |
| 12/18/2015 to 12/18/2015 | Theresa Cooper | Immune & Inflammation | Orlando, FL | $ 2,163 |
| 12/18/2015 to 12/18/2015 | Desiree Belliard | Immune & Inflammation | Orlando, FL | $ 2,163 |
| 12/18/2015 to 12/18/2015 | Nancy Ellis | Immune & Inflammation | Orlando, FL | $ 2,163 |
| 12/18/2015 to 12/18/2015 | Heather Goodwill | Immune & Inflammation | Orlando, FL | $ 2,163 |
| 12/18/2015 to 12/18/2015 | Karen Grace | Immune & Inflammation | Orlando, FL | $ 2,163 |
| 12/18/2015 to 12/18/2015 | Helen Hinkle | Immune & Inflammation | Orlando, FL | $ 2,163 |
| 12/18/2015 to 12/18/2015 | Janice Maguire | Immune & Inflammation | Orlando, FL | $ 2,163 |
| 12/18/2015 to 12/18/2015 | Linda Mckee | Immune & Inflammation | Orlando, FL | $ 2,163 |
| 12/18/2015 to 12/18/2015 | Teresa Neria | Immune & Inflammation | Orlando, FL | $ 2,163 |
| 12/18/2015 to 12/18/2015 | SaVonna Staton | Immune & Inflammation | Orlando, FL | $ 2,163 |
| 12/18/2015 to 12/18/2015 | Judith Stovall | Immune & Inflammation | Orlando, FL | $ 2,163 |
| 12/18/2015 to 12/18/2015 | Nancy Wood | Immune & Inflammation | Orlando, FL | $ 2,163 |
| 12/18/2015 to 12/18/2015 | Judith Zoia | Immune & Inflammation | Orlando, FL | $ 2,163 |
| 12/18/2015 to 12/18/2015 | Iris Nichols | Immune & Inflammation | Orlando, FL | $ 2,163 |

| Meeting Date | Name | Product/Therapeutic area | City | Amount | |
|---|---|---|---|---|---|
| 12/18/2015 to 12/18/2015 | Ethel Owen | Immune & Inflammation | Orlando, FL | $ | 2,163 |
| 12/18/2015 to 12/18/2015 | Andrea Zlatkus | Immune & Inflammation | Orlando, FL | $ | 2,163 |
| 10/06/2015 to 10/06/2015 | Thomas Werfel | Immune & Inflammation | | $ | 2,120 |
| 08/25/2016 to 09/02/2016 | Lawrence Alan Leiter | CV/Renal | | $ | 2,115 |
| 08/25/2016 to 09/02/2016 | Ulrich Laufs | CV/Renal | Italy, Rome | $ | 2,115 |
| 08/25/2016 to 09/02/2016 | Eli Roth | CV/Renal | Italy, Rome | $ | 2,115 |
| 08/25/2016 to 09/02/2016 | Robert Rosenson | CV/Renal | Italy, Rome | $ | 2,115 |
| 08/25/2016 to 09/02/2016 | Peter Toth | CV/Renal | Italy, Rome | $ | 2,115 |
| 08/25/2016 to 09/02/2016 | Kausik Kumar Ray | CV/Renal | Italy, Rome | $ | 2,115 |
| May 2, 2017 | Louis S Christos | REGN 1500 | Chicago, IL | $ | 2,100 |
| May 2, 2017 | Collin K. Hennessey | REGN 1500 | Chicago, IL | $ | 2,100 |
| 10/06/2015 to 10/06/2015 | Paul Carle | Immune & Inflammation | Denmark | $ | 2,037 |
| December 9, 2016 | Anthony J. Chiefari | Immune & Inflammation | New York/New Jersey | $ | 2,000 |
| 05/14/2016 to 05/14/2016 | Eric Bateman | Immune & Inflammation | San Francisco, CA | $ | 1,980 |
| October 22, 2016 | Richard Keen | Muscle & Metabolism | Boston, MA | $ | 1,968 |
| February 11, 2017 | Nathan Pennell | REGN 2810 | Turnberry Isle Miami, 19999 West Country Club Drive, Miami FL, 33180 | $ | 1,957 |
| 11/05/2016 | Vanessa Milne Hurta | CV/Renal | New York, NY | $ | 1,900 |
| 06/24/2016 to 07/23/2016 | Deborah Reissman | PRALUENT® (alirocumab) Injection | California | $ | 1,860 |
| October 22, 2016 | J. Coen Netelenbos | Muscle & Metabolism | Boston, MA | $ | 1,792 |
| October 22, 2016 | Patricia Delai | Muscle & Metabolism | Boston, MA | $ | 1,736 |
| 10/31/2015 to 10/31/2015 | Cristiano Zerbini | Immune & Inflammation | Brazil | $ | 1,671 |

40

| Meeting Date | Name | Product/Therapeutic area | City | Amount |
|---|---|---|---|---|
| October 29, 2016 | Arnaud Bourdin | Immune & Inflammation | Park Plaza Victoria Amsterdam, Netherlands | $ 1,400 |
| 11/30/2015 to 12/01/2015 | Dana Chais | Ophthalmology | Boston | $ 1,395 |
| 11/30/2015 to 12/01/2015 | Christina McGeough | Ophthalmology | Boston | $ 1,395 |
| 11/30/2015 to 12/01/2015 | Kathy Warwick | Ophthalmology | Boston | $ 1,395 |
| October 22, 2016 | Marelise Eekhoff | Muscle & Metabolism | Boston, MA | $ 1,344 |
| October 22, 2016 | Christiaan Scott | Muscle & Metabolism | Boston, MA | $ 1,344 |
| April 25, 2017 | Susan Mills | REGN 1500 | London, England | $ 1,270 |
| 10/13/2016 | Michelle R Beaulieu | Ophthalmology | Chicago, IL | $ 1,250 |
| 05/14/2016 to 05/14/2016 | Guy Brusselle | Immune & Inflammation | San Francisco, CA | $ 1,200 |
| 12/01/2015 to 12/13/2015 | Augustin Alomar | Immune & Inflammation | Italy | $ 1,200 |
| October 22, 2016 | Genevieve Baujat | Muscle & Metabolism | Boston, MA | $ 1,120 |
| October 22, 2016 | Maja Di Rocco | Muscle & Metabolism | Boston, MA | $ 1,120 |
| October 22, 2016 | Rolf Morhart | Muscle & Metabolism | Boston, MA | $ 1,120 |
| 10/13/2016 | Stephanie Renee Collins | Ophthalmology | Chicago, IL | $ 1,050 |
| 10/13/2016 | Karen M Laughlin | Ophthalmology | Chicago, IL | $ 1,050 |
| 10/13/2016 | Laura Elizabeth Cifers | Ophthalmology | Chicago, IL | $ 1,050 |
| 10/13/2016 | Michele A. Cameron | Ophthalmology | Chicago, IL | $ 950 |
| April 25, 2017 | Helen Williams | REGN 1500 | London, England | $ 940 |
| October 22, 2016 | Carmen De Cunto | Muscle & Metabolism | Boston, MA | $ 920 |
| 10/13/2016 | Samuel Todd Byers | Ophthalmology | Chicago, IL | $ 910 |
| 10/13/2016 | Stephanie Ramon Collins | Ophthalmology | Chicago, IL | $ 910 |
| 11/30/2015 to 12/01/2015 | Joan Czarnowski-Hill | Ophthalmology | Boston | $ 645 |

41

| Meeting Date | Name | Product/Therapeutic area | City | Amount | |
|---|---|---|---|---|---|
| October 22, 2016 | Keqin Zhang | Muscle & Metabolism | Boston, MA | $ | 600 |
| 12/01/2015 to 12/13/2015 | Sergio Chimenti | Immune & Inflammation | Italy | $ | 300 |
| October 29th, 2016 | Eric Simpson | Immune & Inflammation | Denver, Colorado | $ | 8,339 |
| March 18, 2017 | Jeffrey Curtis | Sarilumab | Los Angeles, CA | $ | 8,004 |
| 12/01/2015 to 12/13/2015 | Emma Guttman-Yassky | Immune & Inflammation | Italy | $ | 7,341 |
| 11/21/2015 to 11/21/2015 | Vibeke Strand | Immune & Inflammation | Dallas, Texas | $ | 6,648 |
| 06/24/2016  to 06/24/2016 | Michael Wechsler | Immune & Inflammation | Chicago, IL | $ | 6,466 |
| 09/26/2015 to 09/26/2015 | Jonathan Kay | Immune & Inflammation | Chicago, IL | $ | 6,194 |
| 06/24/2016  to 06/24/2016 | Prescott Woodruff | Immune & Inflammation | Chicago, IL | $ | 5,930 |
| May 5, 2017 | Peter Toth | PRALUENT® (alirocumab) Injection | TBD | $ | 5,643 |
| 06/24/2016  to 06/24/2016 | Thomas Casale | Immune & Inflammation | Chicago, IL | $ | 5,454 |
| Oct. 22, 2016 | Christina Charles-Schoeman | Muscle & Metabolism | Barcelona, Spain | $ | 5,100 |
| 06/24/2016  to 06/24/2016 | Monica Kraft | Immune & Inflammation | Chicago, IL | $ | 4,596 |
| 11/05/2016 | Mary Catherine Cheeley | CV/Renal | New York, NY | $ | 4,092 |
| 10/15/2015 to 10/15/2015 | David Fox | Skeletal Diseases | Vermont | $ | 4,086 |
| Oct. 22, 2016 | Ernest Choy | Muscle & Metabolism | Barcelona, Spain | $ | 3,700 |
| October 29, 2016 | Klaus F. Rabe | Immune & Inflammation | Park Plaza Victoria Amsterdam, Netherlands | $ | 3,060 |

42

| Meeting Date | Name | Product/Therapeutic area | City | Amount |
|---|---|---|---|---|
| Feb. 11, 2017 | Gerd Burmester | Muscle & Metabolism | Berlin, Germany | $ 2,950 |
| 10/24/2015 to 10/24/2015 | Gerd Burmester | Immune & Inflammation | Germany | $ 2,874 |
| 05/19/2016 to 05/22/2016 | Michael Davidson | CV/Renal | Louisiana | $ 2,650 |
| 10/31/2015 to 10/31/2015 | Geraldo da Rocha Castelar Pinheiro | Immune & Inflammation | Brazil | $ 2,421 |
| 06/24/2016 to 07/23/2016 | Norman Lepor | PRALUENT® (alirocumab) Injection | California | $ 2,316 |
| August 26, 2016 | Gerard Hovingh | CV/Renal | Rome, Italy | $ 2,184 |
| August 26, 2016 | Marcello Arca | CV/Renal | Rome, Italy | $ 2,112 |
| 10/24/2015 to 10/24/2015 | Gerd Burmester | Immune & Inflammation | Germany | $ 2,000 |
| 05/14/2016 to 05/14/2016 | Pascal Chanez | Immune & Inflammation | San Francisco, CA | $ 1,200 |

43.   Each Advisory Board was supposed to follow a "Needs Assessment" form, so that the physicians would be appropriately creating committee reports. However, Advisory Boards were often held without adherence to Needs Assessments, and Regeneron Advisory Boards often failed to provide useful information to the company regarding adverse event reporting and handling, as the physicians who attended did not consider that they were seriously being paid to work on a report, but rather to network with friends. Too many exception forms were filed to spending restrictions on physician customers, and no controls were in place or working on the structure or spending.

44.   All Regeneron contracting of physician customers – concerning speaker's bureau payments, healthcare professional consulting, steering committees, Advisory Boards, and other sales and marketing activities required that "needs assessment forms" be completed that detailed the need for the payment to the

43

professional and the expected measurable outcomes from the event. However, these needs assessment forms were so infrequently filled out by the company that payment exception requests were often submitted in order to pay the physician customers because there were no needs assessment form properly submitted to allow an orderly approval of the pay request.

45.     Steering Committees were also overseen by Regeneron's commercial marketing, medical affairs, and also the clinical (clinical studies) department. For commercial marketing, was just a way to put together a group of people multiple times over a period of time. However, steering committees were supposed to have a rationale and justification for meeting over time, not just an excuse to meet. Marketing would invite and nominate the members of the Steering Committees. Physician's travel was paid, and they were paid for participating, at least $1500, and as much as $40,890. Over 59% of attendees received more than $10,000 to attend.

46.     For example, Defendant's December 2017 spreadsheet called Regeneron Activity Tracker, shows that the company engaged its physician customers as paid consultants to attend Steering Committee meetings in Amsterdam; Chicago; Dallas; Denver; and Paris, France.

47.     For Example, in just fifteen (15) months, between September 2016, and December 2017, Regeneron contracted to pay $1,122,615 in steering committee fees and travel expenses to the following physicians to promote Regeneron drugs on ninety-one (91) occasions, including many physician customers that were paid to travel to exotic or vacation destinations, including Paris and Amsterdam:

| Meeting Date | Name | Product/Therapeutic area | City | Amount |
|---|---|---|---|---|
| December 16, 2016 & Advisor/Author Panel - Atlanta, GA | David M. Pariser | Immune & Inflammation | Advisor Author Panel - Review Conference 1 (December 28) Web-Conference & Advisor/Author Panel - Review Conference (January 11) Web-conference | $ 40,980 |
| December 16, 2016 & Advisor/Author Panel - Atlanta, GA | Jonathan Silverberg | Immune & Inflammation | Advisor Author Panel - Review Conference 1 (December 28) Web-Conference & Advisor/Author Panel - Review Conference (January 11) Web-conference | $ 32,580 |
| September 17 & 18, 2016 | Alexandra Boer Kimball | Immune & Inflammation | Westin Dallas Ft. Worth Airport, Dallas Irving, Texas | $ 30,780 |
| September 17 & 18, 2016 | David Pariser | Immune & Inflammation | Westin Dallas Ft. Worth Airport, Dallas Irving, Texas | $ 24,345 |
| September 17 & 18, 2016 | Amy Paller | Immune & Inflammation | Westin Dallas Ft. Worth Airport, Dallas Irving, Texas | $ 24,345 |
| September 17 & 18, 2016 | Gary Goldenberg | Immune & Inflammation | Westin Dallas Ft. Worth Airport, Dallas Irving, Texas | $ 24,345 |
| September 17 & 18, 2016 | April Armstrong | Immune & Inflammation | Westin Dallas Ft. Worth Airport, Dallas Irving, Texas | $ 24,345 |
| September 17 & 18, 2016 | Jonathan Silverberg | Immune & Inflammation | Westin Dallas Ft. Worth Airport, Dallas Irving, Texas | $ 19,845 |
| September 17 & 18, 2016 | Paul Steven Yamauchi | Immune & Inflammation | Westin Dallas Ft. Worth Airport, Dallas Irving, Texas | $ 19,845 |
| September 17 & 18, 2016 | Howard Sofen | Immune & Inflammation | Westin Dallas Ft. Worth Airport, Dallas Irving, Texas | $ 19,845 |
| September 17 & 18, 2016 | Peter Lio | Immune & Inflammation | Westin Dallas Ft. Worth Airport, Dallas Irving, Texas | $ 19,845 |
| September 17 & 18, 2016 | Mark Boguniewicz | Immune & Inflammation | Westin Dallas Ft. Worth Airport, Dallas Irving, Texas | $ 18,990 |
| September 17 & 18, 2016 | Luz Fonacier | Immune & Inflammation | Westin Dallas Ft. Worth Airport, Dallas Irving, Texas | $ 18,990 |
| September 17 & 18, 2016 | Harold Kaiser | Immune & Inflammation | Westin Dallas Ft. Worth Airport, Dallas Irving, Texas | $ 18,990 |
| April 14th + Q3 + Q4 | Jonathan Corren | Dupilumab | Chicago, IL; Denver, CO; Virtual | $ 18,728 |
| April 14th + Q3 + Q4 | Eli O. Meltzer | Dupilumab | Chicago, IL; Denver, CO; Virtual | $ 18,728 |
| April 14th + Q3 + Q4 | Thomas Casale | Dupilumab | Chicago, IL; Denver, CO; Virtual | $ 18,728 |
| April 14th + Q3 + Q4 | Reynold A. Panettieri Jr. | Dupilumab | Chicago, IL; Denver, CO; Virtual | $ 18,428 |
| April 14th + Q3 + Q4 | Monica Kraft | Dupilumab | Chicago, IL; Denver, CO; Virtual | $ 18,428 |
| April 14th + Q3 + Q4 | Warner Carr | Dupilumab | Chicago, IL; Denver, CO; Virtual | $ 18,428 |
| April 14th + Q3 + Q4 | Rohit Katial | Dupilumab | Chicago, IL; Denver, CO; Virtual | $ 18,428 |
| April 14th + Q3 + Q4 | William W. Busse | Dupilumab | Chicago, IL; Denver, CO; Virtual | $ 18,128 |
| April 14th + Q3 + Q4 | Jonathan A. Bernstein | Dupilumab | Chicago, IL; Denver, CO; Virtual | $ 18,128 |
| April 14th + Q3 + Q4 | Nicola S. Hanania | Dupilumab | Chicago, IL; Denver, CO; Virtual | $ 16,580 |
| February - December 2017 | Alvin Wells | Sarilumab | TBC | $ 15,334 |
| February - December 2017 | Mark Genovese | Sarilumab | TBC | $ 15,334 |
| February - December 2017 | Vibeke Strand | Sarilumab | TBC | $ 15,334 |
| April 14th + Q3 + Q4 | Bradley E. Chipps | Dupilumab | Chicago, IL; Denver, CO; Virtual | $ 15,172 |

| Meeting Date | Name | Product/Therapeutic area | City | Amount |
|---|---|---|---|---|
| September 17 & 18, 2016 | Ned T. Rupp | Immune & Inflammation | Westin Dallas Ft. Worth Airport, Dallas Irving, Texas | $ 15,120 |
| September 17 & 18, 2016 | Steven Meltzer | Immune & Inflammation | Westin Dallas Ft. Worth Airport, Dallas Irving, Texas | $ 15,120 |
| September 17 & 18, 2016 | Jan Bernhisel-Broadbent | Immune & Inflammation | Westin Dallas Ft. Worth Airport, Dallas Irving, Texas | $ 15,120 |
| September 17 & 18, 2016 | Eric J. Schenkel | Immune & Inflammation | Westin Dallas Ft. Worth Airport, Dallas Irving, Texas | $ 15,120 |
| September 17 & 18, 2016 | Iftikhar Hussain | Immune & Inflammation | Westin Dallas Ft. Worth Airport, Dallas Irving, Texas | $ 15,120 |
| September 17 & 18, 2016 | Philip C. Halverson | Immune & Inflammation | Westin Dallas Ft. Worth Airport, Dallas Irving, Texas | $ 15,120 |
| April 14th + Q3 + Q4 | Prescott G.Woodruff | Dupilumab | Chicago, IL; Denver, CO; Virtual | $ 14,924 |
| February - December 2017 | Alan Epstein | Sarilumab | TBC | $ 14,790 |
| February - December 2017 | Alan Kivitz | Sarilumab | TBC | $ 14,790 |
| February - December 2017 | Anthony Sebba | Sarilumab | TBC | $ 14,790 |
| February - December 2017 | George Karpouzas | Sarilumab | TBC | $ 14,790 |
| February - December 2017 | Grace Wright | Sarilumab | TBC | $ 14,790 |
| February - December 2017 | Jeff Curtis | Sarilumab | TBC | $ 14,790 |
| February - December 2017 | Jeffrey Louis Kaine | Sarilumab | TBC | $ 14,790 |
| February - December 2017 | John Tesser | Sarilumab | TBC | $ 14,790 |
| February - December 2017 | Leonard Calabrese | Sarilumab | TBC | $ 14,790 |
| February - December 2017 | Sergio Schwartzman | Sarilumab | TBC | $ 14,790 |
| February - December 2017 | Allan Morton | Sarilumab | TBC | $ 12,240 |
| February - December 2017 | Amar Majjhoo | Sarilumab | TBC | $ 12,240 |
| February - December 2017 | Ara Dikranian | Sarilumab | TBC | $ 12,240 |
| September 17 & 18, 2016 | Neal Jain | Immune & Inflammation | Westin Dallas Ft. Worth Airport, Dallas Irving, Texas | $ 11,880 |
| May 2017; November 2017 | Thomas Casale | Dupilumab | Amsterdam, Netherlands; TBD | $ 11,516 |
| May 2017; November 2017 | Rohit Katial | Dupilumab | Amsterdam, Netherlands; TBD | $ 11,516 |
| May 2017; November 2017 | Eugene Bleecker | Dupilumab | Amsterdam, Netherlands; TBD | $ 11,516 |
| Friday 9 December 2016 | Christie Mitchell Ballantyne | CV/Renal | SANOFI Corporate Headquarters, 54-56 Rue La Boetie, Paris, France | $ 10,267 |
| December 16, 2016 & Advisor/Author Panel - Atlanta, GA | Edmund Pezalla | Immune & Inflammation | Advisor/Author Panel - Review Conference 1 (December 28) Web-Conference & Advisor/Author Panel - Review Conference (January 11) Web-conference | $ 9,494 |
| May 2017; November 2017 | Michael E. Wechsler | Dupilumab | Amsterdam, Netherlands; TBD | $ 9,484 |
| May 2017; November 2017 | Sally Wenzel | Dupilumab | Amsterdam, Netherlands; TBD | $ 9,484 |
| Friday 9 December 2016 | Jennifer Robinson | CV/Renal | SANOFI Corporate Headquarters, 54-56 Rue La Boetie, Paris, France | $ 8,727 |
| December 16, 2016 & Advisor/Author Panel - Atlanta, GA | Winston Wong | Immune & Inflammation | Advisor/Author Panel - Review Conference 1 (December 28) Web-Conference & Advisor/Author Panel - Review Conference (January 11) Web-conference | $ 7,960 |

46

| Meeting Date | Name | Product/Therapeutic area | City | Amount |
|---|---|---|---|---|
| May 2017; November 2017 | Santiago Quirce | Dupilumab | Amsterdam, Netherlands; TBD | $ 7,568 |
| May 2017; November 2017 | Kenneth R. Chapman | Dupilumab | Amsterdam, Netherlands; TBD | $ 7,200 |
| December 16, 2016 & Advisor/Author Panel - Atlanta, GA | Lynn M. Nishida | Immune & Inflammation | Advisor Author Panel - Review Conference 1 (December 28) Web-Conference & Advisor/Author Panel - Review Conference (January 11) Web-conference | $ 7,030 |
| Friday 9 December 2016 | Lawrence Alan Leiter | CV/Renal | SANOFI Corporate Headquarters, 54-56 Rue La Boetie, Paris, France | $ 6,414 |
| March 15, 2017 | Lawrence F. Eichenfield | Dupilumab | Chicago, IL | $ 6,036 |
| March 15, 2017 | Lisa Beck | Dupilumab | Chicago, IL | $ 5,454 |
| March 15, 2017 | Emma Guttman-Yassky | Dupilumab | Chicago, IL | $ 5,454 |
| March 15, 2017 | David Pariser | Dupilumab | Chicago, IL | $ 5,454 |
| May 2017; November 2017 | Ian Douglas Pavord | Dupilumab | Amsterdam, Netherlands; TBD | $ 4,960 |
| March 15, 2017 | Mark Boguniewicz | Dupilumab | Chicago, IL | $ 4,956 |
| May 2017; November 2017 | Christopher Brightling | Dupilumab | Amsterdam, Netherlands; TBD | $ 4,628 |
| May 2017; November 2017 | Sven-Erik Dahlen | Dupilumab | Amsterdam, Netherlands; TBD | $ 4,464 |
| May 2017; November 2017 | Guy Brusselle | Dupilumab | Amsterdam, Netherlands; TBD | $ 4,308 |
| Friday 9 December 2016 | Børge G. Nordestgaard | CV/Renal | SANOFI Corporate Headquarters, 54-56 Rue La Boetie, Paris, France | $ 4,266 |
| May 2017; November 2017 | Giorgio Walter Canonica | Dupilumab | Amsterdam, Netherlands; TBD | $ 4,176 |
| May 2017; November 2017 | Pierluigi Paggiaro | Dupilumab | Amsterdam, Netherlands; TBD | $ 4,176 |
| Friday 9 December 2016 | Stephen James Nicholls | CV/Renal | SANOFI Corporate Headquarters, 54-56 Rue La Boetie, Paris, France | $ 3,928 |
| May 2017; November 2017 | Eric Bateman | Dupilumab | Amsterdam, Netherlands; TBD | $ 3,808 |
| May 2017; November 2017 | Elisabeth Bel | Dupilumab | Amsterdam, Netherlands; TBD | $ 3,542 |
| March 15, 2017 | Peter Lio | Dupilumab | Chicago, IL | $ 3,408 |
| March 15, 2017 | Jonathan Silverberg | Dupilumab | Chicago, IL | $ 3,408 |
| Friday 9 December 2016 | Klaus Parhofer | CV/Renal | SANOFI Corporate Headquarters, 54-56 Rue La Boetie, Paris, France | $ 3,330 |
| Friday 9 December 2016 | Martin John Chapman | CV/Renal | SANOFI Corporate Headquarters, 54-56 Rue La Boetie, Paris, France | $ 3,164 |
| May 2017; November 2017 | Johann Christian Virchow Jr. | Dupilumab | Amsterdam, Netherlands; TBD | $ 2,816 |
| March 15, 2017 | Joseph Gorelick | Dupilumab | Chicago, IL | $ 2,490 |
| March 15, 2017 | Kristine J. Kucera | Dupilumab | Chicago, IL | $ 2,424 |
| May 2017; November 2017 | Arnaud Bourdin | Dupilumab | Amsterdam, Netherlands; TBD | $ 2,128 |
| May 2017; November 2017 | Paul O'Byrne | Dupilumab | Amsterdam, Netherlands; TBD | $ 1,200 |
| December 16, 2016 & Advisor/Author Panel - Atlanta, GA | Diana Brixner | Immune & Inflammation | Advisor/Author Panel - Review Conference 1 (December 28) Web-Conference & Advisor/Author Panel - Review Conference (January 11) Web-conference | $ 12,510 |
| May 2017; November 2017 | Klaus Rabe | Dupilumab | Amsterdam, Netherlands; TBD | $ 5,040 |
| Friday 9 December 2016 | Kausik Kumar Ray | CV/Renal | SANOFI Corporate Headquarters, 54-56 Rue La Boetie, Paris, France | $ 4,277 |

| Meeting Date | Name | Product/Therapeutic area | City | Amount |
|---|---|---|---|---|
| Friday 9 December 2016 | Philippe Gabriel Steg | CV/Renal | SANOFI Corporate Headquarters, 54-56 Rue La Boetie, Paris, France | $    3,014 |
| Friday 9 December 2016 | Peter Libby | CV/Renal | SANOFI Corporate Headquarters, 54-56 Rue La Boetie, Paris, France | $    1,500 |

48.     Sales representatives have also been required by Regeneron managers to bring a very large number of catered lunches to physicians' offices. They are given budgets that they are required to spend on lunches and have provided multiple meals per month between breakfasts with coffee, lunches and dinners.

49.     While these lunches are ostensibly for an "educational" purpose to fall within anti-kickback safe harbors, the sales representatives are expected to cater birthday parties and holiday parties for physicians' offices, and often do not get the opportunity to give a sales message to physicians who have to eat and run at the office. To call the meals "educational" in nature is untrue in nearly all cases. Either no educational messages are delivered at all to physicians, or sales representatives are instructed to deliver the same canned sales lines that they have been delivering all along to the physicians. The number of attendees listed were not the physician customers but were just the number of office staff who happened to be there eating, so not much physician education was going on instead of just schmoozing with office staff.

50.     For example, on August 6, 2015, Regeneron paid $240.93 for lunch from Moe's 165 for the staff of Savannah Cardiology in Bluffton, South Carolina.

51.     For example, on September 10, 2015, Regeneron paid $178.85 for lunch from Longhorn Steakhouse for the staff of the Cholesterol and Metabolism Center in Cincinnati, Ohio.

52.     For example, on August 10, 2015, Regeneron paid $181.50 for lunch from Guignard Diner for the staff of Sumter Cardiology clinic in Sumter, South Carolina.

53.     Physicians are catered to on a frequent basis, with some physicians' offices being catered lunch by Regeneron sales representatives several times a month, depending on their prescribing volume. The catered lunches are quid pro quo by nature in that the majority of the lunches are catered to the offices of high-prescribing physician customers, who the sales representatives and sales managers called "big writers" or "whales"; and are given to offices based on an ability to start more patients on Regeneron drugs.

54.     Regeneron failed to control speaker honoraria payments and travel payments to physicians from the various sales, marketing, clinical, and medical teams on restaurant and in-office meals, Sunshine Act reporting had a high compliance error rate, there was a lack of proper documentation for the meals and entertainment provided by the Praluent sales representatives, sign-in sheets for customer meals were not used or were missing or were illegible, and expense and payment information was not t properly recorded.

55.     For example, a Regeneron sales representative named Wendy Cooper confirmed in the Regeneron "Concur" expense database for event attendees a Louisiana cardiologist named Dr. Stanley Bleich had attended an in-office meal on July 31, 2015. Dr. Bleich's meal expense was verified in the Concur expense database by Cooper's sales manager, Steve Meyers. However, Dr. Bleich died ten (10) months prior on October 21, 2014, while visiting family in the Boston, Massachusetts area, and obituaries were printed in Louisiana.

56.     The Regeneron commercial operations personnel found that they could not

49

trust the information that the sales representatives and marketing personnel were recording in the Concur expense database. The situation was so bad that commercial operations personnel, who were responsible for reviewing expenses prior to submission by the compliance office to CMS as part of the Sunshine Act reporting, found that many expense items were not verified and/or that evidence was missing. This occurred in or around February 2016 when finalizing the final report expense.

## KICKBACKS IN THE FORM OF SPEAKER HONORARIA

57.     Speaker panels were completely overseen by Regeneron's marketing department. The Defendants' marketing department would nominate and invite the speakers.

58.     Regeneron rewarded physicians with many of these kickbacks for prescribing large quantities of EYLEA, Dupixent, Praluent, Zaltrap, Arcalyst, and Kevzara, and other Regeneron drugs. Some physicians, who prescribed a large number of Regeneron's drugs, were given gifts including expensive meals and frequent, continuous catered meals for themselves and their large staffs at their offices.

59.     Speaker programs were so important to inducing business from physician clients that Regeneron established a formal structure for dealing with large numbers of paid physician speakers. For example, on August 21, 2015, Mike Johnson, Associate Director of Field Services for Commercial Operations at Regeneron sent a company-wide email to welcome the addition of Dev Khanna, a Senior Associate to help with speaker programs, who had previously run "over 8,000 annual events" at a company that focused on promoting physician speakers

for pharmaceutical companies.

60.     Regeneron developed formal internal guidelines for the award of these benefits to physicians, in effect pushing "prescribe to play," quid pro quo-focused sales strategies which are based entirely on the amount of prescriptions written by the physicians and the ability of the physician to influence other physicians to begin prescribing Regeneron's drugs. The recipients of these awards and benefits were selected by Regeneron marketers based on the recipients' ability to prescribe EYLEA, Dupixent, Praluent, Zaltrap, Arcalyst, and Kevzara, and other Regeneron's drugs, and to influence other physicians to do so.

61.     At one point in 2015, speaker programs at Regeneron were being booked too frequently by sales staff to induce physicians. These were being booked with such frequency that the programs were bumping each other, as sales staff rushed to book speaker programs at the last minute. David Robinson, Vice President of Sales, Access and Reimbursement had to send a company-wide email on August 25, 2015 requiring that sales staff stop booking speaking programs at the last minute and give the company at least three (3) days lead time to keep the programs from running over each other.

62.     By September 2015, Regeneron had flooded the nation with seventy (70) "Field Access Specialists" ("FAS" – staff who are supposed to be separate from sales activity, but in execution they sell, pull through, can take physicians out to dinner etc.), and one hundred and ninety-eight (198) physician speakers who were high volume prescribers [called "big writers" or "whales" by sales staff and sales managers] and opinion leaders that the company paid to induce their use of Regeneron products and to speak to other doctors. The company was spending an average of $2,700 per speaker program, and had approved 9,872 venues nationally,

with 6,219 of them being high-end restaurants, even though the company policy was to supposedly make these "educational" meetings in private, professional settings. These programs could take place for doctors and/or their staff, and many doctors and offices utilized them as a cross-referral opportunity (inviting referral partners for a free meal) and an opportunity to feed and entertain their own staff – an added benefit.

63.    Paid speakers received increasing amounts of money over time with Regeneron, starting from about One Thousand Five Hundred Dollars ($1,500) per presentation and increasing up to Three Thousand Dollars ($3000) per presentation or even more depending on the speaker. As long as the money was in the budget, Regeneron pervasively instructed, managed and directed its sales representatives to pay for speakers in order to entice them to prescribe more drug.

64.    For example, Regeneron contracted with physician Dr. John Kitchens, from Lexington, Kentucky, for $30,600 to speak at meetings throughout the nation during 2017.

65.    For example, Regeneron contracted with Dr. Nancy Holekamp, from Chesterfield, Missouri, for $30,600 to speak at meetings throughout the nation during 2017.

66.    For example, Regeneron contracted with Dr. Elias Reichel, from Leominster, Massachusetts, for $30,600 to speak at meetings throughout the nation during 2017.

67.    For example, Regeneron contracted with Dr. Rishi Singh, from Twinsburg, Ohio, for $30,600 to speak at meetings throughout the nation during 2017.

68.    For example, Regeneron contracted with Dr. William Lloyd Clark, from Columbia, South Carolina, for $30,600 to speak at meetings throughout the nation

during 2017.

69.     For example, Regeneron contracted with Dr. Mark Boguniewicz, from Denver, Colorado for $13,662 to speak at a meeting in Fairfield, New Jersey on May 4, 2017.

70.     For example, Regeneron contracted with Dr. Kevin L. Zacharoff, from Setauket, New York, for $11,368 to speak at a meeting in New York/New Jersey on December 9, 2016.

71.     For Example, in just than twenty-six (26) months, between October 2015, and December 2017, Regeneron contracted to pay $372,664 in speaker fees and travel expenses to the following physicians to promote Regeneron drugs on forty-nine (49) occasions, including many physician customers that were paid to travel to exotic or vacation destinations, such as Paris, Germany, Spain, Rome, and Hawaii:

| Meeting Date | Name | Product/Therapeutic area | City | Amount |
|---|---|---|---|---|
| 01/01/2017-12/31/2017 | John Kitchens | Ophthalmology | Nationwide | $30,660 |
| 01/01/2017-12/31/2017 | Nancy Holekamp | Ophthalmology | Nationwide | $30,660 |
| 01/01/2017-12/31/2017 | Elias Reichel | Ophthalmology | Nationwide | $30,660 |
| 01/01/2017-12/31/2017 | Rishi Singh | Ophthalmology | Nationwide | $30,660 |
| 01/01/2017-12/31/2017 | William Lloyd Clark | Ophthalmology | Nationwide | $30,660 |
| 5/4/2017 | Mark Boguniewicz | Dupilumab | Fairfield, NJ | $13,662 |
| 9-Dec-16 | Kevin L. Zacharoff | Immune & Inflammation | New York/New Jersey | $11,368 |
| 5/4/2017 | Jonathan Silverberg | Dupilumab | Fairfield, NJ | $9,184 |
| November, 2016 | Alan S. Brown | CV/Renal | Film studio, location TBD - Chicago, IL (or TBD based on HCP location and studio availability) | $7,710 |
| 01/01/2017-12/31/2017 | Mandeep Brar | Ophthalmology | Nationwide | $7,320 |
| 3 Dates: April 29, May 19-20, Oct 8 | Alan L. Epstein | Sarilumab | Hilton Sandestin Beach Hotel, Destin, FL 32540 | $6,960 |
| 18-Mar-17 | Sergio Schwartzman | Sarilumab | Los Angeles, CA | $6,870 |
| 22-Jul-17 | Nancy E. Lane | Immune & Inflammation | NY Area - TBD as per facility availability | $6,870 |
| 12/10/2015 to 12/11/2015 | Michael Davidson | CV/Renal | France | $6,747 |
| 12/09/2015 to 12/16/2015 | David Borenstein | Pain, Addiction & Neurology | Newark, NJ | $6,590 |
| 01/01/2017-12/31/2017 | Paul Karpecki | Ophthalmology | Nationwide | $6,480 |
| 01/01/2017-12/31/2017 | Mark Dumbar | Ophthalmology | Nationwide | $6,480 |
| 01/01/2017-12/31/2017 | Leo Semes | Ophthalmology | Nationwide | $6,480 |

53

| Meeting Date | Name | Product/Therapeutic area | City | Amount |
|---|---|---|---|---|
| 18-Mar-17 | Vibeke Strand | Sarilumab | Los Angeles, CA | $6,444 |
| 1st Week of December, 2016 and Sometime between April and June, 2017 | Lisa Beck | Immune & Inflammation | Tarrytown, NY, Dallas, TX and Chicago, IL | $6,204 |
| Friday 9 December 2016 | C. Daniel Mullins | CV/Renal | SANOFI Corporate Headquarters, 54-56 Rue La Boetie, Paris, France | $5,890 |
| 12/09/2015 to 12/16/2015 | Nancy E. Lane | Pain, Addiction & Neurology | Newark, NJ | $5,820 |
| Feb. 11, 2017 | Robert Moots | Muscle & Metabolism | Berlin, Germany | $5,568 |
| 9-Dec-16 | Thomas J. Schnitzer | Immune & Inflammation | New York/New Jersey | $5,288 |
| 12/09/2015 to 12/16/2015 | Jean-Pierre Raynauld | Pain, Addiction & Neurology | Newark, NJ | $5,237 |
| 01/01/2017-12/31/2017 | Reecha Kampani | Ophthalmology | Nationwide | $4,920 |
| 5 December, 2016 | Ralf Gunter Thiele | Immune & Inflammation | Regeneron, Tarrytown, New York | $4,845 |
| 24-Feb-17 | Renato Stein | Infectious Diseases | NYC - TBD as per facility availability | $4,770 |
| 22-Jul-17 | Stephen McMahon | Immune & Inflammation | NY Area - TBD as per facility availability | $4,636 |
| 24-Feb-17 | Octavio Ramilo | Infectious Diseases | NYC - TBD as per facility availability | $4,450 |
| 24-Feb-17 | Eric Simoes | Infectious Diseases | NYC - TBD as per facility availability | $4,450 |
| Tuesday, September 13 - TBC | Lawrence F. Eichenfield | Immune & Inflammation | New York, NY | $4,446 |
| Oct. 22, 2016 | Micahel T. Nurmohammed | Muscle & Metabolism | Barcelona, Spain | $4,000 |
| Oct. 22, 2016 | Ioanna Gouni-Berthold | Muscle & Metabolism | Barcelona, Spain | $4,000 |
| Tuesday, September 13 - TBC | Jonathan Silverberg | Immune & Inflammation | New York, NY | $3,846 |
| 19-Jan-17 | Peter Lio | Immune & Inflammation | Regeneron Headquarters, Tarrytown, NY | $3,372 |
| Feb. 11, 2017 | Frank Buttgereit | Muscle & Metabolism | Berlin, Germany | $2,848 |
| Saturday, November 12, 2016 | Mark Boguniewicz | Immune & Inflammation | Moscone West Convention Center, San Francisco, CA | $2,736 |
| 4-Mar-17 | Donald Leung | Dupilumab | Hyatt Regency, Atlanta, GA | $2,654 |
| 23-Mar-17 | Lawrence F. Eichenfield | Dupilumab | Grand Wailea Hotel, Maui, HI | $2,568 |
| 26-Aug-16 | Daniel Gaudet | CV/Renal | Rome, Italy | $2,466 |
| 10/24/2015 to 10/24/2015 | Raphaele Seror | Immune & Inflammation | Germany | $2,412 |
| 4-Mar-17 | Eric L. Simpson | Dupilumab | Hilton Orlando Hotel, Orlando, FL | $2,277 |
| 21-Apr-17 | Jeffrey Curtis | Sarilumab | Web-Ex | $2,025 |
| 22-Mar-17 | Eric L. Simpson | Dupilumab | Grand Wailea, Maui, HI | $1,923 |
| 4-Mar-17 | Jonathan Silverberg | Dupilumab | Hilton Orlando Hotel, Orlando, FL | $1,779 |
| 4-Mar-17 | Lawrence F. Eichenfield | Dupilumab | Orange County Convention Center, Orlando, FL | $1,762 |
| 22-Mar-17 | Jonathan Silverberg | Dupilumab | Grand Wailea, Maui, HI | $1,508 |
| 12/09/2015 to 12/16/2015 | Francis Berenbaum | Pain, Addiction & Neurology | Newark, NJ | $1,500 |

54

72.     For example, a Texas physician customer named Dr. Charles Wykoff received $31,174 worth of consulting, transportation, and Steering Committee payments from Regeneron for just a nine (9) month period from June 2016 through March 2017.

73.     For example, a Los Angeles, California physician customer named Dr. Christina Charles-Schoeman received $11,670 worth of transportation and Advisory Board payments from Regeneron for just a seventeen (17) month period from October 2015, through February 2017. This included a paid trip to Barcelona, Spain.

74.     For example, a Virginia physician customer named Dr. David Pariser received $62,313 worth of transportation and Steering Committee payments from Regeneron for just a seventeen (17) month period from November 2015, through March 2017.

75.     For example, a New York physician customer named Dr. Eliza Geer received $33,300 worth of transportation and consulting payments from Regeneron for just a six (6) month period from October 2015, through March 2016.

76.     For example, a Long Beach, CA physician customer named Dr. George Karpouzas received $21,510 worth of transportation, Advisory Board, and Steering Committee payments from Regeneron for just a seventeen (17) month period from October 2015, through February 2017.

77.     For example, a Quebec, Canada physician customer named Dr. Jean-Pierre Raynauld received $4,037 as an all-day fee as a "consultant and presenter" at a Regeneron Advisory Board meeting in Boston, along with $186 worth of transportation for a single meeting on January 7, 2016.

78.     Many of these same physicians are paid or induced by both Defendants

Regeneron and Sanofi at the same event, as many of the speaking events and customer meals are co-promoted by both Regeneron and Sanofi.

79.     For example, on July 26, 2017 Regeneron paid for two (2) items of travel and lodging for paid speaker Dr. Mark Boguniewicz in the amounts of $98.20 and $194.20, while on the same day for the same event, Sanofi paid a $110.43 food and beverage expense for Dr. Boguniewicz.

80.     For example, on December 20, 2017 Regeneron paid a "Consulting Fee" to paid speaker Dr. Vibeke Strand of Portola Valley, California in the amount of $4,059.00, while on the previous day, Sanofi made three "Research" payments of $201.00, $268.00, and $201.00 to Dr. Strand.

81.     In addition, in Defendants' rush to sign up physician customers to attend paid events, sometimes Regeneron sales, marketing, clinical and medical personnel would agree to pay an HCP without a contract, as long as they were under contract with marketing partner Sanofi pharmaceutical company.

82.     Regeneron paid excessive "preparation" fees to physicians to prepare slides and other materials for meetings as an inducement to use their products. Regeneron also paid excessive travel funds to physicians who were otherwise paid to attend speaker meetings, Advisory Board meetings, Steering committee meetings, and other meetings, often at vastly inflated rates that covered not only the physician's travel, but also paid the physicians an excessive hourly rate to sit on an airplane (or other mode of transport).

83.     Starting in 2015, travel stipends for physicians increased from more of a flat fee of approximately $1,000 for a few hours travel for a physician customer to attend a Regeneron paid travel event, to a very high hourly rate of several hundred dollars per hour for sitting in a plane seat or other mode of transport. There was no

control over the Regeneron sales, marketing, clinical and medical departments that paid for travel for their HCPs, as they often allowed the HCPs to book their own travel and to use 3rd party vendors other than the approved Regeneron travel vendor (Carlton Waggonlit and other 3rd party travel vendors).

84.     Regeneron sales, marketing, clinical, and medical department personnel filled out invoices for physician expenses and requests for payment, instead of the physicians themselves. Physicians frequently negotiated for additional payments beyond the Regeneron contracted or budgeted rates for traveling to participate in Regeneron meetings. When physicians wanted more money than was budgeted, Regeneron sales, marketing, clinical, and medical department personnel filled out "Payment exception forms" in order to get them as much as they wanted.

85.     For example, a Columbia, South Carolina physician customer named Dr. William Lloyd Clark received payment for two (2) hours at $1,020 per hour for "Slide Review and On Site Preparation," and for four (4) hours at $1,020 for a presentation on diabetic eye disease, for a total of $6,120 for a single presentation on April 6, 2017.

86.     For example, an Oklahoma physician customer named Kristina Ball received payment of $1,264 for a "full day serve" on the Regeneron Expert Panel in San Diego, California along with $888 in travel fees for a total of $2,152.40 for a meeting on June 23, 2017.

87.     For example, a Los Altos, California physician customer named Dr. Quan Dong Nguyen received payment of $10,600 for five (5) hours of meeting time and five (5) hours of "Pre-Work" for attending a meeting in Tarrytown, New York. Dr. Nguyen was also paid for six (6) hours of travel at his "Travel Time Compensation" rate of $1,060 per hour, or $6,360, and compensated for an

57

additional $566 worth of limousine and Uber rides, $195 for a hotel room, and $80 for dinner at the hotel, for a grand total of $17,801 for the trip and the meeting. Dr. Nguyen invoiced for the amount on November 26, 2017.

88.    For example, a Frisco, Texas physician customer named Dr. Charles Lance Cowey received payment of $6,698 for a "full day" of "consulting/advisory board" time for attending a meeting in Jersey City, New Jersey. Dr. Cowey was also paid for six (6) hours of travel at his "Travel Time Compensation" rate of $705 per hour, or $4,230, for a total of $10,928 for the trip and the meeting on October 21, 2017.

89.    For example, a Guilford, Connecticut physician customer named Dr. Roy Decker received payment of $6,698 for a "Full Day Advisory Board" time for attending a meeting in Jersey City, New Jersey. Dr. Decker was also paid for six (6) hours of travel at his "Travel Time Compensation" rate of $705 per hour, or $4,230, for a total of $10,928 for the trip and the meeting on October 21, 2017.

90.    For example, a Norfolk, Virginia physician customer named Dr. David M. Parier received payment of $6,555 for participating in an Advisory Board meeting in Jersey City, New Jersey. Dr. Parier was also paid his "Travel Time Compensation" fee of $2,760, for a total of $9,315 for the trip and the meeting on October 21, 2017.

91.    For example, a Charleston, South Carolina physician customer named Dr. Todd Schlesinger received payment of $5,463 for participating in an Advisory Board meeting in Jersey City, New Jersey. Dr. Schlesinger was also paid his "Travel Time Compensation" fee of $2,300 plus $130 for parking and meals, for a total of $7,893 for the trip and the meeting on October 21, 2017.

92.    For example, a Normal, Illinois physician customer named Dr. Dareen Siri

58

received payment of $2,688 for "Advising, Discussion on Participant Panel, Review of Clinical Trial Data and Indications" at a meeting in Denver, Colorado. Dr. Siri was also paid his "Travel Time Compensation" fee of $1,200 plus $90 for taxis and meals, for a total of $3,978 for the trip and the meeting on October 29, 2016.

93.     For example, an Austin, Texas physician customer named Dr. Paul G. Vigo received payment of $5,270 for attending an Advisory Board meeting in Phoenix, Arizona. Dr. Vigo was also paid his "Travel Time Compensation" fee of $3,720 plus $97 for parking, mileage, and meals, for a total of $9,087 for the trip and the meeting on November 3, 2017.

94.     For example, a Seattle, Washington physician customer named Dr. Clive Liu received payment of $4,888 for attending an Experts Meeting. Dr. Liu was also paid his "Travel Time Compensation" fee of $3,450, along with $168 for meals, room service and parking, for a total of $8,506 for the trip and the meeting on November 3, 2017.

95.     For example, a Sellersville, Pennsylvania physician customer named Dr. Ann Marie Edwards received payment of $5,800 for attending a "Practice Management Advisory Board." Dr. Edwards was also paid her "Travel Time Compensation" fee of $3,480, along with $118 for airline fees and parking, for a total of $9,398 for the trip and the meeting on December 15, 2017.

96.     For example, a New York City physician customer named Dr. Szilard Kiss received payment for two (2) hours at $600 per hour for "Telephone call with to speaker deck content" for a total of $1,200 on November 13, 2016. Dr. Kiss also billed for two (2) hours at $660 per hour for "Preparation for EYLEA Training" for a total of $1,320 on June 11, 2016.

97.     For example, a Murrieta, California pediatrician named Dr. Seema Sharma Aceves was contracted by Regeneron to attend an Advisory Board meeting on August 15, 2017 in New York regarding the Regeneron drug Dupixent at a price of $7,211 for consulting and $4,554 for traveling.

98.     For example, an $89,943 budget was set up for an April-May 2017 Advisory Board meeting in New York. Regeneron planned the meeting for ten to twelve (10-12) attendees plus two speakers, with Regeneron planning to pay the attendees for ten (10) hours plus travel, and the speakers for fourteen (14) hours plus travel. Ultimately, the Advisory Board was held on July 22, 2017 in Chicago, and a number of healthcare professionals were contracted to be paid to attend and to travel. For example, Regeneron contracted with Dr. Siba P. Raychaudhuri from Davis, California on May 12, 2017 to attend the meeting for a compensation of $3,480 and a travel fee of $2,610.

99.     For example, Regeneron contracted with Dr. Neil Singla from Pasadena, California on May 12, 2017 to attend the July 22, 2017 Chicago meeting for a compensation of $5,488 and an exorbitant travel fee of $4,116.

100.    For example, Dr. Thomas J. Schnitzer from Chicago was contracted by Regeneron on May 12, 2017 to attend the July 22, 2017 Advisory Board meeting in Chicago for a compensation of $3,480 as a member/consultant, and a "travel fee" of $870 despite the meeting being held in his hometown. Regeneron additionally engaged Dr. Schnitzer on November 19, 2016, to attend a December 8, 2016 Advisory Board meeting in New Jersey for a fee of $4,088 as a Speaker/presenter and a travel fee of $1,200.

101.    For example, Dr. Nancy E. Lane from Hillsborough, California was contracted with on May 12, 2017 to attend the July 22, 2017 Advisory Board

60

meeting in Chicago for a compensation of $6,090 as a Speaker/Presenter, and a travel fee of $2,610. Regeneron went on to engage Dr. Lane to attend a second Advisory Board meeting in Dallas, TX on August 12, 2017. Dr. Lane was to receive $3,698 for a full day of attending, in addition to $2,610 (again) as a travel fee.

102.   For example, a $30,000 budget was set up for a July 1, 2018 Advisory Board meeting in Chicago. Regeneron planned the meeting for nineteen (19) attendees, with Regeneron planning to pay the attendees for four and a half (4.5) hours plus travel.

103.   For example, an $85,000 budget was set up to pay HCPs to attend an October 20-21, 2017 Advisory Board meeting in Jersey City, New Jersey. Regeneron planned the meeting for eight to fourteen (8-14) HCPs to attend. Ultimately, the Advisory Board was scheduled for October 21, 2017 in Jersey City, and a number of healthcare professionals were contracted to be paid to attend and to travel.

104.   For example, Regeneron contracted with Dr. Michael Migden from Houston, Texas on October 4, 2017 to attend the meeting for a compensation of $5,293 and an exorbitant travel fee of $3,450. Regeneron went on to engage Dr. Migden to attend a second Advisory Board meeting in Tarrytown, NY on February 23, 2018. Dr. Migden was to receive $1,725 for a full day of attending, in addition to an exorbitant $3,450 (again) as a travel fee.

105.   Regeneron also put physician customers on lucrative hourly "Consulting Services" contracts, which paid them exorbitant hourly wages and annual fees for vague "consulting" and "advising" services. For example, on September 11, 2016, Regeneron signed Dr. David Pariser to a Consulting Services contract at a rate of

$541 per hour for up to $24,345 worth of payments to participate in an Advisory Council and advise the company on vaguely described criteria.

106.   No one within the company tracked how the different physicians were utilized throughout the company, causing overutilization of speakers and consultants, and sometimes booking physician customers on back-to-back paid consulting activities that overlapped in time such that they could not attend both. For example, Dr. Michael Cork from England was once placed on back to back paid Regeneron Advisory Boards and was booked in such a way that he couldn't make both meetings and had to phone into one of them instead of attending in person. Dr. Cork also complained about his payments and got Regeneron to grandfather in older, payment higher rates. Certain high-use physicians were used so frequently by the company that there was no control over how often they were used.

107.   Often the physicians who attended Regeneron's expensive dinners were friends, colleagues or referral partners and this was no more than a social event, an opportunity to have a referral dinner and enjoy some entertainment provided to them by the Regeneron.

108.   Dinners were scheduled several times per month and lunches given several times a week. Most of the time, the restaurant would provide the food, but sometimes the sales representatives had to bring in the food. Offices were also brought coffee, breakfast, and other treats on a consistent basis. High-volume physicians often received multiple, valuable meals and payments over short periods of time, and were referred to as "big writers" or "whales" by the sales representatives and sales managers.

109.   Regeneron knew that its provision of kickbacks to these physicians was

illegal and made efforts to conceal its illegal and fraudulent scheme by funneling some payments through third-party consulting organizations. Regeneron also understood that its provision of these kickbacks actually caused EYLEA, Dupixent, Praluent, Zaltrap, Arcalyst, and Kevzara to be used. Many of these drugs were paid for by Medicaid, Medicare, and the TRICARE health care system for military members and their families. Had the United States and the several States known that these drugs were used due to a fraudulent kickback scheme, they would not have provided reimbursement for Defendants' drugs.

## CLINICAL STUDIES AS A KICKBACK

110.   Specifically, as part of its scheme to promote EYLEA, Dupixent, Praluent, Zaltrap, Arcalyst, and Kevzara, Regeneron sought out physicians and proffered kickbacks to them in return for participating in clinical studies and showing loyalty to Regeneron's drugs. Most of the research consisted of paying a physician to prescribe EYLEA, Dupixent, Praluent, Zaltrap, Arcalyst, and Kevzara, or being paid to travel to a Regeneron clinical research meeting or Advisory Board meeting and report some simple findings. The Regeneron marketing department made the decisions on which physicians to pay to participate in clinical studies and be involved in research protocols based on their drug prescription volume, showing that Regeneron was not paying those physicians for a legitimate research purpose.

111.   Regeneron ran nationwide clinical studies which engaged a large number of investigators and for which physicians were remunerated with large "consulting payments" in order to create brand loyalty with the physicians. Regeneron sought out physician customers and proffered kickbacks to them in return for participating in clinical studies and showing loyalty to Regeneron's drugs, sometimes adding

research payments into the mix of other payments such as speaker and consulting fees that were paid out as inducements to high prescribing physician customers.

112.    For example, in 2016, Regeneron paid physician customer Dr. Norman Lepor of Beverly Hills, California $28,073 for "research" and "associated research" fees, while also engaging him as a speaker and paying him $144,029.19 worth of speaker fees, consulting fees, and associated meals, travel, and entertainment.

113.    For example, in 2016, Regeneron paid physician customer Dr. William L. Clark of West Columbia, South Carolina $407,857 for "associated research" fees, while also engaging him as a speaker and paying him $80,132 worth of speaker fees, consulting fees, and associated meals, travel, and entertainment. In 2017, Regeneron paid Dr. Clark $444,837 for "research" and "associated research" fees, while also engaging him as a speaker and paying him $139,288 worth of speaker fees, consulting fees, and associated meals, travel, and entertainment.

114.    For example, Regeneron paid Dr. Jonathan Silverberg from Chicago Illinois $145,189 worth of "General" payments in 2017, including numerous large payments over $6,000 each for serving as a speaker or faculty, along with $6,137 for "Research" payments.

115.    For example, Regeneron paid Dr. Mark Boguniewicz of Denver, Colorado $135,676 worth of "General" payments in 2017, including numerous large payments over $6,000 each for serving as a speaker or faculty, along with $16,817 for "Associated Research" payments.

116.    For example, Regeneron paid Dr. John Williams Kitchens of Lexington, Kentucky $100,359 worth of "General" payments in 2017, including numerous large payments over $6,000 each for serving as a speaker or faculty, along with

$131,209 for "Associated Research" payments.

117.   For example, 2015 to 2017, Regeneron paid the following nineteen (19)
physician customers a total of $181,877 to study EYLEA and other Regeneron
drugs:

| Meeting Date | Activity Name | Meeting Location | HCP Name | Contract Total Amount |
|---|---|---|---|---|
| 05/23/2016 to 05/23/2017 | Review of Clinical Study Report | | Lisa Beck | $   55,000 |
| 4/1/17 | A Longitudinal Retrospective Study of the Epidemiological and Economic Burden of Respiratory Syncytial Virus | Teleconference | Eric Simoes | $   17,450 |
| 08/11/2015 to 08/10/2016 | R1033-sIBM-1512 Study | | Anthony Amato | $   14,100 |
| 06/23/2016 to 06/22/2017 | Dupilumab 1225 Clinical Study Report | | Mette Deleuran | $   12,760 |
| 08/03/2015 to 08/02/2016 | REGN2222 study design and clinical development plan consultations | | Tina Hartert | $   9,260 |
| September, 2016 - April 2017 | Dr. M. debruin-Weller - Consultant to serve as Coordinating Investigator for Dupilumab 1424 Study | Utrecht, Netherlands | Marjolein Saskia de Bruin-Weller | $   8,880 |
| October 29th, 2016 | Dermatology RSM Physician Insight Meeting: SOLO1/SOLO2/CHRONOS Study Insights | Denver, Colorado | Eric Simpson | $   8,339 |
| 08/27/2015 to 08/26/2016 | REGN2222 study design and clinical development plan consultations | | James Gern | $   7,640 |
| 08/18/2015 to 08/17/2016 | Consultant's input for REGN2222 study design and clinical development plan | | Theresa Guilbert | $   7,260 |
| October 29th, 2016 | Dermatology RSM Physician Insight Meeting SOLO1/SOLO2/CHRONOS Study Insights | Denver, Colorado | Jeffrey Weinberg | $   5,528 |
| October 29th, 2016 | Dermatology RSM Physician Insight Meeting SOLO1/SOLO2/CHRONOS Study Insights | Denver, Colorado | Henry Wong | $   5,528 |
| October 29th, 2016 | Dermatology RSM Physician Insight Meeting SOLO1/SOLO2/CHRONOS Study Insights | Denver, Colorado | Laura Ferris | $   5,528 |
| October 29th, 2016 | Dermatology RSM Physician Insight Meeting SOLO1/SOLO2/CHRONOS Study Insights | Denver, Colorado | Benjamin Lockshin | $   4,728 |
| October 29th, 2016 | Dermatology RSM Physician Insight Meeting SOLO1/SOLO2/CHRONOS Study Insights | Denver, Colorado | Miguel J. Lanz | $   4,576 |
| October 29th, 2016 | Dermatology RSM Physician Insight Meeting SOLO1/SOLO2/CHRONOS Study Insights | Denver, Colorado | Dareen D. Siri | $   3,888 |
| October 29th, 2016 | Dermatology RSM Physician Insight Meeting SOLO1/SOLO2/CHRONOS Study Insights | Denver, Colorado | Nathan Segall | $   3,888 |
| October 29th, 2016 | Dermatology RSM Physician Insight Meeting SOLO1/SOLO2/CHRONOS Study Insights | Denver, Colorado | Joshua Jacobs | $   3,312 |

| October 29th, 2016 | Dermatology RSM Physician Insight Meeting SOLO1/SOLO2/CHRONOS Study Insights | Denver, Colorado | David Patterson | $ | 3,312 |
| 12/07/2015 to 12/06/2016 | Consulting on REGN 2176- 1417-3 Phase 2 Anti-PDGF /Aflibercept study | | Nadia Waheed | $ | 900 |

## DEFENDANTS' SALES REPRESENTATIVES FED FALSE INFORMATION INTO MEDICAID AND INSURER PRIOR AUTHORIZATION SYSTEMS

118.   Defendants' sales representatives were encouraged to take over the prior authorization process, and routinely accessed patient data through friends at physicians' offices in order to switch some or all of a physician's patients to Regeneron drugs. Sales representatives accessed patient data in order to pass false information to Medicaid and insurance payors and have the prescription approved. Sales representatives brought catered lunches and other perks to physicians' staffs in order to get access to their patient data, and to help with switching those physician's patients to Regeneron drugs.

119.   Defendants' sales representative involvement in the prior authorization process endangered the patients' HIPAA rights and was designed to bypass the existing formulary process to gain the prescription. Defendants' sales representatives would set up computerized systems for physician's offices and pharmacies to help the office staff to get its drug payments approved through insurance company prior authorization programs. This was a very valuable benefit to both the physicians and pharmacy offices because physicians' office staff often do not have enough employees to undertake the extra hours of work required to receive prior authorization for drug reimbursement from a payor.

120.   Defendants also turned the computerized prior authorization aids into a very

valuable benefit for themselves. Here, Defendants' sales representatives set up the prior authorization computer systems with a user name and password for the physicians to log in with to enter information about the case and submit it for reimbursement approval from the insurance payors. However, many of the sales representatives kept the log-in and password information for the physicians and provided fake prior authorization information for patients in lieu of the physician submitting accurate information themselves. This was a way to get false claims paid for the Regeneron drugs by Medicaid, Medicare Part D, and other payors.

121.   Defendants' sales representatives would set up computer programs to get physicians' offices linked with pharmacies to get prior authorizations done faster and easier for Regeneron medications like Praluent that have difficulty with coverage on certain plans. This would mean asking who is doing the prior authorizations ("PA's") in the physician's office, who gets calls from the pharmacy, who gets calls to re-fill prescriptions, and whether Regeneron drugs like Praluent were in the system. The sales representatives were instructed by Regeneron sales managers to bring frequent perks to the physicians such as breakfast, office lunches, and expensive dinners, and then ask the physician if he is willing to allow the Defendants' sales representatives "help them" with their prior authorizations submissions to Medicaid and other insurance payors for Regeneron drugs.

122.   Some physicians' offices did see this as a form of "help" and accepted and allowed Defendants' sales representatives to feed data directly to Medicaid and other payors to get their Regeneron prescriptions to pass through the prior authorization systems. Defendants' sales representatives were incentivized by increased commissions and bonuses to carry out this program, and so some of them

did feed information into the prior authorization systems of Medicaid and other payors.

## DEFENDANTS PROMOTED USE OF EYLEA, DUPIXENT, PRALUENT, ZALTRAP, ARCALYST, AND KEVZARA, AND OTHER DRUGS BY ILLEGALLY PROMOTING A SPREAD BETWEEN PUBLISHED AWP AND WAC PRICING AND THE PRICES OFFERED TO CUSTOMERS

123.   Commencing sometime by at least 2012 and continuing through the present, Defendants defrauded States and the United States by knowingly causing the Medicaid Programs to pay false or fraudulent claims. Examples of The Defendants' specific drug products at issue include EYLEA, Dupixent, Praluent, Zaltrap, Arcalyst, and Kevzara, and are identified by "NDC" numbers in Relator's extensive documentary evidence. The drugs at issue are referred to jointly as the "Spread Drugs."

124.   Regeneron marketed and sold their Spread Drugs to their Customers. The Customers purchased the Spread Drug products either directly from Defendants, through a GPO contract, or through wholesalers or specialty distributors. When Defendants sold their Spread Drugs to wholesalers, they invoiced wholesalers at gross prices which Defendants referred to as wholesale acquisition cost prices, however Defendants reported misleading, inflated AWPs and, in some cases, WACs to the pricing compendia for the Spread Drugs which had no relation to the prices Regeneron knew were generally and currently available in the marketplace.

125.   The amount paid by a Customer was typically based on a price negotiated with Regeneron, a price negotiated with a GPO, or an often equally competitive price set by a specialty wholesaler or distributor. Regeneron offered "contract

68

pricing" to many of their Customers that was less than "Non-Contract" or "Regular Cost" prices generally offered by wholesalers and distributors to any customer. Regeneron created inflated Spreads on the Spread Drugs for Customers that purchased the Spread Drugs at regular cost, available to virtually any industry customer, and an even greater Spread for those purchasing the Spread Drugs "under contract."

126.   Regeneron defrauded the Medicaid program by reporting excessively high and false prices for some of their prescription Spread Drugs with knowledge that Medicaid used these reported prices for establishing reimbursement to its Medicaid providers for these Spread Drugs. As a result, Medicaid sustained significant losses to its program by making reimbursement payments to Regeneron's Customers/Medicaid providers for the Spread Drugs at illegally excessive prices compared to the prices at which the Regeneron's Customers/Medicaid providers actually acquired the same Spread Drugs. This is a practice known in the industry as "creating a Spread." The Spread is utilized by pharmaceutical companies to seize market share and thereby to fraudulently increase their profits.

127.   Regardless of the method of purchase, Regeneron's Customers submitted claims for payment to Medicaid when a Spread Drug was dispensed to a program beneficiary. The claims submitted by Regeneron's Customers were paid at amounts directly influenced by Regeneron's false and fraudulent prices. Regeneron disseminated false pricing information for their Spread Drug products to the Pricing Publications. Regeneron knew the prices they reported to the pricing compendia controlled the pricing compendia's published reports of AWP and WAC.

128.   The manufacturers control the prices that are reported by the compendia,

including First DataBank (FDB) a Division of the Hearst Corporation. Some state Medicaid programs use FDB. For example, FDB asserts that all pricing information is supplied and verified by the products' manufacturers, and that there is no independent review of those prices for accuracy.

129.   Accordingly, the manufacturers functionally control what price information that payors, including the Medicaid program, can obtain. Regeneron has taken undue advantage of the resulting disparity in status, power and knowledge by knowingly reporting prices for Medicaid reimbursement purposes that bear no relationship whatsoever to prices generally or currently available in the marketplace. Regeneron knew that the state Medicaid programs, which employ small numbers of pharmacy staff, would not have the manufacturers' insider knowledge, resources, or opportunity necessary to discover and remedy Regeneron's Spread Drug pricing fraud.

130.   Regeneron first reported false prices for the Spread Drug products sometime by at least 2012. The reported prices did not represent prices actually being charged in the marketplace. Thereafter, Regeneron's employees typically reported and/or confirmed the false and fraudulent prices to the Pricing Publications periodically. During the relevant time period, Regeneron generally reported falsely inflated AWPs and WACs on the Spread Drugs while simultaneously offering dramatically lower prices to their Customers in the marketplace. Regeneron routinely failed to update, adjust, decrease or correct their initial price reports for the Spread Drugs to reflect prices being charged in the marketplace. Consequently, Regeneron caused the price reporting compendia to publish false inflated WACs and/or AWPs from sometime by at least 2012 and continuing through the present.

131.   Regeneron knew that the prices they reported to the Price Publications

directly affected reimbursement amounts paid by the Medicaid Programs. The false prices Regeneron reported to the Pricing Publications caused inflated government reimbursement amounts to be paid on claims submitted by Regeneron's payors for the Spread Drug products at issue. Additionally, Regeneron knew that withholding reports of WAC to the pricing compendia during the relevant time period would ensure the pricing compendia's failure to report WAC. Relator's extensive documentary evidence includes a pricing chart illustrating multiple examples of the NDCs at issue showing: reported prices (AWP and, if applicable, WAC), the Relator's Cost and the corresponding Spreads (difference between the prices at which Regeneron actually sold their Spread Drugs and the false prices reported by Regeneron). The prices listed as those available to the Relator, as an independent pharmacy, are some of the highest prices offered by Regeneron in the marketplace. Therefore, the inflated Spreads available to the Relator were some of the lowest Spreads in the marketplace.

132.    Regeneron manipulated AWPs and WACs to induce their Customers to purchase Regeneron's Spread Drugs by marketing to their Customers the huge profits that would result to them from excessive reimbursement payments. Regeneron actively used the inflated Spreads and huge profits as a marketing tool directed at providers to promote increased sales of the Spread Drugs. Moreover, the Spreads, in effect, marketed themselves. Any purchaser could easily calculate the potential profit by using the reported prices and the actual sales price. For example, the inflated Spreads were readily apparent from information on the drug purchasing software programs available to Customers from drug wholesalers.

133.    Regeneron reported or caused to be reported false or misleading prices to Medicaid by providing false or misleading price information including but not

71

necessarily limited to AWP, Suggested Wholesale Price ("SWP"), CDP, WAC, DP, List Price and direct wholesale price to the compendia with knowledge that they in turn would utilize such false and misleading price information in determining the AWPs and DPs that were reported to Medicaid.

134.   Regeneron was well aware of how Medicaid used Regeneron's reported pricing information to set reimbursement levels to providers for the drugs. At all relevant times, Regeneron was aware that Medicaid used published AWPs and/or WACs to estimate acquisition costs, defined as the best estimate of the price generally and currently paid by providers in the marketplace.

135.   Regeneron was also aware that the extraordinarily high volume of prescriptions processed by Medicaid requires the type of electronic data interchange that Regeneron has taken advantage of in order to defraud the Medicaid program. For example, from 2003 through 2011 Medicaid paid for an average of 35.8 million prescriptions per week nationwide. During this time, Medicaid processed prescriptions for over 35,000 NDC drug codes each year, reaching a peak of 39,212 NDC drug codes in 2011.

136.   Regeneron pays the Medicaid rebates and have reports that indicate the amount of their Spread Drugs, and the number of prescriptions for their Spread Drugs paid for by State by quarter. Regeneron knows that the Medicaid States are processing so many claims that it cannot be handled manually. Regeneron knows that Medicaid used complicated electronic payment databanks, and Regeneron provided the databanks with false information.

137.   After creating price Spreads for their Spread Drugs, Regeneron enlarged those Spreads by reducing acquisition costs to providers without disclosing the reductions to compendia such as First DataBank or to the Medicaid Program.

Regeneron also gave Customers incentives that decreased the price of prescription Spread Drugs, such as discounts, rebates, off-invoice pricing, free goods, charge backs, volume discounts, credit memos, "consulting" fees, debt forgiveness, educational and promotional grants, and other financial incentives. Price reductions were granted to some retail pharmacy chains, wholesalers, buying groups, pharmacy benefit managers at the request of those chains, wholesalers, buying groups or pharmacy benefit managers. These price reductions financially benefitted providers but were not reflected in the AWPs and other price quotes the Regeneron reported to the compendia, which formed the basis for reimbursements by Medicaid.

## DEFENDANTS HAVE CAUSED AND ARE CAUSING FALSE CLAIMS TO BE SUBMITTED FOR REIMBURSEMENT TO THE UNITED STATES AND THE STATES

138.   Illegally marketed drugs are not eligible to be purchased by Medicare, Medicaid or any other health insurance program funded by the United States. At all relevant times, Defendants have been aware that the federal government was the ultimate purchaser of the numerous Subject Drugs. Thus, Defendants knew that Medicaid and Medicare would receive numerous claims for reimbursement for their illegally marketed products. Defendants were also aware that Medicaid and Medicare and all other federally funded programs were not supposed to pay for illegally marketed products. Consequently, every claim presented to Medicaid or Medicare (or any other health care program financed by the federal government) for Subject Drugs for which the Defendants paid illegal inducements for was a false claim, and each claim was knowingly caused by Defendants.

139.   Each of these statements were used by the Defendants to market or distribute the Subject Drugs were false and resulted in claims for the use of the drugs being submitted to Medicare, Medicaid and other federal payment programs.

140.   As a result of the Defendants' actions, thousands of false claims relating the Subject Drugs, including unnecessary medical services and office and hospital visits, have been presented and paid by the United States. This has resulted in the United States expending millions of dollars for false Medicare, Medicaid, and federal insurance claims that should have never been paid.

**DEFENDANTS HAVE PAID BRIBES TO FOREIGN GOVERNMENT OFFICIALS IN VIOLATION OF THE FOREIGN CORRUPT PRACTICES ACT ("FCPA"), 15 U.S.C. § 78DD-1, ET SEQ.**

141.   Defendants' inappropriate payment of physicians extended beyond high-prescribing physicians in the United States of America. Relators discovered that Regeneron routinely paid foreign physicians and government agencies thousands of dollars in consulting, clinical research, and travel fees in order to get their business. These physicians predominately meet the FCPA's broad definition of "foreign official," because healthcare is publicly-funded in those countries and regions, where the public funding is controlled directly by the government or by an agency of the government for the benefit of the entire population.

142.   The FCPA prohibits the act of payments to foreign officials for the purpose of influencing acts or decisions of such foreign officials in their official capacity.

143.   For example, Regeneron paid Dr. Axel Hauschild, a professor of dermatology from Nolfsee, Germany, an honorarium of $2,970 for attending an Advisory Board meeting on August 31, 2016. Dr. Hauschild works at the

74

University of Kiel, which is a state-operated university. Germany has universal healthcare in which government funds pay for over ninety (90%) of health care.

144.   For example, Regeneron paid Dr. Felix Kiecker from Berlin, Germany, an honorarium of $2,560 and travel fees of €757.75 for attending an Advisory Board meeting on August 31, 2016. Dr. Kiecker works at Charité - Universitätsmedizin Berlin, a university which is wholly owned by the Federal State of Berlin.

145.   For example, Regeneron paid Dr. Roland Kaufmann from Frankfurt, Germany, an honorarium of $2,560 and travel fees of €757.75 for attending an Advisory Board meeting on August 31, 2016. Dr. Kaufmann works at the University Hospital Frankfurt am Main, part of the Johann Wolfgang Goethe University in Frankfurt, Germany. Goethe University is a public university funded by the state plus endowment funds.

146.   For example, Regeneron paid Dr. Gerard Kees Hovingh from Driebergen, The Netherlands, an honorarium of $2,034 and travel fees of $150 for attending an Advisory Board meeting in Rome on August 26, 2016. He works at the Academic Medical Center of the University of Amsterdam, a publicly funded university.

147.   Regeneron kept a running list of physician customers they paid thousands of dollars' worth of consulting fees and other payments to in order to gain their prescribing business in countries outside the US:

| Count of Country | | |
|---|---|---|
| **Country** | **HCP Name** | **Total** |
| Argentina | Carmen De Cunto | 1 |
| | Luis Catoggio | 1 |
| **Argentina Total** | | **2** |
| Australia | Alexander Guminski | 1 |
| | Christine Jenkins | 1 |
| | Peter Sly | 1 |
| | Simon Finfer | 1 |
| | Stephen James Nicholls | 1 |

| | | |
|---|---|---|
| **Australia Total** | | **5** |
| Belgium | Bruno Flamion | 1 |
| | Claus Bachert | 1 |
| | Guy Brusselle | 1 |
| | Jan Gutermuth | 1 |
| | Peter Hellings | 1 |
| | Philippe Gevaert | 1 |
| | Philippe Van Wilder | 1 |
| | Vera Bormans | 1 |
| **Belgium Total** | | **8** |
| Brazil | Cristiano Zerbini | 1 |
| | Geraldo da Rocha Castelar Pinheiro | 1 |
| | Patricia Delai | 1 |
| | Renato Stein | 1 |
| | Sebastiao Radominski | 1 |
| **Brazil Total** | | **5** |
| Canada | Dan Cooper | 1 |
| | Daniel Gaudet | 1 |
| | David Hogg | 1 |
| | Edward Keystone | 1 |
| | Jacques Brown | 1 |
| | Jean-Pierre Raynauld | 1 |
| | John Marshall | 1 |
| | Judy McPhee | 1 |
| | Kenneth Chapman | 1 |
| | Kim Papp | 1 |
| | Lawrence Alan Leiter | 1 |
| | Martin Desrosiers | 1 |
| | Melinda Gooderham | 1 |
| | Mohit Bhandari | 1 |
| | Olaf Koester | 1 |
| | Vincent Ho | 1 |
| **Canada Total** | *\*Healthcare in Canada is publicly funded* | **16** |
| China | Keqin Zhang | 1 |
| **China Total** | | **1** |
| Colombia | Carlo Caballero | 1 |
| | Monique Rose Chalem | 1 |
| **Colombia Total** | | **2** |

76

| | | |
|---|---|---|
| Czech Republic | Karel Pavelka | 1 |
| **Czech Republic Total** | | **1** |
| Denmark | Bent Deleuran | 1 |
| | Børge G Nordestgaard | 1 |
| | Lars Arendt-Nielsen | 1 |
| | Mette Deleuran | 1 |
| | Thomas Graven-Nielsen | 1 |
| **Denmark Total** | | **5** |
| Finland | Terho Heikkinen | 1 |
| **Finland Total** | | **1** |
| France | Arnaud Bourdin | 1 |
| | Brigitte Dreno | 1 |
| | Carle Paul | 1 |
| | Francis Berenbaum | 1 |
| | Genevieve Baujat | 1 |
| | Jean Bousquet | 1 |
| | Jean Francois Stalder | 1 |
| | Martin John Chapman | 1 |
| | Olivier Blin | 1 |
| | Pascal Chanez | 1 |
| | Paul Carle | 1 |
| | Philippe Gabriel Steg | 1 |
| | Raphaele Seror | 1 |
| | Sylvie Chollet-Martin | 1 |
| **France Total** | *\*France has universal health care, with about 77% public funding* | **14** |
| Germany | Andreas Wollenberg | 1 |
| | Axel Hauschild | 1 |
| | Diamant Thaci | 1 |
| | Dirk Schadendorf | 1 |
| | Eva Dietrich | 1 |
| | Felix Kiecker | 1 |
| | Frank Buttgereit | 1 |
| | Gerald Klose | 1 |
| | Gerd R. Burmester | 1 |
| | Inken Barth | 1 |
| | Ioanna Gouni-Berthold | 1 |
| | Jan Geldmacher | 1 |
| | Johann Christian Virchow Jr. | 1 |
| | Klaus G. Parhofer | 1 |

| | | |
|---|---|---|
| | Klaus Rabe | 1 |
| | Margitta Worm | 1 |
| | Martin Aringer | 1 |
| | Martin Reck | 1 |
| | Max S. Topp | 1 |
| | Michael Schlander | 1 |
| | Ralf Baron | 1 |
| | Ralf Gutzmer | 1 |
| | Rolf Morhart | 1 |
| | Stephan Thurau | 1 |
| | Stephan Weidinger | 1 |
| | Susanne Grässel | 1 |
| | Thomas Bieber | 1 |
| | Thomas Eigentler | 1 |
| | Thomas Welfel | 1 |
| | Ulrich Laufs | 1 |
| | Ulrich Schwabe | 1 |
| **Germany Total** | *German govt funds pay for over 90% of healthcare* | **31** |
| Greece | Alexandros Stratigos | 1 |
| **Greece Total** | | **1** |
| Ireland | Alan Irvine | 1 |
| | Martin Steinhoff | 1 |
| | Theresa  W. Guilbert | 1 |
| **Ireland Total** | | **3** |
| Italy | Aleksandra Torbica | 1 |
| | Angelo Manfredi | 1 |
| | Giampiero Girolomoni | 1 |
| | Giorgio Canonica | 1 |
| | Giuseppe Turchetti | 1 |
| | Ketty Peris | 1 |
| | Maja Di Rocco | 1 |
| | Marcello Arca | 1 |
| | Marco Marchetti | 1 |
| | Pier Cannonico | 1 |
| | Pierluigi Paggiaro | 1 |
| | Sergio Chimenti | 1 |
| **Italy Total** | *Italy has a state-run healthcare system in which about 77% of healthcare is publicly funded* | **12** |
| Japan | Hiroshi Fujishima | 1 |

| | | |
|---|---|---|
| | Koichiro Asano | 1 |
| | Mariko Harada-Shiba | 1 |
| | Yoko Kataoka | 1 |
| | *Japan has a state-run healthcare system, with about 70% of funding coming from public funds* | |
| **Japan Total** | | **4** |
| Mexico | Carlos Javier Pineda Villasenor | 1 |
| | Sergio Gutierrez Urena | 1 |
| **Mexico Total** | | **2** |
| Netherlands | Elisabeth Bel | 1 |
| | Elisabeth de Vries | 1 |
| | Errol Prens | 1 |
| | Gerard Hovingh | 1 |
| | J. Coen Netelenbos | 1 |
| | John Kastelein | 1 |
| | Marelise Eekhoff | 1 |
| | Marjolein Saskia de Bruin-Weller | 1 |
| | Michael T. Nurmohamed | 1 |
| | Sita Bierma-Zeinstra | 1 |
| | Stefan Nierkens | 1 |
| | Thomas Willem Johannes Huizinga | 1 |
| **Netherlands Total** | | **12** |
| Singapore | David  Price | 1 |
| **Singapore Total** | | **1** |
| South Africa | Christiaan Scott | 1 |
| | Eric Bateman | 1 |
| **South Africa Total** | | **2** |
| Spain | Antonio Domingo Gomez Centeno | 1 |
| | Augustin Alomar | 1 |
| | Eulalia Baselga | 1 |
| | Francisco Martinez Granados | 1 |
| | Joaquim Mullol | 1 |
| | Joaquin Borras Blasco | 1 |
| | Jose Carlos Armario Hita | 1 |
| | Jose Luis Trillo | 1 |
| | Jose Manuel Martinez Sesmero | 1 |
| | Josep Darba | 1 |
| | Juan Francisco Silvestre Salvador | 1 |
| | Luis Puig | 1 |
| | Pedro Gomez Pajuelo | 1 |

|  | Santiago Quirce | 1 |
|  | Sola Morales Oriol | 1 |
| **Spain Total** | *Spain has a state-run universal healthcare system* | **15** |
| Sweden | Lars-Åke Levin | 1 |
|  | Stefan Lohmander | 1 |
|  | Sven-Erik Dahlen | 1 |
|  | Ulf Persson | 1 |
| **Sweden Total** | *Sweden's healthcare system is mainly government-funded* | **4** |
| Switzerland | Alain Schoepfer | 1 |
|  | Ekaterina Safroneeva | 1 |
|  | Klaus Rose | 1 |
| **Switzerland Total** | | **3** |
| Thailand | Virote Sriuranpong | 1 |
| **Thailand Total** | | **1** |
| Turkey | Ozden Altundag | 1 |
| **Turkey Total** | | **1** |
| UK | Adnan Custovic | 1 |
|  | Alan Ronald Haycox | 1 |
|  | Andrew Walker | 1 |
|  | Anita Hill | 1 |
|  | Anthony Brzezicki | 1 |
|  | Anthony Henry Dickenson | 1 |
|  | Athimalaipet Ramanan | 1 |
|  | Azfar Zaman | 1 |
|  | Ben van Hout | 1 |
|  | Brian A Ference | 1 |
|  | Carsten Flohr | 1 |
|  | Christopher Brightling | 1 |
|  | Christopher Edwards | 1 |
|  | Ernest Ho Sing Choy | 1 |
|  | Helen Williams | 1 |
|  | Ian Douglas Pavord | 1 |
|  | Kausik K. Ray | 1 |
|  | Keith Fox | 1 |
|  | Keith Pearson | 1 |
|  | Malcolm Rustin | 1 |
|  | Martin Lee | 1 |
|  | Marwan Bukhari | 1 |
|  | Michael Cork | 1 |

80

| | | |
|---|---|---|
| | Miles Ayling | 1 |
| | Nigel Arden | 1 |
| | Patrick Kiely | 1 |
| | Paul Miller | 1 |
| | Philip Conaghan | 1 |
| | Rajesh Chopra | 1 |
| | Richard Keen | 1 |
| | Robert Cramb | 1 |
| | Robert J. Moots | 1 |
| | Robin Choudhury | 1 |
| | Stephen Brendan McMahon | 1 |
| | Stephen McMahon | 1 |
| | Susan Mills | 1 |
| | Tonia L. Vincent | 1 |
| | Victoria Chapman | 1 |
| **UK Total** | *England has a public healthcare system that is mainly provided through the National Health Service* | **38** |
| (blank) | (blank) | |
| (blank) Total | | |
| **Grand Total** | | **190** |

148.   Despite getting paid thousands of dollars apiece for brief appearances at Regeneron meetings, some of the European physicians demanded higher consulting fees from the company, calling Regeneron's rates "insulting" in 2016 to a physician employed by the company, who forwarded their compensation demands to Regeneron management. Regeneron ran a system in which nearly any customer could demand more money and get it called "Tier Exception" ratings, and numerous foreign physician customers successfully received higher consultant pay through the Tier Exception process.

149.   Despite the payment of thousands of dollars apiece to these foreign "consultants," Defendants' consultant meetings were run in a slip-shod fashion in

which simple paperwork like sign-in sheets and itemized expense receipts went missing. An October 21, 2015 email noted such missing paperwork from a meeting called the "CLEAR MEETING," which numerous foreign physician customers were paid well to attend. This lack of basic administrative organization brings into question whether the meetings were little more than a reason to hand checks to their high prescribers and key opinion leader customers.

150.   Defendants exhibited a stunning and pervasive lack of education and compliance with the FCPA.  Defendants' unlawful expenditures on physicians in foreign countries mirrors its treatment of physicians here, here Defendants' sales representatives have been permitted and encouraged at an executive level to lavish trips, meals, large consulting fees and other activities upon physicians to generate sales and market share.

## CONCLUSION

151.   Defendants' nationwide fraudulent activities, as set forth in this Complaint, have resulted in significant fraud on the government's health care systems. These concerted, national and international schemes for fraudulent promotion of Defendants' drugs have resulted in at least millions of dollars in unnecessary and fraudulent claims for reimbursement, increasing the cost of healthcare and wasting the American taxpayer money.

## COUNT I; FALSE CLAIMS ACT

## CAUSING PRESENTATION OF FALSE OR FRAUDULENT CLAIMS

152.   This is a civil action by the Plaintiff, UNITED STATES, and the Relators,

JANE DOE NUMBER ONE AND JANE DOE NUMBER TWO, on behalf of the UNITED STATES and on behalf of the Relators, against the Defendants REGENERON PHARMACEUTICALS, INC., REGENERON HEALTHCARE SOLUTIONS, INC., AND SANOFI AVENTIS US, LLC, under the False Claims Act, 31 U.S.C. §§3729-32.

153.   Relators reallege and incorporate the allegations above as if fully set forth herein and further allege as follows:

154.   The Defendants, from at least January 1, 2012 to the present date knowingly [as defined in 31 USC, §3729(b)] caused to be presented to officers or employees of the UNITED STATES GOVERNMENT and STATES GOVERNMENTS false or fraudulent claims for payment or approval, in that The Defendants, caused to be presented to officers or employees of the UNITED STATES GOVERNMENT AND STATES GOVERNMENTS false or fraudulent price and cost information for the specified drugs (as the term "specified drugs" has been defined throughout this Complaint) and caused the UNITED STATES and STATE GOVERNMENTS to pay out sums of money to the healthcare providers and suppliers of the Defendants' specified drugs, grossly in excess of the amounts permitted by law, resulting in great financial loss to the UNITED STATES and STATE GOVERNMENTS.

155.   Because of the DEFENDANTS' conduct as set forth in this Count, the UNITED STATES suffered actual damages in amount to be proven at trial, all in violation of 31 U.S.C. §3729(a)(1)(A).

## COUNT II; FALSE CLAIMS ACT

**CAUSING A FALSE RECORD OR STATEMENT TO BE MADE OR USED TO GET A FALSE OR FRAUDULENT CLAIM PAID OR APPROVED BY THE GOVERNMENT**

156.   This is a civil action by the Plaintiff, UNITED STATES, and the Relator, This is a civil action by the Plaintiff, UNITED STATES, and the Relators, JANE DOE NUMBER ONE AND JANE DOE NUMBER TWO, on behalf of the UNITED STATES and on behalf of the Relators, against the Defendants REGENERON PHARMACEUTICALS, INC., REGENERON HEALTHCARE SOLUTIONS, INC., AND SANOFI AVENTIS US, LLC, under the False Claims Act, 31 U.S.C. §§3729-32.

157.   Relators reallege and incorporate the allegations above as if fully set forth herein and further allege as follows:

158.   The Defendants, from at least January 1, 2012 to the present date knowingly [as defined in 31 USC, §3729(b)] caused false records or statements to be made or used to get false or fraudulent claims to be paid or approved by the GOVERNMENT, in that The Defendants, caused false records or statements of process and costs of the Defendants' drugs specified herein to be used by the GOVERNMENT to pay or approve claims presented by healthcare providers and suppliers of the Defendants' specified drugs, which claims were grossly in excess of the amounts permitted by law, resulting in great financial loss to the UNITED STATES and STATE GOVERNMENTS.

159.   Because of the Defendants' conduct as set forth in this Count, the UNITED STATES suffered at least millions of dollars of actual damages, all in violation of 31 U.S.C. §3729(a)(1)(B).

## COUNT III; FALSE CLAIMS ACT

### CAUSING FALSE RECORDS OR STATEMENT TO BE USED TO CONCEAL AN OBLIGATION TO PAY MONEY TO THE GOVERNMENT

160.   This is a civil action by the Plaintiff, UNITED STATES, and the Relators, JANE DOE NUMBER ONE AND JANE DOE NUMBER TWO, on behalf of the UNITED STATES and on behalf of the Relators, against the Defendants REGENERON PHARMACEUTICALS, INC., REGENERON HEALTHCARE SOLUTIONS, INC., AND SANOFI AVENTIS US, LLC, under the False Claims Act, 31 U.S.C. §§3729-32.

161.   Relators reallege and incorporate the allegations above as if fully set forth herein  and further allege as follows:

162.   The Defendants, from at least January 1, 2012 to the present date knowingly [as defined in 31 USC, §3729(b)] caused false records or statements to be made or used to conceal obligations to pay money to the GOVERNMENT, in that: the Defendants knew that the States' Medicaid Programs have used the Defendants' false price and cost representations for purposes of paying or approving claims of the healthcare providers and suppliers of the Defendants' specified drugs; the Defendants knew that sums of money paid by the STATES GOVERNMENTS to the healthcare providers and suppliers if the Defendants' specified drugs were grossly in excess of the amounts permitted by law; the Defendants knew it was the obligation of the State Governments to recoup governments' funds paid in excess of the amounts permitted by law; The Defendants, nevertheless, continued to conceal the facts that they had caused to be made or used false records or statements of prices and costs for the specified drugs that were grossly in excess of the reasonable amounts permitted by law and to conceal from the GOVERNMENT

an obligation to pay to the GOVERNMENT the excessive reimbursement amounts paid to healthcare providers for which DEEFENDANTS were directly responsible.

163.   Because of the Defendants' conduct as set forth in this Count, the UNITED STATES suffered millions of dollars in actual damages, all in violation of 31 U.S.C. §3729(a)(1)(G).

## COUNT IV; FALSE CLAIMS ACT

### CAUSING PRESENTATION OF FALSE OR FRAUDULENT CLAIMS; ILLEGAL RENUMERATION

164.   This is a civil action by the Plaintiff, UNITED STATES, and the Relators, JANE DOE NUMBER ONE AND JANE DOE NUMBER TWO, on behalf of the UNITED STATES and on behalf of the Relators, against the Defendants REGENERON PHARMACEUTICALS, INC., REGENERON HEALTHCARE SOLUTIONS, INC., AND SANOFI AVENTIS US, LLC, under the False Claims Act, 31 U.S.C. §§3729-32.

165.   Relators reallege and incorporate the allegations above as if fully set forth herein and further allege as follows:

166.   The Defendants, from at least January 1, 2012 to the present date knew that the prices charged to their customers for the specified drugs were significantly reduced in the amount from the prices and costs represented by the Defendants and upon which the Defendants knew the Medicaid claims would be approved and paid. Accordingly, the Defendants have each knowingly offered or paid, or caused to be offered or paid, directly or indirectly, overtly or covertly, in cash or in kind, remuneration to their customers on the form of price reductions and/or in the form of illegal remuneration from the States' Medicaid Programs to induce them to purchase, order or arrange or to recommend purchasing, arranging or ordering the

specified drugs for which the Defendants knew that payment would be made, in whole or in part, by the States' Medicaid Programs. Such financial inducement is specifically prohibited by 42 U.S.C. §1320a-7b(b) and 18 U.S.C.§2

167.   The Defendants' knowing and willful actions in arranging for their customers to receive remuneration prohibited by 42 U.S.C. §1320a-7b(b), in causing the omission of material information from the claims, and in causing the failure to properly disclose and appropriately reflect the remuneration in the claims, caused the claims for the specified drugs to be false and fraudulent claims and caused the claims to be presented to the States' Medicaid Programs for payment and approval in violation of 31 U.S.C. §3729(a)(1)(A).

168.   Because of the Defendants' conduct as set forth in this Count, the UNITED STATES suffered millions of dollars of actual damages, all in violation of 31 U.S.C. §3729(a)(1).

## COUNT V; FALSE CLAIMS ACT

**CAUSING A FALSE RECORD OR STATEMENT TO BE MADE OR USED TO GET A FALSE OR FRAUDULENT CLAIM PAID OR APPROVED BY THE GOVERNMENT; PROHIBITED REFERRALS, CLAIMS AND COMPENSATION ARRANGEMENTS**

169.   This is a civil action by the Plaintiff, UNITED STATES, and the Relators, JANE DOE NUMBER ONE AND JANE DOE NUMBER TWO, on behalf of the UNITED STATES and on behalf of the Relators, against the Defendants REGENERON PHARMACEUTICALS, INC., REGENERON HEALTHCARE SOLUTIONS, INC., AND SANOFI AVENTIS US, LLC, under the False Claims Act, 31 U.S.C. §§3729-32.

170.   Relators reallege and incorporate the allegations above as if fully set forth

herein and further allege as follows:

171.   The Defendants, from at least January 1, 2012 to the present date knowingly presented or caused to be presented, prohibited claims or bills to individuals and other entities for designated health services [outpatient prescription drugs] furnished pursuant to prohibited referrals from physicians, physician groups and/or outpatient clinics with which the Defendants have financial relationships, for which the Defendants knew that payment would be made, in whole or in part, by the States' Medicaid Programs. Such prohibited referrals, claims bills and compensation arrangements are specifically prohibited by 42 U.S.C. §1395nn(a)(1)(B) and 18 U.S.C. §2.

172.   The Defendants knowingly made or used or caused referring physicians, physician groups or outpatient clinics to make or use records or statements to get false or fraudulent claims and bills for the Defendants' outpatient prescription drugs to be paid or approved by the States' Medicaid Programs.

173.   The Defendants' knowing presentment or causing others to present, claims or bills to the States' Medicaid programs in violation of 42 U.S.C. §1395nn(a)(1)(B) without disclosing facts revealing said violations constituted the making or using, or the causing others to make or use, false records or statements to get a false or fraudulent claims paid or approved by the GOVERNMENT in violation of 31 U.S.C. §3729(a)(1)(B).

174.   Because of the Defendants' conduct as set forth in this Count, the UNITED STATES suffered millions of dollars in actual damages, all in violation of 31 U.S.C. §3729(a)(1)(B).

## COUNT VI; FALSE CLAIMS ACT

**CONSPIRING TO DEFRAUD THE GOVERNMENT BY GETTING A FALSE OR FRAUDULENT CLAIM ALLOWED OR PAID**

175.   This is a civil action by the Plaintiff, UNITED STATES, and the Relators, JANE DOE NUMBER ONE AND JANE DOE NUMBER TWO, on behalf of the UNITED STATES and on behalf of the Relators, against the Defendants REGENERON PHARMACEUTICALS, INC., REGENERON HEALTHCARE SOLUTIONS, INC., AND SANOFI AVENTIS US, LLC, under the False Claims Act, 31 U.S.C. §§3729-32.

176.   Relators reallege and incorporate the allegations above as if fully set forth herein  and further allege as follows:

177.   With respect to State Medicaid Programs, this Count also applies to all Defendants' manufacturing specified drugs which: 1) were multiple-source drugs and/or single-source drugs, 2) were subject to State Medicaid reimbursement methodology similar to the Medicare "J Code" methodology, and 3) had a falsely inflated reported AWP and/or WAC or another falsely inflated reported price or cost if such price or cost was utilized in creating an array or prices or costs from which one was selected or reimbursement of all versions of a given drug.

178.   Defendants' liability as to this Count extends from the time it first reported a falsely inflated AWP and/or WAC, or in the case of Medicaid, a falsely inflated AWP and/or WAC or such other price cost used to create the array of drug prices or costs, until such time, if any, Defendants stopped reporting said inflated AWP and/or WAC or, in the case of Medicaid, stopped reporting said inflated AWP and/or WAC or such other reported price or cost used to create the array of drug prices or costs from which one was selected for reimbursement purposes.

179.   Because of the Defendants' conduct as set forth in this Count, the UNITED STATES suffered millions of dollars in actual damages, all in violation of 31

U.S.C. §3729(a)(1)(C).

## COUNT VII; FOREIGN CORRUPT PRACTICES ACT

### VIOLATIONS OF SECTION 30A OF THE EXCHANGE ACT

180.   Relators reallege and incorporate the allegations above as if fully set forth herein  and further allege as follows:

181.   As described above, Defendants, through means or instrumentalities of U.S. commerce, corruptly offered, promised to pay, or authorized corrupt payments to a person, while knowing that all or a portion of those payments would be offered, give, or promised, directly or indirectly, to foreign government officials for the purposes of influencing their acts or decisions in their official capacity, inducing them to do or omit to do actions in violation of their lawful duties, securing an improper advantage, or inducing such foreign officials to use their influence with a foreign government or instrumentality thereof to assist Defendants in obtaining or retaining business.

182.   By reason of the foregoing, Defendants violated the anti-bribery provisions of the FCPA, as codified at Section 30A of the Exchange Act [15 U.S.C. §78dd-1].

## COUNT VIII; FOREIGN CORRUPT PRACTICES ACT

### VIOLATIONS OF SECTION 13(b)(2)(A) OF THE EXCHANGE ACT

183.   Relators reallege and incorporate the allegations above as if fully set forth herein  and further allege as follows:

184.   As described above, with respect to improper payments to foreign officials, Defendants failed to make and keep books, records and accounts which, in reasonable detail, accurately and fairly reflected its transactions and dispositions of its assets.

185.   By reason of the foregoing, Defendants violated the anti-bribery provisions of the FCPA, as codified at Section 13(b)(2)(A) of the Exchange Act [15 U.S.C.§ 78m(b)(2)(A)].

## COUNT IX; FOREIGN CORRUPT PRACTICES ACT

### VIOLATIONS OF SECTION 13(b)(2)(B)  OF THE EXCHANGE ACT

186.   Relators reallege and incorporate the allegations above as if fully set forth herein  and further allege as follows:

187.   As described above, with respect to improper payments to foreign officials, Defendants failed to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that: (i) payments were made in accordance with management's general or specific authorization; and (ii) payments were recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and to maintain accountability for its assets.

188.   By reason of the foregoing, Defendants violated the anti-bribery provisions of the FCPA, as codified at Section 13(b)(2)(B) of the Exchange Act [15 U.S.C.§ 78m(b)(2)(B)].

## COUNT X

### (Arkansas Medicaid Fraud False Claims Act, A.C.A. § 20-77-901 *et seq.*)

189.   Relators re-allege and incorporate the allegations above as if fully set forth herein  and further allege as follows. Additionally, Relators state that the course of conduct described in this Complaint was a nationwide practice of Defendants. Defendants conducts business in the State of Arkansas. Upon information and belief, Defendants actions described herein occurred in the State of Arkansas as

well. This is a qui tam action brought by Relators and the State of Arkansas to recover treble damages and civil penalties under the Arkansas Medicaid Fraud False Claims Act, A.C.A. § 20-77-901 et seq.

190.   The Arkansas Medicaid Fraud False Claims Act § 20-77-902 provides liability for any person who-

191.   Knowingly makes or causes to be made any false statement or representation of a material fact in any application for any benefit or payment under the Arkansas Medicaid program;

192.   At any time knowingly makes or causes to be made any false statement or representation of a material fact for use in determining rights to a benefit or payment;

193.   In addition, A.C.A. § 20-77-902(7)(A) prohibits soliciting, accepting, or agreeing to accept any type of remuneration for recommending the purchase, lease, or order of any good, facility, service, or item for which payment may be made under the Arkansas Medicaid program.

194.   Defendants violated the Arkansas Medicaid Fraud False Claims Act §20-77-902(1) (2) & (7)(A) from at least 2011 to the present by engaging in the fraudulent and illegal practices described herein.

195.   Defendants furthermore violated the Arkansas Medicaid Fraud False Claims Act § 20-77-902(1) & (2) and knowingly caused thousands of false claims to be made, used and presented to the State of Arkansas from at least 2011 to the present by its violation of federal and state laws, including A.C.A. § 20-77-902(7)(A), the Anti-Kickback Act and Stark Act Requirements, as described herein.

196.   The State of Arkansas, by and through the Arkansas Medicaid program and other State health care programs, and unaware of Defendants' fraudulent and

92

illegal practices, paid the claims submitted by health care providers and third payers in connection therewith.

197.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Arkansas is connection with Defendants fraudulent and illegal practices.

198.   Had the State of Arkansas known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Defendants' fraudulent and illegal practices.

199.   As a result of Defendants' violations of § 20-77-902(1) (2) & (7)(A), the State of Arkansas has been damaged in an amount far in excess of millions of dollars exclusive of interest.

200.   Relators are private persons with direct and independent knowledge of the allegations of this Complaint, and this action is brought pursuant to A.C.A. § 20-77-911(a) on behalf of Relators and the State of Arkansas.

201.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Arkansas in the operation of its Medicaid program.

202.   Pursuant to the Arkansas Medicaid Fraud False Claims Act, the State of Arkansas and Relators are entitled to the following damages as against Defendants:

203.   To the STATE OF ARKANSAS:

204.   Three times the amount of actual damages which the State of Arkansas has sustained as a result of Defendants' fraudulent and illegal practices;

205.   A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of Arkansas;

206.   Prejudgment interest; and

207.   All costs incurred in bringing this action.

208.   To RELATORS:

209.   The maximum amount allowed pursuant to A.C.A. § 20-77-911(a) and /or any other applicable provision of law;

210.   Reimbursement for reasonable expenses which Relators incurred in connection with this action;

211.   An award of reasonable attorneys' fees and costs; and

212.   Such further relief as this court deems equitable and just.

## COUNT XI

### (California False Claims Act, Cal. Gov't Code § 12650 et seq.)

213.   Relators re-allege and incorporate the allegations above as if fully set forth herein and further allege as follows.

214.   Additionally, Relators state that the course of conduct described in this Complaint was a California statewide practice of Defendants.  Defendants conduct business in the State of California.  Defendants' actions described herein occurred in the State of California as well.

215.   This is a qui tam action brought by Relators and the State of California to recover treble damages and civil penalties under the California False Claims Act, Cal. Gov't. Code § 12650 et seq.

216.   Cal. Gov't Code § 12651(a) provides liability for any person who—

217.   Knowingly presents, or causes to be presented, to an officer or employee of

94

the state of any political division thereof, a false claim for payment or approval;

218.    Knowingly makes, uses, or causes to be made or used a false record of statement to get a false claim paid or approved by the state or by any political subdivision;

219.    Conspires to defraud the state or any political subdivision by getting a false claim allowed or paid by the state of by any political subdivision.

220.    Is a beneficiary of an inadvertent submission of a false claim to the state or a political subdivision, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the state or the political subdivision within a reasonable time after discovery of the false claim.

221.    In addition, the payment or receipt of bribes or kickbacks is prohibited under Cal. Bus. & Prof. Code §§ 650 and 650.1, and is also specifically prohibited in treatment of Medi-Cal patients pursuant to Cal. Welf. & Inst. Code § 14107.2.

222.    Defendants violated Cal Bus. & Prof. Code §§ 650 and 650.1 and Cal. Welf. & Inst. Code § 14107.2 from at least 2011 to the present by engaging in the fraudulent and illegal practices described herein.

223.    Defendants furthermore violated Cal. Gov't Code § 12651(a) and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of California from at least 2011 to the present by its violation of federal and state laws, including Cal. Bus. & Prof. Code §§ 650 and 650.1 and Cal. Welf. & Inst. Code § 14107.2, the Anti-Kickback Act and Stark Act Requirements, as described herein.

224.    The State of California, by and through the California Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third party

payers in connection therewith.

225.   Compliance with applicable Medicare, Medi-Cal and the various other federal and state laws cited herein was implied, and upon information and belief, also an express condition of payment of claims submitted to the State of California in connection with Defendants' fraudulent and illegal practices.

226.   Had the State of California known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Defendants' fraudulent and illegal practices.

227.   As a result of Defendants' violations of Cal. Gov't Code § 12651(a), the State of California has been damaged in an amount far in excess of millions of dollars exclusive of interest.

228.   Relators are private persons with direct and independent knowledge of the allegations of this Complaint, this action is being brought pursuant to Cal. Gov't Code § 12652(c) on behalf of Relators and the State of California.

229.   This Court is requested to accept supplemental jurisdiction over this related state claim as it is predicated upon the same exact facts as the federal claim, and merely asserts separate damages to the State of California in the operation of its Medicaid program.

230.   Pursuant to the California False Claims Act, the State of California and Relators are entitled to the following damages as against Defendants:

231.   To the STATE OF CALIFORNIA:

232.   Three times the amount of actual damages which the State of California has sustained as a result of Defendants' fraudulent and illegal practices;

233.   A civil penalty of not less than $5,500 and not more than $11,000 for each

false claim which Defendants presented or caused to be presented to the State of California;

234. Prejudgment interest; and

235. All costs incurred in bringing this action.

236. To RELATORS:

237. The maximum amount allowed pursuant to Cal. Gov't Code § 12652 and /or any other applicable provision of law;

238. Reimbursement for reasonable expenses which Relators incurred in connection with this action;

239. An award of reasonable attorneys' fees and costs; and

240. Such further relief as this Court deems equitable and just.

## COUNT XII

**(California Insurance Frauds Prevention Act, Cal. Ins. Code § 1871.7 et seq.)**

241. Relators re-allege and incorporate the allegations above as if fully set forth herein and further allege as follows.

242. This is a claim for treble damages and penalties under the California Insurance Fraud Prevention Act.

243. By virtue of the acts described above, Defendants knowingly utilized a scheme by which they improperly procured "runners, cappers, steerers, and other persons" to procure patients who held private insurance contracts and against whom Defendants could cause the filing of claims for payment. *See* Cal. Ins. Code § 1871.7(a).

244. Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the private insurers in California, or for patients in California

those insurers covered, for payment or approval in violation of each patient's private health insurance contract.

245. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements and omitted material facts to induce the private insurers in California, or for patients in California covered by those insurers, to approve or pay such false and fraudulent claims.

246. By virtue of the acts described above, the Defendants conspired to violate the California Insurance Fraud Prevention Act and each patient's private health insurance contract.

247. The private insurers in California, or those insurers that covered patients in California, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be presented by Defendants, paid and continue to pay the claims that are non-payable as a result of Defendants' illegal conduct.

248. Defendants knowingly submitted and/or caused to be made or used false records or false statements in order to avoid or decrease their respective obligations to return overpayments to these private insurance companies.

249. By reason of Defendants' acts, these private insurance companies have been damaged, and continue to be damaged, in a substantial amount to be determined at trial.

250. Each claim for reimbursement that was a result of the Defendants' scheme represents a false or fraudulent record or statement and a false or fraudulent claim for payment.

251. The State of California is entitled to the maximum penalty of $10,000.00 for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used, or presented by Defendants.

252.   WHEREFORE, Relators request the following relief:

253.   That this Court enter judgment against Defendants in an amount equal to three times the amount of damages that the private insurance companies have sustained because of Defendants' actions, plus a civil penalty of not less than $5,000.00 and not more than $10,000.00 for each violation of Cal. Ins. Code § 1871.7(a) and (b);

254.   At least thirty percent (30%) and up to forty percent (40%) of the proceeds of this action to the Relators if the State of California elects to intervene, and forty percent (40%) to fifty percent (50%) if it does not;

255.   Relator's'' attorneys' fees, litigation and investigation costs, and other related expenses; and

256.   Such other relief as the Court deems just and appropriate.

## COUNT XIII

**(Colorado Medicaid False Claims Act, Col. Rev. Stat. §§ 25.5-4-303.5 et seq.)**

257.   Relators re-allege and incorporate the allegations above as if fully set forth herein  and further allege as follows.

258.   Additionally, Relators state that the course of conduct described in this Complaint was a nationwide practice of Defendants.  Defendants conduct business in the State of Colorado.  Upon information and belief, Defendants' actions described herein occurred in the State of Colorado as well.

259.   This is a qui tam action brought by Relators and the State of Colorado to recover treble damages and civil penalties under the Colorado Medicaid False Claims Act, Colorado Revised Statutes § 25.5-4-303.5. et seq.

260.   Colorado Revised Statutes § 25.5-4-305 provides liability for any person

who-

261. Knowingly presents, or causes to be presented, to an officer or employee of the state a false or fraudulent claim for payment or approval;

262. Knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim;

263. Has possession, custody, or control of property or money used, or to be used, by the state in connection with the "Colorado Medical Assistance Act" and knowingly delivers, or causes to be delivered, less than all of the money or property;

264. Authorizes the making or delivery of a document certifying receipt of property used, or to be used, by the state in connection with the "Colorado Medical Assistance Act" and, intending to defraud the state, makes or delivers the receipt without completely knowing that the information on the receipt is true;

265. Knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the state in connection with the "Colorado Medical Assistance Act" who lawfully may not sell or pledge the property;

266. Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state in connection with the "Colorado Medical Assistance Act", or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state in connection with the "Colorado Medical Assistance Act;"

267. Conspires to commit a violation of paragraphs (a) to (f) of this subsection.

268. Defendants violated Colorado Revised Statutes § 25.5-4-305 from at least 2011 to the present by engaging in the fraudulent and illegal practices described

herein.

269.   Defendants furthermore violated Colorado Revised Statutes § 25.5-4-305 and knowingly caused thousands of false claims to be made, used and presented to the State of Colorado from at least 2011 to the present by its violation of federal and state laws, including the Anti-Kickback Act, and the Stark Act, as described herein.

270.   The State of Colorado, by and through the State of Colorado Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third payers in connection therewith.

271.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Colorado in connection with Defendants' fraudulent and illegal practices.

272.   Had the State of Colorado known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Defendants' fraudulent and illegal practices.

273.   As a result of Defendants' violations of Colorado Revised Statutes § 25.5-4-305 the State of Colorado has been damaged in an amount far in excess of millions of dollars exclusive of interest.

274.   Relators have direct and independent knowledge of the allegations of this Complaint, this action is brought pursuant to Colorado Revised Statutes § 25.5-4-306(2) on behalf of Relators and the State of Colorado.

275.   This Court is requested to accept supplemental jurisdiction of this related

state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Colorado in the operation of its Medicaid program.

276.   Pursuant to the Colorado Medicaid False Claims Act, the State of Colorado and Relators are entitled to the following damages as against Defendants:

277.   To the STATE OF COLORADO:

278.   Three times the amount of actual damages which the State of Colorado has sustained as a result of Defendants' fraudulent and illegal practices;

279.   A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendants caused to be presented to the State of Colorado;

280.   Prejudgment interest; and

281.   All costs incurred in bringing this action.

282.   To RELATORS:

283.   The maximum amount allowed pursuant to Colorado Revised Statutes § 25.5-4-306(4) and /or any other applicable provision of law;

284.   Reimbursement for reasonable expenses which Relators incurred in connection with this action;

285.   An award of reasonable attorneys' fees and costs; and

286.   Such further relief as this court deems equitable and just.

## COUNT XIV

**(Connecticut False Claims Act for Medical Assistance Programs, Connecticut General Statutes § 17b-301b. et seq.)**

287.   Relators re-allege and incorporate the allegations above as if fully set forth herein and further allege as follows.

288.   Additionally, Relators state that the course of conduct described in this

102

Complaint was a nationwide practice of Defendants.  Defendants conduct business in the State of Connecticut.  Upon information and belief, Defendants' actions described herein occurred in the State of Connecticut as well.

289.   This is a qui tam action brought by Relators and the State of Connecticut to recover treble damages and civil penalties under the Connecticut False Claims Act for Medical Assistance Programs, Connecticut General Statutes § 17b-301b. et seq.

290.   Connecticut General Statutes § 17b-301b. provides liability for any person who-

291.   Knowingly presents or causes to be presented to an officer or employee of the state a false or fraudulent claim for payment or approval under a medical assistance program administered by the Department of Social Services;

292.   Knowingly make, use or cause to be made or used, a false record or statement to secure the payment or approval by the state of a false or fraudulent claim under a medical assistance program administered by the Department of Social Services;

293.   Conspire to defraud the state by securing the allowance or payment of a false or fraudulent claim under a medical assistance program administered by the Department of Social Services.

294.   Defendants violated Connecticut General Statutes § 17b-301b from at least 2011 to the present by engaging in the fraudulent and illegal practices described herein.

295.   Defendants furthermore violated Connecticut General Statutes § 17b-301b and knowingly caused thousands of false claims to be made, used and presented to the State of Connecticut from at least 2011 to the present by its violation of federal and state laws, including the Anti-Kickback Act, and the Stark Act, as described

herein.

296.   The State of Connecticut, by and through the State of Connecticut Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third payers in connection therewith.

297.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Connecticut in connection with Defendants' fraudulent and illegal practices.

298.   Had the State of Connecticut known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with 'Defendants' fraudulent and illegal practices.

299.   As a result of Defendants' violations of Connecticut General Statutes § 17b-301b the State of Connecticut has been damaged in an amount far in excess of millions of dollars exclusive of interest.

300.   Relators have direct and independent knowledge of the allegations of this Complaint, this action is brought pursuant to Connecticut General Statutes § 17b-301d on behalf of Relators and the State of Connecticut.

301.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Connecticut in the operation of its Medicaid program.

302.   Pursuant to the Connecticut False Claims Act for Medical Assistance Programs, the State of Connecticut and Relator are entitled to the following

damages as against Defendants:

303.   To the STATE OF CONNECTICUT:

304.   Three times the amount of actual damages which the State of Connecticut has sustained as a result of Defendants' fraudulent and illegal practices;

305.   A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendants caused to be presented to the State of Connecticut;

306.   Prejudgment interest; and

307.   All costs incurred in bringing this action.

308.   To RELATORS:

309.   The maximum amount allowed pursuant to Connecticut General Statutes § 17b-301 and /or any other applicable provision of law;

310.   Reimbursement for reasonable expenses which Relators incurred in connection with this action;

311.   An award of reasonable attorneys' fees and costs; and

312.   Such further relief as this court deems equitable and just.

## COUNT XV

### (Delaware Medicaid False Claims Act, 6 Del. C. § 1201 et seq.)

313.   Relators re-allege and incorporate the allegations above as if fully set forth herein and further allege as follows.

314.   Additionally, Relators state that the course of conduct described in this Complaint was a nationwide practice of Defendants.  Defendants conduct business in the State of Delaware.  Upon information and belief, Defendants' actions described herein occurred in Delaware as well.

315.   This is a qui tam action brought by Relators and the State of Delaware to

105

recover treble damages and civil penalties under the Delaware Medicaid False Claims Act, 6 Del. C. § 1201 et seq.

316.   6 Del. C. § 1201 et seq. provides liability for any person who—

317.   Knowingly presents, or causes to be presented, directly or indirectly, to an officer or employee of the Government a false or fraudulent claim for payment or approval;

318.   Knowingly makes, uses or causes to be made or used, directly or indirectly, a false record or statement to get a false or fraudulent claim paid or approved;

319.   Conspires to defraud the Government by getting a false or fraudulent claim allowed or paid;

320.   Knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, increase or decrease an obligation to pay or transmit money or property to or from the Government.

321.   Further, 31 Del. C. § 1005 provides that— It shall be unlawful for any person to offer or pay any remuneration (including any kickback, bribe or rebate) directly or indirectly, in cash or in kind to induce any other person . . . [t]o purchase, lease, order or arrange for or recommend purchasing, leasing or ordering any property, facility, service, or item of medical care or medical assistance for which payment may be made in whole or in part under any public assistance program.

322.   Defendants violated 6 Del. C. § 1201 and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Delaware from 2011 to the present by its violation of federal and state laws, including 31 Del. C. §1005, and Anti-Kickback Act and the Stark Act Requirements, as described herein.

323.   The State of Delaware, by and through the Delaware Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

324.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Delaware in connection with Defendants' fraudulent and illegal practices.

325.   Had the State of Delaware known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Defendants' fraudulent and illegal practices.

326.   As a result of Defendants' violations of 6 Del C. § 1201(a), the State of Delaware has been damage in an amount far in excess of millions of dollars exclusive of interest.

327.   Defendants did not, within 30 days after it first obtained information as to such violations, furnish such information to officials of the State responsible for investigating false claims violations, did not otherwise fully cooperate with any investigation of the violations, and have not otherwise furnished information to the State regarding the claims for reimbursement at issue.

328.   Relators are private persons with direct and independent knowledge of the allegations of this Complaint, this action is brought pursuant to 6 Del. C. § 1203(b) on behalf of Relators and the State of Delaware.

329.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and

107

merely asserts separate damage to the State of Delaware in the operation of its Medicaid program.

330.   Pursuant to the Delaware Medicaid False Claims Act, the State of Delaware and Relators are entitled to the following damages as against Defendants:

331.   To the STATE OF DELAWARE:

332.   Three times the amount of actual damages which the State of Delaware has sustained as a result of Defendants' fraudulent and illegal practices;

333.   A civil penalty on not less than $5,500 and not more than $ 11,000 for each false claim which Defendants caused to be presented to the State of Delaware;

334.   Prejudgment interest; and

335.   All costs incurred in bringing this action.

336.   To RELATORS:

337.   The maximum amount allowed pursuant to 6 Del C. § 1205,and /or any other applicable provision of law;

338.   Reimbursement for reasonable expenses which Relators incurred in connection with this action; and

339.   An award of reasonable attorneys' fees and costs; and

340.   Such further relief as this court deems equitable and just.

## COUNT XVI

**(District of Columbia Procurement Reform Amendment Act, D.C. § 2-308.13 et seq.)**

341.   Relators re-allege and incorporate the allegations above as if fully set forth herein  and further allege as follows.

342.   Additionally, Relators state that the course of conduct described in this Complaint was a nationwide practice of Defendants.  Defendants conduct business

in the District of Columbia. Upon information and belief, Defendants' actions described herein occurred in the District of Columbia as well.

343. This is a qui tam action brought by Relators and the District of Columbia to recover treble damages and civil penalties under the District of Columbia Procurement Reform Amendment Act, D.C. § 2-308.13 et seq.

344. D.C. Code § 2-30814(a) provides liability for any person who-

345. Knowingly presents, or causes to be presented, to an officer or employee of the District a false claim for payment or approval;

346. Knowingly makes, uses or causes to be made or used, a false record or statement to get a false claim paid or approved by the District;

347. Conspires to defraud the District by getting a false claim allowed or paid by the District;

348. Is the beneficiary of an inadvertent submission of a false claim to the District, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the District.

349. In addition, D.C. Code § 4-802(c) prohibits soliciting, accepting, or agreeing to accept any type of remuneration for the following:

350. Referring a recipient to a particular provider of any item or service or for which payment may be made under the District of Columbia Medicaid program; or

351. Recommending the purchase, lease, or order of any good, facility, service, or item for which payment may be made under the District of Columbia Medicaid Program.

352. Defendants violated D. C. Code § 4-802(c) from at least 2011 to the present by engaging in the fraudulent and illegal practices described herein.

353. Defendants furthermore violated D. C. Code § 2-308.14(a) and knowingly

caused thousands of false claims to be made, used and presented to the District of Columbia from at least 2011 to the present by its violation of federal and state laws, including D. C. Code § 4-802(c), the Anti-Kickback Act and the Stark Act, as described herein.

354.   The District of Columbia, by and through the District of Columbia Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

355.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the District of Columbia in connection with Defendants' fraudulent and illegal practices.

356.   Had the District of Columbia known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Defendants' fraudulent and illegal practices.

357.   As a result of Defendants' violations of D.C. Code § 2-308.14(a) the District of Columbia has been damaged in an amount far in excess of millions of dollars exclusive of interest.

358.   Relators are private persons with direct and independent knowledge of the allegations of this Complaint, and this action is brought pursuant to D.C. Code § 2-308.15(b) on behalf of Relators and the District of Columbia.

359.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the District of Columbia in the operation of its

Medicaid program.

360.   Pursuant to the District of Columbia Procurement Reform Amendment Act, the District of Columbia and Relators are entitled to the following damages as against Defendants:

361.   To the DISTRICT OF COLUMBIA:

362.   Three times the amount of actual damages which the District of Columbia has sustained as a result of Defendants' fraudulent and illegal practices;

363.   A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendants caused to be presented to the District of Columbia;

364.   Prejudgment interest; and

365.   All costs incurred in bringing this action.

366.   To RELATORS:

367.   The maximum amount allowed pursuant to D. C. Code § 2-308.15(f) and /or any other applicable provision of law;

368.   Reimbursement for reasonable expenses which Relators incurred in connection with this action;

369.   An award of reasonable attorneys' fees and costs; and

370.   Such further relief as this court deems equitable and just.

## COUNT XVII

### (Florida False Claims Act, Fla. Stat. §§ 68.081 et seq.)

371.   Relators re-allege and incorporate the allegations above as if fully set forth herein  and further allege as follows.

372.   Additionally, Relators state that the course of conduct described in this Complaint was a nationwide practice of Defendants.  Defendants conduct business

111

in the State of Florida.  Upon information and belief, Defendants' actions described herein occurred in the State of Florida as well.

373.   This is a qui tam action brought by Relators and the State of Florida to recover treble damages and civil penalties under the Florida False Claims Act, West's F.S.A. § 68.081 et seq.

374.   West's F.S.A. § 68.082 provides liability for any person who-

375.   Knowingly presents or causes to be presented to an officer or employee of an agency a false claim for payment or approval

376.   Knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by an agency

377.   Conspires to submit a false claim to an agency or to deceive an agency for the purpose of getting a false or fraudulent claim allowed or paid

378.   Defendants violated West's F.S.A. § 68.082 from at least 2011 to the present by engaging in the fraudulent and illegal practices described herein.

379.   Defendants furthermore violated West's F.S.A. § 68.082 and knowingly caused thousands of false claims to be made, used and presented to the State of Florida from at least 2011 to the present by its violation of federal and state laws, including the Anti-Kickback Act, and the Stark Act, as described herein.

380.   The State of Florida, by and through the State of Florida Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third payers in connection therewith.

381.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of

112

Florida in connection with Defendants' fraudulent and illegal practices.

382.   Had the State of Florida known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Defendants' fraudulent and illegal practices.

383.   As a result of Defendants' violations of West's F.S.A. § 68.082 the State of Florida has been damaged in an amount far in excess of millions of dollars exclusive of interest.

384.   Relators are private persons with direct and independent knowledge of the allegations of this Complaint, and this action is brought pursuant to West's F.S.A. § 68.083(2) on behalf of Relators and the State of Florida.

385.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Florida in the operation of its Medicaid program.

386.   Pursuant to the Florida False Claims Act, the State of Florida and Relator are entitled to the following damages as against Defendants:

387.   To the STATE OF FLORIDA:

388.   Three times the amount of actual damages which the State of Florida has sustained as a result of Defendants' fraudulent and illegal practices;

389.   A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendants caused to be presented to the State of Florida;

390.   Prejudgment interest; and

391.   All costs incurred in bringing this action.

392.   To RELATORS:

393.   The maximum amount allowed pursuant to West's F.S.A. § 68.085 and /or any other applicable provision of law;

394.   Reimbursement for reasonable expenses which Relators incurred in connection with this action;

395.   An award of reasonable attorneys' fees and costs; and

396.   Such further relief as this court deems equitable and just.

## COUNT XVIII

**(Georgia State False Medicaid Claims Act, Ga. Code Ann. § 49-4-168 et seq.)**

397.   Relators re-allege and incorporate the allegations above as if fully set forth herein  and further allege as follows.

398.   Additionally, Relators state that the course of conduct described in this Complaint was a nationwide practice of Defendants.  Defendants conduct business in the State of Georgia.  Upon information and belief, Defendants' actions described herein occurred in Georgia as well.

399.   This is a qui tam action brought by Relators and the State of Georgia to recover treble damages and civil penalties under the Georgia State False Medicaid Claims Act, Ga. Code Ann. § 49-4-168  et seq.

400.   Ga. Code Ann. § 49-4-168.1 et seq. provides liability for any person who—

401.   Knowingly presents or causes to be presented to the Georgia Medicaid program a false or fraudulent claim for payment or approval;

402.   Knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Georgia Medicaid program;

403.   Conspires to defraud the Georgia Medicaid program by getting a false or

114

fraudulent claim allowed or paid;

404.   Knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay, repay or transmit money or property to the State of Georgia.

405.   Defendants violated Ga. Code Ann. § 49-4-168.1 and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Georgia from 2011 to the present by its violation of federal and state laws, including the Anti-Kickback Act and the Stark Act, as described herein.

406.   The State of Georgia, by and through the Georgia Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

407.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Georgia in connection with Defendants' fraudulent and illegal practices.

408.   Had the State of Georgia known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Defendants' fraudulent and illegal practices.

409.   As a result of Defendants' violations of Ga. Code Ann. § 49-4-168.1, the State of Georgia has been damaged in an amount far in excess of millions of dollars exclusive of interest.

410.   Defendants did not, within 30 days after it first obtained information as to such violations, furnish such information to officials of the State responsible for

115

investigating false claims violations, did not otherwise fully cooperate with any investigation of the violations, and have not otherwise furnished information to the State regarding the claims for reimbursement at issue.

411.   Relators are private persons with direct and independent knowledge of the allegations of this Complaint, and this action is brought pursuant to Ga. Code Ann., § 49-4-168.2(b) on behalf of Relators and the State of Georgia.

412.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Georgia in the operation of its Medicaid program.

413.   Pursuant to the Georgia State False Medicaid Claims Act, the State of Georgia and Relator are entitled to the following damages as against Defendants:

414.   To the STATE OF GEORGIA:

415.   Three times the amount of actual damages which the State of Georgia has sustained as a result of Defendants' fraudulent and illegal practices;

416.   A civil penalty on not less than $5,500 and not more than $ 11,000 for each false claim which Defendants caused to be presented to the State of Georgia;

417.   Prejudgment interest; and

418.   All costs incurred in bringing this action.

419.   To RELATORS:

420.   The maximum amount allowed pursuant to Ga. Code Ann., § 49-4-168.2(i), and/ or any other applicable provision of law;

421.   Reimbursement for reasonable expenses which Relators incurred in connection with this action;

422.   An award of reasonable attorneys' fees and costs; and

116

423.   Such further relief as this Court deems equitable and just.

## COUNT XIX

### (Hawaii False Claims Act, Haw. Rev. Stat. § 661.21 et seq.)

424.   Relators re-allege and incorporate the allegations above as if fully set forth herein  and further allege as follows.

425.   Additionally, Relators state that the course of conduct described in this Complaint was a nationwide practice of Defendants.  Defendants conduct business in the State of Hawaii.  Upon information and belief, Defendants' actions described herein occurred in Hawaii as well.

426.   This is a qui tam action brought by Relators and the State of Hawaii to recover treble damages and civil penalties under the Hawaii False Claims Act, Haw. Rev. Stat. § 661.21 et seq.

427.   Haw. Rev. Stat. § 661-21(a) provides liability for any person who—

428.   Knowingly presents, or causes to be presented, to an officer or employee of the state a false or fraudulent claim for payment or approval;

429.   Knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the state;

430.   Conspires to defraud the state by getting a false or fraudulent claim allowed or paid; or

431.   Is a beneficiary of an inadvertent submission of a false claim to the State, who subsequently discovers the falsity of the claim, and fails to disclose the false claim to the State within a reasonable time after discovery of the false claim.

432.   Defendants violated Haw. Rev. Stat. § 661.21(a) and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State

117

of Hawaii from at least 2011 to the present by its violation of federal and state laws, including the Anti-Kickback Act, and Stark Act, as described herein.

433.   The State of Hawaii, by and through the Hawaii Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

434.   Compliance with applicable Medicare, Medicaid and the various other federal state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Hawaii in connection with Defendants' fraudulent and illegal practices.

435.   Had the State of Hawaii known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Defendants' fraudulent and illegal practices.

436.   As a result of Defendants' violations of Haw. Rev. Stat. § 661-21(a) the State of Hawaii has been damaged in an amount far in excess of millions of dollars exclusive of interest.

437.   Relators are private persons with direct and independent knowledge of the allegations of this Complaint, and this action is brought pursuant to Haw. Rev. Stat. § 661-25(a) on behalf of Relators and the State of Hawaii.

438.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Hawaii in the operation of its Medicaid program.

439.   Pursuant to the Hawaii False Claims Act, the State of Hawaii and Relator are

118

entitled to the following damages as against Defendants:

440.   To the STATE OF HAWAII:

441.   Three times the amount of actual damages which the State of Hawaii has sustained as a result of Defendants' fraudulent and illegal practices;

442.   A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendants caused to be presented to the State of Hawaii;

443.   Prejudgment interest; and

444.   All costs incurred in bringing this action.

445.   To RELATORS:

446.   The maximum amount allowed pursuant to Haw. Rev. Stat. § 661-27 and /or any other applicable provision of law;

447.   Reimbursement for reasonable expenses which Relators incurred in connection with this action; and

448.   Such further relief as this Court deems equitable and just.

## COUNT XX

**(Illinois Whistleblower Reward and Protection Act, 740 ILCS 175 et seq.)**

449.   Relators re-allege and incorporate the allegations above as if fully set forth herein and further allege as follows.

450.   Additionally, Relators state that the course of conduct described in this Complaint was a nationwide practice of Defendants.  Defendants conduct business in the State of Illinois.  Upon information and belief, Defendants' actions described herein occurred in Illinois as well.

451.   This is a qui tam action brought by Relators and the State of Illinois to recover treble damages and civil penalties under the Illinois Whistleblower Reward

and Protection Act, 740 ILCS 175 et seq.

452.   740 ILCS 175/3(a) provides liability for any person who—

453.   knowingly presents, or causes to be presented, to an officer or employee of the State of a member of the Guard a false or fraudulent claim for payment or approval;

454.   knowingly makes, uses, of causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State;

455.   Conspires to defraud the State by getting a false or fraudulent claim allowed or paid.

456.   In addition, 305 ILCS 5/8A-3(b) of the Illinois Public Aid Code (Vendor Fraud and Kickbacks) prohibits the solicitation or receipt of any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing any item of service for which payment may be made in whole or in part under the Illinois Medicaid program.

457.   Defendants violated 305 ILCS 5/8A-3(b) from at least 2011 to the present by engaging in the fraudulent and illegal practices described herein.

458.   Defendants furthermore violated 740 ILCS 175/3(a) and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Illinois from at least 2011 to the present by its violation of federal and state laws, including 305 ILCS 5/8A-3(b), the Anti-Kickback Act and the Stark Act, as described herein.

459.   The State of Illinois, by and through the Illinois Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

460.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein with an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Illinois in connection with Defendants' fraudulent and illegal practices.

461.    Had the State of Illinois known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Defendants' fraudulent and illegal practices.

462.    As a result of Defendants' violations of 740 ILCS 175/3(a), the State of Illinois has been damaged in an amount far in excess of millions of dollars exclusive of interest.

463.    Relators are private persons with direct and independent knowledge of the allegation of this Complaint, and this action is brought pursuant to 740 ILCS 175/3(b) on behalf of Relators and the State of Illinois.

464.    This court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Illinois in the operation of its Medicaid program.

465.    Pursuant to the Illinois Whistleblower Reward and Protection Act, the State of Illinois and Relator are entitled to the following damages as against Defendants:

466.    To the STATE OF ILLINOIS:

467.    Three times the amount of actual damages which the State of Illinois has sustained as a result of Defendants' fraudulent and illegal practices;

468.    A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendants caused to be presented to the State of Illinois;

469. Prejudgment interest; and

470. All costs incurred in bringing this action.

471. To RELATORS:

472. The maximum amount allowed pursuant to 740 ILCS/4(d) and/or any other applicable provision of law;

473. Reimbursement for reasonable expenses which Relators incurred in connection with this action;

474. An award of reasonable attorneys' fees and costs; and

475. Such further relief as this Court deems equitable and just.

## COUNT XXI

**(Illinois Insurance Claims Fraud Prevention Act, 740 ILCS 92/1 et seq.)**

476. Relators re-allege and incorporate the allegations above as if fully set forth herein and further allege as follows.

477. This is a claim for treble damages and penalties under the Illinois Insurance Claims Fraud Prevention Act.

478. By virtue of the acts described above, Defendants knowingly offered and/or paid remuneration to physicians to induce the procurement of patients for Defendants' drugs for which Defendant could cause the filing of claims for payment from the patients' insurers. *See* 740 Ill. Comp. Stat. § 92/5(a).

479. Defendants knowingly presented or caused to be presented false or fraudulent claims to the private insurers in Illinois, or for patients in Illinois those insurers covered, for payment or approval in violation of each patient's private health insurance contract.

480. By virtue of the acts described above, Defendants knowingly made, used, or

caused to be made or used false records and statements and omitted material facts to induce the private insurers in Illinois, or for patients in Illinois covered by those insurers, to approve or pay such false and fraudulent claims.

481.   By virtue of the acts described above, the Defendants conspired to violate the Illinois Insurance Claims Fraud Prevention Act and each patient's private health insurance contract.

482.   The private insurers in Illinois, or those insurers that covered patients in Illinois, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be presented by Defendants, paid and continue to pay the claims that are non-payable as a result of Defendants' illegal conduct.

483.   Defendants knowingly submitted and/or caused to be made or used false records or false statements in order to avoid or decrease their respective obligations to return overpayments to these private insurance companies.

484.   By reason of Defendants' acts, these private insurance companies have been damaged, and continue to be damaged, in a substantial amount to be determined at trial.

485.   Each claim for reimbursement that was a result of the Defendants' scheme represents a false or fraudulent record or statement and a false or fraudulent claim for payment.

486.   The State of Illinois is entitled to the maximum penalty of $10,000.00 for each and every false or fraudulent claim, record, or statement made, 'used, presented, or caused to be made, used, or presented by Defendants.

487.   WHEREFORE, Relator requests the following relief:

488.   That this Court enter judgment against Defendants in an amount equal to three times the amount of damages that the private insurance companies have

sustained because of Defendants' actions, plus a civil penalty of not less tl1an $5,000,00 and not more than $10,000.00 for each violation of 740 Ill. Comp. Stat. §§ 92/5(a) and (b);

489.   No less than thirty percent (30%) of the proceeds of this action to the Relator if the State of Illinois elects to intervene, and no less than forty percent (40%) if it does not;

490.   Relators' attorneys' fees, litigation and investigation costs, and other related expenses; and

491.   Such other relief as the Court deems just and appropriate.

## COUNT XXII

**(Indiana False Claims and Whistleblower Protection Act, IC 5-11-5.5 et seq.)**

492.    Relators re-allege and incorporate the allegations above as if fully set forth herein  and further allege as follows.

493.   Additionally, Relators state that the course of conduct described in this Complaint was a nationwide practice of Defendants.  Defendants conduct business in the State of Indiana.  Upon information and belief, Defendants' actions described herein occurred in Indiana as well.

494.   This is a qui tam action brought by Relators and the State of Indiana to recover treble damages and civil penalties under the Indiana False Claims and Whistleblower Protection Act, IC 5-11-5.5 et seq.

495.   IC 5-11-5.5-2 provides liability for any person who—

496.   presents a false claim to the state for payment or approval;

497.   makes or uses a false record or statement to obtain payment or approval of a false claim from the state;

124

498. with intent to defraud the state, delivers less money or property to the state than the amount recorded on the certificate or receipt the person receives from the state;

499. with intent to defraud the state, authorizes issuance of a receipt without knowing that the information on the receipt is true;

500. receives public property as a pledge of an obligation on a debt from an employee who is not lawfully authorized to sell or pledge the property;

501. makes or uses a false record or statement to avoid an obligation to pay or transmit property to the state;

502. conspires with another person to perform an act described in subdivisions (a) through (f); or

503. causes or induces another person to perform an act described in subdivisions (a) through (f).

504. In addition, IC 12-15-24-1 & IC 12-15-24-2 prohibits the provision of a kickback or bribe in connection with the furnishing of items or services or the making or receipt of the payment under the Indiana Medicaid program.

505. Defendants violated IC 12-15-24-1 & IC 12-15-24-2 from at least 2011 to the present by engaging in the fraudulent and illegal practices described herein.

506. Defendants furthermore violated IC 5-11-5.5-2 and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Indiana from at least 2011 to the present by its violation of federal and state laws, including IC 12-15-24-1 & IC 12-15-24-2, the Anti-Kickback Act and the Stark Act, as described herein.

507. The State of Indiana, by and through the Indiana Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal

practices, paid the claims submitted by health care providers and third party payers in connection therewith.

508.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein with an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Indiana in connection with Defendants' fraudulent and illegal practices.

509.   Had the State of Indiana known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Defendants' fraudulent and illegal practices.

510.   As a result of Defendants' violations of IC 5-11-5.5-2, the State of Indiana has been damaged in an amount far in excess of millions of dollars exclusive of interest.

511.   Relators are private persons with direct and independent knowledge of the allegation of this Complaint, and this action is brought pursuant to IC 5-11-5.5-4 on behalf of Relators and the State of Indiana.

512.   This court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Indiana in the operation of its Medicaid program.

513.   Pursuant to the Indiana False Claims and Whistleblower Protection Act, the State of Indiana and Relators are entitled to the following damages as against Defendants:

514.   To the STATE OF INDIANA:

515.   Three times the amount of actual damages which the State of Indiana has

sustained as a result of Defendants' fraudulent and illegal practices;

516.   A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of Indiana;

517.   Prejudgment interest; and

518.   All costs incurred in bringing this action.

519.   To RELATORS:

520.   The maximum amount allowed pursuant to IC 5-11-5.5-6 and/or any other applicable provision of law;

521.   Reimbursement for reasonable expenses which Relators incurred in connection with this action;

522.   An award of reasonable attorneys' fees and costs; and

523.   Such further relief as this Court deems equitable and just.

## COUNT XXIII

### (Iowa False Claims Act, Iowa Code § 685.1 et seq.)

524.    Relators re-allege and incorporate the allegations above as if fully set forth herein  and further allege as follows.

525.   Additionally, Relators state that the course of conduct described in this Complaint was a nationwide practice of Defendants.   Defendants conduct business in the State of Iowa.  Upon information and belief, Defendants' actions described herein occurred in Iowa as well.

526.   This is a qui tam action brought by Relators and the State of Iowa to recover treble damages and civil penalties under the Iowa False Claims Act, Iowa Code § 685.1 et seq.

527.   Iowa Code § 685.2 provides liability for any person who—

528.   Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

529.   Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

530.   Conspires to commit a violation of paragraphs (a), (b), (d)-(g);

531.   Has possession, custody, or control of property or money used, or to be used, by the state and knowingly delivers, or causes to be delivered, less than all of that money or property;

532.   Is authorized to make or deliver a document certifying receipt of property used, or to be used, by the state and, intending to defraud the state, makes or delivers the receipt without completely knowing that the information on the receipt is true;

533.   Knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the state, or a member of the Iowa national guard, who lawfully may not sell or pledge property;

534.   Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state.

535.   Defendants violated Iowa Code § 685.2 from at least 2011 to the present by engaging in the fraudulent and illegal practices described herein.

536.   Defendants furthermore violated Iowa Code § 685.2 and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Iowa from at least 2011 to the present by its violation of federal and state laws, including the Anti-Kickback Act and the Stark Act, as described herein.

537.   The State of Iowa, by and through the Iowa Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

538.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein with an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Iowa in connection with Defendants' fraudulent and illegal practices.

539.   Had the State of Iowa known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Defendants' fraudulent and illegal practices.

540.   As a result of Defendants' violations of Iowa Code § 685.2, the State of Iowa has been damaged in an amount far in excess of millions of dollars exclusive of interest.

541.   Relators are private persons with direct and independent knowledge of the allegations of this Complaint, and this action is brought pursuant to Iowa Code § 685.3(2)(a) on behalf of themselves and the State of Iowa.

542.   This court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Iowa in the operation of its Medicaid program.

543.   Pursuant to the Iowa False Claims Act, the State of Iowa and Relator are entitled to the following damages as against Defendants:

544.   To the STATE OF IOWA:

545.   Three times the amount of actual damages which the State of Iowa has sustained as a result of Defendants' fraudulent and illegal practices;

546.   A civil penalty for each false claim which Defendants caused to be presented to the State of Iowa;

547.   Prejudgment interest; and

548.   All costs incurred in bringing this action.

549.   To RELATORS:

550.   The maximum amount allowed pursuant to Iowa Code § 685.3(4)(a)(1) and/or any other applicable provision of law;

551.   Reimbursement for reasonable expenses which Relators incurred in connection with this action;

552.   An award of reasonable attorneys' fees and costs; and

553.   Such further relief as this Court deems equitable and just.

## COUNT XXIV

### (Louisiana Medical Assistance Programs Integrity Law, La Rev. Stat. Ann § 437.1 et seq.)

554.    Relators re-allege and incorporate the allegations above as if fully set forth herein  and further allege as follows.

555.   Additionally Relators state that the course of conduct described in this Complaint was a nationwide practice of Defendants.  Defendants conduct business in the State of Louisiana.  Upon information and belief, Defendants' actions described herein occurred in Louisiana as well.

556.   This is a qui tam action brought by Relators and the State of Louisiana to recover treble damages and civil penalties under the Louisiana Medical Assistance Programs Integrity Law, La Rev. Stat. Ann § 437.1 et seq.

130

557.   La. Rev. Stat. Ann. § 438.3 provides –

558.   No person shall knowingly present or cause to be presented a false or fraudulent claim;

559.   No person shall knowingly engage in misrepresentation to obtain, or attempt to obtain, payment from medical assistance programs funds;

560.   No person shall conspire to defraud, or attempt to defraud, the medical assistance programs through misrepresentation or by obtaining, or attempting to obtain, payment for a false or fraudulent claim.

561.   In addition, La. Rev. Stat. Ann.§ 438.2(A) prohibits the solicitation, receipt, offering or payment of any financial inducements, including kickbacks, bribes, rebated, etc., directly or indirectly, overtly or covertly, in cash or in kind, for furnishing health care goods or services paid for in whole or in part by the Louisiana medical assistance programs.

562.   Defendants violated La. Rev. Stat. Ann § 438.2(A) from at least 2011 to the present by engaging in the fraudulent and illegal practices described herein.

563.   Defendants furthermore violated La. Rev. Stat. Ann. § 438.3 and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Louisiana from at least 2011 to the present by its violation of federal and state laws, including La. Rev. Stat. Ann. § 438.2(A), the Anti-Kickback Act and Stark Act, as described herein.

564.   The State of Louisiana, by and through the Louisiana Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

565.   Compliance with applicable Medicare, Medicaid and the various other

federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Louisiana in connection with Defendants' fraudulent and illegal practices.

566.   Had the State of Louisiana known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Defendants' fraudulent and illegal practices.

567.   As a result of Defendants' violations of La. Rev. Stat. Ann. § 438.3 the State of Louisiana has been damaged in an amount far in excess of millions of dollars exclusive of interest.

568.   Relators are private persons with direct and independent knowledge of the allegations of this Complaint, and this action is brought pursuant to La. Rev. Stat. Ann. § 439.1(A) on behalf of Relators and the State of Louisiana.

569.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Louisiana in the operation of its Medicaid program.

570.   Pursuant to the Louisiana Medical Assistance Programs Integrity Law, the State of Louisiana and Relator are entitled to the following damages as against Defendants:

571.   To the STATE OF LOUISIANA:

572.   Three times the amount of actual damages which the State of Louisiana has sustained as a result of Defendants' fraudulent and illegal practices;

573.   A civil penalty of not more than $10,000 for each false claim which Defendants caused to be presented to the State of Louisiana;

574.   Prejudgment interest; and

575.   All costs incurred in bringing this action.

576.   To RELATORS:

577.   The maximum amount allowed pursuant to La. Rev. Stat. § 439.4(A) and/or any other applicable provision of law;

578.   Reimbursement for reasonable expenses which Relators incurred in connection with this action;

579.   An award or reasonable attorneys' fees and costs; and

580.   Such further relief as this Court deems equitable and just.

## COUNT XXV

### (Maryland Medicaid False Claims Against State Health Plans and State Health Programs Act, Annotated Code of Maryland § 2-601 et seq.)

581.   Relators re-allege and incorporate the allegations above as if fully set forth herein and further allege as follows.

582.   Additionally, Relators state that the course of conduct described in this Complaint was a nationwide practice of Defendants.  Defendants conduct business in the Commonwealth of Maryland.  Upon information and belief, Defendants' actions described herein occurred in Maryland as well.

583.   This is a qui tam action brought by Relators and the State of Maryland to recover treble damages and civil penalties under the Maryland Medicaid False Claims Against State Health Plans and State Health Programs Act, Annotated Code of Maryland § 2-601 et seq.

584.   Annotated Code of Maryland § 2-602 provides liability for any person who-

585.   Knowingly presents or causes to be presented a false or fraudulent claim for payment or approval;

133

586.   Knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim;

587.   Conspires to commit a violation under this subtitle;

588.   Has possession, custody, or control of money or other property used by or on behalf of the State under a State health plan or a State health program and knowingly delivers or causes to be delivered to the State less than all of that money or other property;

589.   Knowingly makes any other false or fraudulent claim against a State health plan or a State health program.

590.   Defendants violated the Annotated Code of Maryland § 2-602 from at least 2011 to the present by engaging in the fraudulent and illegal practices described herein.

591.   Defendants furthermore violated the Annotated Code of Maryland § 2-602 and knowingly caused thousands of false claims to be made, used and presented to the State of Maryland from at least 2011 to the present by its violation of federal and state laws, including the Anti-Kickback Act, and the Stark Act, as described herein.

592.   The State of Maryland, by and through the State of Maryland Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third payers in connection therewith.

593.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Maryland in connection with Defendants' fraudulent and illegal practices.

594.   Had the State of Maryland known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Defendants' fraudulent and illegal practices.

595.   As a result of Defendants' violations of the Annotated Code of Maryland § 2-602 the State of Maryland has been damaged in an amount far in excess of millions of dollars exclusive of interest.

596.   Relators have direct and independent knowledge of the allegations of this Complaint, and this action is brought pursuant to the Annotated Code of Maryland § 2-604 on behalf of Relators and the State of Maryland.

597.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Maryland in the operation of its Medicaid program.

598.   Pursuant to the Maryland Medicaid False Claims Against State Health Plans and State Health Programs Act, the State of Maryland and Relator are entitled to the following damages as against Defendants:

599.   To the STATE OF MARYLAND:

600.   Three times the amount of actual damages which the State of Maryland has sustained as a result of Defendants' fraudulent and illegal practices;

601.   A civil penalty of not less than the amount of the actual damages the State health plan or State health program incurs as a result of the violation, and not more than $10,000 for each false claim which Defendants caused to be presented to the State of Maryland;

602.   Prejudgment interest; and

135

603.   All costs incurred in bringing this action.

604.   To RELATORS:

605.   The maximum amount allowed pursuant to the Annotated Code of Maryland § 2-605 and /or any other applicable provision of law;

606.   Reimbursement for reasonable expenses which Relators incurred in connection with this action;

607.   An award of reasonable attorneys' fees and costs; and

608.   Such further relief as this court deems equitable and just.

## COUNT XXVI

**(Massachusetts False Claims Act, Mass. Gen. Laws Ann. Chap 12 § 5(A) et seq.)**

609.    Relators re-allege and incorporate the allegations above as if fully set forth herein and further allege as follows.

610.   Additionally, Relators state that the course of conduct described in this Complaint was a nationwide practice of Defendants.  Defendants conduct business in the Commonwealth of Massachusetts.  Upon information and belief, Defendants' actions described herein occurred in Massachusetts as well.

611.   This is a qui tam action brought by Relators and the State of Massachusetts for treble damages and penalties under Massachusetts False Claims Act, Mass. Gen. Laws Ann. Chap 12 § 5(A) et seq.

612.   Mass. Gen. Laws Ann. Chap 12 § 5B provides liability for any person who—

613.   Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

614.   Knowingly makes, uses, or causes to be made or used, a false record or

136

statement to obtain payment or approval of a claim by the commonwealth or any political subdivision thereof;

615.    Conspires to defraud the commonwealth or any political subdivision thereof through the allowance or payment of a fraudulent claim;

616.    Is a beneficiary of an inadvertent submission of a false claim to the common wealth or political subdivision thereof, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the commonwealth or political subdivision within a reason able time after discovery of the false claim.

617.    In addition, Mass. Gen. Laws Ann. Chap. 118E § 41 prohibits the solicitation, receipt or offering of any remuneration, including any bribe ore rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing any good, service or item for which payment may be made in whole or in part under the Massachusetts Medicaid program.

618.    Defendants violated Mass. Gen. Laws Ann. Chap. 118E § 41 from at least 2011 to the present by engaging in the fraudulent and illegal practices described herein.

619.    Defendants furthermore violated Mass. Gen. Laws Ann. Chap 12 § 5B and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Massachusetts from at least 2011 to the present by its violation of federal and state laws, including Mass. Gen. Laws Ann. Chap. 118E § 41, the Anti-Kickback Act and the Stark Act, as described herein.

620.    The State of Massachusetts, by and through the Massachusetts Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

137

621.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Massachusetts in connection with Defendants' fraudulent and illegal practices.

622.   Had the State of Massachusetts known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Defendants' fraudulent and illegal practices.

623.   As a result of Defendants' violations of Mass. Gen. Laws Ann. Chap. 12 § 5B the State of Massachusetts has been damaged in an amount far in excess of millions of dollars exclusive of interest.

624.   Relators are private persons with direct and independent knowledge of the allegations of the Complaint, this action is brought pursuant to Mass. Gen. Laws Ann Chap. 12 § 5(c)(2) on behalf of themselves and the State of Massachusetts.

625.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon that exact same facts as the federal claim, and merely asserts separate damage to the State of Massachusetts in the operation of its Medicaid program.

626.   Pursuant to the Massachusetts False Claims Act, the State of Massachusetts and Relator are entitled to the following damages as against Defendants:

627.   To the STATE OF MASSACHUSETTS:

628.   Three times the amount of actual damages which that State of Massachusetts has sustained as a result of Defendants' fraudulent and illegal practices;

629.   A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendants caused to be presented to the State of Massachusetts;

630. Prejudgment interest; and

631. All costs incurred in bringing this action.

632. To RELATORS:

633. The maximum amount allowed pursuant to Mass. Gen. Laws Ann. Chap. 12 § 5F and/or any other applicable provision of law;

634. Reimbursement for reasonable expenses which Relators incurred in connection with this action;

635. An award of reasonable attorneys' fees and costs; and

636. Such further relief as this court deems equitable and just.

## COUNT XXVII

### (Michigan Medicaid False Claim Act, M.C.L.A. 400.601 et seq.)

637. Relators re-allege and incorporate the allegations above as if fully set forth herein and further allege as follows.

638. Additionally, Relators state that the course of conduct described in this Complaint was a nationwide practice of Defendants. Defendants conduct business in Michigan. Upon information and belief, Defendants' actions described herein occurred in Michigan as well.

639. This is a qui tam action brought by Relators and the State of Michigan for treble damages and penalties under Michigan Medicaid False Claim Act, M.C.L.A. 400.601 et seq.

640. M.C.L.A. 400.607 provides liability for any person who, among other things—

641. Causes to be made or presented to an employee or officer of this state a claim under the social welfare act, Act No. 280 of the Public Acts of 1939, as

139

amended, being sections 400.1 to 400.121 of the Michigan Compiled Laws, upon or against the state, knowing the claim to be false.

642. Presents or causes to be made or presented a claim under the social welfare act, Act No. 280 of the Public Acts of 1939, which he or she knows falsely represents that the goods or services for which the claim is made were medically necessary in accordance with professionally accepted standards.

643. In addition, M.C.L.A. 400.604 prohibits the solicitation, receipt or offering of a kickback or bribe in connection with the furnishing of goods or services for which payment is or may be made in whole or in part pursuant to the Michigan Medicaid program.

644. Defendants violated M.C.L.A. 400.604 from at least 2011 to the present by engaging in the fraudulent and illegal practices described herein.

645. Defendants furthermore violated M.C.L.A. 400.607 and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Michigan from at least 2011 to the present by its violation of federal and state laws, including M.C.L.A. 400.604, the Anti-Kickback Act and the Stark Act, as described herein.

646. The State of Michigan, by and through the Michigan Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

647. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Michigan in connection with Defendants' fraudulent and illegal practices.

140

648.   Had the State of Michigan known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Defendants' fraudulent and illegal practices.

649.   As a result of Defendants' violations of M.C.L.A. 400.607 the State of Michigan has been damaged in an amount far in excess of millions of dollars exclusive of interest.

650.   Relators are private persons with direct and independent knowledge of the allegations of the Complaint, and this action is brought pursuant to M.C.L.A. 400.610a on behalf of themselves and the State of Michigan.

651.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon that exact same facts as the federal claim, and merely asserts separate damage to the State of Michigan in the operation of its Medicaid program.

652.   Pursuant to the Michigan Medicaid False Claim Act, the State of Michigan and Relator are entitled to the following damages as against Defendants:

653.   To the STATE OF MICHIGAN:

654.   Three times the amount of actual damages which that State of Michigan has sustained as a result of Defendants' fraudulent and illegal practices;

655.   A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of Michigan;

656.    Prejudgment interest; and

657.   All costs incurred in bringing this action.

658.   To RELATORS:

659.   The maximum amount allowed pursuant to M.C.L.A. 400.610a(9) and/or

any other applicable provision of law;

660.   Reimbursement for reasonable expenses which Relators incurred in connection with this action;

661.   An award of reasonable attorneys' fees and costs; and

662.   Such further relief as this court deems equitable and just.

## COUNT XXVIII

### (Minnesota False Claims Act, (Minnesota Statutes § 15C.01 et seq.)

663.    Relators re-allege and incorporate the allegations above as if fully set forth herein and further allege as follows.

664.   Additionally, Relators state that the course of conduct described in this Complaint was a nationwide practice of Defendants.  Defendants conduct business in Minnesota.  Upon information and belief, Defendants' actions described herein occurred in Minnesota as well.

665.   This is a qui tam action brought by Relators and the State of Minnesota to recover treble damages and civil penalties under the Minnesota False Claims Act, Minnesota Statutes § 15C.01 et seq.

666.   Minnesota Statutes § 15C.02 provides liability for any person who-

667.   Knowingly presents, or causes to be presented, to an officer or employee of the state or a political subdivision a false or fraudulent claim for payment or approval;

668.   Knowingly makes or uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the state or a political subdivision;

669.   Knowingly conspires to either present a false or fraudulent claim to the state

142

or a political subdivision for payment or approval or makes, uses, or causes to be made or used a false record or statement to obtain payment or approval of a false or fraudulent claim.

670.   Defendants violated Minnesota Statutes § 15C.02 from at least 2011 to the present by engaging in the fraudulent and illegal practices described herein.

671.   Defendants furthermore violated Minnesota Statutes § 15C.02 and knowingly caused thousands of false claims to be made, used and presented to the State of Minnesota from at least 2011 to the present by its violation of federal and state laws, including the Anti-Kickback Act, and the Stark Act, as described herein.

672.   The State of Minnesota, by and through the State of Minnesota Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third payers in connection therewith.

673.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Minnesota in connection with Defendants' fraudulent and illegal practices.

674.   Had the State of Minnesota known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Defendants' fraudulent and illegal practices.

675.   As a result of Defendants' violations of Minnesota Statutes § 15C.02 the State of Minnesota has been damaged in an amount far in excess of millions of dollars exclusive of interest.

676.   Relators have direct and independent knowledge of the allegations of this Complaint, and this action is brought pursuant to Minnesota Statutes § 15C.05 on behalf of themselves and the State of Minnesota.

677.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Minnesota in the operation of its Medicaid program.

678.   Pursuant to the Minnesota False Claims Act, the State of Minnesota and Relator are entitled to the following damages as against Defendants:

679.   To the STATE OF MINNESOTA:

680.   Three times the amount of actual damages which the State of Minnesota has sustained as a result of Defendants' fraudulent and illegal practices;

681.   A civil penalty of not less than $5,500, and not more than $11,000 for each false claim which Defendants caused to be presented to the State of Minnesota;

682.   Prejudgment interest; and

683.   All costs incurred in bringing this action.

684.   To RELATORS:

685.   The maximum amount allowed pursuant to Minnesota Statutes § 15C.12 and § 15C.13 and /or any other applicable provision of law;

686.   Reimbursement for reasonable expenses which Relators incurred in connection with this action;

687.   An award of reasonable attorneys' fees and costs; and

688.   Such further relief as this court deems equitable and just.

## COUNT XXIX

**(Missouri Health Care Payment Fraud and Abuse Act, Missouri Revised Statutes § 191.900 et seq.)**

689.    Relators re-allege and incorporate the allegations above as if fully set forth herein  and further allege as follows.

690.    Additionally, Relators state that the course of conduct described in this Complaint was a nationwide practice of Defendants.  Defendants conduct business in the State of Missouri.  Upon information and belief, Defendants' actions described herein occurred in the State of Missouri as well.

691.    This is a qui tam action brought by Relators and the State of Missouri to recover treble damages and civil penalties under the Missouri Health Care Payment Fraud And Abuse Act, Missouri Revised Statutes § 191.900 et seq.

692.    The Missouri Health Care Payment Fraud And Abuse Act § 191-905(1) provides liability for any person -

693.    Knowingly presenting to a health care payer a claim for a health care payment that falsely represents that the health care for which the health care payment is claimed was medically necessary, if in fact it was not;

694.    Knowingly concealing the occurrence of any event affecting an initial or continued right under a medical assistance program to have a health care payment made by a health care payer for providing health care;

695.    Knowingly concealing or failing to disclose any information with the intent to obtain a health care payment to which the health care provider or any other health care provider is not entitled, or to obtain a health care payment in an amount greater than that which the health care provider or any other health care provider is entitled;

696.    Knowingly presenting a claim to a health care payer that falsely indicates that any particular health care was provided to a person or persons, if in fact health

145

care of lesser value than that described in the claim was provided.

697.   The Missouri Health Care Payment Fraud And Abuse Act § 191-905(2) provides liability if any person shall knowingly solicit or receive any remuneration, including any kickback, bribe, or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for -

698.   Referring another person to a health care provider for the furnishing or arranging for the furnishing of any health care; or

699.   Purchasing, leasing, ordering or arranging for or recommending purchasing, leasing or ordering any health care.

700.   The Missouri Health Care Payment Fraud And Abuse Act § 191-905(3) provides liability if any person shall knowingly offer or pay any remuneration, including any kickback, bribe, or rebate, directly or indirectly, overtly or covertly, in cash or in kind, to any person to induce such person to refer another person to a health care provider for the furnishing or arranging for the furnishing of any health care.

701.   Defendants violated the Missouri Health Care Payment Fraud and Abuse Act § 191-905(1) & (2) & (3) from at least 2011 to the present by engaging in the fraudulent and illegal practices described herein.

702.   Defendants furthermore violated Missouri Health Care Payment Fraud And Abuse Act § 191-905(1) & (2) & (3) and knowingly caused thousands of false claims to be made, used and presented to Missouri from at least 2011 to the present by its violation of federal and state laws, including Missouri Revised Statutes § 191-905(3), the Anti-Kickback Act and Stark Act Requirements, as described herein.

703.   Missouri, by and through the Missouri Medicaid program and other state

146

health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third payers in connection therewith.

704.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to Missouri in connection with Defendants' fraudulent and illegal practices.

705.   Had the State of Missouri known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Defendants' fraudulent and illegal practices.

706.   As a result of Defendants' violations of § 191-905(1) & (2) & (3), the State of Missouri has been damaged in an amount far in excess of millions of dollars exclusive of interest.

707.   Relators are private persons with direct and independent knowledge of the allegations of this Complaint, and this action is brought pursuant to Missouri Revised Statutes § 191.907 on behalf of Relators and the State of Missouri.

708.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Missouri in the operation of its Medicaid program.

709.   Pursuant to the Missouri Health Care Payment Fraud And Abuse Act, the State of Missouri and Relator are entitled to the following damages as against Defendants:

710.   To the STATE OF MISSOURI:

147

711.   Three times the amount of actual damages which the State of Missouri has sustained as a result of Defendants' fraudulent and illegal practices;

712.   A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of Missouri;

713.   Prejudgment interest; and

714.   All costs incurred in bringing this action.

715.   To RELATORS:

716.   The maximum amount allowed pursuant to Missouri Revised Statutes § 191.907 and /or any other applicable provision of law;

717.   Reimbursement for reasonable expenses which Relators incurred in connection with this action;

718.   An award of reasonable attorneys' fees and costs; and

719.   Such further relief as this court deems equitable and just.


## COUNT XXX

### (Montana False Claims Act, MT ST 17-8-401 et seq.)

720.    Relators re-allege and incorporate the allegations above as if fully set forth herein and further allege as follows.

721.    Additionally, Relators state that the course of conduct described in this Complaint was a nationwide practice of Defendants.  Defendants conduct business in Montana.  Upon information and belief, Defendants' actions described herein occurred in Montana as well.

722.   This is a qui tam action brought by Relators and the State of Montana for treble damages and penalties under Montana False Claims Act, MT ST 17-8-401 et

seq.

723.   MT ST 17-8-403 provides liability for any person who—

724.   knowingly presenting or causing to be presented to an officer or employee of the governmental entity a false claim for payment or approval;

725.   knowingly making, using, or causing to be made or used a false record or statement to get a false claim paid or approved by the governmental entity;

726.   conspiring to defraud the governmental entity by getting a false claim allowed or paid by the governmental entity.

727.   In addition, MT ST 45-6-313 prohibits the solicitation, receipt or offering any remuneration, including but not limited to a kickback, bribe, or rebate, other than an amount legally payable under the medical assistance program, for furnishing services or items for which payment may be made under the Montana Medicaid program.

728.   Defendants violated MT ST 45-6-313 from at least 2011 to the present by engaging in the fraudulent and illegal practices described herein.

729.   Defendants furthermore violated MT ST 17-8-403 and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Montana from at least 2011 to the present by its violation of federal and state laws, including MT ST 45-6-313, the Anti-Kickback Act and the Stark Act, as described herein.

730.   The State of Montana, by and through the Montana Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

731.   Compliance with applicable Medicare, Medicaid and the various other

149

federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Montana in connection with Defendants' fraudulent and illegal practices.

732.   Had the State of Montana known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Defendants' fraudulent and illegal practices.

733.   As a result of Defendants' violations of MT ST 17-8-403 the State of Montana has been damaged in an amount far in excess of millions of dollars exclusive of interest.

734.   Relators are private persons with direct and independent knowledge of the allegations of the Complaint, and this action is brought pursuant to MT ST 17-8-406 on behalf of Relators and the State of Montana.

735.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon that exact same facts as the federal claim, and merely asserts separate damage to the State of Montana in the operation of its Medicaid program.

736.   Pursuant to the Montana False Claims Act, the State of Montana and Relator are entitled to the following damages as against Defendants:

737.   To the STATE OF MONTANA:

738.   Three times the amount of actual damages which that State of Montana has sustained as a result of Defendants' fraudulent and illegal practices;

739.   A civil penalty of between $5,500 and $11,000 (adjusted for inflation) for each false claim which Defendants caused to be presented to the State of Montana;

740.   Prejudgment interest; and

741. All costs incurred in bringing this action.

742. To RELATORS:

743. The maximum amount allowed pursuant to MT ST 17-8-410 and/or any other applicable provision of law;

744. Reimbursement for reasonable expenses which Relators incurred in connection with this action;

745. An award of reasonable attorneys' fees and costs; and

746. Such further relief as this Court deems equitable and just.

## COUNT XXXI

### (Nevada False Claims Act, N.R.S. § 357.010 et seq.)

747. Relators re-allege and incorporate the allegations above as if fully set forth herein and further allege as follows.

748. Additionally, Relators state that the course of conduct described in this Complaint was a nationwide practice of Defendants. Defendants conduct business in the State of Nevada. Upon information and belief, Defendants' actions described herein occurred in Nevada as well.

749. This is a qui tam action brought by Relators and the State of Nevada to recover treble damages and civil penalties under the Nevada False Claims Act, N.R.S. § 357.010 et. seq.

750. N.R.S. § 357.040(1) provides liability for any person who—

751. Knowingly presents or causes to be presented a false claim for payment or approval;

752. Knowingly makes or uses, or causes to be made or used, a false record or statement to obtain payment or approval of a false claim;

151

753. Conspires to defraud by obtaining allowance or payment of a false claim;

754. Is a beneficiary of an inadvertent submission of a false claim and, after discovering the falsity of the claim, fails to disclose the falsity to the state or political subdivision within a reasonable time.

755. In addition, N.R.S. § 422.560 prohibits the solicitation, acceptance or receipt of anything of value in connection with the provision of medical goods or services for which payment may be made in whole or in part under the Nevada Medicaid program.

756. Defendants violated N.R.S. § 422.560 from at least 2011 to the present by engaging in the fraudulent and illegal practices described herein.

757. Defendants furthermore violated N.R.S. § 357.040(1) and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Nevada from at least 2011 to the present by its violation of federal and state laws, including N.R.S. § 422.560, the Anti-Kickback Act and the Stark Act, as described herein.

758. The State of Nevada, by and through the Nevada Medicaid program and other health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

759. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Nevada in connection with Defendants' fraudulent and illegal practices.

760. Had the State of Nevada known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health

152

care providers and third party payers in connection with Defendants' fraudulent and illegal practices.

761. As a result of Defendants' violations of N.R.S. § 357.040(1) the State of Nevada has been damaged in an amount far in excess or millions of dollars exclusive of interest.

762. Relators are private persons with direct and independent knowledge of the allegations of this Complaint, and this action is brought pursuant to N.R.S. § 357.080(1) on behalf of Relators and the State of Nevada.

763. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Nevada in the operation of its Medicaid program.

764. Pursuant to the Nevada False Claims Act, the State of Nevada and Relator are entitled to the following damages as against Defendants:

765. To the STATE OF NEVADA:

766. Three times the amount of actual damages which the State of Nevada has sustained as a result of Defendants' fraudulent and illegal practices;

767. A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendants caused to be presented to the State of Nevada;

768. Prejudgment interest; and

769. All costs incurred in bringing this action.

770. To RELATORS:

771. The maximum amount allowed pursuant to N.R.S § 357.210 and/or any other applicable provision of law;

772. Reimbursement for reasonable expenses which Relators incurred in

connection with this action;

773.   An award of reasonable attorneys' fees and costs; and

774.   Such further relief as this Court deems equitable and just.

## COUNT XXXII

### (New Jersey False Claims Act, N.J.S.A. 2A:32C-1 et seq.)

775.   Relators re-allege and incorporate the allegations above as if fully set forth herein and further allege as follows.

776.   Additionally, Defendants conduct business in the New Jersey. Upon information and belief, Defendants' actions described herein occurred in New Jersey as well.

777.   This is a qui tam action brought by Relators and the State of New Jersey for treble damages and penalties under New Jersey False Claims Act, N.J.S.A. 2A:32C-1 et seq.

778.   N.J.S.A. 2A:32C-3 provides liability for any person who—

779.   Knowingly presents or causes to be presented to an employee, officer or agent of the State, or to any contractor, grantee, or other recipient of State funds, a false or fraudulent claim for payment or approval;

780.   Knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the State;

781.   Conspires to defraud the State by getting a false or fraudulent claim allowed or paid by the State.

782.   In addition, N.J.S.A. 30:4D-17 prohibits solicitation, offers, or receipt of any kickback, rebate or bribe in connection with the furnishing of items or services for which payment is or may be made in whole or in part under the New Jersey

154

Medicaid program, or the furnishing of items or services whose cost is or may be reported in whole or in part in order to obtain benefits or payments under New Jersey Medicaid.

783.   Defendants violated N.J.S.A. 30:4D-17 from at least 2011 to the present by engaging in the fraudulent and illegal practices described herein.

784.   Defendants furthermore violated N.J.S.A. 2A:32C-3 and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Nevada from at least 2011 to the present by its violation of federal and state laws, including N.J.S.A. 30:4D-17, the Anti-Kickback Act and the Stark Act, as described herein.

785.   The State of New Jersey, by and through the New Jersey Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

786.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of New Jersey in connection with Defendants' fraudulent and illegal practices.

787.   Had the State of New Jersey known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Defendants' fraudulent and illegal practices.

788.   As a result of Defendants' violations of N.J.S.A. 2A:32C-3 the State of New Jersey has been damaged in an amount far in excess of millions of dollars exclusive of interest.

789. Relators are private persons with direct and independent knowledge of the allegations of the Complaint, and this action is brought pursuant to N.J.S.A. 2A:32C-5 on behalf of Relators and the State of New Jersey.

790. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon that exact same facts as the federal claim, and merely asserts separate damage to the State of New Jersey in the operation of its Medicaid program.

791. Pursuant to the New Jersey False Claims Act, the State of New Jersey and Relator are entitled to the following damages as against Defendants:

792. To the STATE OF NEW JERSEY:

793. Three times the amount of actual damages which that State of New Jersey has sustained as a result of Defendants' fraudulent and illegal practices;

794. A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendants caused to be presented to the State of New Jersey;

795. Prejudgment interest; and

796. All costs incurred in bringing this action.

797. To RELATORS:

798. The maximum amount allowed pursuant to N.J.S.A. 2A:32C-7and/or any other applicable provision of law;

799. Reimbursement for reasonable expenses which Relators incurred in connection with this action;

800. An award of reasonable attorneys' fees and costs; and

801. Such further relief as this Court deems equitable and just.

## COUNT XXXIII

**(New Mexico Medicaid False Claims Act, and New Mexico Fraud Against Taxpayers Act, N. M. S. A. 1978, § 27-14-1 et seq., and N. M. S. A. 1978, § 44-9-1 et seq.)**

802.   Relators re-allege and incorporate the allegations above as if fully set forth herein and further allege as follows.

803.   Additionally, Relators state that the course of conduct described in this Complaint was a nationwide practice of Defendants. Defendants conduct business in the State of New Mexico.  Upon information and belief, Defendants' actions described herein occurred in the State of New Mexico as well.

804.   This is a qui tam action brought by Relators and the State of New Mexico to recover treble damages and civil penalties under the New Mexico Medicaid False Claims Act, N. M. S. A. 1978, § 27-14-1 et seq. and the New Mexico Fraud Against Taxpayers Act, N. M. S. A. 1978, § 44-9-1 et seq.

805.   N. M. S. A. 1978, § 27-14-4 provides liability for any person who-

806.   Presents, or causes to be presented, to the state a claim for payment under the Medicaid program knowing that the person receiving a Medicaid benefit or payment is not authorized or is not eligible for a benefit under the Medicaid program;

807.   Makes, uses or causes to be made or used a record or statement to obtain a false or fraudulent claim under the Medicaid program paid for or approved by the state knowing such record or statement is false;

808.   Conspires to defraud the state by getting a claim allowed or paid under the Medicaid program knowing that such claim is false or fraudulent.

809.   N.M.S.A. 1978 § 44-9-3 provides liability for any person who-

810.   knowingly presents, or causes to be presented, to an employee, officer or agent of the state or to a contractor, grantee or other recipient of state funds a false

or fraudulent claim for payment or approval;

811.   knowingly makes or uses, or causes to be made or used, a false, misleading or fraudulent record or statement to obtain or support the approval of or the payment on a false or fraudulent claim;

812.   conspires to defraud the state by obtaining approval or payment on a false or fraudulent claim;

813.   conspires to make, use or cause to be made or used, a false, misleading or fraudulent record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the state.

814.   Defendants violated N. M. S. A. 1978, § 27-14-4 and N.M.S.A. 1978 § 44-9-3 from at least 2011 to the present by engaging in the fraudulent and illegal practices described herein.

815.   Defendants furthermore violated N. M. S. A. 1978, § 27-14-4 and N.M.S.A. 1978 § 44-9-3 and knowingly caused thousands of false claims to be made, used and presented to the State of New Mexico from at least 2011 to the present by its violation of federal and state laws, including the Anti-Kickback Act, and Stark Act, as described herein.

816.   The State of New Mexico, by and through the State of New Mexico Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third payers in connection therewith.

817.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of New Mexico in connection with Defendants' fraudulent and illegal practices.

818.   Had the State of New Mexico known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Defendants' fraudulent and illegal practices.

819.   As a result of Defendants' violations of N. M. S. A. 1978, § 27-14-4 and N.M.S.A. 1978 § 44-9-3 the State of New Mexico has been damaged in an amount far in excess of millions of dollars exclusive of interest.

820.   Relators are private persons with direct and independent knowledge of the allegations of this Complaint, and this action is brought pursuant to N. M. S. A. 1978, § 27-14-7 and N. M. S. A. 1978, § 44-9-5 on behalf of Relators and the State of New Mexico.

821.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of New Mexico in the operation of its Medicaid program.

822.   Pursuant to the New Mexico Medicaid False Claims Act and the New Mexico Fraud Against Taxpayers Act, the State of New Mexico and Relators are entitled to the following damages as against Defendants:

823.   To the STATE OF NEW MEXICO:

824.   Three times the amount of actual damages which the State of New Mexico has sustained as a result of Defendants' fraudulent and illegal practices;

825.   A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of New Mexico;

826.   Prejudgment interest; and

827.   All costs incurred in bringing this action.

159

828.   To RELATORS:

829.   The maximum amount allowed pursuant to N. M. S. A. 1978, § 27-14-9 and N. M. S. A. 1978, § 44-9-7 and /or any other applicable provision of law;

830.   Reimbursement for reasonable expenses which Relators incurred in connection with this action;

831.   An award of reasonable attorneys' fees and costs; and

832.   Such further relief as this court deems equitable and just.

## COUNT XXXIV

### (New York False Claims Act, N.Y. State Fin. Law § 187 et seq.)

833.    Relators re-allege and incorporate the allegations above as if fully set forth herein  and further allege as follows.

834.   Additionally, Relators state that the course of conduct described in this Complaint was a nationwide practice of Defendants. Defendants conduct business in the New York.  Upon information and belief, Defendants' actions described herein occurred in New York as well.

835.   This is a qui tam action brought by Relators and the State of New York for treble damages and penalties under New York False Claims Act, N.Y. State Finance Law § 187 et seq.

836.   N.Y. State Finance Law § 189 provides liability for any person who—

837.   Knowingly presents, or causes to be presented, to any employee, officer or agent of the state or a local government, a false or fraudulent claim for payment or approval;

838.   Knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the state or a local

160

government;

839.   Conspires to defraud the state or a local government by getting a false or fraudulent claim allowed or paid.

840.   Defendants violated § 189 from at least 2011 to the present by engaging in the fraudulent and illegal practices described herein.

841.   Defendants furthermore violated § 189 and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Nevada from at least 2011 to the present by its violation of federal and state laws, including the Anti-Kickback Act and the Stark Act, as described herein.

842.   The State of New York, by and through the New York Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

843.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of New York in connection with Defendants' fraudulent and illegal practices.

844.   Had the State of New York known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Defendants' fraudulent and illegal practices.

845.   As a result of Defendants' violations of § 189 the State of New York has been damaged in an amount far in excess of millions of dollars exclusive of interest.

846.   Relators are private persons with direct and independent knowledge of the

allegations of the Complaint, and this action is brought pursuant to N.Y. State Finance Law § 190(2) on behalf of Relators and the State of New York.

847.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon that exact same facts as the federal claim, and merely asserts separate damage to the State of New York in the operation of its Medicaid program.

848.   Pursuant to the New York False Claims Act, the State of New York and Relators are entitled to the following damages as against Defendants:

849.   To the STATE OF NEW YORK:

850.   Three times the amount of actual damages which that State of New York has sustained as a result of Defendants' fraudulent and illegal practices;

851.   A civil penalty of not less than $6,000 and not more than $12,000 for each false claim which Defendants caused to be presented to the State of New York;

852.   Prejudgment interest; and

853.   All costs incurred in bringing this action.

854.   To RELATORS:

855.   The maximum amount allowed pursuant to N.Y. State Finance Law § 190(6) and/or any other applicable provision of law;

856.   Reimbursement for reasonable expenses which Relators incurred in connection with this action;

857.   An award of reasonable attorneys' fees and costs; and

858.   Such further relief as this Court deems equitable and just.

## COUNT XXXV

**(North Carolina False Claims Act, North Carolina General Statutes § 51-1-605 et seq.)**

162

859.   Relators re-allege and incorporate the allegations above as if fully set forth herein and further allege as follows.

860.   Additionally, Relators state that the course of conduct described in this Complaint was a nationwide practice of Defendants.  Defendants conduct business in the State of North Carolina.  Upon information and belief, Defendants' actions described herein occurred in the State of North Carolina as well.

861.   This is a qui tam action brought by Relators and the State of North Carolina to recover treble damages and civil penalties under the North Carolina False Claims Act, North Carolina General Statutes § 51-1-605 et seq.

862.   North Carolina General Statutes § 51-1-607 provides liability for any person who-

863.   Knowingly presents or causes to be presented a false or fraudulent claim for payment or approval

864.   Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

865.   Conspires to commit a violation of subdivisions of this section.

866.   Defendants violated North Carolina General Statutes § 51-1-607 from at least 2011 to the present by engaging in the fraudulent and illegal practices described herein.

867.   Defendants furthermore violated North Carolina General Statutes § 51-1-607 and knowingly caused thousands of false claims to be made, used and presented to the State of North Carolina from at least 2011 to the present by its violation of federal and state laws, including the Anti-Kickback Act, and the Stark Act, as described herein.

868.   The State of North Carolina, by and through the State of North Carolina

163

Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third payers in connection therewith.

869.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of North Carolina in connection with Defendants' fraudulent and illegal practices.

870.   Had the State of North Carolina known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Defendants' fraudulent and illegal practices.

871.   As a result of Defendants' violations of North Carolina General Statutes § 51-1-607 the State of North Carolina has been damaged in an amount far in excess of millions of dollars exclusive of interest.

872.   Relators have direct and independent knowledge of the allegations of this Complaint, and this action is brought pursuant to North Carolina General Statutes § 51-1-608 on behalf of Relators and the State of North Carolina.

873.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of North Carolina in the operation of its Medicaid program.

874.   Pursuant to the North Carolina False Claims Act, the State of North Carolina and Relators are entitled to the following damages as against Defendants:

875.   To the STATE OF NORTH CAROLINA:

876.   Three times the amount of actual damages which the State of North Carolina

164

has sustained as a result of Defendants' fraudulent and illegal practices;

877.   A civil penalty of not less than $5,500, and not more than $11,000 for each false claim which Defendants caused to be presented to the State of North Carolina;

878.   Prejudgment interest; and

879.   All costs incurred in bringing this action.

880.   TO RELATORS:

881.   The maximum amount allowed pursuant to North Carolina General Statutes § 51-1-610 and /or any other applicable provision of law;

882.   Reimbursement for reasonable expenses which Relators incurred in connection with this action;

883.   An award of reasonable attorneys' fees and costs; and

884.   Such further relief as this court deems equitable and just.

## COUNT XXXVI

### (Oklahoma Medicaid False Claims Act, 63 Okl. St. Ann. § 5053 et seq.)

885.   Relators re-allege and incorporate the allegations above as if fully set forth herein  and further allege as follows.

886.   Additionally, Relators state that the course of conduct described in this Complaint was a nationwide practice of Defendants.  Defendants conduct business in the State of Oklahoma.  Upon information and belief, Defendants' actions described herein occurred in the State of Oklahoma as well.

887.   This is a qui tam action brought by Relators and the State of Oklahoma to recover treble damages and civil penalties under the Oklahoma Medicaid False Claims Act, 63 Okl. St. Ann. § 5053 et seq.

888.   63 Okl. St. Ann. § 5053.1 provides liability for any person who-

889.   Knowingly presents, or causes to be presented, to an officer or employee of the State of Oklahoma, a false or fraudulent claim for payment or approval;

890.   Knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the state;

891.   Conspires to defraud the state by getting a false or fraudulent claim allowed or paid.

892.   In addition, 56 Okl. St. Ann. § 1005 prohibits solicitation or acceptance of a benefit, pecuniary benefit, or kickback in connection with goods or services paid or claimed by a provider to be payable by the Oklahoma Medicaid Program.

893.   Defendants violated 56 Okl. St. Ann. § 1005 from at least 2011 to the present by engaging in the fraudulent and illegal practices described herein.

894.   Defendants furthermore violated 63 Okl. St. Ann. § 5053.1 and knowingly caused thousands of false claims to be made, used and presented to the State of Oklahoma from at least 2011 to the present by its violation of federal and state laws, including 56 Okl. St. Ann. § 1005, the Anti-Kickback Act, and Stark Act, as described herein.

895.   The State of Oklahoma, by and through the State of Oklahoma Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third payers in connection therewith.

896.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Oklahoma in connection with Defendants' fraudulent and illegal practices.

897.   Had the State of Oklahoma known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Defendants' fraudulent and illegal practices.

898.   As a result of Defendants' violations of 63 Okl. St. Ann. § 5053.1 the State of Oklahoma has been damaged in an amount far in excess of millions of dollars exclusive of interest.

899.   Relators are private persons with direct and independent knowledge of the allegations of this Complaint, and this action is brought pursuant to 63 Okl. St. Ann. § 5053.2(B) on behalf of Relators and the State of Oklahoma.

900.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Oklahoma in the operation of its Medicaid program.

901.   Pursuant to the Oklahoma Medicaid False Claims Act, the State of Oklahoma and Relators are entitled to the following damages as against Defendants:

902.   To the STATE OF OKLAHOMA:

903.   Three times the amount of actual damages which the State of Oklahoma has sustained as a result of Defendants' fraudulent and illegal practices;

904.   A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of Oklahoma;

905.   Prejudgment interest; and

906.   All costs incurred in bringing this action.

907.   To RELATORS:

908.   The maximum amount allowed pursuant 63 Okl. St. Ann. § 5053.4 and /or any other applicable provision of law;

909.   Reimbursement for reasonable expenses which Relators incurred in connection with this action;

910.   An award of reasonable attorneys' fees and costs; and

911.   Such further relief as this court deems equitable and just.

## COUNT XXXVII

### (Rhode Island False Claims Act, Gen. Laws 1956, § 9-1.1-1 et seq.)

912.   Relators re-allege and incorporate the allegations above as if fully set forth herein and further allege as follows.

913.   Additionally, Relators state that the course of conduct described in this Complaint was a nationwide practice of Defendants.  Defendants conduct business in the State of Rhode Island.  Upon information and belief, Defendants' actions described herein occurred in the State of Rhode Island as well.

914.   This is a qui tam action brought by Relators and the State of Rhode Island to recover treble damages and civil penalties under the Rhode Island False Claims Act, Gen. Laws 1956, § 9-1.1-1 et seq.

915.   Gen. Laws 1956, § 9-1.1-3 provides liability for any person who-

916.   knowingly presents, or causes to be presented, to an officer or employee of the state or a member of the guard a false or fraudulent claim for payment or approval;

917.   knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the state;

918.   conspires to defraud the state by getting a false or fraudulent claim allowed

or paid.

919.   In addition, Gen. Laws 1956, § 40-8.2-3 prohibits the solicitation, receipt, offer, or payment of any remuneration, including any kickback, bribe, or rebate, directly or indirectly, in cash or in kind, to induce referrals from or to any person in return for furnishing of services or merchandise or in return for referring an individual to a person for the furnishing of any services or merchandise for which payment may be made, in whole or in part, under the Rhode Island Medicaid program.

920.   Defendants violated Gen. Laws 1956, § 40-8.2-3 from at least 2011 to the present by engaging in the fraudulent and illegal practices described herein.

921.   Defendants furthermore violated Gen. Laws 1956, § 9-1.1-3 and knowingly caused thousands of false claims to be made, used and presented to the State of Rhode Island from at least 2011 to the present by its violation of federal and state laws, including Gen. Laws 1956, § 40-8.2-3, the Anti-Kickback Act, and Stark Act, as described herein.

922.   The State of Rhode Island, by and through the State of Rhode Island Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third payers in connection therewith.

923.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Rhode Island in connection with Defendants' fraudulent and illegal practices.

924.   Had the State of Rhode Island known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by

health care providers and third party payers in connection with Defendants' fraudulent and illegal practices.

925.   As a result of Defendants' violations of Gen. Laws 1956, § 9-1.1-3 the State of Rhode Island has been damaged in an amount far in excess of millions of dollars exclusive of interest.

926.   Relators are private persons with direct and independent knowledge of the allegations of this Complaint, and this action is brought pursuant to Gen. Laws 1956, § 9-1.1-4(b) on behalf of Relators and the State of Rhode Island.

927.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Rhode Island in the operation of its Medicaid program.

928.   Pursuant to the Rhode Island False Claims Act, the State of Rhode Island and Relators are entitled to the following damages as against Defendants:

929.   To the STATE OF RHODE ISLAND:

930.   Three times the amount of actual damages which the State of Rhode Island has sustained as a result of Defendants' fraudulent and illegal practices;

931.   A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of Rhode Island;

932.   Prejudgment interest; and

933.   All costs incurred in bringing this action.

934.   To RELATORS:

935.   The maximum amount allowed pursuant Gen. Laws 1956, § 9-1.1-4(d) and /or any other applicable provision of law;

936.   Reimbursement for reasonable expenses which Relators incurred in

170

connection with this action;

937.  An award of reasonable attorneys' fees and costs; and

938.  Such further relief as this court deems equitable and just.

## COUNT XXXVIII

**(Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-181 et seq.)**

939.  Relators re-allege and incorporate the allegations above as if fully set forth herein and further allege as follows.

940.  Additionally, Relators state that the course of conduct described in this Complaint was a nationwide practice of Defendants. Defendants conduct business in the State of Tennessee. Upon information and belief, Defendants' actions described herein occurred in Tennessee as well.

941.  This is a qui tam action brought by Relators and the State of Tennessee to recover treble damages and civil penalties under the Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-181 et seq.

942.  Section 71-5-182(a)(1) provides liability for any person who—

943.  Presents, or causes to be presented to the state, a claim for payment under the Medicaid program knowing such claim is false or fraudulent;

944.  Makes or uses, or causes to be made or used, a record or statement to get a false or fraudulent claim under the Medicaid program paid for and approved by the state knowing such record or statement is false;

945.  Conspires to defraud the State by getting a claim allowed or paid under the Medicaid program knowing such claim is false or fraudulent.

946.  Defendants violated Tenn. Code Ann. § 71-5-182(a)(1) and knowingly caused hundreds of thousands of false claims to be made, used and presented to the

171

State of Tennessee from at least 2011 to the present by its violation of federal and state laws, including the Anti-Kickback Act and the Stark Act, as described herein.

947.   The State of Tennessee, by and through the Tennessee Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

948.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Tennessee in connection with Defendants' fraudulent and illegal practices.

949.   Had the State of Tennessee known that Defendants violated the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Defendants' fraudulent and illegal practices.

950.   As a result of Defendants' violations of Tenn. Code Ann. § 71-5-182(a)(1), the State of Tennessee has been damaged in an amount far in excess of millions of dollars exclusive of interest.

951.   Relators are private persons with direct and independent knowledge of the allegations of this Complaint, and this action is brought pursuant to Tenn. Code Ann. § 71-5-183(a)(1) on behalf of Relators and the State of Tennessee.

952.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Tennessee in the operation of its Medicaid program.

953.   Pursuant to the Tennessee Medicaid False Claims Act, the State of

Tennessee and Relators are entitled to the following damages as against Defendants:

954.   To the STATE OF TENNESSEE:

955.   Three times the amount of actual damages which the State of Tennessee has sustained as a result of Defendants' fraudulent and illegal practices;

956.   A civil penalty of not less than $5,000 and not more than $25,000 for each false claim which Defendants caused to be presented to the State of Tennessee;

957.   Prejudgment interest; and

958.   All costs incurred in bringing this action.

959.   To RELATORS:

960.   The maximum amount allowed to Tenn. Code Ann. §71-5-183(d) and/or any other applicable provision of law;

961.   Reimbursement for reasonable expenses which Relators incurred in connection with this action;

962.   An award of reasonable attorneys' fees and costs; and

963.   Such further relief as this Court deems equitable and just.

## COUNT XXXIX

**(Texas False Claims Act, V.T.C.A. Hum. Res. Code § 36.001 et seq.)**

964.   Relators re-allege and incorporate the allegations above as if fully set forth herein  and further allege as follows.

965.   Additionally, Relators state that the course of conduct described in this Complaint was a nationwide practice of Defendants.  Defendants conduct business in the State of Texas.  Defendants' actions described herein occurred in Texas as well.

173

966.   This is a qui tam action brought by Relators and the State of Texas to recover double damages and civil penalties under the Texas False Claims Act, V.T.C.A. Hum. Res. Code § 36.001 et seq.

967.   V.T.C.A. Hum. Res. Code § 36.002, in relevant part, provides liability for any person who—

968.   knowingly makes or causes to be made a false statement or misrepresentation of a material fact to permit a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized;

969.   knowingly conceals or fails to disclose information that permits a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized;

970.   knowingly applies for and receives a benefit or payment on behalf of another person under the Medicaid program and converts any part of the benefit or payment to a use other than for the benefit of the person on whose behalf it was received;

971.   except as authorized under the Medicaid program, knowingly pays, charges, solicits, accepts, or receives, in addition to an amount paid under the Medicaid program, a gift, money, a donation, or other consideration as a condition to the provision of a service or product or the continued provision of a service or product if the cost of the service or product is paid for, in whole or in part, under the Medicaid program;

972.   except as authorized under the Medicaid program, knowingly pays, charges, solicits, accepts, or receives, in addition to an amount paid under the Medicaid program, a gift, money, a donation, or other consideration as a condition to the

provision of a service or product or the continued provision of a service or product if the cost of the service or product is paid for, in whole or in part, under the Medicaid program;

973.    knowingly enters into an agreement, combination, or conspiracy to defraud the state by obtaining or aiding another person in obtaining an unauthorized payment or benefit from the Medicaid program or a fiscal agent;

974.    knowingly makes, uses, or causes the making or use of a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to this state under the Medicaid program.

975.    Defendants violated V.T.C.A. Hum. Res. Code § 36.002 and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Texas from at least 2011 to the present by its violation of federal and state laws, including, the Anti-Kickback Act and the Stark Act, as described herein.

976.    The State of Texas, by and through the Texas Medicaid program and other state healthcare programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

977.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Texas in connection with Defendants' fraudulent and illegal practices.

978.    Had the State of Texas known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Defendants' fraudulent and illegal practices.

175

979.   As a result of Defendants' violations of V.T.C.A. Hum. Res. Code § 36.002, the State of Texas has been damaged in an amount far in excess of millions of dollars exclusive of interest.

980.   Defendants did not, within 30 days after it first obtained information as to such violations, furnish such information to officials of the State responsible for investigating false claims violations, did not otherwise fully cooperate with any investigation of the violations, and have not otherwise furnished information to the State regarding the claims for reimbursement at issue.

981.   Relators are private persons with direct and independent knowledge of the allegations of this Complaint, and this action is brought pursuant to V.T.C.A. Hum. Res. Code § 36.101 on behalf of Relators and the State of Texas.

982.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Texas in the operation of its Medicaid program.

983.   Pursuant to the Texas False Claims Act, the State of Texas and Relators are entitled to the following damages as against Defendants:

984.   To the STATE OF TEXAS:

985.   Damages at two times the value of any payment or monetary or in-kind benefit provided under the Medicaid program, directly or indirectly, as a result of the unlawful acts set forth above, as provided by the Texas Human Resources Code § 36.052(a)(3) & (4), and

986.   A civil penalty of: (1) Not less than $5,500 or the minimum amount imposed as provided by 31 U.S.C. Section 3729(a), if that amount exceeds $5,500, and not more than $15,000 or the maximum amount imposed as provided by 31 U.S.C.

Section 3729(a), if that amount exceeds $15,000, for each unlawful act committed by the person that results in injury to an elderly person, as defined by Section 48.002(a)(1), a disabled person, as defined by Section 48.002(a)(8)(A), or a person younger than 18 years of age; or (2) Not less than $5,500 or the minimum amount imposed as provided by 31 U.S.C. Section 3729(a), if that amount exceeds $5,500, and not more than $11,000 or the maximum amount imposed as provided by 31 U.S.C. Section 3729(a), if that amount exceeds $11,000, for each unlawful act committed by the person that does not result in injury to a person described by Paragraph (A)

987.   Pre- and post-judgment interest, Tex. Hum. Res. Code § 36.052(a)(2),

988.   To RELATORS:

989.   The maximum amount allowed pursuant to V.T.C.A. Hum Res. Code § 36.110(a), and/or any other applicable provision of law;

990.   Reimbursement for reasonable expenses and costs which Relators incurred in connection with this action, Tex. Hum. Res. Code §§ 36.007 & 36.110(c);

991.   Reasonable attorneys' fees which Relators necessarily incurred in bringing and pressing this case, Tex. Hum. Res. Code §§ 36.007 & 36.110(c); and

992.   Such further relief as this Court deems equitable and just.

## COUNT XL

### (Vermont False Claims Act, 32 V.S.A. 630 et seq.)

993.   Relators re-allege and incorporate the allegations above as if fully set forth herein  and further allege as follows.

994.   Additionally, Relators state that the course of conduct described in this Complaint was a nationwide practice of Defendants. Defendants conduct business

in the State of Vermont. Upon information and belief, Defendants' actions described herein occurred in the State of Vermont as well.

995.  This is a qui tam action brought by Relators and the State of Vermont to recover treble damages and civil penalties under the Vermont False Claims Act, 32 V.S.A. 630 *et seq.*

996.  32 V.S.A. 631 provides liability for any person who shall-

997.  Knowingly present, or cause to be presented, a false or fraudulent claim for payment or approval.

998.  Knowingly make, use, or cause to be made or used, a false record or statement material to a false or fraudulent claim.

999.  Conspires to commit a violation of this subsection.

1000. Defendants violated 32 V.S.A. 630 *et seq.* from at least 2011 to the present by engaging in the fraudulent and illegal practices described herein.

1001. Defendants furthermore violated 32 V.S.A. 630 *et seq.* and knowingly caused thousands of false claims to be made, used and presented to the State of Vermont from at least 2011 to the present by its violation of federal and state laws, including 32 V.S.A. 630 *et seq.*, the Anti-Kickback Act, and Stark Act, as described herein.

1002. The State of Vermont, by and through the State of Vermont Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third payers in connection therewith.

1003. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of

Vermont in connection with Defendants' fraudulent and illegal practices.

1004. Had the State of Vermont known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third-party payers in connection with Defendants' fraudulent and illegal practices.

1005. As a result of Defendants' violations of 32 V.S.A. 630 *et seq.* the State of Vermont has been damaged in an amount far in excess of millions of dollars exclusive of interest.

1006. Relators are private persons with direct and independent knowledge of the allegations of this Complaint, and this action is brought pursuant to 32 V.S.A. 632(b)(1) on behalf of Relators and the State of Vermont.

1007. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Vermont in the operation of its Medicaid program.

1008. Pursuant to the Vermont False Claims Act, the State of Vermont and Relators are entitled to the following damages as against Defendants:

1009. To the STATE OF VERMONT:

1010. Three times the amount of actual damages which the State of Vermont has sustained as a result of Defendants' fraudulent and illegal practices;

1011. A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendants caused to be presented to the State of Vermont;

1012. Prejudgment interest; and

1013. All costs incurred in bringing this action.

1014. To RELATORS:

179

1015. The maximum amount allowed pursuant 32 V.S.A. 635(b) and /or any other applicable provision of law;

1016. Reimbursement for reasonable expenses which Relators incurred in connection with this action;

1017. An award of reasonable attorneys' fees and costs; and

1018. Such further relief as this court deems equitable and just.

## COUNT XLI

### (Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.1et seq.)

1019.  Relators re-allege and incorporate the allegations above as if fully set forth herein  and further allege as follows.

1020. Additionally, Relators state that the course of conduct described in this Complaint was a nationwide practice of Defendants.  Defendants conduct business in the Commonwealth of Virginia.  Upon information and belief, Defendants' actions described herein occurred in the Commonwealth of Virginia as well.

1021. This is a qui tam action brought by Relators and the Commonwealth of Virginia to recover treble damages and civil penalties under the Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.1 et seq.

1022. Va. Code Ann. § 8.01-216.3 provides liability for any person who-

1023. Knowingly presents, or causes to be presented, to an officer or employee of the Commonwealth a false or fraudulent claim for payment or approval;

1024. Knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Commonwealth

1025. Conspires to defraud the Commonwealth by getting a false or fraudulent

claim allowed or paid.

1026. Defendants violated Va. Code Ann. § 8.01-216.3 from at least 2011 to the present by engaging in the fraudulent and illegal practices described herein.

1027. Defendants furthermore violated Va. Code Ann. § 8.01-216.3 and knowingly caused thousands of false claims to be made, used and presented to the Commonwealth of Virginia from at least 2011 to the present by its violation of federal and state laws, including the Anti-Kickback Act and Stark Act, as described herein.

1028. The Commonwealth of Virginia, by and through the Commonwealth of Virginia Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third payers in connection therewith.

1029. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the Commonwealth of Virginia in connection with Defendants' fraudulent and illegal practices.

1030. Had the Commonwealth of Virginia known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Defendants' fraudulent and illegal practices.

1031. As a result of Defendants' violations of Va. Code Ann. § 8.01-216.3 the Commonwealth of Virginia has been damaged in an amount far in excess of millions of dollars exclusive of interest.

1032. Relators are private persons with direct and independent knowledge of the

allegations of this Complaint, and this action is brought pursuant to Va. Code Ann. § 8.01-216.5(A) on behalf of himself and the Commonwealth of Virginia

1033. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the Commonwealth of Virginia in the operation of its Medicaid program.

1034. Pursuant to the Virginia Fraud Against Taxpayers Act, the Commonwealth of Virginia and Relators are entitled to the following damages as against Defendants:

1035. To the COMMONWEALTH OF VIRGINIA:

1036. Three times the amount of actual damages which the Commonwealth of Virginia has sustained as a result of Defendants' fraudulent and illegal practices;

1037. A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendants caused to be presented to the Commonwealth of Virginia;

1038. Prejudgment interest; and

1039. All costs incurred in bringing this action.

1040. To RELATORS:

1041. The maximum amount allowed pursuant to Va. Code Ann. § 8.01-216.7 and /or any other applicable provision of law;

1042. Reimbursement for reasonable expenses which Relators incurred in connection with this action;

1043. An award of reasonable attorneys' fees and costs; and

1044. Such further relief as this court deems equitable and just.

1045.

## COUNT XLII

**(Washington False Claims Act, Washington Revised Code § 74 66-005 et seq.)**

1046.  Relators re-allege and incorporate the allegations above as if fully set forth herein  and further allege as follows.

1047. Additionally, Relators state that the course of conduct described in this Complaint was a nationwide practice of Defendants.  Defendants conduct business in the State of Washington.  Upon information and belief, Defendants' actions described herein occurred in the State of Washington as well.

1048. This is a qui tam action brought by Relators and the State of Washington to recover treble damages and civil penalties under the Washington False Claims Act, Washington Revised Code § 74 66-005 et seq.

1049. Washington Revised Code § 74 66-020 provides liability for any person who-

1050. Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

1051. Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

1052. Conspires to commit one or more of the violations in this subsection.

1053. Defendants violated Washington Revised Code § 74 66-020 from at least 2011 to the present by engaging in the fraudulent and illegal practices described herein.

1054. Defendants furthermore violated Washington Revised Code § 74 66-020 and knowingly caused thousands of false claims to be made, used and presented to the State of Washington from at least 2011 to the present by its violation of federal and state laws, including the Anti-Kickback Act, and the Stark Act, as described

183

herein.

1055. The State of Washington, by and through the State of Washington Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third payers in connection therewith.

1056. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Washington in connection with Defendants' fraudulent and illegal practices.

1057. Had the State of Washington known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Defendants' fraudulent and illegal practices.

1058. As a result of Defendants' violations of Washington Revised Code § 74 66-020 the State of Washington has been damaged in an amount far in excess of millions of dollars exclusive of interest.

1059. Relators have direct and independent knowledge of the allegations of this Complaint, and this action is brought pursuant to Washington Revised Code § 74 66-050 on behalf of Relators and the State of Washington.

1060. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Washington in the operation of its Medicaid program.

1061. Pursuant to the Washington False Claims Act, the State of Washington and Relators are entitled to the following damages as against Defendants:

1062. To the STATE OF WASHINGTON:

1063. Three times the amount of actual damages which the State of Washington has sustained as a result of Defendants' fraudulent and illegal practices;

1064. A civil penalty of not less than $5,500, and not more than $11,000 for each false claim which Defendants caused to be presented to the State of Washington;

1065. Prejudgment interest; and

1066. All costs incurred in bringing this action.

1067. To RELATORS:

1068. The maximum amount allowed pursuant to Washington Revised Code § 74 66-070 and /or any other applicable provision of law;

1069. Reimbursement for reasonable expenses which Relators incurred in connection with this action;

1070. An award of reasonable attorneys' fees and costs; and

1071. Such further relief as this court deems equitable and just.

## **REQUESTS FOR RELIEF**

WHEREFORE, the Relator, on behalf of the UNITED STATES, demand that judgment be entered in its favor and against Defendants REGENERON PHARMACEUTICALS, INC., REGENERON HEALTHCARE SOLUTIONS, INC., AND SANOFI AVENTIS US, LLC, with judgment to be entered against Defendants for the amount of damages to the States' Medicaid Programs arising (a) from claims for Defendants' respective specified drugs and (b) jointly and severally with such other Defendants for damages as set forth in each paragraph above and herein, as follows:

1.    On Count I (False Claims Act; Causing Presentation of False Claims) for triple the amount of the UNITED STATES' damages, plus civil penalties of the

maximum amount allowed by law be imposed for each and every false claim that Defendants presented to the UNITED STATES;

2.     On Count II (False Claims Act; Causing False Statements to Be Used to Get False Claims Paid or Approved by The GOVERNMENT) for triple the amount of UNITED STATES' damages plus civil penalties of the maximum amount allowed by law be imposed for each and every false claim that Defendants presented to the UNITED STATES;

3.     On Count III (False Claims Act; Causing False Statements to Be Used to Conceal an Obligation to Pay Money to The GOVERNMENT) for triple amount of the UNITED STATES' damages plus civil penalties of the maximum amount allowed by law be imposed for each and every false claim that Defendants presented to the UNITED STATES;

4.     On Count IV (False Claims Act; Causing Presentation of False and Fraudulent Claims; Illegal Remuneration) for triple amount of the UNITED STATES' damages plus civil penalties of the maximum amount allowed by law be imposed for each and every false claim that Defendants presented to the UNITED STATES;

5.     On Count V (False Claims Act; Causing A False Record or Statement to Be Made or Used to Get a False or Fraudulent Claim Paid or Approved by The Government; Prohibited Referrals, Claims, and Compensation Arrangements) for triple amount of the UNITED STATES' damages plus civil penalties of the maximum amount allowed by law be imposed for each and every false claim that Defendants presented to the UNITED STATES;

6.     On Count VI (False Claims Act; Conspiring to Defraud the Government by Getting a False or Fraudulent Claim Allowed or Paid) for triple amount of the UNITED STATES' damages plus civil penalties of the maximum amount allowed

by law be imposed for each and every false claim that Defendants presented to the UNITED STATES.

Further, the Relators, on their behalf, request that they receive the maximum amount as permitted by the law, of the proceeds of this action or settlement of this action collected by the UNITED STATES, plus an amount for reasonable expenses incurred, plus reasonable attorneys' fees and costs of this action. The Relators request that their award be based upon the total value recovered, both tangible and intangible, including any amounts received from individuals or entities not parties to this action.

## DEMAND FOR JURY TRIAL

Relator hereby demands a jury trial.

Dated:  November 1, 2018

          Respectfully submitted,

                       **UNITED STATES OF AMERICA, ex rel. Relators**

By: _____
                    Mychal Wilson, Esq.
                    The Law Offices of Mychal Wilson
                    401 Wilshire Blvd., 12th Floor
                    Santa Monica, CA 90401
                    Telephone: (424) 252-4232
                    Facsimile: (310) 424-7116

*Attorney for Relators JANE DOE NUMBER ONE and JANE DOE NUMBER TWO*

187