C. Brooks Cutter (SBN 121407)
bcutter@cutterlaw.com
**CUTTER LAW P.C.**
401 Watt Ave., Sacramento, CA 95864
Phone: (916) 290-9400
Fax: (916) 588-9330

Mychal Wilson (SBN: 236189)
mychal@mychalwilsonesq.com
**THE LAW OFFICE OF MYCHAL WILSON**
401 Wilshire Blvd.,
12th Floor Santa Monica, CA 90401
T: (424) 252-4232
F: (310) 424-7116

Renée Brooker (*Pro hac vice pending*)
reneebrooker@tzlegal.com
**TYCKO & ZAVAREEI LLP**
1828 L Street NW, Suite 1000,
Washington, DC 20036
Phone: (202) 417-3664
Fax: (202) 973-0950

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE UNITED STATES OF AMERICA, THE STATES OF ARKANSAS, CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, THE DISTRICT OF COLUMBIA, FLORIDA, GEORGIA, HAWAII, ILLINOIS, INDIANA, IOWA, LOUISIANA, MARYLAND, MASSACHUSETTS, MICHIGAN, MINNESOTA, MISSOURI, MONTANA, NEVADA, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH CAROLINA, OKLAHOMA, RHODE ISLAND, | Case No.: 2:18-CV-09368-JWH-MRW<br><br>Jury Trial Requested<br><br>**FIRST AMENDED COMPLAINT** |

TENNESSEE, TEXAS, VERMONT, VIRGINIA, AND WASHINGTON

ex rel.

NARESHA MOORE AND BEATA DAMAVANDI

v.

REGENERON PHARMACEUTICALS, INC., REGENERON HEALTHCARE SOLUTIONS, INC., and SANOFI AVENTIS US, LLC

Defendants.

FIRST AMENDED COMPLAINT

2

1

## **Table of Contents**

**I.    STATEMENT OF THE CASE** .............................................................**5**

**II.    LEGAL FRAMEWORK** .....................................................................**14**

**A.  Parties**       ...................................................................................**14**

**B.  Jurisdiction and Venue** ..............................................................**16**

**C.  Period**        ...................................................................................**17**

**D.  The Laws Violated** .....................................................................**17**

         **1.    Federal False Claims Act** ...............................................**17**

         **2.    Anti-Kickback Statute** ...................................................**19**

         **3.    The Sunshine Law** ..........................................................**24**

         **4.    State False Claims Acts** ..................................................**25**

**III.    THE REGULATORY FRAMEWORK** ...............................................**26**

**A.  Federal Health Care Programs** .................................................**26**

**B.  The Covered Drugs** .....................................................................**71**

         **1.    Eylea (eye disease)** ..........................................................**71**

         **2.    Praluent (high-cholesterol)** ............................................**74**

         **3.    Dupixent (eczema)** ..........................................................**76**

         **4.    Kevzara (rheumatoid arthritis)** .....................................**77**

**IV.    THE FRAUD SCHEME** .....................................................................**79**

**A.  The Fox in the Henhouse** ............................................................**83**

**B.  Paying Doctors & Their Staff: Good Return on Investment** .............**84**

**C.  Thousands of False Claims Tainted by the Kickbacks** ......................**95**

**D.  Sneaking Through the Back Door to Circumvent Prior Authorization Rules**       ...................................................................................**97**

         **1.    Flouting Patient Safety, Cost Control** .............................**99**

         **2.    Inducing Doctor Office Staff, Not Just the Doctor** ........**101**

                **a.    Destination Praluent** .............................................**104**

                **b.    Examples of Inducements** .....................................**106**

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

FIRST AMENDED COMPLAINT

3.      Providing Other Perks Galore..........................................118

E.  Sham Programs, Boards and Committees. ........................................124

1.      Examples of Inducements..................................129

F.  Fair Market Value: A Ruse ...............................................................139

1.      Examples of Ignoring FMV.............................................141

V.   MATERIALITY .........................................................................................146

VI.  COUNTS   ...............................................................................................158

1       1.      This is a False Claims Act qui tam action by Relators on behalf of the
2   United States and the named states to recover treble damages and civil penalties
3   arising from the actions of Regeneron Pharmaceuticals, Inc. (Regeneron) and
4   Sanofi-Aventis US LLC (Sanofi) (Defendants).

5   **I.      STATEMENT OF THE CASE**

6       2.      Regeneron and Sanofi manufactured, marketed and sold drugs in the
7   United States and co-marketed the drugs at issue for these medical conditions:
8   Eylea (eye disease), Praluent (high cholesterol), Dupixent (eczema) and Kevzara
9   (rheumatoid arthritis) (the Covered Drugs).

10      3.      Defendants' aggressive co-marketing led to the wild success of these
11  drugs in the marketplace, but it also crossed a line and violated the Anti-Kickback
12  Statute, not to mention their own written compliance policies.

13      4.      For Eylea alone, 83 percent of doctors who prescribed $7 billion
14  worth of the drug to Medicare patients received some form of remuneration from
15  Defendants between 2013 and 2019; the government (the taxpayer) paid those false
16  or fraudulent claims tainted by the unlawful kickbacks.

17      5.      The story of drug companies giving short shrift to patient safety and
18  cost control is an old one.  There have been dozens of False Claims Act and

19

20

FIRST AMENDED COMPLAINT

1   criminal cases involving conduct like the allegations in this Complaint. The

2   conduct is pernicious.

3       6.      However, this is not the typical case seen before.  Regeneron and

4   Sanofi have forged new ground to violate the Anti-Kickback Statute and cheat the

5   taxpayer.  They snuck through the back door and paid unlawful kickbacks to

6   doctor office staff and not just doctors.

7       7.      Because of prior drug company fraud, the government took additional

8   measures to protect patients from such predatory behavior, or so it thought.

9       8.      For one thing, there are now Sunshine Laws that require that drug

10  companies report payments they make to doctors and those reports are made

11  available to the public.

12      9.      Further, Medicare and Medicaid require doctors to obtain prior

13  authorization to prescribe certain drugs, including the costly and often unnecessary

14  Covered Drugs in this case.  Doing so, helps guard against drug companies

15  aggressively pushing drugs (on doctors) which patients may not need or that are

16  not as reasonably priced as other drugs.

17      10.     Prior authorization was intended as a fail-safe to avoid a default to one

18  drug over another without regard to medical need or cost to government (the

19  taxpayer).

20

FIRST AMENDED COMPLAINT

11.     Because prior authorization rules applied to the Covered Drugs, Regeneron and Sanofi considered them both a roadblock and an opportunity.  They created and implemented financial incentive programs aimed at doctor office staff to circumvent prior authorization rules and to beat the competitor.

12.     This fraud scheme to induce doctor office staff (and not just the doctor) through direct cash payments and other perks like free lunches and free propriety online tool-accounts was ground-breaking.  It was a backdoor way to circumvent the prior authorization rules and evade the Sunshine Laws

13.     Drug company executives pressured their sales reps to force their way into doctor offices and inject themselves into the prior authorization process—by hook or crook.  They created an assembly line that accelerated prior authorization approvals by the government.

14.     These boots on the ground supplied the doctor offices with a free online proprietary tool-account (MyPraluent) that gave them access to confidential (HIPAA) patient information and allowed them to track and target doctors' prescribing volume, and appeal government denials of prior authorizations.  They also created canned medical justifications and induced doctor office staff to use them and pharmacists to accept them; induced doctor office staff to accelerate prior authorizations; and gave patients free samples even when prior authorizations were

1   denied.  In short, the sales force did whatever it took to get the Covered Drugs

2   prescribed and authorized, and the government (the taxpayer) footed the bill.

3        15.   For example, Regeneron paid over $17,000 to one staff person at a

4   medical practice group in Florida to speak at steak houses in New Jersey, Virginia,

5   Maryland and Las Vegas. That same practice group prescribed $47 million in

6   Eylea; and the government (the taxpayer) paid these Eylea claims that were tainted

7   by the unlawful kickbacks.

8        16.   Another nurse practitioner in Georgia was paid by the drug companies

9   as a "Praluent Office Champion" and prescribed over $1.5 million worth of the

10   drug to Medicare patients over just two years.

11        17.   As a bonus to their scheme, the drug companies evaded reporting

12   requirements because the Sunshine Laws did not contemplate that drug companies

13   would funnel payments through the back door to doctor office staff.  By not

14   reporting these payments to the public, they were able to fly under the radar.

15        18.   Regeneron and Sanofi covered all their bases. They continued to

16   induce doctors just like in the dozens of prior cases through extravagant meals and

17   travel in the States and abroad, including to hot spots such as Las Vegas, Hawaii,

18   Paris, and Barcelona.

19

20

FIRST AMENDED COMPLAINT

19.     They continued to use the tried-and-true vehicles to pay doctors (and their staff) the unlawful kickbacks—speaker programs, advisory boards and steering committees—believing them to give the appearance of authenticity.

20.     As recognized by their own written compliance policies, programs that do not violate the Anti-Kickback Statute have an educational component. However, these programs were not educational.  Doctor offices were wined and dined frequently and routinely. Yet, there were no significant changes to the efficacy or other attributes of the Covered Drugs to warrant "re-educating" the same doctor offices; and there was no new content in the Regeneron-approved written presentation (slide deck) to justify the routine freebies.  Instead, these programs were shams.  They were used as the vehicles to pay inducements to doctors and doctor office staff.

21.     The drug companies paid an Iowa doctor at least $577,000, including to attend meetings at Sanofi's corporate headquarters in Paris, France; paid a California doctor at least $335,000, including for trips to Hawaii; and paid another doctor who prescribed over $2.22 million worth of the Covered Drugs over $45,000.

FIRST AMENDED COMPLAINT

22.    Their fraud scheme was as simple as this schematic:



**The Kickback Scheme**

Free meals, hotel, travel            Doctor writes scripts            Assembly line for
                                                                     prior authorizations

23.    The drug companies compulsively tracked their return on investment from these unlawful kickbacks. They paid one doctor nearly $1.1 million dollars to travel on their dime to destinations such as Hawaii, Japan, Spain, Saudi Arabia and other international destinations.  That doctor prescribed at least $432,000 worth of Eylea to Medicare patients over two years; and the government (the taxpayer) paid those claims.  Defendants got a good return on their investment, while the government was cheated.

24.    When return on investment was good, doctors and staff stayed on the drug company payroll.  When return on investment was not good, doctors and staff were dropped from the payroll.  One Florida doctor was added to the payroll when his prescriptions increased by over $650,000 in one year.  On the flip side, a New

Jersey doctor was dropped from the payroll when his prescriptions declined precipitously.

25.     While Regeneron had plenty of compliance policies that appeared to conform with the Anti-Kickback Statute, compliance itself was nothing more than words on paper.  Regeneron handcuffed their own compliance people.

26.     Regeneron put the fox in the henhouse. The department responsible for increasing drug sales was also responsible for enforcing the written compliance policies.  The sales force called all the shots, while the compliance department was feckless.  Indeed, drug company employees bantered about how their dual roles were likely to land them in trouble with the government and find Regeneron on the receiving end of a corporate integrity agreement.

27.     Defendants also created a farcical tiering system to look like they were paying doctors and their staff fair market value.  However, exceptions were liberally granted by non-compliance people.

28.     Defendants knowingly submitted or caused the submission of thousands of false or fraudulent claims to the government, in violation of the federal and state False Claims Acts; and the government was footing the bill.

29.     Because of Defendants' fraud scheme, the government (the taxpayer) paid claims for the Covered Drugs that were tainted by these unlawful kickbacks.

One representative sample alone (Exhibit A) showed that the Medicare program paid nearly $50 million in tainted claims.

30.     The Anti-Kickback Statute is intended to make sure that judgments of doctors are not compromised by improper financial incentives and are instead based on the best interests of their patients.  A violation of the Anti-Kickback Statute presumptively establishes a False Claims Act violation, including materiality.

31.     Victims of this fraud are the taxpayers as well as patients being cared for by doctors and their staff who accepted kickbacks.  This kind of scheme depletes the funds set aside to support and care for older, poor and sick Americans, and members of our military (and their families) and veterans.  The fraud also creates improper inducements that corrupt the integrity of physician decision-making.

32.     As one official has said, "the Justice Department is committed to protecting the integrity of physician prescribing decisions and ensuring that financial arrangements in the healthcare marketplace comply with the law. The Department will continue to hold companies and responsible individuals accountable when they use improper incentives."

FIRST AMENDED COMPLAINT

33.     Troublingly, Regeneron and Sanofi are repeat offenders.  Just last year, the United States Attorney for the District of Massachusetts filed suit against Regeneron for allegations that it paid tens of millions of dollars in kickbacks to push Eylea, using a foundation as a conduit to cover co-pays for the drug.

34.     In July 2021, a private insurer also filed a racketeering and fraud suit against Regeneron, alleging that the company engaged in a kickback scheme through a "sham charity" to inflate the price of Eylea from $1,500 a dose to $1,950 — $10,000 for one year of treatment — by partnering with a charity to cover cost-sharing expenses for the drug but not for an allegedly equally effective drug, which was 3 percent of the price of Eylea.

35.     Sanofi has already been subject to two corporate integrity agreements (CIA) with the government both of which involved remedying unlawful kickbacks in prior False Claims Act cases.  Under the CIA that overlapped with the allegations in this Complaint, Sanofi was required to fix its broken compliance program and make sure that its speaker programs did not violate the Anti-Kickback Statute.  Yet, Sanofi thumbed its nose at the CIA requirements.

36.     The False Claims Act is the appropriate tool to remedy this fraudulent scheme according to the Deputy Assistant Attorney General for the United States

Department of Justice: "the False Claims Act has long served as an important vehicle for ensuring compliance with the Anti-Kickback Statute."

## II.   LEGAL FRAMEWORK

### A. Parties

37.   Plaintiff-Relators bring this action based on their direct knowledge and, where indicated, on information and belief.

38.   None of the actionable allegations in this Complaint are based on public disclosures set forth in 31 U.S.C. § 3730(e)(3).

39.   For this reason, they are not prohibited public disclosures under 31 U.S.C. § 3730(e)(3).

40.   Plaintiff-Relators are the original sources of the information upon which this Complaint is based, and the facts alleged in this Complaint, under 31 U.S.C. § 3730(e)(4)(B).

41.   Plaintiffs-Relators have complied with all procedural requirements of the laws under which this Complaint is brought.

42.   Plaintiffs-Relators' claims and this Complaint are not based upon allegations or transactions which are the subject of a civil suit or an administrative civil money penalty proceeding in which the Government is already a party, as enumerated in 31 U.S.C. § 3730(e)(3).

43.     Plaintiffs-Relators are entitled to 25 – 35 percent of the proceeds arising from this Complaint under 31 U.S.C. § 3730(d)(2).

44.     Plaintiff-Relator Naresha Moore (also known as "Jane Doe 1") worked for Regeneron from October 12, 2015, to September 14, 2018, in the sales department at its Tarrytown, New York headquarters.

45.     Plaintiff-Relator Teá Damavandi (also known as "Jane Doe 2") worked for Regeneron from May 18, 2015, to August 13, 2015, as a sales rep covering the greater Los Angeles and Beverly Hills areas for the Covered Drugs.

46.     Defendant Regeneron Pharmaceuticals, Inc. ("Regeneron") is a manufacturer and seller of pharmaceutical products, including Eylea, Praluent, Dupixent and Kevzara (the Covered Drugs). Regeneron is a New York corporation and has its principal place of business at 777 Old Saw Mill River Road, Tarrytown, NY 10591. Regeneron conducts business nationwide.

47.     Defendant Sanofi-Aventis US LLC ("Sanofi") is a Delaware corporation with its principal place of business in Bridgewater, New Jersey. Sanofi is a wholly owned subsidiary of Sanofi S.A., a French multinational pharmaceutical company headquartered in Paris, France. Sanofi co-promotes the drugs Dupixent and Kevzara in the United States with Defendant Regeneron. Prior

to April 1, 2020, Sanofi co-promoted the drug Praluent in the United States with Defendant Regeneron. Regeneron conducts business nationwide.

48.    Sanofi has already been subject to two corporate integrity agreements (CIA) with the government (HHS-OIG) both of which involved remedying unlawful kickbacks in prior False Claims Act cases.  Under the CIA that overlapped with the allegations in this Complaint, Sanofi was required to implement a system with "controls designed to ensure that speaker programs are used for legitimate and lawful purposes in accordance with all applicable Federal health care program requirements and FDA requirements." https://oig.hhs.gov/fraud/cia/agreements/Aventis_Inc_Sanofi_US_Services_Inc_Sanofi-Aventis_US_LLC_and_Genzyme_Corporation_02282020.pdf; https://www.sanofi.us/-/media/Project/One-Sanofi-Web/Websites/North-America/Sanofi-US/Home/products/Corporate-Integrity-Agreement.pdf?la=en&hash=A7EF8A405B332D0C2804988160DADF74

**B. Jurisdiction and Venue**

49.    This action arises under the False Claims Act ("FCA"), as amended, 31 U.S.C. §§ 3729-33.

50.    This Court has subject matter jurisdiction over the claims asserted in this Complaint under the False Claims Act, 31 U.S.C. § 3732, 28 U.S.C. § 1331,

---

FIRST AMENDED COMPLAINT

and supplemental jurisdiction over the counts relating to the State False Claims

Acts under 28 U.S.C. § 1367.

51.    This Court may exercise personal jurisdiction over Defendants under

31 U.S.C. § 3732(a) because they can be found, reside, or transact business in this

District.

52.    Venue is proper in this judicial district, pursuant to 31 U.S.C. §

3732(a), because Defendants can be found, reside, or transact business in this

District, or because an act, proscribed by 31 U.S.C. § 3729, occurred in this

District.

### C. Period

53.    The conduct alleged in this Complaint was ongoing during the

employment of Plaintiff-Relators.  On information and belief, this same conduct

began as early as 2012, and is ongoing, because the conduct was part of

Regeneron's pattern or practice.

### D. The Laws Violated

#### 1.  Federal False Claims Act

54.    The FCA provides, in pertinent part, that any individual who, or entity

that:

FIRST AMENDED COMPLAINT

- "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," 31 U.S.C. § 3729(a)(1)(A); or

- "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," *id.* § 3729(a)(1)(B),

shall be "liable to the United States Government for a civil penalty [up to $10,000], as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 . . . plus 3 times the amount of damages which the Government sustains because of the act of that person," 31 U.S.C. § 3729(b)(1).

55.     For purposes of the FCA, the terms "knowingly" and "knowingly" mean that a person or entity, with respect to information: "(i) has actual knowledge of the information; (ii) acts in deliberate ignore of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." No proof of specific intent to defraud is required. 31 U.S.C. § 3729(b)(1).

56.     The FCA defies the term "claim," in pertinent part, as:

any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that--(i) is presented to an officer, employee, or agent of the United

FIRST AMENDED COMPLAINT

States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government--(I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded[.] 31 U.S.C. § 3729(b)(2).

57.    For purposes of the FCA, the term "material" means "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." *Id.* at § 3729(b)(4).

## 2.  Anti-Kickback Statute

58.    The Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), arose out of Congressional concern that payoffs to those who can influence health care decisions would result in goods and services being provided that are excessively costly, medically unnecessary, of poor quality, or potentially harmful to patients. To protect the integrity of Federal health care programs from these difficult-to-detect harms, Congress enacted a per se prohibition against the payment of kickbacks in any form, regardless of whether the particular kickback gives rise to overutilization, poor quality of care, or patient harm. In particular, when

FIRST AMENDED COMPLAINT

determining what conduct to prohibit, Congress determined that the inducements at issue would "contribute significantly to the cost" of federal health care programs absent federal penalties as a deterrent. H.R. Rep. No. 95-393, at 53 (1977), reprinted in 1977 U.S.C.C.A.N. 3039, 3056. First enacted in 1972, Congress strengthened the Anti-Kickback Statute in 1977, 1987, and 2010 to ensure that kickbacks masquerading as legitimate transactions did not evade its reach. See Social Security Amendments of 1972, Pub. L. No. 92-603, §§ 242(b) and (c); 42 U.S.C. § 1320a-7b, Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93; Patient Protection and Affordable Care Act, Pub. L. No. 111-148.

59.     The Anti-Kickback Statute prohibits any person or entity from offering, making, soliciting, or accepting remuneration, in cash or in kind, directly or indirectly, to induce or reward any person for purchasing, ordering, or recommending or arranging for the purchasing or ordering of federally-funded medical goods or services:

(b) Illegal remunerations ** *

---

FIRST AMENDED COMPLAINT

(2) whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person-¬

(A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

(B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

42 U.S.C. § 1320a-7b(b)(2).

60.    Violation of the Anti-Kickback Statute also can subject the perpetrator to exclusion from participation in federal health care programs and civil monetary penalties. 42 U.S.C. § 1320a-7b(b)(2); 42 U.S.C. § 1320a-7(b)(7); 42 U.S.C. § 1320a-7a(a)(7).

FIRST AMENDED COMPLAINT

61.     The Anti-Kickback Statute defines remuneration to include anything of value, including "cash" and "in-kind" payments or rebates. 42 U.S.C. § 1320a-7b(b)(2). Money and other forms of financial subsidies that can be used to pay or waive Medicare co-pays constitute remuneration under the Anti-Kickback Statute.

62.     The Anti-Kickback Statute defines a "Federal health care program" to mean "any plan or program that provides health benefits, whether directly, through insurance, or otherwise, which is funded directly, in whole or in part, by the United States Government," except for the health insurance program for federal employees under 5 U.S.C. §§ 8901 et seq. 42 U.S.C. § 1320a-7b(f). Medicare is a "Federal health care program" for purposes of the Anti-Kickback Statute.

63.     The Anti-Kickback Statute provides that, "[w]ith respect to violations of this section, a person need not have actual knowledge of this section or specific intent to commit a violation of this section." 42 U.S.C. § 1320a-7b(h).

64.     In 2010, Congress amended the Anti-Kickback Statute to include language that reaffirmed prior case law and provided that any Medicare claim "that includes items or services resulting from a violation of [the Anti-Kickback Statute] constitutes a false or fraudulent claim for purposes of [the False Claims Act]." 42 U.S.C. § 1320a-7b(g). This amendment was intended to clarify "that all claims resulting from illegal kickbacks are considered false claims for the purposes of

FIRST AMENDED COMPLAINT

civil actions under the False Claims Act, even when the claims are not submitted directly by the wrongdoers themselves." Under this provision, claims submitted to federal health care programs that result from violations of the Anti-Kickback Statute are per se false or fraudulent within the meaning of 31 U.S.C. § 3729(a). Accordingly, a person violates the False Claims Act when he or she knowingly submits, or causes to be submitted, a claim to a federal health care program that results from a violation of the Anti-Kickback Statute. 155 Cong Rec. S10854.

65.     Compliance with the Anti-Kickback Statute is material to the federal and state governments' decision to pay claims.

66.     There is a "personal services safe harbor" under the AKS.  The personal services safe harbor applies to payments to an agent as long as: (1) the agency agreement is in writing and signed by the parties; (2) the agreement specifies all of the services that the agent is to provide for the principal; (3) if "the agency agreement is intended to provide the services of the agent on a periodic, sporadic, or part-time basis" then the agreement must specify the intervals and their schedules and charges with specificity; (4) the term of the agreement must be not less than 1 year; (5) the aggregate compensation to the agent must be set in advance, "consistent with fair-market value," and not be determined "in a manner that takes into account the volume or value of any referrals or business otherwise

FIRST AMENDED COMPLAINT

generated between the parties;" (6) the services must not involve promotion of any activity that violates state or Federal law; and (7) the aggregate services contracted for must not exceed those reasonably necessary to accomplish the business purpose of the entity. 42 C.F.R. § 1001.952(d).

67.     As alleged in this Complaint, providing kickbacks to doctors and staff to induce doctors to prescribe Defendants' drugs, Defendants have caused false claims to be submitted to federal health care programs.  Defendants cannot make use of the personal services safe harbor because the required conditions have not been met.  (Doctors, physicians and health care providers are used interchangeably in this Complaint).

### 3.  The Sunshine Law

68.     The one mechanism to allow the public to see the payments that drug companies make to doctors like the ones alleged is this Complaint is the Open Payments Database required by the Physician Payments Sunshine Act (the Sunshine Act or Law).

69.     The Sunshine Law was passed to promote a "more transparent and accountable health care system," and was based on concerns that the medical judgment of doctors should not be swayed by money.  As one high-ranking Department of Justice Official noted earlier this year in announcing settlements

FIRST AMENDED COMPLAINT

with drug companies for improper payments to doctors, "Kickbacks in the healthcare industry are pernicious because of their potential to subvert medical decision-making. https://www.justice.gov/opa/pr/justice-department-recovers-over-22-billion-false-claims-act-cases-fiscal-year-2020

70.    To that end, the law requires that drug companies report annually any "transfer of anything of value" they make to a "physician, physician assistant, nurse practitioner, clinical nurse specialist, certified registered nurse anesthetist, or certified nurse-midwife []." 42 U.S.C. § 1320a-7h and 42 C.F.R. §§ 403.900-914.

71.    As alleged in this Complaint, Defendants found a way to circumvent the Sunshine Law by making backdoor payments to doctor office staff and not just the doctors.

### 4. State False Claims Acts

72.    Violations of the False Claims Act of numerous states are also alleged in this Complaint, including the states California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Louisiana, Massachusetts, Michigan, Minnesota, Montana, Nevada, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Vermont, Virginia and Washington and the District of Columbia.

FIRST AMENDED COMPLAINT

73.     Each of the above States' False Claims Act laws contains materially similar provisions as the Federal False Claims Act. Payments made by these States' Medicaid agencies for prescriptions tainted by kickbacks, such as those alleged in this Complaint, are false claims under the state statutes. Further, Medicaid providers in each of these states, as set forth below, must certify that they are compliant with the state and federal Medicaid requirements, including the federal Anti-Kickback Statute. As a result, Defendants caused health care providers who participated in the States' Medicaid programs to submit false certifications and false claims because of the unlawful kickback scheme in violation of their States' False Claims Act statutes.

## III.    THE REGULATORY FRAMEWORK

### A. Federal Health Care Programs

74.     Medicare is a government health care program that provides federally subsidized health insurance primarily for persons who are 65 or older or disabled and is administered by the Centers for Medicare and Medicaid Services ("CMS"), a component agency of the Department of Health and Human Services ("HHS"). 42 U.S.C. §§1395, *et seq*.

75.     Medicare Part B primarily covers outpatient medical services and drugs like Eylea that must be administered by the doctor.

FIRST AMENDED COMPLAINT

76.     When a doctor administers a drug covered by Medicare Part B, the physician typically submits a claim to Medicare for the drug, and Medicare reimburses the doctor 106 percent of the average sales price of the drug, less the applicable Medicare Part B co-pay. 42 U.S.C. § 1395w–3a(b).

77.     Medicare Part D provides benefits for Medicare beneficiaries for prescription drugs like Dupixent, Praluent and Kevzara.

78.     All individuals enrolled in Medicare Parts A or B are eligible to enroll in a prescription drug plan under Part D.  CMS contracts with private companies (or "Part D sponsors") to administer prescription drug plans.  They are regulated and subsidized by CMS pursuant to one-year, annually renewable contracts. Part D sponsors enter subcontracts with pharmacies to provide drugs to the Part D beneficiaries enrolled in their plans.

79.     Generally, after a doctor writes a prescription for a patient who is a Medicare beneficiary, that patient takes the prescription to a pharmacy to be filled. When the pharmacy dispenses drugs to the Medicare beneficiary, the pharmacy submits a claim electronically to the beneficiary's Part D sponsor (sometimes through the sponsor's pharmacy benefit manager, or "PBM"). The pharmacy receives reimbursement from the sponsor (or PBM) for the "gross drug cost" of the

FIRST AMENDED COMPLAINT

drug dispensed—the portion of the drug cost not paid by the beneficiary, the pharmacy's dispensing fee, and any applicable sales taxes.

80. The Part D sponsor is reimbursed by CMS for the portion of the drug cost not paid by the beneficiary.

81. The payments made by CMS to the Part D sponsor come from the Medicare Prescription Drug Account, an account within the Federal Supplementary Medical Insurance Trust Fund. 42 C.F.R. § 423.315(a).

82. To receive Part D funds from CMS, Part D sponsors, as well as their authorized agents, employees, and contractors (including pharmacies), are required to comply with all applicable federal laws, regulations, and CMS instructions.

83. By statute, all contracts between a Part D Plan sponsor and CMS must include a provision whereby the Plan sponsor agrees to comply with the applicable requirements and standards of the Part D program, as well as the terms and conditions of payment governing the Part D program. 42 U.S.C. § 1395w-112.

84. Medicare Part D sponsors must also certify in their contracts with CMS that they agree to comply with all federal laws and regulations designed to prevent fraud, waste, and abuse, including the False Claims Act and Anti-Kickback Statute. 42 C.F.R. § 423.505(h)(1).

FIRST AMENDED COMPLAINT

85.     CMS regulations further require that all subcontracts between Part D sponsors and downstream entities (such as pharmacies and PBMs) contain language obligating the pharmacy to comply with all applicable federal laws, regulations, and CMS instructions, including the Anti-Kickback Statute. 42 C.F.R. § 423.505(i)(4)(iv).

86.     Thus, subcontracting entities that certify compliance with all appliable laws and regulations are expressly certifying compliance with the Anti-Kickback Statute.

87.     Medicare also enters into provider agreements with doctors to establish the doctor's eligibility to participate in the Medicare program. For the doctors to be eligible, they must certify that they agree to comply with the Anti-Kickback Statute, among other federal health care laws.

88.     Specifically, on the Medicare enrollment form (CMS Form 855I), the "Certification Statement" that the medical provider signs states: "You MUST sign and date the certification statement below in order to be enrolled in the Medicare program. In doing so, you are attesting to meeting and maintaining the Medicare requirements stated below." Those requirements include:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to me . . . The Medicare laws, regulations and program instructions are available through the fee-for-service contractor. I understand that payment of a claim by Medicare is

conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal Anti-Kickback Statute and the Stark law), and on the supplier's compliance with all applicable conditions of participation in Medicare.

. . .

I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

89.     Medicaid is a joint federal-state program that provides health care benefits for certain groups, primarily the poor and disabled. The federal portion of each state's Medicaid payments, known as the Federal Medical Assistance Percentage ("FMAP"), is based on the state's per capita income compared to the national average. 42 U.S.C. § 1396d(b). Among the states, the FMAP is at least 50 percent and is as high as 83 percent.

90.     The Medicaid programs of all states reimburse for prescription drugs. Most states award contracts to private companies to evaluate and process claims for payment on behalf of Medicaid recipients. Typically, after processing the claims, these private companies then generate funding requests to the state Medicaid programs.

91.     Claims arising from illegal kickbacks are not authorized to be paid under state rules. For example, the New York rules provide that an "overpayment includes any amount not authorized to be paid under the medical assistance

program, whether paid as the result of inaccurate or improper cost reporting, improper claiming, unacceptable practices, fraud, abuse or mistake." N.Y. Comp. Codes R. & Regs. Title 18 § 518.1(c).

92. "Unacceptable practice" is defined to include "[b]ribes and kickbacks" (§ 515.2(b)(5)), and lists within this category both "soliciting and receiving" (§ 515.2(b)(5)(ii)), and "offering or paying" (§ 515.2(b)(5)(iv), "either directly or indirectly any payment (including any kickback, bribe, referral fee, rebate or discount), whether in cash or in-kind, in return for purchasing, leasing, ordering or recommending any medical care, services or supplies for which payment is claimed under the program" (§ 515.2(b)(5)(ii), (iv)). New York's Anti-Kickback Statute forbids kickbacks in similar terms. N.Y. Soc. Serv. Law §§ 366-d-f.

93. States also require certifications by doctors as a condition of providing Medicaid reimbursement for the prescriptions they write. These certifications include compliance with the Anti-Kickback Statute, among other federal health care laws.

94. A provider who participates in the Medicaid program must sign an agreement with their State that certifies compliance with the state and federal Medicaid requirements, including the Anti-Kickback Statute. Although there are

FIRST AMENDED COMPLAINT

variations among the States, the agreement typically requires the prospective Medicaid provider to agree that he or she will comply with all state and federal laws and Medicaid regulations in billing the state Medicaid program for services or supplies furnished:

| Alabama | The Provider Enrollment application that a provider is required to sign before it can participate in the State of Alabama Program requires a provider to agree to the following: <br><br> "As a condition for participation as a provider under the Alabama Medicaid Program (MEDICAID), the provider (Provider) agrees to comply with all terms and conditions of this Agreement…. <br><br> "§1.1. This Agreement is deemed to include . . . all State and Federal laws and regulations. <br><br> §1.2.3. This Agreement is subject to all state and federal laws and regulations relating to fraud and abuse in health care and the Medicaid program." <br><br> Alabama Medicaid Provider Enrollment Application, §§1.1, 1.2.3. |
|---|---|
| Alaska | The Provider Enrollment Form that a provider is required to sign before it can participate in the State of Alaska Program requires a provider to agree to the following terms and conditions: <br><br> "1. To abide by federal Medicaid regulations and regulations of the Alaska Department of Health and Social Services pertaining to the furnishing of services or items or claiming payments under Alaska's Medical Assistance programs . . . . To ensure that my practice/business remains in compliance with all federal and state, laws, regulations, policies, and rules . . . ." |

| | |
|---|---|
| | Alaska Medical Assistance Program, Provider Enrollment Form, at 4. |
| **Arizona** | The Provider Participation Agreement that a provider is required to sign before it can participate in the State of Arizona Program requires a provider to agree to the following terms and conditions:<br><br>"6. The Provider shall comply with all federal, State and local laws, rules, regulations, standards and executive orders governing performance of duties under this Agreement, without limitation to those designated within this Agreement….<br>"13. By signing this Agreement, the Provider certifies that it has not engaged in any violation of the Medicare Anti-Kickback Statute (42 USC §§1320a-7b…."<br><br>Arizona Health Care Cost Containment System Administration Provider Participation Agreement, §111(6), (13). |
| **Arkansas** | The contract that a provider is required to sign before it can participate in the State of Arkansas Program requires a provider to agree to the following terms and conditions:<br><br>"Provider, in consideration of the covenants therein, agrees: ... [t]o conform to all Medicaid requirements covered in Federal or State laws, regulations or manuals."<br><br>Contract to Participate in the Arkansas Medical Assistance Program, § l(K). |

FIRST AMENDED COMPLAINT

| California | The Provider Agreement that a provider is required to sign to participate in the State of California Program requires a provider to agree to the following:

"2. Compliance With Laws and Regulations. Provider agrees to comply with all applicable provisions of Chapters 7 and 8 of the Welfare and Institutions Code (commencing with Sections 14000 and 14200), and any applicable rules or regulations promulgated by DHS pursuant to these Chapters.... Provider further agrees to comply with all federal laws and regulations governing and regulating Medicaid providers."

"3. Forbidden Conduct. Provider agrees that it shall not engage in conduct inimical to the public health, morals, welfare and safety of any Medi-Cal beneficiary, or the fiscal integrity of the Medi-Cal program."
"14. Provider Fraud and Abuse. Provider agrees that it shall not engage in or commit fraud and abuse. 'Fraud' . . . includes any act that constitutes fraud under applicable federal or state law."

"18. Prohibition of Rebate, Refund, or Discount. Provider agrees that it shall not offer, give, furnish, or deliver any rebate, refund, commission preference, patronage dividend, discount, or any other gratuitous consideration, in connection with the rendering of health care services to any Medi-Cal beneficiary. Provider further agrees that it shall not solicit, request, accept, or receive, any rebate, refund, commission preference, patronage dividend, discount, or any other gratuitous consideration in connection with the rending of health care services to any Medi-Cal beneficiary. Provider further agrees that it will not take any other action or receive any other benefit prohibited by state or federal law."

"Provider agrees that compliance with the provisions of this agreement is a condition precedent to payment to provider."

California Medi-Cal Provider Agreement. |
|---|---|

| | |
|---|---|
| **Colorado** | The Medicaid Provider Participation Agreement that a provider is required to sign to participate in the State of Colorado Program requires a provider to agree to the following:<br><br>"A. Provider will comply with all applicable provisions of the Social Security Act, as amended; federal or state laws, regulations, and guidelines; and Department rules."<br><br>Colorado Medicaid Provider Agreement, Definitions ¶ A. |
| **Connecticut** | The Connecticut Medical Assistance Program application that a provider is required to sign to participate in the State of Connecticut Program requires a provider to agree to the following terms and conditions:<br><br>"I further certify that, if I am granted status as a provider for Connecticut Medical Assistance programs, I expressly agree to the following terms and conditions: to abide by all applicable federal and state statutes and regulations."<br><br>Connecticut Medical Assistance Program Enrollment/ Re-Enrollment Application.<br><br>In addition, the Provider Enrollment Agreement that a provider is required to sign to participate in the State of Connecticut's Program requires a provider to agree to the following terms and conditions:<br><br>"Provider . . . wishes to participate in the Connecticut Medical Assistance Program and, therefore, represents and agrees as follows:"<br><br>"2. To abide by and comply with all federal and state statutes, regulations, and policies pertaining to Provider's participation in the Connecticut Medical Assistance Program."<br><br>"26. Provider acknowledges and understands that the prohibitions set forth in [Section 1909 of the Social Security Act] include but are not limited to.... false statements, |

FIRST AMENDED COMPLAINT

| | |
|---|---|
| | misrepresentation, concealment, failure to disclose and conversion of benefits.... and any giving or seeking of kickbacks, rebates, or similar remuneration[.]"<br><br>Connecticut Department of Social Services Health Care Financing, Provider Enrollment Agreement. |
| **Delaware** | The Contract for Items or Services Delivered to Delaware's Medical Assistance Program Eligibles that a provider is required to sign in order to participate in the State of Delaware's Program requires a provider to agree to the following terms and conditions:<br><br>"1. Applicable Laws and Regulations<br><br>The Provider agrees, as a participant in the programs under the authority of the Delaware Medical Assistance Program (DMAP), to abide by the rules, regulations, policies and procedures of the DMAP, and to comply with all the terms, conditions, and requirements as set forth herein.... The Provider also understands that penalties may be imposed for failure to observe the terms of the Social Security Act."<br><br>"3. Payment for Items or Services<br><br>... The Provider shall not solicit, charge, accept, or receive any money, gift or other consideration from a DMAP eligible or from any other person on behalf of the eligible for any service or item allowable under the DMAP...."<br><br>Delaware's Contract for Items or Services Delivered to Delaware Medical Assistance Program Eligibles. |

| | |
|---|---|
| **District of Columbia** | The Provider Agreement that a provider is required to sign to participate in the District of Columbia Program requires a provider to agree to the following:<br><br>"C. To satisfy all requirements of the Social Security Act, as amended, and be in full compliance with the standards prescribed by Federal and State standards…. [and that]<br><br>If the Department determines that a provider has failed to comply with the applicable Federal or District law or rule, ... the Department may do all of the following: A. Withhold all or part of the providers' payments…."<br><br>District of Columbia Medicaid Provider Agreement, at 20, 23. |
| **Florida** | The Medicaid Provider Agreement that a provider is required to sign to participate in the State of Florida's Program requires a provider to agree to the following:<br><br>"The provider agrees to comply with local, state, and federal laws, as well as rules, regulations, and statements of policy applicable to the Medicaid program, including the Medicaid Provider Handbooks issued by [the Florida Agency for Health Care Administration]."<br><br>See Non-Institutional Medicaid Provider Agreement.<br>In addition, Florida's Medicaid Provider Enrollment Application, which a provider is required to sign to participate in the State of Florida's Program, requires a provider to agree that:<br><br>"Providers who choose to submit claims electronically . . . must understand and agree to the following terms and conditions: . . . [a]bide by all Federal and State statutes, rules, regulations, and manuals governing the Florida Medicaid program."<br><br>Florida Medicaid Provider Enrollment Application. |

FIRST AMENDED COMPLAINT

| Georgia | The Statement of Participation that a provider is required to sign to participate in the State of Georgia's Plan for Medical Assistance Program requires a provider to agree to the following terms and conditions: |
|---------|---|
|         | "2A. Legal Compliance. Provider shall comply with all of the Department's requirements applicable to the category(ies) of service in which Provider participates under this Statement of Participation, including Part I, Part II and the applicable Part Ill manuals." |
|         | "4A. Claim Submission; Certification of Claims. Provider shall submit claims for Covered Services rendered to eligible Medicaid recipients in the form and format designated by the Department. For each claim submitted by or on behalf of a Provider, Provider shall certify each claim for truth, accuracy and completeness, and shall be responsible for research and correction of all billing discrepancies without cost to the Department. This provision shall survive termination or expiration of this Statement of Participation for any reason." |
|         | "4D. Reimbursement for Covered Services. Reimbursement for Covered Services performed shall be made in a form and format designated by the Department. Payment shall be made in conformity with the provisions of the Medicaid program, applicable federal and state laws, rules and regulations promulgated by the U.S. Department of Health and Human Services and the State of Georgia, and the Department's Policies and Procedures manuals in effect on the date the service was rendered. . . . Provider agrees that the Department shall not reimburse any claim, or portion thereof, for services rendered prior to the effective date of enrollment indicated by the Department or for which federal financial participation is not available." |
|         | "Provider acknowledges that payment of claims submitted by or on behalf of Provider will be from federal and state funds, and the Department may withhold, recoup or recover payments |

| | |
|---|---|
| | as a result of Provider's failure to abide by the Department's requirements. This provision shall survive termination or expiration of this Statement of Participation for any reason." <br><br> Georgia Statement of Participation, Department of Community Health, Division of Medical Assistance, § lll (D). |
| **Hawaii** | The Hawaii State Medicaid Program Provider Agreement that a provider is required to sign to participate in the State of Hawaii's Program requires a provider to agree to the following: <br><br> "1. I/We agree to abide by the applicable provisions of the Hawaii State Medicaid Program . . . and applicable provisions set forth in the Code of Federal Regulations (C.F.R.) related to the Medical Assistance Program. Upon certification by the Hawaii State Medicaid Program, I/We also agree to abide by the policies and procedures contained in the Hawaii State Medicaid Manual." <br><br> "6. ... I/We am aware that it is violation of Federal law to accept or require additional payments over and beyond those established by the Hawaii State Department of Human Services for services rendered under the Hawaii State Medicaid Program." <br><br> Hawaii State Medicaid Program Provider Agreement and Condition of Participation, ¶ 1. |
| **Idaho** | The Provider Agreement that a provider is required to sign to participate in the State of Idaho Program requires the following: <br><br> "1. Compliance. <br> To provide services in accordance with all applicable provisions of statutes, rules and federal regulations governing the reimbursement of services and items under Medicaid in Idaho, including IDAPA 16.03.09 and 16.03.10, as amended; the current applicable Medicaid Provider Handbook; any Additional Terms attached hereto and hereby incorporated by |

| | |
|---|---|
| | reference; and any instructions contained in provider information releases or other program notices." <br><br> Idaho Department of Health and Human Services, Medicaid Provider Agreement. |
| **Illinois** | The Agreement for Participation in the Illinois Medical Assistance Program that a provider is required to sign to participate in the State of Illinois' Program requires a provider to agree to the following: <br><br> "1. The Provider agrees, on a continuing basis, to comply with all current and future program policy and billing provisions as set forth in the applicable Department of Public Aid Medical Assistance Program rules and handbooks." <br><br> "3. The Provider agrees, on a continuing basis, to comply with Federal standards specified in Title XIX and XXI of the Social Security Act and with all other applicable Federal and State laws and regulations." <br><br> "6. The Provider agrees to be fully liable for the truth, accuracy and completeness of all claims submitted electronically or on hard copy to the Department for payment. Provider acknowledges that it understands the laws and handbook provisions regarding services and certifies that the services will be provided in compliance with such laws and handbook provisions. Provider further acknowledges that compliance with such laws and handbook provisions is a condition of payment for all claims submitted. Any submittal of false or fraudulent claim or claims or any concealment of a material fact may be prosecuted under applicable Federal and State laws." <br><br> Agreement for Participation in the Illinois Medical Assistance Program, ¶¶ 1, 3, 6. |

FIRST AMENDED COMPLAINT

| Indiana | The Indiana Health Coverage Programs ("IHCP") Provider Agreement that a provider is required to sign to participate in the State of Indiana's Program requires a provider to agree to the following: |
| --- | --- |
| | "By execution of this Agreement, the undersigned entity ("Provider") requests enrollment as a provider in the Indiana Health Coverage Programs. As an enrolled provider in the Indiana Health Coverage Programs, the undersigned entity agrees to provide Medicaid-covered . . . services and/or supplies to Indiana Medicaid . . . members. As a condition of enrollment, this agreement cannot be altered and the Provider agrees to all of the following:..." |
| | "2. To comply with all federal and state statutes and regulations pertaining to the Medicaid Program or CHIP, as they may be amended from time to time." |
| | "5. To provide Medicaid-covered and CHIP-covered services and/or supplies for which federal financial participation is available for Medicaid and CHIP members pursuant to all applicable federal and state statutes and regulations." |
| | "11. To abide by the Indiana Health Coverage Programs Provider Manual [Chapter 13 of which defines Medicaid Fraud to include soliciting, offering, or receiving a kickback, bribe, or rebate]..." |
| | "13. To be individually responsible and accountable for the completion, accuracy, and validity of all claims filed under the provider number issued, including claims filed by the Provider, the Provider's employees, or the Provider's agents. Provider understands that the submission of false claims, statements, and documents or the concealment of material fact may be prosecuted under the applicable Federal and/or State law." |

FIRST AMENDED COMPLAINT

| | |
|---|---|
| | "16. To submit claims that can be documented by Provider as being strictly for ... compensation that Provider is legally entitled to receive."<br><br>Indiana Health Coverage Programs ("IHCP") Provider Agreement, ¶¶ 2, 5, 11, 16(c). |
| **Iowa** | The Medicaid Provider Agreement that a provider is required to sign to participate in the State of Iowa's Program requires a provider to agree to the following:<br><br>"1.4 To comply with all applicable Federal and State laws, rules and written policies of the Iowa Medicaid program, including but not limited to Title XIX of the Social Security Act (as amended), the code of Federal Regulations (CFR), the provisions of the Code of Iowa and rules of the Iowa Department of Administrative Services and written Department policies, including but not limited to, policies contained in the Iowa Medicaid Provider Manual, and the terms of this Agreement."<br><br>Iowa Medicaid Provider Agreement, Form 470-2965, §1.4 |

FIRST AMENDED COMPLAINT

| Kansas | The Provider Agreement that a provider is required to sign to participate in the State of Kansas Program requires a provider to agree to the following terms and conditions:

"1. Rules, Regulations, Policies
The provider agrees to participate in the Kansas Medical Assistance Program (KMAP) and to comply with all applicable requirements for participation as set forth in federal and state statutes and regulations, and Program policies, within the authorities of such statutes and regulations, of the SRS Health Care Policy (HCP) as published in the KMAP Provider Manuals and Bulletins. The provider also agrees to comply with all state and federal laws and regulations applicable to services delivered and professional activities….

14. Fraud
The provider agrees that payment of claims is from federal and/or state funds and that any false claims, statements or documents or concealment of a material fact may be prosecuted under applicable federal or state laws. The provider acknowledges that the submission of a false claim, cost report, document or other false information, charging the recipient for covered services except for authorized spenddown and co-payment, and giving or taking of a kickback or bribe in relationship to covered services are crimes which are prosecutable under applicable federal and/or state laws. Among such applicable laws is K.S.A. 21-3844 et. seq. and amendments thereto (the Kansas Medicaid Fraud Control Act)."

Kansas Medical Assistance Program Provider Agreement, §§ 1,14. |

FIRST AMENDED COMPLAINT

| Kentucky | The Provider Agreement that a provider is required to sign to participate in Kentucky's Program requires a provider to agree to the following terms and conditions:<br><br>"The Provider:…<br>(5) Assures awareness of the provisions of 42 U.S.C. § 1320a-7b . . . and of the provisions of KRS 205.8451 to KRS 205.8483 relating to Medicaid Program Fraud and Abuse….<br><br>(7) Agrees [that] . . . payment and satisfaction of claims will be from federal and state funds and that any false claims, statements, or documents or concealment or falsification of a material fact, may be prosecuted under applicable federal and state law."<br>See Commonwealth of Kentucky Department for Medicaid Services Provider Agreement, §§4(5), 4(7)(c).<br><br>In addition, the Provider Application that a provider is required to sign to participate in the Kentucky Program requires a provider to agree to the following terms and conditions:<br><br>"I certify that I have read and understand the Medicaid Rules, Regulations, Policy and 42 U.S.C. § 1320a-7b ... to the best of my ability. I agree to abide by the Medicaid Program terms and conditions listed in this document…."<br><br>Commonwealth of Kentucky Department for Medicaid Services and/or Kentucky Health Care Partnership Provider Application, at 10. |

FIRST AMENDED COMPLAINT

| Louisiana | The Provider Agreement Enrollment Form that a provider is required to sign to participate in the State of Louisiana Program requires a provider to agree to the following terms and conditions:<br><br>"5. I agree to abide by Federal and State Medicaid laws, regulations and program instructions that are applicable to the provider type for which I am enrolled. I understand that the payment of a claim by Medicaid is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions;"<br><br>"6. I agree to conduct my activities/actions in accordance with the Medical Assistance Program Integrity Law . . . as required to protect the fiscal and programmatic integrity of the medical assistance programs;"<br><br>"13. I agree to adhere to the published regulations of the DHH Secretary and the Bureau of Health Services Financing, including, but not limited to, those rules regarding recoupment and disclosure requirements as specified in 42 CFR 455, Subpart B[.]"<br><br>Enrollment Packet for the Louisiana Medical Assistance Program (PE-50, Addendum), ¶¶ 5-6, 13. |
|---|---|

FIRST AMENDED COMPLAINT

| Maine | The Provider Agreement that a provider is required to sign to participate in the State of Maine Program requires a provider to agree to the following terms and conditions: |
|---|---|
| | "1. Conditions of Participation. As a condition of participation or continued participation as a provider in MaineCare, the Provider agrees to comply with the provisions of the Federal and State laws and regulations related to Medicaid, the provisions of the MaineCare Benefits Manual.... |
| | 2. Changes in Federal or State laws or Regulations.<br>  a) Any change in Federal or State law or regulation that conflicts with or modifies any term of this Agreement will automatically become a part of this Agreement on the date such a change in statute or regulation becomes effective. |
| | b) If the Provider objects to the application of the change in Federal or State law or regulation, it must notify the Department within thirty (30) calendar days of the effective date of the change that it will terminate the Agreement…. Failure to so notify the Department will be deemed acceptance of the change in law or regulation as part of this Agreement…. |
| | 5. Certification….<br>  b) The Provider ... certifies that at the time that this Agreement is executed neither it nor any of its employees, group members or agents has engaged in any activities prohibited by 42 U.S.C. § 1320a-7b….<br>  d) The Provider understands that engaging in activities prohibited by 42 U.S.C. § 1320a-7b may result in sanctions or termination of this Agreement, in accordance with applicable Federal and State laws and regulations." |
| | MaineCare/Medicaid Provider Agreement at A(l), (2), (5). |

| Massachusetts | The Provider Agreement that a provider is required to sign to participate in the Commonwealth of Massachusetts Program requires a provider to agree to the following terms and conditions: |
| --- | --- |
| | "The Provider agrees . . . [t]o comply with all federal and state laws, regulations, and rules applicable to the Provider's participation in MassHealth, now existing or adopted during the term of this Provider Contract." |
| | MassHealth Provider Agreement ¶ II. B |

| **Michigan** | The Provider Agreement that a provider is required to sign to participate in the State of Michigan Program requires a provider to agree to the following terms and conditions:

"In applying for enrollment as a provider or trading partner in the Medical Assistance Program (and programs for which the Michigan Department of Community Health (MDCH) is the fiscal intermediary), I represent and certify as follows. . .

6. Before billing for any medical services I render, I will read the Medicaid Provider Manual from the Michigan Department of Community Health (MDCH). I also agree to comply with 1) the terms and conditions of participation noted in the manual, and 2) MDCH's policies and procedures for the Medical Assistance Program contained in the manual, provider bulletins and other program notifications.

7. I agree to comply with the provisions of 42 CFR 455.104, 42 CFR 455.105, 42 CFR 431.107 and Act No. 280 of the Public Acts of 1939, as amended, which state the conditions and requirements under which participation in the Medical Assistance Program is allowed.

13. I agree to comply with all policies and procedures of the Medical Assistance Program when billing for services rendered.
In pertinent part, the Michigan Medicaid Provider Manual states:

"8.2 RENDERING SERVICES

"All such services [Medicaid] rendered must be in compliance with the provider enrollment agreement; contracts (when appropriate); Medicaid policies; and applicable county, state, and federal laws and regulations governing the delivery of health care services." |
|---|---|

FIRST AMENDED COMPLAINT

| | |
|---|---|
| | Michigan Department of Health and Human Services, Medicaid Provider Manual. |
| **Minnesota** | The Provider Agreement that a provider is required to sign to participate in the State of Minnesota Program requires a provider to agree to the following:<br><br>"[T]he Provider agrees to . . . [c]omply with all federal and state statutes and rules relating to the delivery of services to Individuals and to the submission of claims for such services."<br><br>Minnesota Health Care Programs Provider Agreement, ¶ 2. |
| **Mississippi** | The Participation Agreement that a provider is required to sign to participate in the State of Mississippi Program requires a provider to agree to the following:<br><br>"The Medicaid Provider agrees ... [t]o abide by federal and state laws and regulations affecting delivery of services."<br><br>Mississippi Medicaid Assistance Participation Agreement § C,1]2.104 |

| Missouri | The Participation Agreement that a provider is required to sign to participate in the State of Missouri Program requires a provider to agree to the following terms and conditions: |
|---|---|
| | "1. [Provider] will comply with the Medicaid manual, bulletins, rules and regulations as required by the Division of Medical Services and the United States Department of Health and Human Services in the delivery of services and merchandise and in submitting claims for payment. I understand that in my field of participation I am not entitled to Medicaid reimbursement if I fail to so comply, and that I can be terminated from the program for failure to comply…. |
| | 117. Medicaid participation under this agreement may be terminated...Such reason(s) could include the provider being in violation of . . . (c) rules regulations, policies or procedures of the Division of Medical Services. . . . The provider must be in compliance with all other applicable state or federal laws or regulations. Violation of any law or regulation may result in this agreement being terminated immediately upon mailing of written notice from the Division of Medical Services…. |
| | Missouri Department of Social Services, Division of Medical Services Participation Agreement, 1, 7. |
| Montana | The Provider Agreement that a provider is required to sign to participate in the State of Montana Program requires a provider to agree to the following terms and conditions: |
| | "The Provider hereby agrees to comply with all applicable laws, rules and written policies pertaining to the Montana Medicaid Program (Medicaid), including but not limited to Title XIX of the Social Security Act, the Code of Federal Regulations (CFR), Montana Codes Annotated (MCA), Administrative Rules of Montana (ARM) and written Department of Public Health and Human Services (Department) policies, including but not limited to policies |

FIRST AMENDED COMPLAINT

| | |
|---|---|
| | contained in the Medicaid provider manuals, and the terms of this document."<br><br>Montana Medicaid Provider Enrollment Agreement and Signature Page, at 2. |
| **Nebraska** | The Provider Agreement that a provider is required to sign to participate in the State of Nebraska's Program requires a provider to agree to the following terms and conditions:<br><br>"I agree to participate as a provider in the Nebraska Medical Assistance Program, and assure the Nebraska Health and Human Services System:<br><br>• That the policies and procedures of the Nebraska Health and Human Services System in the administration of the Nebraska Medical Assistance Program will be followed….<br><br>• That any false claims (including claims submitted electronically), statements, documents, or concealment of material fact may be prosecuted under applicable State or Federal laws (42 CFR 455.18)….<br><br>I certify the information on this form is true, accurate, and complete."<br><br>Medical Assistance Provider Agreement, at 2.111<br><br>The policies and procedures of the Nebraska Medical Assistance Program include the following:<br><br>"2-001.03 Provider Agreements: Each provider is required to have an approved agreement with the Department. By signing the agreement, the provider agrees to – |

FIRST AMENDED COMPLAINT

| | |
|---|---|
| | 1. Fully meet standards established by the federal Department of Health and Human Services, and any applicable state and federal laws governing the provision of their services....<br><br>Nebraska HHS Finance and Support Manual, Chapter 2-000 Provider Participation, at 1. |
| **Nevada** | The Provider Application that a provider is required to sign to participate in the State of Nevada Program requires a provider to agree to the following terms and conditions:<br><br>"I understand that I am responsible for the presentation of true, accurate and complete information on all invoices submitted to First Health Services. I further understand that payment and satisfaction of these claims will be from federal and state funds and that false claims, statements, documents, or concealment of material facts may be prosecuted under applicable federal and state laws."<br><br>Provider Enrollment Application, at 6. |
| **New Jersey** | The Provider Agreement that a provider is required to sign to participate in the State of New Jersey Program requires a provider to agree to the following terms and conditions:<br><br>"Provider agrees:<br><br>(1) To comply with all applicable State and Federal laws, policies, rules and regulations...." |

FIRST AMENDED COMPLAINT

| New Mexico | The Provider Agreement that a provider is required to sign to participate in the State of New Mexico Program requires a provider to agree to the following terms and conditions: |
|---|---|
| | The "Medicaid Provider Shall: |
| | 1.1 Abide by all federal, state, and local laws, rules, and regulations, including but not limited to those laws, regulations, and policies applicable to providers of medical services under Title XIX (Medicaid) and Title XXI (SCHIP) of the Social Security Act and other health care programs administered by HSD." |
| | "1.11 Submission of false claims or fraudulent representation may subject the provider to termination, criminal investigation and charges, and other sanctions specified in the MAD Provider Program Manual." |
| | "7.3 Provider status may be terminated immediately, without notice, in instances in which the health and safety of clients in institutions are deemed to be in immediate jeopardy; are subject to an immediate or serious threat; or when it has been demonstrated, on the basis of reliable evidence, that a provider has committed fraud, abuse[.]" |
| | "BY SIGNATURE, THE PROVIDER AGREES TO ABIDE BY AND BE HELD TO All FEDERAL. STATE, AND LOCAL LAWS, RULES, AND REGULATIONS, INCLUDING, BUT NOT LIMITED TO THOSE APPLICABLE TO MEDICAID AND THOSE STATED HEREIN. BY SIGNATURE, THE PROVIDER SOLEMNLY SWEARS UNDER PENALTY OF PERJURY THAT THE INFORMATION GIVEN IS TRUE AND ACCURATE." |
| | New Mexico Provider Participation Agreement, at 3-6. |

| New York | The Provider Certification that a provider is required to sign to participate in the State of New York Program also requires a provider to agree to the following terms and conditions: |
| --- | --- |
| | "As of [date of the certification], all claims submitted electronically or on paper to the State's Medicaid fiscal agent . . . will be subject to the following certification...." |
| | "I (or the entity) have furnished or caused to be furnished the care, services, and supplies itemized and done so in accordance with applicable federal and state laws and regulations...." |
| | "All statements, data and information transmitted are true, accurate and complete to the best of my knowledge; no material fact has been omitted; I understand that payment and satisfaction of this claim will be from federal, state and local public funds and that I may be prosecuted under applicable federal and state laws for any violation of the terms of this certification including but not limited to false claims, statements or documents, or concealment of a material fact...." |
| | "In submitting claims under this agreement I understand and agree that I (or the entity) shall be subject to and bound by all rules, regulations, policies, standards, fee codes and procedures of the New York State Department of Health and the Office of the Medicaid Inspector General as set forth in statute or title 18 of the Official Compilation of Codes, Rules and Regulation of New York State and other publications of the Department, including eMed NY Provider Manuals and other official bulletins of the Department." |
| | New York Certification Statement for Provider Billing Medicaid. |

FIRST AMENDED COMPLAINT

| North Carolina | The Provider Agreement that a provider is required to sign to participate in the State of North Carolina Program requires a provider to agree to the following terms and conditions:<br><br>A .1. "Comply with federal and state laws, regulations, state reimbursement plan and policies governing the services authorized under the Medicaid Program and this agreement (including, but not limited to, Medicaid provider manuals and Medicaid bulletins published by the Division of Medical Assistance and/or its fiscal agent)."<br><br>B.1. "Payment of claims is from State, Federal and County funds and any false claims, false statements or documents, or misrepresentation or concealment of material fact may be prosecuted by applicable State and/or Federal law."<br><br>C.6. "To not offer or provide any discount, rebate, refund, or any other similar unearned gratuity for the purpose of soliciting the patronage of Medicaid clients."<br><br>North Carolina Division of Medical Assistance Medicaid Participation Agreement, at 3-5.131<br><br>In addition, North Carolina's Electronic Claims Submission (ESA) Agreement states:<br><br>"The Provider of Medical Care ("Provider") under the Medicaid Program in consideration of the right to submit claims by paperless means rather than by, or in addition to, the submission of paper claims agrees that it will abide by the following terms and conditions:<br><br>1. The Provider shall abide by all Federal and State statutes, rules, regulations and policies (including, but not limited to: the Medicaid State Plan, Medicaid Manuals, and Medicaid bulletins published by the Division of Medical Assistance (OMA) and/or its fiscal agent of the Medicaid Program, and the conditions set out in any Provider Participation |
|---|---|

FIRST AMENDED COMPLAINT

Agreement entered into by and between the Provider and OMA.

2. Provider's signature electing electronic filing shall be binding as certification of Provider's intent to file electronically and its compliance with all applicable statutes, rules, regulations and policies governing electronic claims submission. The Provider agrees to be responsible for research and correction of all billing discrepancies. Any false statement, claim or concealment of or failure to disclose a material fact may be prosecuted under applicable federal and/or state law (P.L. 95-142 and N.C.G.S. 108A-63), and such violations are punishable by fine, imprisonment and/or civil penalties as provided by law.

5. . . . For purposes of compliance with this agreement and the laws, rules, regulations and policies applicable to Medicaid providers, the acts and/or omissions of Provider's staff or any entity acting on its behalf for electronic submission of the Provider's claims shall be deemed those of the Provider, including any acts and/or omissions in violation of Federal and State criminal and civil false claims statutes . . . .

The undersigned having read this Agreement for billing Medicaid claims electronically and understanding it in its entirety, hereby agree(s) to all of the stipulations, conditions, and terms stated herein.

North Carolina Department of Health And Human Services Division of Medical Assistance Electronic Claims Submission (ECS) Agreement, at 1-3
It further states:

"By signature below, I understand and agree that non-electronic Medicaid claims may be submitted without signature and this certification is binding upon me for my actions as a Medicaid provider, my employees, or agents who provide services to Medicaid recipients under my

FIRST AMENDED COMPLAINT

| | |
|---|---|
| | direction or who file claims under my provider name and identification number.<br><br>I certify that all claims made for Medicaid payment shall be true, accurate, and complete and that services billed to the Medicaid Program shall be personally furnished by me, my employees, or persons with whom I have contracted to render services, under my personal direction.<br><br>I understand that payment of claims will be from federal, state and local tax funds and any false claims, statements, or documents or concealment of a material fact may be prosecuted under applicable Federal and State laws and I may be fined or imprisoned as provided by law."<br><br>North Carolina Division of Medical Assistance, Provider Certification for Signature on File. |
| **Ohio** | The Provider Agreement that a provider is required to sign to participate in the State of Ohio Program requires a provider to agree to the following terms and conditions:<br><br>"This provider agreement is a contract between the Ohio Department of Job and Family Services (the Department) and the undersigned provider of medical assistance services in which the Provider agrees to comply with the terms of this provider agreement, state statutes, Ohio Administrative Code rules, and Federal statutes and rules...."<br><br>Ohio Health Plans Provider Enrollment Application/Agreement at 13. |
| **Oklahoma** | The Provider Agreement that a provider is required to sign to participate in the State of Oklahoma Program requires a provider to agree to the following terms and conditions:<br><br>4.1 "(c) Provider agrees to comply with all applicable Medicaid statutes, regulations, policies, and properly promulgated rules of OHCA...." |

FIRST AMENDED COMPLAINT

| | |
|---|---|
| | 4.2 "(e) Satisfaction of all claims will be from federal and state funds. Any false claims, statements, or documents, or any concealment of a material fact may be prosecuted under applicable federal or state laws."<br><br>"5.0 The parties to this Agreement acknowledge and expect that over the term of this Agreement laws may change. Specifically, the parties acknowledge and expect (i) federal Medicaid statutes and regulations, (ii) state Medicaid statutes and rules, (iii) state statutes and rules governing practice of health-care professions, and (iv) any other laws cited in this contract may change. The parties shall be mutually bound by such changes."<br><br>§5.2 "Provider shall comply with and certifies compliance with: . . .<br>      p) The Federal False Claims Act, 31 U.S.C. §3729-3733; 31 U.S.C. 3801."<br><br>Oklahoma Health Care Authority Agreement. |
| **Oregon** | The Provider Agreement that a provider is required to sign to participate in the State of Oregon Program requires a provider to agree to the following terms and conditions:<br><br>"D. Compliance with applicable laws… Provider shall comply with federal, state and local laws and regulations applicable to this Enrollment Agreement, including but not limited to OAR 410-120-1380. OMAP's obligations under this Enrollment Agreement are conditioned upon Provider's compliance with provisions of ORS 279.312,279.314, 279.316, 279.320, and 279.555, as amended from time to time, which are incorporated in this agreement. Provider is responsible for all Social Security payments and federal or state taxes applicable to payments under this Enrollment Agreement."<br><br>OMAP Provider Application, §D. |

FIRST AMENDED COMPLAINT

| | |
|---|---|
| **Pennsylvania** | The Provider Agreement that a provider is required to sign to participate in the Commonwealth of Pennsylvania Program requires a provider to agree to the following terms and conditions:<br><br>"A. The Provider agrees to participate in the Pennsylvania Medical Assistance Program (the 'Program'), and in the course of such participation to comply with all federal and Pennsylvania laws generally and specifically governing participation in the Program. The foregoing include but are not limited to: 42 U.S.C. § 1396 et seq., 62 P.S.§§ 441-451,42 C.F.R. §§431-481 and the regulations adopted by the Department of Public Welfare (the 'Department'). The Provider agrees to be knowledgeable of and to comply with applicable rules, regulations, rates and fee schedules promulgated under such laws and any amendments thereto."<br><br>Pennsylvania Provider Agreement, § 1(A). |
| **Rhode Island** | The Provider Agreement that a provider is required to sign to participate in the State of Rhode Island Program requires a provider to agree to the following terms and conditions:<br><br>"I, the Provider with the understanding that participation in the Rhode Island Executive Office of Health and Human Services Medical Assistance Program hereafter, "EOHHS" or "RIMAP" is voluntary, agrees to the following:<br><br>1. To follow all laws, rules, regulations, certification standards, policies and amendments including but not limited to the False Claims Act and HIPPA, that govern the Rhode Island Medical Assistance Program as specified by the Federal Government and the State of Rhode Island. Suspected violations must be ·reported by the Provider to EOHHS, its fiscal agent, or the Medicaid Fraud Control Unit of the Rhode Island Attorney General's Office."<br><br>Rhode Island Executive Office of Health and Human Services Provider Agreement Form, at 1. |

FIRST AMENDED COMPLAINT

| South Carolina | The Medicaid Enrollment form that a provider is required to sign to participate in the State of South Carolina Program requires a provider to agree to the following terms and conditions: |
|---|---|
| | "• That all services rendered and claims submitted shall be in compliance with all applicable federal and state laws and regulations and in accordance with SCDHHS policies, procedures and Medicaid Provider Manuals. |
| | • That all information provided on the Medicaid enrollment form is incorporated as part of this agreement. |
| | • That Medicaid reimbursement (payment of claims) is from state and federal funds and that any falsification (false claims, statement or documents) or concealment of material fact may be prosecuted under applicable state and federal laws." |
| | South Carolina Medicaid Enrollment Agreement at 1-2. In addition, in 2010, the State of Carolina added the following additional term and condition : |
| | "I agree to abide by the Medicaid laws, regulations and program instructions that that apply to me or to the organization. The Medicaid laws, regulations, and program instructions are available through SCDHHS. I understand that payment of a claim by Medicaid is conditioned upon the claim and the underlying transaction complying with such laws, regulations and program instructions, and on the provider's compliance with all applicable conditions of participation in Medicaid." |
| | South Carolina Medicaid Enrollment Agreement, at 1-2. |

FIRST AMENDED COMPLAINT

| | |
|---|---|
| **Tennessee** | One of the Provider Agreements that a provider was required to sign to participate in the State of Tennessee Program requires a provider to agree to the following terms and conditions:<br><br>C. TENNCARE Provider Agreement Requirements…<br><br>42. The Provider, Subcontractor or any other entity agrees to abide by the Medicaid laws, regulations, and program instructions that apply to the Provider. The Provider, Subcontractor or any other entity understands that payment of a claim by TENNCARE or a TENNCARE Managed Care Contractor and/or Organization is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, federal Anti-Kickback Statute, the Stark law, and federal requirements on disclosure, debarment and exclusion screening), and is conditioned on the Provider's, Subcontractor's, or any other entity's compliance with all applicable conditions of participation in Medicaid. The Provider, Subcontractor, or any other entity understands and agrees that each claim the Provider, Subcontractor, or any other entity submits to TENNCARE or a TENNCARE managed contractor, and/or Organization constitutes a certification that the Provider, Subcontractor, or any other entity has complied with all applicable Medicaid laws, regulations and program instructions (including, but not limited to, the federal Anti-Kickback Statute and the Stark law and federal requirements on disclosure, debarment and exclusion screening), in connection with such claims and the services provided therein.<br><br>Tennessee Volunteer State Health Plan Provider Administration Manual, XII (C). ¶ 42. |

| Texas | The Provider Agreement that a provider is required to sign to participate in the State of Texas Program requires a provider to agree to the following terms and conditions: |
|---|---|
| | "As a condition for participation as a provider under the Texas Medical Assistance Program (Medicaid), the provider (Provider) agrees to comply with all terms and conditions of this agreement. |
| | I. ALL PROVIDERS |
| | 1.1 Agreement and documents constituting Agreement. Provider has a duty to become educated and knowledgeable with the contents and procedures contained in the Provider Manual. Provider agrees to comply with all of the requirements of the Provider Manual, as well as all state and federal laws governing or regulating Medicaid, and provider further acknowledges and agrees that the provider is responsible for ensuring that all employees and agents of the provider also comply. Provider agrees to acknowledge HHSC's provision of enrollment processes and authority to make enrollment decisions as found in Title 1, Part 15, Chapter 352 of the Texas Administrative Code. Provider is specifically responsible for ensuring that the provider and all employees and agents of the Provider comply with the requirements of Title 1, Part 5, Chapter 371 of the Texas Administrative Code, related to waste, abuse and fraud, and provider acknowledges and agrees that the provider and its principals will be held responsible for violations of this agreement through any acts or omissions of the provider, its employees, and its agents." |
| | "1.2.3. This Agreement is subject to all state and federal laws and regulations relating to fraud, abuse and waste in health care and the Medicaid program." |
| | "XI ACKNOWLEDGMENTS AND CERTIFICATIONS 11.1 By signing below, Provider acknowledges and certifies to all of the following... |

FIRST AMENDED COMPLAINT

| | |
|---|---|
| | (g) Provider agrees to abide by all Medicaid regulations, program instructions, and Title XIX of the Social Security Act. The Medicaid laws, regulations, and program instruction are available through the Medicaid contractor. Provider understands that payment of a claim by Medicaid is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal Anti-Kickback Statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicaid." |
| **Virginia** | The Provider Agreement that a provider is required to sign to participate in the Commonwealth of Virginia Program requires a provider to agree to the following terms and conditions:<br><br>"8. The provider agrees to comply with all applicable state and federal laws, as well as administrative policies and procedures of VMAP as from time to time amended."<br><br>Commonwealth of Virginia Department of Medical Assistance Services Medical Assistance Program Participation Agreement, at 1. |
| **Washington** | The Provider Agreement that a provider is required to sign to participate in the State of Washington Program requires a provider to agree to the following terms and conditions:<br><br>"The Provider is subject to and shall comply with all federal and state laws, rules, and regulations and all program policy provisions, including department numbered memoranda, billing instructions, and other associated written department issuances in effect at the time the service is rendered, which are incorporated into this Agreement by this reference."<br><br>Washington Core Provider Agreement (DSHS 09-048), ¶ 1. |

FIRST AMENDED COMPLAINT

| West Virginia | The Provider Enrollment Application that a provider is required to sign to participate in the State of West Virginia Program requires a provider to agree to the following terms and conditions:<br><br>"1. The Provider hereby agrees to comply with all applicable laws, rules and written policies pertaining to the West Virginia Medicaid Program (Medicaid), including but not limited to Title XIX and Title XXI (Children's Health Insurance) of the Social Security Act, the Code of Federal Regulations, the West Virginia State Plan, the Department of Health and Human Resources Bureau for Medical Services (Department/Bureau), written manuals, program instructions, policies and this document….<br><br>I understand that payment of any claims will be from Federal and State funds, and that any falsification, or concealment of a material fact may be prosecuted under Federal and State laws."<br><br>West Virginia Medicaid Provider Enrollment Agreement. |
|---|---|

95.     TRICARE, administered by the Department of Defense ("DOD"), is the United States military's health care system, designed to maintain the health of active duty military men and women, provide health care during military operations, and offer health care to non-active duty beneficiaries, including dependents of active duty personnel and military retirees and their dependents.

96.     TRICARE operates through various military-operated hospitals and clinics worldwide and is supplemented through contracts with civilian health care providers. TRICARE is at triple-option benefit program designed to give beneficiaries a choice between health maintenance organizations (HMOs), preferred provider organizations (PPOs), and fee-for-service benefits.

97.     Military prescription drug benefits are provided through three programs: military treatment facility outpatient pharmacies, TRICARE contractor retail pharmacies, and a national contractor's mail-order service.

98.     Pharmaceutical manufacturers like Defendants are required to enter national contracts with the DOD pursuant to which the manufacturer makes available for procurement certain covered drugs at the Federal Ceiling Price (a price that is calculated as at least 24 percent less than the manufacturer's average price based on all sales to commercial customers through a wholesaler or distributor). Pursuant to the DOD's contract with its national prime vendor, the

FIRST AMENDED COMPLAINT

national prime vendor submits an invoice to the DOD for payment of pharmaceuticals supplied to the PBM in connection with the mail order pharmacy program, charging the DOD the price set by the contract awarded by the DOD to the drug manufacturer. 38 U.S.C. §8126

99.    TRICARE contracts with a pharmacy benefits manager, Express Scripts, Inc. ("ESI"), to administer TRICARE's mail order pharmacy programs. ESI also administers TRICARE's retail pharmacy program.

100.   Similarly, TRICARE's military treatment facilities purchase medications through procurement contracts with third party pharmaceutical prime vendors. When a TRICARE beneficiary submits an outpatient prescription to a military treatment facility's outpatient pharmacy, the pharmacy purchases the medication from the prime vendor pursuant to an existing procurement contract, and the drug is then dispensed to the patient.

101.   While some doctors enroll in the TRICARE program as network or participating providers, any doctor that is licensed, accredited and meets other standards of the medical community is authorized to provide services to TRICARE beneficiaries. Doctors who are enrolled in the TRICARE network must expressly certify their compliance with TRICARE's regulations and all providers that offer services to TRICARE beneficiaries, whether network providers or non-

FIRST AMENDED COMPLAINT

participating providers, are required to comply with TRICARE's program requirements, including its anti-abuse provisions. 32 C.F.R. §199.9(a)(4).

102.   TRICARE's Reimbursement Manual (6010.61-M, April 1, 2015) provides the following with respect to the "Reimbursement of Covered Services Provided By Individual Health Care Providers And Other Non-Institutional Health Care Providers":

> *Services provided by individual authorized health care providers and other non-institutional health care providers shall be billed only on the current CMS 1500 Claim Form or the TRICARE 2642 for payment. Individual health care providers (e.g., physicians) and non-institutional providers (e.g., suppliers) are to use the CMS 1500 Claim Form. Institutional providers (e.g., hospitals) are to use the CMS 1500 Claim Form or the CMS 1450 UB-04 (if adequate Common Procedure Terminology (CPT) coding information is submitted) to bill for the professional component of physicians and other authorized professional providers. Beneficiaries (or their representatives) who complete and file their own claims for individual health care providers and other non-institutional health care provider services may want to use the TRICARE 2642 claim form for payment.*

FIRST AMENDED COMPLAINT

Chapter 1, Section 7 at 3.1.3. (The requirements of TRICARE's TRICARE's 2015 Reimbursement Manual apply to all contracts awarded on or after July 21, 2016. Materially similar requirements are included in TRICARE's 2008 Reimbursement Manual, which applies to all contracts awarded on or after June 27, 2008, and before July 21, 2016.)

103.   TRICARE regulations provide that claims submitted in violation of TRICARE's anti-abuse provisions can be denied. 32 C.F.R. §199.9(b). Kickback arrangements are included within the definition of abusive situations that constitute program fraud. 32 C.F.R. §§199.2(b), 199.9(c)(12).

104.   Likewise, TRICARE's program regulations specifically state that providers "have a duty to familiarize themselves with, and comply with, the program requirements," while contractors and peer review organizations "have a responsibility to apply provisions of this regulation in the discharge of their duties, and to report all known situations involving fraud, abuse, or conflict of interest." 32 C.F.R. §§199.9(a)(4), (5).

105.   Under TRICARE regulations, claims tainted by kickbacks are presumed to be fraudulent in nature and, as a result, should not be submitted by providers for reimbursement.

106.   CMS-1500 (02-12) currently requires the following certification by doctors and suppliers as a pre-condition of payment:

*In submitting this claim for payment from federal funds, I certify that: 1) the information on this form is true, accurate and complete; 2) I have familiarized myself with all applicable laws, regulations, and program instructions, which are available from the Medicare contractor; 3) I have provided or will provide sufficient information required to allow the government to make an informed eligibility and payment decision; 4) this claim, whether submitted by me or on my behalf by my designated billing company, complies with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment including but not limited to the Federal Anti-Kickback Statute and Physician Self- Referral law (commonly known as Stark law); 5) the services on this form were medically necessary and personally furnished by me or were furnished incident to my professional service by my employee under my direct supervision, except as otherwise expressly permitted by Medicare or TRICARE; 6) for each service rendered incident to my professional service, the identity (legal name and NPI, license #, or SSN) of the primary individual rendering each service is reported in the designated section. For services to be considered "incident to" a physician's professional services, 1) they must be rendered under the physician's direct supervision by his/her employee, 2) they must be an integral, although incidental part of a covered physician service, 3) they must be of kinds commonly furnished in physician's offices, and 4) the services of non-physicians must be included on the physician's bills.*

*For TRICARE claims, I further certify that I (or any employee) who rendered services am not an active duty member of the Uniformed Services or a civilian employee of the United States Government or a contract employee of the United States Government, either civilian or military (refer to 5 USC 5536). For Black-Lung claims, I further certify that the services performed were for a Black Lung-related disorder.*

FIRST AMENDED COMPLAINT

*No Part B Medicare benefits may be paid unless this form is received as required by existing law and regulations (42 CFR 424.32).*

*NOTICE: Anyone who misrepresents or falsifies essential information to receive payment from Federal funds requested by this form may upon conviction be subject to fine and imprisonment under applicable Federal laws.*

CMS Form 1500 at 2 (02/12).

107.   The Department of Veterans Affairs ("VA") maintains a system of medical facilities from which all pharmaceutical supplies, including prescription drugs, are procured directly by the VA. A VA beneficiary can take a prescription to a VA medical facility, at which point the VA dispenses the medication to the VA beneficiary from its existing inventory. The VA also supports a mail service prescription program as part of its outpatient drug benefit. VA beneficiaries can submit prescriptions to that mail service program, and the VA then dispenses pharmaceuticals purchased by the VA directly to VA beneficiaries. The VA medical system serves approximately four million veterans.

108.   The VA purchases the pharmaceuticals that it dispenses at its medical facilities and through its mail service prescription program through its Federal Supply Schedule ("FSS") program.

109.   Pursuant to 38 U.S.C. § 8126, pharmaceutical manufacturers are required to enter national contracts with the VA, pursuant to which the manufacturer makes available for procurement certain covered drugs at the Federal

Ceiling Price (a price that is calculated as 24 percent less than the manufacturer's average price based on all sales to commercial customers through a wholesaler or distributor). A VA facility that requires a supply of a particular medication (including a mail order facility) submits a purchase order to the VA's pharmaceutical prime vendor ("PPV") for distribution of pharmaceuticals.

110.   McKesson Corporation serves as the VA's PPV. The PPV fills the order for the facility, and then submits an invoice to the VA for payment, charging the VA the price set by the contract awarded by the VA to the drug manufacturer. The VA makes payment to the PPV. The PPV then seeks a chargeback from the drug manufacturer for any difference between the contract price paid by the VA and the PPV's acquisition price.

111.   On information and belief, the VA awarded contracts to Regeneron and Sanofi that require them to comply with all applicable federal, state and local laws, executive orders, rules and regulations applicable to performance of their duties under that VA contract.

**B. The Covered Drugs**

**1. Eylea (eye disease)**

112.   Generally, Eylea is an eye disease drug that is administered by injection in a doctor's office.  It is manufactured, marketed and sold by Regeneron

since the FDA approved it to treat neovascular (wet) age-related macular degeneration ("AMD") in November 2011.

113.   Prior authorization may be required for Eylea.

114.   The recommended dose for Eylea injections is 2 mg per eye once a month for the first 12 doses, and about 6 to 7 times per year thereafter.

115.   Eylea was profitable for Regeneron from the get-go.  Eylea's 2012 sales exceeded even Regeneron's projections.

116.   Eylea is the top-selling retinal disease drug in the United States, and as of 2019, was the seventh highest-grossing drug of any type (up from being the ninth highest-grossing drug in 2018).

117.   Sales of Eylea account for most of Regeneron's revenue, and as shown in the below demonstratives, Eylea sales far outpace its closest competitor, Lucentis:

FIRST AMENDED COMPLAINT





118.   For the years ended December 31, 2020, and December 31, 2019, Eylea net sales in the United States represented 58 percent and 71 percent of Regeneron's total revenues.

119.   As shown immediately below, Regeneron's net sales in the United States for Eylea steadily increased:

- $2.6 billion in 2015

- $3.2 billion in 2016

- $3.7 billion in 2017

- $4.07 billion in 2018

- $4.6 billion in 2019

FIRST AMENDED COMPLAINT

- $4.9 billion in 2020



### 2. Praluent (high cholesterol)

120.   Generally, Praluent is an injectable high-cholesterol drug that is self-administered. It is manufactured by Regeneron and jointly marketed and sold by Regeneron and Sanofi.  However, after April 1, 2020, Regeneron assumed sole responsibility for Praluent in the United States and Sanofi assumed sole responsibility for Praluent outside the United States. Prior to April 1, 2020, both companies equally shared profits and losses from sales of Praluent in the United States.

121.   Prior authorization may be required for Praluent.

122.    Praluent injections are given bi-weekly or monthly.

123.    Other treatments for cholesterol-related conditions are available at a fraction of the costs of Praluent. These include statins and other generic lipid-lowering drugs.

124.    Although not blockbusters like Eylea and Dupixent, both Regeneron and Sanofi have enjoyed significant revenues from the sale of Praluent in the United States, as reflected by the below demonstratives of their net sales:



125.    As shown immediately above, these figures represent Defendants' net sales in the United States for Praluent as:

- $9.5 million in 2015

- $94.4 million in 2016

- $131 million in 2017

- $181 million in 2018

- $126 million in 2019

- $186 million in 2020

### 3. Dupixent (eczema)

126.   Generally, Dupixent is an injectable eczema drug that is self-administered. It is manufactured by Regeneron and jointly marketed and sold by Defendants Regeneron and Sanofi. Both companies equally share profits and losses from sales of Dupixent in the United States.

127.   Prior authorization may be required for Dupixent.

128.   For patients over the age of 12, two injections of Dupixent are given on the first day followed by one injection every two weeks.

129.   Dupixent sales in the United States have consistently generated sizeable revenue for Regeneron and Sanofi, as reflected in the below demonstratives showing their net sales in the United States:

FIRST AMENDED COMPLAINT





130.   As shown immediately above, Defendants' net sales in the United States for Dupixent steadily increased:

- $256.5 million in 2017

- $776 million in 2018

- $1.8 billion in 2019

- $3.2 billion in 2020

### 4.  Kevzara (rheumatoid arthritis)

131.   Generally, Kevzara is an injectable rheumatoid arthritis drug that is self-administered.  It is manufactured by Regeneron and jointly marketed and sold

by Defendants Regeneron and Sanofi. Both companies equally share profits and losses from sales of Kevzara in the United States.

132.   Prior authorization is often required for Kevzara.

133.   Basically, Kevzara is used to treat rheumatoid arthritis in adults when other treatments fail. There can be serious side effects from taking Kevzara as it affects the immune system, and some patients have died from infections such as tuberculosis after receiving Kevzara.

134.   Kevzara is typically injected once every two weeks.

135.   Kevzara sales in the United States has generated sizeable revenue for Regeneron and Sanofi, as reflected in the below demonstratives showing net sales in the United States:



136.   As shown immediately above, these figures represent Defendants' revenue as:

- $13.3 million in 2017
- $74.7 million in 2018
- $129 million in 2019
- $141.6 million in 2020

## IV.   THE FRAUD SCHEME

137.   Regeneron and Sanofi unlawfully "induced [doctors] to prescribe, recommend, purchase, or use a [Covered Drug]," and conspired to do so, in violation of the Anti-Kickback Statute, as well as their own written compliance policies.  They did so through sham speaker programs, advisory boards and steering committees as vehicles; and through outright freebies like catered lunches.

138.   Their scheme involved making cash payments and providing other forms of remuneration (perks) to doctors and their staff (through the back door) to induce them to prescribe and obtain prior authorizations for the Covered Drugs. Those inducements included:

- Payments to participate in sham speaker programs and consulting arrangements

FIRST AMENDED COMPLAINT

- All-expenses-paid U.S. and international trips for doctors and their staff on sham advisory boards and steering committees

- Catered lunches, free assistance and other perks (e.g., free online tool-account) to doctor office staff to induce them to complete government-required prior authorizations, circumventing clinical requirements

139.   Defendants' intent to induce doctors to write prescriptions for the Covered Drugs is demonstrated at the least by:

- the many cash and in-kind payments to doctors and their staff without legitimate business justification or educational value to the programs

- the frequency of these cash and in-kind inducements

- the recency of programs involving the same participants

- the liberal exceptions that Regeneron (and, on information and belief, Sanofi) management granted to their fair market value tiering system

140.   Further, Defendants cannot make use of the personal services safe harbor under the Anti-Kickback Statute because the required conditions under 42 C.F.R. § 1001.952(d) have not been met as shown in this chart:

| ANTI-KICKBACK SAFE HARBOR REQUIREMENTS/ | DID DEFENDANTS' PROGRAMS MEET THIS EXCEPTION REQUIREMENT? |
|---|---|
| (1) the agreement is in writing and signed by the parties (doctor and the drug company) | NOT MET |
| (2) the agreement specifies all the services that the agent (doctor) is to provide for the principal (drug company) | NOT MET |
| (3) if the agreement is intended to provide the services of the agent (doctor) on a periodic, sporadic, or part-time basis then the agreement must specify the intervals and their schedules and charges with specificity | NOT MET |
| (4) the term of the agreement must be not less than 1 year | NOT MET |
| (5) the aggregate compensation to the agent (doctor) must be set in advance, commercially reasonable, consistent with fair-market value and not be determined in a manner that takes into account the volume or value of any referrals or business otherwise generated between the parties (doctor/drug company) | NOT MET |

FIRST AMENDED COMPLAINT

| | |
|---|---|
| (6) the services must not involve promotion of any activity that violates state or Federal law; and | NOT MET |
| (7) the aggregate services contracted for must not exceed those reasonably necessary to accomplish the business purpose of the entity | NOT MET |

141.   Under certain of Defendants' programs, such as the free catered lunches, doctors and their staff provided no services let alone services with written agreements.  When written agreements were in place for programs or consulting arrangements, there was no specificity included (i.e., the intervals, schedules, charges), or they were not limited to a term of less than one year.  Services provided—whether pursuant to written agreement or not—rarely had a business purpose.  Further, the payments to doctors and their staff were not at fair market value because exceptions to Defendants' payment tiers were liberally granted by non-compliance people.  Indeed, Defendants' system of fair market value tiering was set up as window dressing to give the appearance of legitimacy.

142.   Regeneron's and Sanofi's programs and consulting arrangements were shams that violated the Anti-Kickback Statute and their own written compliance policies and did not comply with the personal services safe harbor.

Further, they provided numerous other perks to doctor office staff to induce them to circumvent prior authorization requirements in violation of the Anti-Kickback Statute, as well.  No exceptions to the law save them from being in violation of the laws designed to protect patients from medical judgment warped by financial incentives.

### A. The Fox in the Henhouse

143.   Regeneron knowingly structured its business to ensure that the sales department called all the shots, while compliance was feckless.

144.   The sales department chased the very types of unlawful arrangements with doctors and staff alleged in this Complaint right under the nose of the people in compliance.  Sales and compliance people worked side by side.  By placing both competing functions—promoting financial arrangements with doctors and overseeing compliance with the Anti-Kickback Statute under the same umbrella, Regeneron put the fox in the henhouse.

145.   Indeed, drug company employees bantered about how their dual roles were likely to land them in trouble with the government and find Regeneron on the receiving end of a corporate integrity agreement.

146.   Compliance people had no authority over the selection, invitation or nomination of speakers, advisory board or steering committee members, or the

1 payments to the doctors and their staff.  This allowed the unlawful kickback

2 scheme to go unchecked.

3       147.    While the drug company had plenty of compliance policies that

4 appeared to conform with the Anti-Kickback Statute, compliance itself was

5 nothing more than words on paper.  Regeneron handcuffed their own compliance

6 people.

7       148.   Marrying sales and compliance, while giving the power to sales,

8 allowed Regeneron management to ignore written compliance policies, liberally

9 provide "exceptions" to Regeneron's fair market value tiering system and engage

10 in the unlawful kickback scheme described in this Complaint.

11       **B. Paying Doctors & Their Staff: Good Return on Investment**

12       149.   Regeneron's unlawful kickbacks to doctors and their staff paid off

13 handsomely and was a good return on their investment.

14       150.   As shown below, 83 percent of doctors who prescribed $7 billion

15 worth of Eylea to Medicare patients received some form of remuneration from

16 Defendants between 2013 and 2019; the government (the taxpayer) paid these

17 claims tainted by the unlawful kickbacks.

18

19

20

FIRST AMENDED COMPLAINT



151.   As shown below, 75 percent of doctors who prescribed over $262 million worth of Praluent to Medicare patients received some form of remuneration from Defendants between 2015 and 2019; the government (the taxpayer) paid these claims tainted by the unlawful kickbacks.



FIRST AMENDED COMPLAINT

152.   As shown below, 63 percent of doctors who prescribed over $45 million worth of Dupixent to Medicare patients received some form of remuneration from Defendants between 2017 and 2019; the government (the taxpayer) paid these claims tainted by the unlawful kickbacks.



153.   The staggering numbers of prescribers of the Covered Drugs who received inducements from Regeneron and Sanofi validates the underlying rationale for the Anti-Kickback Statute:  Doctors' medical judgment should be based on what is best for the patient, and not clouded by cash, expensive meals, perks and other drug company kickbacks.

154.   The Justice Department has called out drug companies for the exact conduct alleged in this Complaint: "Kickbacks in the healthcare industry are

FIRST AMENDED COMPLAINT

pernicious because of their potential to subvert medical decision-making....

Placing financial gain above the legitimate needs of patients is deplorable."

155.   To achieve these numbers, Defendants methodically tracked, analyzed, and fine-tuned their financial relationships with doctors to make sure they were getting a good return on investment.

156.   However, doing so violated the Anti-Kickback Statute and their own written compliance policies: "[R]eturn on investment ('ROI') analyses and other tracking for business generation must not be undertaken in connection with any member [doctor or office staff] of a Speaker Bureau or Speaker Training."

157.   One Regeneron division head circulated a document in January 2018 describing its annual priority for tracking the success of the speaker programs: to "[e]stablish a standardized score card for speaker programs" and to work with a third-party vendor "to drill-down reports for **Sales and Marketing Leads for Regeneron speaker** programs on a monthly basis." (emphasis added)

158.   The purpose of this "score card" was to "[e]nsure that key metrics are captured," including "**impact of investment on sale/share growth**," "program volume," "targeted [doctor] attendance," "speaker utilization," and "cost break-down by Program components." (emphasis added)

159.   Similarly, in a January 2018 internal presentation, leadership in the sales department addressed "2018 Team Priorities," which included "[e]stablish[ing] a standardized score card for Speaker Programs," that "[i]ncludes key metrics for Speaker Programs regarding cost, targeted HCP attendance, [and] **impact and value in terms of growing sales/share with targeted attendee**." (emphasis added)

160.   Sanofi was tracking these metrics of success as well. The same Regeneron document referenced the need for the sales department to work with "Regeneron Business Analytics" to blend Regeneron's score card metrics "with those of Alliance partners [i.e., Sanofi among them]."

161.   Also, in early 2018, two Regeneron executives responsible for oversight of the speaker programs gave sales reps a "year in review" presentation of one of the Covered Drugs (Kevzara).  The presentation showed how meticulously Regeneron tracked the average number of speaker programs per region, compared to the average speaker program cost (i.e., from $255.11 for in-office events to $802.86 for out-of-office events in the Northwest region) and average number of attendees for each region, as well as the average number of "Targets" (i.e., doctors in attendance at the program who would be likely to prescribe a covered drug such as Kevzara).

FIRST AMENDED COMPLAINT

162.    Regeneron even paid $10,595.10 to doctors for events that never occurred, further showing that the purpose of the program was to induce doctors to prescribe more of the Covered Drugs and not to "educate."

163.    Regeneron and Sanofi meticulously tracked every dollar they paid to doctors and staff to ensure that they got a return on their investment, while knowing that they were receiving little to no services in exchange for those payments.

164.    Regeneron and Sanofi (on information and belief) tracked speakers, program costs, numbers of attendees and "targets" for the Covered Drugs to analyze return on investment. Below are some examples.

165.    Regeneron and Sanofi paid Los Angeles, California doctor Dr. A at least $1,099,825.20 between 2014 and 2019.

166.    Dr. A traveled to at least these locations on the drug company dime between 2016 and 2019: Honolulu, Hawaii; Fukuoka and Hiroshima, Japan; Taipei, Taiwan; Hong Kong, China; Singapore; Barcelona, Spain; Munich, Germany; Seoul, South Korea; Riyadh, Saudi Arabia; Medellin, Colombia; Cancun, Mexico and Cartagena de Indias, Columbia.

167.    These are some examples of payments to Dr. A in addition to travel expenses for some of these trips:

FIRST AMENDED COMPLAINT

- $54,744 from Sanofi for an August 2018 trip to Seoul

- $30,344 from Sanofi for an April 2018 trip to Medellin

- $22,091 from Sanofi for an April 2018 trip to Riyadh

168.   Based on the limited data available, Defendants got a good return on their investment because Dr. A prescribed at least $432,000 worth of the Covered Drugs to Medicare patients alone between 2016 and 2018; and the government paid those claims tainted by the unlawful kickbacks:



169.   Regeneron provided in-office catered lunches, breakfasts and coffee to the staff of Dr. B in Bloomfield, Connecticut—on 4 occasions between September 2015, and November 2015.

170.   These free perks were designed to induce Dr. B's staff to get prescriptions and prior authorization for the Covered Drugs. On information and

belief, improper inducements to Dr. B's staff continued at least through 2016 into 2017.

171.   Based on the limited data available, Defendants got a good return on their investment because Dr. B's volume of prescriptions for Medicare patients for the Covered Drugs roughly doubled each year between 2016 and 2018, as the inducements to Dr. B nearly doubled each year during the same time; and the government paid those claims tainted by the unlawful kickbacks:



172.   Regeneron and Sanofi paid Los Angeles doctor Dr. R to attend an advisory board meeting in May 2017 in Chicago, Illinois even though they knew he would already be in Chicago. Yet, they reimbursed him for a first-class return

ticket and car service in Los Angeles and paid for his transportation while in Chicago with a justification of back spasms.

173.   Regeneron's own written compliance policies forbid these payments: "For Domestic air travel, seating should be booked in economy/coach class []….[A]irfare . . . not in connection with the consulting services may not be reimbursed if the HCP Consultant was planning to attend on their own."

174.   When a Regeneron third party vendor had declined his request for reimbursement for a resort stay on another trip because it violated Regeneron's written compliance policies ("[s]tays at . . . resorts or spas are not permitted"), Dr. R threatened to cancel all other speaking engagement; and Regeneron continued to do business with him.  They paid Dr. R over $140,000 between 2015 and 2019.

175.   Regeneron and Sanofi paid New York City Dr. C at least $49,859.80 between 2013 and 2016. In turn, Dr. C prescribed over $7.2 million worth of the Covered Drugs between 2013 and 2018; and the government paid those claims tainted by the unlawful kickbacks.

176.   Regeneron and Sanofi paid Monterey, California Dr. D at least $116,423.61 between 2013 and 2018. In turn, Dr. D prescribed over $4.04 million worth of the Covered Drugs during the same period; and the government paid those claims tainted by the unlawful kickbacks.

177.   Regeneron and Sanofi continued to pay speakers who prescribed and dropped speakers from the payroll when they did not prescribe as expected.

178.   For example, Regeneron added Bradenton, Florida Dr. E to its speaker payroll in 2017, as his prescriptions for the Covered Drugs increased by over $650,000 in 2016:



179.   And shown in the above demonstrative, Defendants' payments to Dr. E in 2017, to the tune of $41,400.06 were a good return on investment.  His prescriptions for the Covered Drugs doubled to $1.35 million in 2017 and remained high at $1.384 million in 2018; and the government paid those claims tainted by the unlawful kickbacks.

FIRST AMENDED COMPLAINT

180.   On the flip side, Regeneron and Sanofi dropped New Brunswick, New Jersey doctor Dr. F from its payroll in 2017 because his prescriptions for the Covered Drugs declined:



181.   As shown in the above demonstrative, Dr. F's prescriptions for the Covered Drugs fell by 10.17 percent in 2016; and more precipitously by 47.73 percent in 2017 when he was dropped as a speaker altogether.

182.   These demonstratives show the undeniable causal link between the unlawful kickback payments to doctors (and staff) and the doctors prescribing habits for the Covered Drugs.  The drug companies tracked and analyzed their return on investment; and took steps to ensure a good return on investment.

FIRST AMENDED COMPLAINT

### C. Thousands of False Claims Tainted by the Kickbacks

183.   Regeneron and Sanofi caused thousands of prescriptions and prior authorizations for the Covered Drugs to be submitted because of payments and other remuneration made in connection with the unlawful kickback scheme alleged in this Complaint.

184.   Exhibit "A" contains a representative sample of nearly $50 million in false Medicare (Parts B and D) claims tainted by the unlawful kickbacks from 2013 to 2019, in violation of the Anti-Kickback Statute.  The government paid these claims tainted by the unlawful kickbacks.

185.   Regeneron and Sanofi are liable to the government for treble damages and penalties based on the payment of the sample claims and all other claims submitted to the government for the Covered Drugs prescribed by health care providers who received inducements as part of the fraud scheme alleged in this Complaint, beginning from the time the doctors began receiving financial inducements and continuing to date, because the claims were the result of prescriptions induced by remuneration.

186.   Compliance with the Anti-Kickback Statute is a precondition of payment by virtue of federal and state statutes, regulations, provider agreements, and contracts.

FIRST AMENDED COMPLAINT

187.   The certifications and attestations signed by doctors, pharmacies, pharmacy benefits managers, Medicare Part D sponsors, and state Medicaid agencies (specifically, Form CMS-64, submitted to the federal government for federal reimbursement of Medicaid expenditures) certified compliance with the Anti-Kickback Statute. Kickbacks that were paid to doctors as alleged in this Complaint rendered those certifications and attestations false. Those false statements were material to the false claims submitted for prescriptions written by the doctors who took kickbacks from Regeneron and Sanofi.

188.   Claims for Regeneron's and Sanofi's Covered Drugs arising from the kickbacks expressly and impliedly misrepresented compliance with a material condition of payment, namely, compliance with the Anti-Kickback Statute. Claims that induce items or services resulting from a violation of this statute constitute false or fraudulent claims. 42 U.S.C. § 1320a-7b(b).

189.   By providing remuneration to doctors and other health care providers as alleged in this Complaint, Regeneron and Sanofi intended to induce those doctors (and their staff) to prescribe and obtain prior authorization for the Covered Drugs. It was reasonably foreseeable that some of those prescriptions would be for federal health care program beneficiaries and that claims for those prescriptions would be submitted to the government healthcare programs. Thousands of such

prescriptions or claims based on such prescriptions for the Covered Drugs were, in fact, submitted to and paid for by government healthcare programs.

190.   The decision-making of the doctors, a critical element in government healthcare coverage policy, was completely undermined by the unlawful inducements made by Defendants. The doctors prescribing the Covered Drugs did not necessarily do so because they believed, based on their review of peer-reviewed medical literature, or discussions with their colleagues, that the drugs would help their patients; rather, the Covered Drugs were often prescribed, and prior authorizations obtained, because the doctors and their office staff were actively pursued and induced by Regeneron and Sanofi with kickbacks.

### D.  Sneaking Through the Back Door to Circumvent Prior Authorization Rules

191.   The Covered Drugs are approved by the government insurers if certain criteria are met.  For one, the doctor must ordinarily demonstrate that the drug is medically necessary for the beneficiary.

192.   Prior authorization is a process by which the government insurer (Medicare, Medicaid, TRICARE) supplies advance notice that it will cover a certain drug for a particular patient in response to an application submitted by the doctor.  Not all drugs require prior authorization, but where required, it is a condition of payment for the drug.

193.   The primary reasons for prior authorization requirements are patient safety and cost control.

194.    Because these rules applied to the Covered Drugs, Regeneron and Sanofi considered them both a roadblock and an opportunity.  They created and implemented financial incentive programs aimed at doctor office staff to circumvent prior authorization rules and to beat the competitor.

195.   These financial inducements were authorized by drug company executives and implemented by sales reps, their boots on the ground.  They defeated the government's dual goals of protecting patients and controlling costs. Further, Defendants got a good return on investment, while the government was cheated.

196.   Based on a review of Medicare claims only, Defendants who paid doctors some form of remuneration got a good return on their investment:

- 83 percent of doctors prescribed $7 billion worth of Eylea

- 75 percent of doctors prescribed $262 million worth of Praluent

- 63 percent of doctors prescribed $45 million worth of Dupixent

197.   On the flip side, doctors not remunerated by Defendants submitted far fewer claims for the Covered Drugs to the government.

FIRST AMENDED COMPLAINT

1

### 1. Flouting Patient Safety, Cost Control

2   198.   The government health care programs (Medicare, Medicaid,

3   TRICARE) address the most vital of basic human needs for older, poor and sickly

4   Americans, members of our military and their families, and veterans.  However,

5   they are also insurance programs without a bottomless pit of taxpayer money to

6   fund them.

7   199.   To protect these programs and to guard against drug companies

8   pushing unnecessary and costly drugs on doctors and their patients, prior

9   authorization rules exist.

10   200.   Take Praluent for example.  It is a costly cholesterol drug, while other

11   treatments may be as (or more) efficacious for the patient and less costly for the

12   patient and the government.  The wholesale acquisition cost for Praluent is nearly

13   $6,000 annually and was $14,000 annually prior to 2019.

14   201.   A prior authorization application requires the doctor office to evaluate

15   whether the patient:

16   • met certain enumerated criteria for the disease or condition

17   • attempted, but failed alternative, safer, and less costly treatment

18   • showed intolerance to the alternative treatments

19   • had been consistent in taking the other treatment or therapy

20

FIRST AMENDED COMPLAINT

202.   These requirements are not intended to be rote "check the box" forms, but meaningful assessments of the patient's medical need for the drug and less costly alternatives for the government.

203.   To prescribe Praluent to a Medicare patient to treat high cholesterol, for example, the doctor must show among other things:

- documented high cholesterol diagnosis

- proven failure of statin treatment or statin intolerance

- concomitant use of statins or other generic drugs

- concomitant diet modifications

- genetic or other laboratory testing to confirm family histories of related disease

- documented low-density lipoprotein cholesterol (LDL-C) test results

204.   For certain government insurers, to prescribe Eylea, the doctor must show that the patient has tried and failed less costly alternatives such as the drug Avastin and met other criteria specific to the diagnosis.

205.   For certain government insurers, to prescribe Dupixent, the doctor must show that the patient has tried and failed less costly alternatives such as topical treatments and met other criteria specific to the diagnosis.

FIRST AMENDED COMPLAINT

206.   For certain government insurers, to prescribe Kevzara, the doctor must show that the patient tried and failed less costly anti-rheumatic drugs and met other criteria specific to the diagnosis.

207.   Further, Medicare and Medicaid often require the doctor to provide supporting medical documentation such as test results or patient histories for each criterion specific to the diagnosis.

208.   Exceptions may be granted for patients who do not meet one or more criteria if the doctor believed the less costly drug would cause adverse health effects, or if the more costly drug is: (a) medically necessary right out of the gate, or (b) more effective.  These exception requests also need to be carefully documented.

209.   However, Regeneron and Sanofi flouted these requirements, ignoring patient safety and discounting the government's need to fund the more cost effective, efficacious drug or treatment.

## 2.  Inducing Doctor Office Staff, Not Just the Doctor

210.   Regeneron and Sanofi were innovative.  Knowing that prior authorization rules would negatively impact their sales, they found a way to circumvent them.

FIRST AMENDED COMPLAINT

211.   Regeneron and Sanofi tracked prior authorization rules as part of their efforts to push their financial incentive programs to doctor offices. One 2018 Praluent study they funded revealed that 96-97 percent of Medicare and Medicaid plans required prior authorization.

212.   Appreciating that prior authorization rules could be circumvented if they could get their sales reps inside the doctor offices, Defendants seized on an opportunity to beat their competitors who would have these same hurdles to overcome.

213.   Regeneron created and implemented programs aimed at doctor office staff.  They paid these practice administrators unlawful kickbacks to do whatever it took to get prior authorizations for the Covered Drugs.

214.   The scheme was simple.  The vehicles used were the tried-and-true speaker payment programs along with other free perks like catered office lunches. Only this time, the inducements were aimed at the doctor's staff and not only the doctor.

215.   Regeneron had written compliance policies that required that speaker programs be "educational."  However, the frequency and recency of the programs show that they were shams with no educational value because there was no new information to share about the Covered Drugs.  There were no changes to the

efficacy of the drugs being discussed and no changes to the written presentations (the Regeneron-approved slide deck).

216.   In fact, the educational component of the speaker programs involved training doctor office staff to treat prior authorization requests for the Covered Drugs as nothing more than paperwork hurdles to overcome.

217.   The idea was to get the sales reps into the doctor offices and get prior authorizations with the help of doctor office staff by hook or crook.  Sanofi similarly staffed doctor offices with their own sales reps.  Once inside, Regeneron sales reps injected themselves into the prior authorization process.  They even provided a free propriety online tool-account to accelerate prior authorizations.

218.   Regeneron-trained doctor office staff were then paid to train staff at other practices.  They did so at restaurants, other doctor offices and other locations. It was all about circumventing prior authorization.

219.   Further, just as with the doctors, Regeneron paid doctor office staff according to their farcical tiering system, which disregarded fair market value.

220.   These financial inducements aimed at doctor office staff were a good return on investment for Defendants, while the government was cheated.

FIRST AMENDED COMPLAINT

221.   As a bonus, paying doctor office staff allowed Regeneron to evade the
Sunshine Laws because payments to administrative staff were not contemplated or
required by the law.

### a. Destination Praluent

222.   One highly aggressive program aimed at doctor office staff and not
just doctors was Destination Praluent.

223.   Destination Praluent induced staff (administrative staff, nurse
practitioners and others) to allow drug company sales reps to inject themselves into
the prior authorization process; and to become "Praluent Office Champions."

224.   For example, one "Praluent Office Champion" was an Atlanta,
Georgia nurse practitioner (Nurse Practitioner A) who prescribed over $1.5 million
of Praluent to Medicare patients from 2016 to 2018 (the years for which data is
available).

225.   A 2016 Destination Praluent planning document anticipated 30
speakers delivering 300 programs in 2017.

226.   Under Destination Praluent, Regeneron and Sanofi also deployed their
boots on the ground to:

- supply the doctor offices with a free online proprietary tool-account
  (MyPraluent) to accelerate prior authorizations

FIRST AMENDED COMPLAINT

- obtain access to confidential patient information protected by HIPAA

- submit patient data directly to the government

- share canned medical justifications to substitute for prior authorization requests

- induce pharmacists to use the canned justifications

- help doctor office staff to finalize and submit prior authorization requests

- deliver free Praluent samples for patients denied prior authorization

227.   Further, even non-cash perks like free catered lunches and a free online tool such as MyPraluent, induced doctor office staff to allow drug company sales reps access to the prior authorization process and to persuade their doctors to prescribe the Covered Drugs.

228.   In fact, the MyPraluent proprietary online tool-account used by the doctor offices allowed drug company sales reps to:

- track Praluent prescriptions

- track, target & drive the patterns of high and low prescribing doctors

- rewrite prior authorization requests submitted to the government to ensure claims would be paid

- submit prior authorization requests to the government

- appeal to the government when prior authorization requests were denied

FIRST AMENDED COMPLAINT

- identify & target patients to give free Praluent samples

229.   All this tracking of patient prescriptions allowed Regeneron and Sanofi to make strategic targeting decisions to increase its sales of Praluent.

230.   Drug company executives pressured and incentivized their boots on the ground to get doctor offices enrolled in MyPraluent.

231.   The sales reps were compensated based on the number of doctor offices they enrolled in MyPraluent and the number of paid prescriptions for Praluent.  Drug company district managers and regional directors drove the sales reps hard to continually increase these numbers.

232.   As intended, this compensation structure incentivized sales reps to improperly inject themselves into and circumvent the prior authorization process at the doctor offices.

**b.  Examples of Inducements**

233.   Below are a few examples of Regeneron's payment of over $560,000 to induce doctor office staff and not just doctors to ensure an assembly line of prior authorization approvals for the Covered Drugs.

234.   Because of these inducements, Medicare paid $153 million in false or fraudulent claims for the Covered Drugs that were tainted by the kickbacks.  As

shown, Regeneron got a good return on investment, while the government was

cheated.

235.   Regeneron paid at least $15,217.50 to one Salt Lake City, Utah doctor

office administrator (Practice Administrator A).  These payments were not tied to

the number of hours this individual worked or their Regeneron-assigned FMV rate,

which was $270 per hour for 2016.

236.   For at least seven speaker programs for the Covered Drugs in 2015,

these payments included:

- $1,980 for a 1-hour program on October 6, 2015, at another doctor office in
  Aurora, Colorado – over seven times the Regeneron-assigned FMV rate

- $1,230 for a 1-hour program on October 6, 2015, at another doctor office in
  Denver, Colorado – four and a half times the Regeneron-assigned FMV rate

- $1,230 for a 1-hour program on October 6, 2015, at The Dickens Tavern in
  Longmont, Colorado – four and a half times the Regeneron-assigned FMV
  rate

- $1,980 for a 1.5-hour program on October 9, 2015, at Firerock Steakhouse in
  Casper, Wyoming – nearly five times the Regeneron-assigned FMV rate

FIRST AMENDED COMPLAINT

- $2,280 for a 2.5-hour program on October 28, 2015, at Bloomfield Steak & Seafood in Bloomfield, New Jersey – over three times the Regeneron-assigned FMV rate

- $2,280 for a 2-hour program on November 5, 2015, at Morton's Steak House in Coral Gables, Florida – over four times the Regeneron-assigned FMV rate

- $2,280 for a 1-hour program on December 9, 2015, at Forbes Mill Steakhouse in Los Gatos, California – over eight times the Regeneron-assigned FMV rate

- $1,215 for consulting work in May 2016

- $742.50 for preparation and participation in a June 2016 conference call on the same consulting project

237.   In total, Regeneron paid this practice administrator at least:

- $13,260 in payments in 2015

- $1,957.50 in payments in 2016

- Reimbursement for flights, hotels, and car service

- Free meals at high-end restaurants

238.   Regeneron knew these amounts were unlawful inducements and not at fair market value, in violation of the Anti-Kickback Statute, its written compliance policies, and its Regeneron-assigned FMV tiering system.

FIRST AMENDED COMPLAINT

239.   Upon information and belief, improper inducements to this same practice administrator continued into 2017 and 2018.

240.   Because of these inducements to this practice administrator who worked for three doctors, Medicare paid $26 million in false or fraudulent claims for the Covered Drugs that were tainted by the kickbacks from at least 2013 to 2019 (the years for which data is available).  Regeneron got a good return on its investment, while the government was cheated:

| Year | Tainted Covered Drugs Medicare Parts B & D claims submitted (and paid) by Dr. CCC, Dr. DDD, Dr. EEE |
|------|------|
| 2013 | $1,620,454.12 |
| 2014 | $2,316,489.57 |
| 2015 | $3,180,679.27 |
| 2016 | $3,693,420.55 |
| 2017 | $5,293,092.40 |
| 2018 | $6,696,941.12 |

241.   Regeneron made payments to a practice administrator (Practice Administrator B) in Dallas, Texas that were not tied to the number of hours this individual worked or their Regeneron-assigned FMV rate, which was $270 per hour in 2016.

242.   For at least seven speaker programs on the Covered Drugs in 2015, these payments included:

FIRST AMENDED COMPLAINT

- $2,280 for a 1-hour program on October 12, 2015, in Utah in Provo, Utah – over eight times the Regeneron-assigned FMV rate

- $1,380 for a 1-hour program on October 12, 2015, at another doctor office in Ogden, Utah – over five times the Regeneron-assigned FMV rate

- $2,280 for a 1-hour program on October 22, 2015, at Fleming's Prime Steakhouse in Tucson, Arizona – over eight times the Regeneron-assigned FMV rate

- $1,980 for a 2.5-hour program on October 27, 2015, at Arthur's Prime Steakhouse in Little Rock, Arkansas – almost three times the Regeneron-assigned FMV rate

- $1,680 for a 1-hour program on October 28, 2015, at Mabry House Restaurant in Shreveport, Louisiana – over six times the Regeneron-assigned FMV rate

- $1,890 for consulting in May 2016

    243.   In total, Regeneron paid this administrator at least:

- $9,600 in payments in 2015

- $1,890 in payments in 2016

- Reimbursement for flights, hotels and car service

- Free meals at high-end restaurants

FIRST AMENDED COMPLAINT

244.   Regeneron knew these amounts were unlawful inducements and not at fair market value, in violation of the Anti-Kickback Statute, its written compliance policies, and its Regeneron-assigned FMV tiering system.

245.   Upon information and belief, these improper inducements to this practice administrator continued into 2017 and 2018.

246.   Because of these inducements to this practice administrator who worked for eleven doctors (Dr. G, Dr. H, Dr. I, Dr. J, Dr. K, Dr. L, Dr. M, Dr. N, Dr. O, Dr. P, Dr. Q), Medicare paid $49.2 million in false or fraudulent claims for the Covered Drugs that were tainted by the kickbacks from at least 2013 to 2019 (the years for which data is available).  Regeneron got a good return on its investment, while the government was cheated:

| Year | Tainted Covered Drugs Medicare Part B & D claims submitted (and paid) by Doctors G, H, I, J, K, L, M, N, O, P, Q |
|---|---|
| 2013 | $3,462,621.89 |
| 2014 | $5,022,760.81 |
| 2015 | $7,216,094.55 |
| 2016 | $8,567,948.13 |
| 2017 | $11,386,585.79 |
| 2018 | $13,590,468.82 |

FIRST AMENDED COMPLAINT

247.   Regeneron paid at least $17,592 to a Ft. Meyers/Naples, Florida doctor office administrator (Practice Administrator C) (who became an employee of Regeneron in 2018) that was not tied to the number of hours this individual worked or the Regeneron-assigned FMV rate, which was $200-$210 per hour in 2016.

248.   For at least five speaker programs for the Covered Drugs in 2015, these payments included:

- $2,000 for a 1-hour program on October 27, 2015, at Salt Creek Grille in Princeton, New Jersey – nine and half times the Regeneron-assigned FMV rate

- $2,000 for a 1-hour program on November 3, 2015, at another doctor office in Leesburg, Virginia – nine and half times the Regeneron-assigned FMV rate

- $1,100 for a 1-hour program on November 3, 2015, at Nick's Airport Inn in Hagerstown, Maryland – over five times the Regeneron-assigned FMV rate

- $1,100 for a 1-hour program on November 4, 2015, at another doctor office in Owings Mill, Maryland – over five times the Regeneron-assigned FMV rate

FIRST AMENDED COMPLAINT

112

- Unknown amount for a 1-hour program on November 4, 2015, at Ruth's Chris Steak House in Pikesville, Maryland

- $800 for a 1-hour program on November 15, 2015, at Db Brasserie, an upscale restaurant in the luxury Venetian Resort and Casino in Las Vegas, Nevada – almost four times the Regeneron-assigned FMV rate

- $900 for consulting in May 2016

- $800 for consulting on the same project in June and July 2016

- $800 for speaker training in July 2016

- $4,624 for a live webinar presentation, plus $3,468 as "travel time compensation" for the same event.

249.   Regeneron knew these amounts were unlawful inducements and not at fair market value, in violation of the Anti-Kickback Statute, its written compliance policies, and its Regeneron-assigned FMV tiering system.

250.   In total, Regeneron paid the administrator at least:

- $7,000 in 2015, plus payments for flights, hotels, and car service

- $2,500 in payments in 2016

- $4,624 in payments and $3,468 in travel time compensation in 2017

251.   Because of these inducements to this practice administrator who worked for six doctors (Dr. S, Dr. T, Dr. U, Dr. V, Dr. W, and Dr. X), Medicare

FIRST AMENDED COMPLAINT

paid $47 million in false or fraudulent claims for Covered Drugs that were tainted by the kickbacks from at least 2013 to 2019 (the years for which data is available). Regeneron got a good return on its investment, while the government was cheated:

| Year | Tainted Covered Drugs Medicare Part B & D claims submitted (and paid) by Doctors S, T, U, V, W, X |
|------|------|
| 2013 | $7,547,052.16 |
| 2014 | $6,525,673.67 |
| 2015 | $6,741,014.21 |
| 2016 | $8,382,636.62 |
| 2017 | $8,698,022.57 |
| 2018 | $9,212,076.13 |

252.   Regeneron made payments to a Milwaukee, Wisconsin doctor office administrator (Practice Administrator D) that were not tied to the number of hours this individual worked or the Regeneron-assigned FMV rate, which was $200 and $270 per hour in 2016.

253.   For at least three speaker programs for the Covered Drugs in 2015, these payments included:

- $1,420 for a 3.5- hour program on October 7, 2015, at Hyde Park Prime Steakhouse in Dublin, Ohio, well above the Regeneron-assigned FMV rate.

- $1,420 for a 1-hour program on November 6, 2015, at Greater Ohio Eye Surgeons Inc. in Springfield, Ohio, well above the Regeneron-assigned FMV rate.

- $820 for a 1.5-hour program on December 9, 2015, at Carmella's An Italian Bistro in Appleton, Wisconsin, well above the Regeneron-assigned FMV rate

254.   In total, Regeneron paid the administrator at least $3,660 in 2015.

255.   Regeneron knew these amounts were unlawful inducements and not at fair market value, in violation of the Anti-Kickback Statute, its written compliance policies, and its Regeneron-assigned FMV tiering system.

256.   Upon information and belief, these improper inducements to this administrator continued into 2016, 2017 and 2018.

257.   Because of these inducements to this practice administrator who worked for six doctors (Dr. Y, Dr. Z, Dr. AA, Dr. BB, Dr. CC, and Dr. DD), Medicare paid $34 million in false or fraudulent claims for Covered Drugs that were tainted by the kickbacks from at least 2013 to 2019 (the years for which data is available). Regeneron got a good return on its investment, and the government was cheated:

FIRST AMENDED COMPLAINT

| Year | Tainted Covered Drugs Medicare Part B & D claims submitted (and paid) by Doctors Y, Z, AA, BB, CC, DD |
|---|---|
| 2013 | $3,906,098.09 |
| 2014 | $4,258,937.20 |
| 2015 | $5,270,470.19 |
| 2016 | $5,674,751.92 |
| 2017 | $6,107,404.66 |
| 2018 | $8,909,589.59 |

258.   In one example, Regeneron made payments to Corbin, Kentucky sisters, one of whom was a doctor and the other her assistant.  The doctor (Dr. EE) received payments of $49,823.32 and the sister (Research Assistant A) was paid $1,561.39.

259.   Because of these inducements to this sister team, Medicare paid over $250,000 (2017) and $492,700 (2018) in false or fraudulent claims for the Covered Drugs that were tainted by the kickbacks (the years for which data is available). Regeneron got a good return on its investment, while the government was cheated:

Dr. EE: Prescription Volume Increases with Defendants' Payments

260.   In summary, Regeneron and Sanofi created and implemented programs aimed at inducing doctor office staff and not just doctors to prescribe the Covered Drugs and to do whatever it took —by hook or crook—to get prior authorizations for the Covered Drugs.  Because of these inducements, Medicare paid millions and millions of dollars in false or fraudulent claims for the Covered Drugs that were tainted by the kickbacks.  To boot, the drug companies evaded the Sunshine Laws because they never contemplated or required reporting of drug company payments to doctor office staff.

FIRST AMENDED COMPLAINT

### 3. Providing Other Perks Galore

261.   In addition to the trips and meals, Regeneron and Sanofi sales reps were given budgets for, and pressured to provide, free catered lunches to doctor offices with no legitimate business need or educational purpose.

262.   Just as with MyPraluent, sales rep compensation was tied to the success of these perks because they were paid bonuses based on the number of claims for the Covered Drugs for the doctor offices in their territory.

263.   Certain telltale signs that catered lunches ("lunch-n-learns") were shams intended to induce doctor office staff to circumvent prior authorization requirements for the Covered Drugs in all the ways described in this Complaint included:

- there were no updates to scientific or educational information about the drugs

- the free lunches were routine or regularly scheduled (e.g., bi-weekly)

- free lunches were provided to non-medical staff who did not need to learn about the efficacy of the drugs

- no scientific or educational information was shared, including the Regeneron-approved written presentation (slide deck)

FIRST AMENDED COMPLAINT

118

264.   Regeneron knew that its "lunch-n-learns" were unlawful kickbacks because their written compliance policies reflected as much:

- "[m]eals must be modest, occasional (infrequent), and always in connection with a legitimate business purpose."

- a gift not be given that is "an item, meal, or other transfer of value that is intended to benefit an HCP [health care provider] or a customer and is not intended to advance the treatment of disease," recognizing that "[t]here is never a legitimate business purpose for giving a Gift."

- free lunches must be part of an effort "to provide accurate, scientific and educational information" regarding the use of its "FDA-approved products, disease states, or other appropriate healthcare topics."

265.   Sanofi knew these "lunch-n-learns" were unlawful kickbacks, too.  It was required to fix its broken compliance program and speaker programs under earlier corporate integrity agreements (CIA) with the government (HHS-OIG) because of False Claims Act kickback allegations that it settled.

266.   Yet, for both drug companies, compliance was nothing more than words on paper.

267.   Regeneron and Sanofi knew that inducing doctors to prescribe the Covered Drugs was only half the battle.  To increase sales and beat the competitor,

1   they viewed prior authorization as a second barrier that needed breaking.  As a

2   result, they used these aggressive marketing tactics to pressure the doctor office

3   staff to perceive the barrier as only a paperwork requirement, a burden which

4   Defendants were happy to reduce or take off their plates entirely.

5      268.   Below are some examples of perks to induce doctor office staff to

6   prescribe the Covered Drugs to government-insured patients.

7      269.   Regeneron provided free in-office catered lunches, breakfasts and

8   coffee to Dr. FF's Medical Clinic in Torrance, California—on 13 occasions during

9   a 3-month period between July 31, 2015, and November 3, 2015, including 3 meals

10   within a 10-day period in August 2015, and 4 meals within a 10-day period in

11   September 2015.

12     270.   Regeneron promoted these as lunch-n-learns, but they were shams

13   because, like the free breakfasts and coffee, they promoted the Covered Drugs to

14   the same doctor (and staff) over and over.  In fact, the same two individuals

15   attended each of these meals – Dr. FF and his office manager.

16     271.   Instead, these perks allowed Regeneron sales reps to force their way

17   into doctor offices, get prescriptions for the Covered Drugs, circumvent prior

18   authorization rules, and get the government to pay the claims.

19

20

FIRST AMENDED COMPLAINT

272.   On information and belief, these same improper inducements to Dr.
FF and his office manager continued at least through 2016 into 2017.

273.   As shown by the demonstrative below, because of these and other
inducements to Dr. FF and his office manager, the doctor nearly doubled the
volume of his prescriptions between 2016 and 2017, with a nearly $100,000
increase between 2017 and 2018; and the government paid those claims tainted by
the unlawful kickbacks:



274.   In turn, Regeneron got a good return on its investment, while the
government was cheated.

275.   Regeneron provided free in-office catered lunches to the offices of Dr. GG in Lapeer, Michigan—on 6 occasions between August 12, 2015, and October 21, 2015, including back-to-back lunches on October 6 and October 7, 2015.

276.   Regeneron promoted these as "lunch-n-learns," but they were shams because they promoted the Covered Drugs to the same doctors and staff over and over.

277.   On information and belief, improper inducements to Dr. GG and his staff continued at least through 2016 into 2017.

278.   As show by the demonstrative below, the more Regeneron and Sanofi induced Dr. GG and his staff, the more Dr. GG wrote prescriptions for the Covered Drugs.  He more than tripled his volume of prescriptions between 2016 and 2017; and the government paid those claims tainted by the unlawful kickbacks:



FIRST AMENDED COMPLAINT

279.   In turn, Regeneron got a good return on its investment, while the government was cheated.

280.   Regeneron provided free in-office catered dinners, lunches and breakfasts to the offices of Dr. A on 8 occasions during a 2 and one-half month period between August 4, 2015, and October 19, 2015.

281.   These were perks to induce prescriptions for the Covered Drugs and to circumvent prior authorizations rules to ensure that the claims were paid by the government.

282.   On information and belief, improper inducements to Dr. A and his staff continued at least through 2016 into 2018.

283.   Regeneron provided free in-office catered meals to the offices of:

- A doctor (Dr. HH) in Laguna Hills, California on 5 occasions between July 29, 2015, and October 15, 2015

- A doctor in South Florida (Dr. II) on 3 occasions in a 2-month period between August 11, 2015, and October 13, 2015

- A doctor in Lexington, Kentucky (Dr. JJ) on 3 occasions: on July 30, 2015, September 25, 2015, and October 5, 2015

FIRST AMENDED COMPLAINT

284.   These perks for the office staff of Drs. HH, II, and JJ caused the government to pay double or nearly double the volume of claims for the Covered Drugs every year for at least three years.

285.   Defendants knew that these free perks were unlawful kickbacks that led to the payment of tainted government claims in violation of the Anti-Kickback Statute.

### E. Sham Programs, Boards and Committees

286.   Regeneron and Sanofi used its speaker programs as vehicles to unlawfully induce doctors to prescribe more of the Covered Drugs; and the government (the taxpayer) paid these claims snuck by the unlawful kickbacks.

287.   These programs complemented their programs aimed at doctor office practice administrators for the Covered Drugs.  The unlawful kickback scheme barged through the front door (inducing the doctors) and tiptoed in the back door (inducing their staff).

288.   Regeneron used the same canned justifications on internal "needs assessment forms" to justify the reasons that the same programs with the same doctors should be renewed each year.  However, these justifications were nothing more than window dressing to make unlawful kickback programs appear to conform to its written compliance policies.

FIRST AMENDED COMPLAINT

289.   On information and belief, Regeneron shared these same canned justifications with Sanofi personnel responsible for the speaker programs for the Covered Drugs. In other words, Sanofi knew that there was no legitimate educational need for these continued speaker programs, yet it continued to work with Regeneron to implement this unlawful kickback scheme every year to increase their market share for the Covered Drugs.

290.   As reflected in the demonstrative below for 2017, Regeneron spent millions of dollars each year promoting its Covered Drugs through these programs:



291.   The primary justification for these programs was not educational, but to increase their market share of the Covered Drugs, and they did so through their sales reps who were the boots on the ground: "[s]ince the FDA approval of

FIRST AMENDED COMPLAINT

PRALUENT July, 2015, PRALUENT has only penetrated 0.2% of the lipid market." Further, sales reps were responsible to implement the program and the "[p]rogram . . . effectiveness [was expected to] be monitored by a variety of analyses . . . as well as feedback from sales."

292.   Regeneron and Sanofi booked speaker programs with such frequency that Regeneron's Vice President of Sales sent an email to all sales reps as early as August 2015, asking them to provide more lead time to prevent programs from overlapping with one another

293.   Regeneron and Sanofi designed and implemented these speaker programs to have no educational value because their value was in wining and dining the speakers (doctors and their staff) to induce them to obtain prior authorizations and submit claims to the government for the Covered Drugs. Therefore, a successful program did not need other attendees other than for window dressing.

294.   Feedback from one Regeneron-funded meeting of doctors in 2016 highlighted how "[d]inner programs with a speaker are not well attended." Educational speaker programs with little to no attendees are shams.

295.   Notably, when recommendations were made by doctors on how to improve the legitimacy of these programs such as "focus groups with a key thought

1  leader are preferred for learning and robust discussion," Regeneron and Sanofi

2  ignored them.

3      296.   The same concerns were raised about Regeneron's advisory boards

4  and steering committees, which were also sham vehicles to induce doctors to

5  prescribe the Covered Drugs; and the government (the taxpayer) paid these claims

6  tainted by the unlawful kickbacks.

7      297.   For example, a Regeneron third-party consultant provided this

8  observation:

9  • "no limit [was imposed] to the number of consultants with whom

10     [Regeneron personnel] may contract."

11  • No "formal compliance/legal review of HCP [health care provider]

12     nominations," even though having such a process in place would "help

13     ensure appropriateness of nominated HCP consultants."

14     298.   Further and notably, these various programs violated Regeneron's

15  written compliance policies because they included these improper components

16  described below:

17         • Speaker "Programs may not be held at resorts or similar locations that

18           are primarily recreational in nature."

19

20

- "Speaker programs must also be held in appropriate venues (e.g., casinos, spas, lavish resorts, or other similar locations not conducive to an education exchange are prohibited)."

- "resorts and luxury hotels are not appropriate venues" for advisory board and steering committee meetings.

299.   Sanofi was required to fix its broken compliance program, under corporate integrity agreements with the government (HHS-OIG) because of earlier kickback allegations that it settled. In fact, the earlier of the CIAs required Sanofi to implement a system with "controls designed to ensure that speaker programs are used for legitimate and lawful purposes in accordance with all applicable Federal health care program requirements and FDA requirements."

300.   Yet, for both drug companies, compliance was nothing more than words on paper.

301.   Regeneron and Sanofi wined and dined doctors and their staff at resorts and luxury hotels and venues all over the country, all the while knowing that the remuneration for their programs was unlawful kickbacks in violation of the Anti-Kickback Statute, and that the government was footing the bill for the Covered Drugs that was tainted by the kickbacks.

FIRST AMENDED COMPLAINT

### 1. Examples of Inducements

302.   Below are some examples of unlawful kickbacks to doctors to prescribe the Covered Drugs; On information and belief, all the below payments to doctors induced them to prescribe the Covered Drugs; and the government (the taxpayer) paid these claims tainted by the unlawful kickbacks.

303.   Regeneron and Sanofi paid a Coralville, Iowa doctor (Dr. KK) at least $8,727, plus round-trip airfare, meals, and a hotel stay, to attend a meeting of doctors at Sanofi's corporate headquarters in Paris, France on December 9, 2016.

304.   Regeneron and Sanofi paid this same doctor at least $10,800, plus round-trip airfare, meals, and a hotel stay, to attend the same meeting of doctors in Paris the following year on December 12, 2017.

305.   In total, Regeneron and Sanofi paid the Dr. KK over $577,000 between 2013 and 2019.

306.   Regeneron and Sanofi paid for Los Angeles, California doctor (Dr. LL) to travel to the Hawaii Islands on multiple occasions:

- October 2015: Regeneron paid his airfare and hotel stay in Hilo, Hawaii

- January 2016: Regeneron paid at least for his hotel stay in Honolulu, Hawaii

- May 2016: Sanofi paid for at least his hotel stays in Waianae and Kailua-Kona, Hawaii

FIRST AMENDED COMPLAINT

- July 2016: Sanofi paid for his airfare and hotel stays in Hilo, Hawaii and Kahului, Hawaii

307.   Regeneron and Sanofi made additional cash payments this doctor for these trips as "[c]ompensation for services other than consulting, including serving as faculty or as a speaker at a venue other than continuing education." For example, Sanofi paid Dr. LL $6,576 for each trip to Hawaii in May 2016 and July 2016.

308.   Regeneron and Sanofi paid him at least over $335,000 between 2015 and 2018.

309.   Regeneron paid a Denver, Colorado doctor (Dr. MM) at least $4,772, plus round-trip airfare, meals, and a hotel stay, to attend an advisory board meeting at the Park Plaza Victoria hotel in Amsterdam on October 29, 2016.

310.   Regeneron paid him at least $5,492 and Sanofi paid him at least $3,024, plus round-trip airfare, meals, and a hotel stay, to attend a steering committee meeting in Amsterdam less than seven months later in May 2017.

311.   Regeneron and Sanofi paid this doctor over $266,900 between 2013 and 2019.

FIRST AMENDED COMPLAINT

312.   Regeneron paid a Sugar Land, Texas doctor (Dr. NN) at least $4,588, plus round-trip airfare, meals, and a hotel stay, to attend an advisory board meeting at the Park Plaza Victoria hotel in Amsterdam, Netherlands on October 29, 2016.

313.   Regeneron and Sanofi paid this doctor over $174,000 between 2016 and 2019.

314.   Regeneron paid an Advance, North Carolina doctor (Dr. OO) at least $5,596, plus round-trip airfare, meals, and a hotel stay, to attend an advisory board meeting at the Park Plaza Victoria hotel in Amsterdam on October 29, 2016.

315.   Regeneron paid the same doctor at least $6,508, plus round-trip airfare, meals, and a hotel stay, to attend a steering committee meeting in Amsterdam less than seven months later in May 2017.

316.   In total, Regeneron and Sanofi paid him over $151,000 between 2013 and 2019.

317.   Regeneron paid one doctor from Philadelphia, Pennsylvania (Dr. PP) $4,210 for a speaker program on a Covered Drug that took place at the Venetian Resort in Las Vegas, Nevada, a luxury hotel, resort, and casino on November 14, 2015. This $4,210 payment included a payment of $2,500 for speaking at this 1-hour program, which well exceeded the Regeneron-assigned rate of $855 for this doctor without a justification based on an assessment.  The doctor was also paid

$1,710 for two 1-hour prep calls with Regeneron at his Regeneron-assigned FMV rate of $855 per hour.

318.   As reflected in the below demonstrative, Dr. PP prescribed over $10.43 million worth of the Covered Drugs to Medicare patients between 2013 and 2017; and the government (the taxpayer) paid these claims tainted by the unlawful kickbacks:



319.   Regeneron paid a doctor from Monterey, California (Dr. D) $3,500 speaker program on a Covered Drug that took place at the Mastro's Ocean Club in Las Vegas, which bills itself as "high end" and "the preferred steakhouse of celebs and locals," and is located adjacent to the Cosmopolitan Hotel & Casino and the ARIA Resort and Casino in a high-end shopping center that includes Prada,

Versace, and Hermès, with its own entrance to the ARIA Resort and Casino on November 16, 2015.

320.   Even the third-party vendor that coordinated this speaker program recognized that this program violated Regeneron's written compliance policies: "Mastro's is located inside the Shops at Crystals, which is part of Aria Resort and Casino," and noted that there was "a stand-alone Morton's Steakhouse 1 mile away" that could be booked instead.

321.   When the vendor heard crickets chirping in response, the individual followed up again, writing that the sales rep leading the program "wants to use a venue that is part of a resort and casino, when there are other compliant venues in the immediate vicinity."  A Regeneron manager responded that "[w]e've done a program in that venue before. It's ok." The vendor replied, "I cannot believe it." Forging ahead, the event at Mastro's lasted only 1-hour, yet the doctor was paid $3,500, significantly higher than his Regeneron-assigned rate of $855.

322.   Regeneron also paid for this same doctor's stay at the Palazzo Hotel at the Venetian Resort and Casino, which also violated Regeneron's written compliance policy: "[s]tays at luxury hotels such as the Ritz Carlton or Four Seasons hotels or at resorts or spas are not permitted."

323.   As reflected in the below demonstrative, Regeneron and Sanofi paid this doctor at least $45,247.67 between 2013 and 2015; and the doctor prescribed over $2.22 million worth of the Covered Drugs to Medicare patients between 2013 and 2016; and the government (the taxpayer) paid these claims tainted by the unlawful kickbacks:



324.   Regeneron and Sanofi paid a Houston, Texas doctor (Dr. QQ) at least $10,267.00, plus round-trip airfare, meals and a hotel stay, to attend a meeting of doctors at Sanofi's corporate headquarters in Paris, France on December 9, 2016.

325.   Regeneron and Sanofi paid the same doctor at least $12,400, plus round-trip airfare, meals, and a hotel stay, to attend the same meeting in Paris on December 12, 2017.

FIRST AMENDED COMPLAINT

326.    Regeneron and Sanofi paid this doctor over $106,000 between 2017 and 2018.  In turn, Defendants got a good return on their investment because the doctor prescribed at least $80,265 of the Covered Drugs to Medicare patients in 2017 and 2018; and the government (the taxpayer) paid these claims tainted by the unlawful kickbacks:



327.    Regeneron and Sanofi paid Los Angeles, California doctor (Dr. RR) at least $5,100, in addition to paying for round-trip airfare, meals, and a hotel stay, to attend an advisory board meeting in Barcelona, Spain on October 22, 2016.

328.    Regeneron and Sanofi paid this doctor at least $33,976.71 between 2013 and 2019.

FIRST AMENDED COMPLAINT

329.   Regeneron paid a Castle Rock, Colorado doctor (Dr. SS) at least $6,508, plus round-trip airfare, meals, and a hotel stay, to attend a steering committee meeting in Amsterdam in May 2017.

330.   Regeneron and Sanofi paid this same doctor over $22,000 in 2017. The next year, in 2018, the doctor prescribed at least $40,259.75 in Covered Drugs to Medicare patients. Further, Regeneron and Sanofi paid the doctor at least $4,800 in additional inducements.

331.   Regeneron paid a La Jolla, California doctor (Dr. TT) at least $6,876, plus round-trip airfare, meals, and a hotel stay, to attend an advisory board meeting at the InterContinental Berlin hotel in Berlin, Germany on February 11, 2017. Regeneron did not report these payments made to the doctor in violation of the Sunshine Law.

332.   Regeneron paid 4 doctors from Philadelphia, Pennsylvania (Dr. PP); Cleveland, Ohio (Dr. UU); Houston, Texas (Dr. VV); and Los Angeles, California (Dr. WW) $1,283, $1,283, $1,282, $855 (respectively) to attend an advisory board meeting for the Covered Drugs that took place at the Peninsula Hotel in Chicago, Illinois, a five-star luxury hotel, on October 16, 2016.

333.   Regeneron also paid each of these doctors an identical travel stipend of $1,200 regardless of the lesser cost of the travel and, for one doctor (Dr. UU)

who traveled less than the required minimum (750 miles round trip), in violation of its travel stipend policy.

334.   Further, Regeneron paid these travel stipends even though the meeting was held at the same time and in the same city as the annual meeting of the American Academy of Ophthalmology in violation of its written compliance policy: "airfare . . . not in connection with the consulting services may not be reimbursed if the HCP Consultant was planning to attend on their own."  At least one doctor (Dr. WW) was already scheduled to be in Chicago to present at the annual conference.

335.   Because of these and other inducements to Dr. WW in the amounts show below, he prescribed more of the Covered Drugs each year from at least 2016 to 2019 (the years for which data is available); and the government (the taxpayer) paid those claims tainted by the unlawful kickbacks:

FIRST AMENDED COMPLAINT



336.   As shown above, Regeneron and Sanofi paid Dr. WW over $23,800 in inducements between 2013 and 2015.  They got a good return on their investment because Dr. WW prescribed over $6 million in Covered Drugs' prescriptions between 2013 and 2016; and the government (the taxpayer) paid these claims tainted by the unlawful kickbacks.

337.   Regeneron and Sanofi increased their payments to Dr. WW each year between 2013 and 2015.

338.   They increased payments to Dr. WW by $7,591, between 2013 and 2014.  In turn, Defendants got a good return on their investment because the doctor prescribed an additional $421,961 worth of the Covered Drugs between 2014 and

FIRST AMENDED COMPLAINT

138

2015; and the government (the taxpayer) paid these claims tainted by the unlawful kickbacks.

339.   Defendants increased payments to Dr. WW by $6,413 between 2014 and 2015.  In turn, Defendants continued to get a good return on their investment because the doctor prescribed an additional $316,496 worth of the Covered Drugs between 2015 and 2016; and the government (the taxpayer) paid those claims tainted by the unlawful kickbacks.

340.   In summary, these examples show the undeniable causal link between the unlawful kickback payments to doctors (and staff) and the doctors prescribing habits for the Covered Drugs.  The drug companies tracked and analyzed their return on investment and took steps to ensure a good return on investment.

**F.  Fair Market Value: A Ruse**

341.   Regeneron's written compliance policies recognized that health care providers must be paid fair market value under the Anti-Kickback Statute.  Sanofi was required to fix its broken compliance program under a corporate integrity agreement (CIA) with the government (HHS-OIG) because of earlier kickback allegations that it settled.   However, compliance for both drug companies was nothing more than words on paper.

342.   Regeneron and Sanofi paid doctors and their staff hourly rates for speaker programs, consulting, advisory boards and steering committees based on a tiering system that was supposed to match fair market values.  Regeneron's payment system had four tiers (Tiers I, II, III and Global Tier I) with increasingly higher hourly payments as the doctor (or staff) moved up the tiers.

343.   Defendants' tiering system was a sham intended to give the veneer of authentic fair market value rates based on experience and credentials.  However, exceptions were liberally granted to increase payments to doctors and staff with no assessment to justify the upward adjustment.  Compliance people had no say in who was paid or how much they were paid.

344.   Regeneron often increased the hourly rates to match those paid by Sanofi and the drug companies conspired to set rates.  In one example, they discussed the compensation for one high-prescribing doctor (Dr. PP).

345.   As confirmed by one internal Regeneron audit in 2016: "the current process [for FMV tiering] does not include a systematic or a sample-based review and validation of the information included on the credentialing form. As a result, there is a risk that the information used to determine the Fair Market Value may be erroneous and that the HCP [doctor] could be inappropriately compensated."

FIRST AMENDED COMPLAINT

346.   A Regeneron consulting firm (Huron LifeSciences) drew the same conclusions in 2016:

- No "formal methodology for tiering HCP [health care provider] consultants – including the review/approval of tiering exceptions."

- "HCPs are nominated and approved for business activities on an ad-hoc basis."

-  "consultants may be re-credentialed [bumped up a tier] for each business activity for which they are contracted."

347.   In May 2017, Regeneron made changes to its tiering process, but these were largely cosmetic and did nothing to address the serious concerns identified by the 2016 audits.

## 1.  Examples of Ignoring FMV

348.   Consistent with these audits, below are some examples where Regeneron granted tier exceptions to increase rates paid to doctors with no assessment to justify the deviation (upward) from the tiering system.

349.   A Franklin, Wisconsin doctor (Dr. XX) was placed in Regeneron-assigned Tier III to be paid as a consultant around October 2015, and he was bumped up to Tier I that same month. Less than one year later (September 2016), the same doctor was bumped up to Global Tier I.  For each of these bumps, he was

---

paid a higher hourly rate, and Regeneron deviated from its own tiering system. Yet, no legitimate justification or assessment was provided.

350.   Regeneron and Sanofi paid this doctor at least $92,688.37 between 2015 and 2019.  Payments to him increased over time:

- At least $3,780 in 2015

- At least $4,727.69 in 2016

- At least $14,011.46 in 2017

- At least $35,253.67 in 2018

- At least $34,915.55 in 2019

351.   A Phoenix, Arizona doctor (Dr. YY) was placed in Regeneron-assigned Tier II to be paid as a consultant in September 2015.  He was bumped up to Tier I only 10 months later, in July 2016. For this bump, the doctor was paid a higher hourly rate, and Regeneron deviated from its own tiering system.  Yet, no legitimate justification or assessment was provided.

352.   Regeneron and Sanofi paid the doctor at least $159,493.99 between 2015 and 2019. Payments to him increased over time:

- At least $4,712.98 in 2015

- At least $8,845.30 in 2016

- At least $44,444.32 in 2017

- At least $79,447.97 in 2018

- At least $22,043.42 in 2019

353.    A Philadelphia, Pennsylvania doctor (Dr. PP) was placed in Regeneron-assigned Tier II as a consultant in September 2015.  He was bumped up to Tier I only 7 months later, in April 2016. For this bump, he was paid a higher hourly rate, and Regeneron deviated from its own tiering system.  Yet, no legitimate justification or assessment was provided.

354.   As reflected in the below demonstrative, the volume of Dr. PP's Medicare claims for the Covered Drugs jumped over $1.3 million in 2016, the year he was approved for a tier exception:



FIRST AMENDED COMPLAINT

355.   A Mission Viejo, California doctor (Dr. ZZ) was placed in Regeneron-assigned Tier III as a consultant in February 2017.  He was bumped up to Tier I only 2 months later, in April 2017. For this bump, the doctor was paid a higher hourly rate, and Regeneron deviated from its own tiering system. Yet, no legitimate justification or assessment was provided.

356.   Regeneron and Sanofi paid him at least $128,505.05 between 2016 and 2019. While the doctor had not prescribed the Covered Drugs to Medicare patients in 2016 before his tier exception was approved, his Medicare claims for the Covered Drugs rose to these amounts:

- $41,132.49 in 2017

- $45,812.69 in 2018

357.   A San Diego, California doctor (Dr. AAA) was placed in Regeneron-assigned Tier I as a consultant in February 2016.  He was bumped up to Global Tier I only 7 months later, in September 2016. For this bump, he was paid a higher hourly rate, and Regeneron deviated from its own tiering system. Yet, no legitimate justification or assessment was provided.

358.   Regeneron and Sanofi paid this doctor at least $263,309.90 between 2016 and 2019.  Payments to him increased significantly after he was granted a tier exception:

- At least $36,874.64 in 2016

- At least $59,053.93 in 2017

- At least $64,172.67 in 2018

- At least $103,208.66 in 2019

359.   A Manhattan, New York doctor (Dr. BBB) was placed in Regeneron-assigned Tier II as a consultant around July 2015. He was bumped up to Tier I only 1 ½ years later, in February 2017.  For this bump, the doctor was paid a higher hourly rate, and Regeneron deviated from its own tiering system. Yet, no legitimate justification or assessment was provided.

360.   Regeneron and Sanofi paid the doctor at least $103,695.63 between 2016 and 2019.  Payments to him increased significantly after he was granted a tier exception in February 2017:

- At least $12,727.11 in 2016

- At least $34,355.83 in 2017

- At least $36,425.24 in 2018

- At least $20,187.45 in 2019

361.   In summary, Regeneron established a tiering system that had a thin veneer of legitimacy for paying doctors and staff fair market value.  In practice,

FIRST AMENDED COMPLAINT

Regeneron did whatever it took to get doctor office staff to complete prior authorization paperwork and doctors to prescribe more of the Covered Drugs.

## V.   MATERIALITY

362.   Defendants knew that compliance with the Anti-Kickback Statute and prior authorization for the Covered Drugs were material to the government's decision to pay claims for the Covered Drugs.  Defendants also knew that truthful records and statements in support of claims for the Covered Drugs, made by doctors, pharmacies, pharmacy benefits managers (PBMs), Part D sponsors, and state Medicaid agencies were material to the government's decision to pay these claims.

363.   Congress reaffirmed the centrality of the anti-kickback statute to the claims payment decision in amending the anti-kickback statute to provide that any Medicare claim "that includes items or services resulting from a violation of [the anti-kickback statute] constitutes

364.   Entities submitting claims to Medicare are subject to mandatory exclusion from Medicare by HHS-OIG if criminally convicted of an anti-kickback statute violation, *see, e.g.*, 42 U.S.C. § 1320a–7(a)(1), and subject to permissive exclusion if HHS-OIG determines that the entity "has committed an act" described in the anti-kickback statute, 42 U.S.C. § 1320a–7(b)(7).

365.   Further, prior authorization is also a condition of payment for certain drugs as described throughout this Complaint.  This means that claims submitted without an indication that the claims submitter made a prior authorization request the claim will be denied.

366.   Some of the factors in evaluating materiality under the False Claims Act include (a) statutory, regulatory, and contractual language, (b) whether the violations go to the heart of the benefit of the bargain, (c) whether the violations were serious and material and not merely technical or minor infractions of rules, (d) the government's actions relative to similar violations, (e) whether any reasonable person would attach importance to Defendants' choice of actions, and (f) Defendants' knowledge relative to these factors.  All these factors demonstrate materiality in this case and have been addressed throughout this complaint.

367.   Defendants knowingly submitted or caused to be submitted thousands of false or fraudulent claims and used false records and statements in support of false or fraudulent claims for the Covered Drugs in violation of laws designed to prevent unlawful kickback schemes and to require prior authorization.

368.   More specifically, Defendants knowingly engaged (and conspired) in an unlawful kickback scheme that was in violation of the Anti-Kickback Statute and no "safe harbor" or "exceptions" applied.  Therefore, all claims for the

Covered Drugs submitted to the government by doctors, pharmacies, pharmacy benefits managers (PBMs), Part D sponsors, and state Medicaid agencies were tainted because of the unlawful kickbacks.

369. Further, they knowingly engaged (and conspired) in an unlawful scheme to circumvent the government's prior authorization rules designed to protect patient safety and control spiraling drug costs.

370. The United States regularly enforces the Anti-Kickback Statute and pursues False Claims Act liability based on underlying violations of the Anti-Kickback Statute. Indeed, it has pursued matters against drug companies like Regeneron and Sanofi for conduct like that alleged in this Complaint.  Notably, many of these same cases have held other drug companies accountable for circumventing prior authorization rules.

371. In 2019, Avanir paid an over $95 million settlement for False Claims Act allegations that included: "provided remuneration in the form of money, honoraria, travel, and food to certain doctors and other health care professionals to induce them to write prescriptions for [their drug].  One form of remuneration included Avanir's payment to certain health care professionals to give talks (commonly known as "speaker's programs") about [their drug] based on their willingness to prescribe [the drug].  These events were primarily social, with no

educational value."  https://www.justice.gov/opa/pr/pharmaceutical-company-targeting-elderly-victims-admits-paying-kickbacks-resolves-related

372.   For example, in 2019, Insys Therapeutics, Inc. paid a $225 million settlement, in part, for False Claims Act allegations that included:

- "Insys began using 'speaker programs' purportedly to increase brand awareness of Subsys through peer-to-peer educational lunches and dinners. However, the programs were actually used as a vehicle to pay bribes and kickbacks to targeted practitioners in exchange for increased Subsys prescriptions to patients and for increased dosage of those prescriptions."

- As an example, "[o]ne practitioner targeted by Insys was a physician's assistant who practiced with a pain clinic in Somersworth, New Hampshire. During the first year that Subsys was on the market, the physician's assistant did not write any Subsys prescriptions for his patients. In May 2013, the physician's assistant joined Insys's sham speaker program knowing that it was a way to receive kickbacks for writing Subsys prescriptions. After joining the sham speaker program, the physician's assistant wrote approximately 672 Subsys prescriptions for his patients – many of which were medically unnecessary – and in turn, received $44,000 in kickbacks from Insys."

https://www.justice.gov/opa/pr/opioid-manufacturer-insys-therapeutics-agrees-enter-225-million-global-resolution-criminal

373.   In 2018, Abbott Laboratories and AbbVie paid a $25 million settlement for False Claims Act allegations that included:

- "Abbott employed kickbacks and unlawful methods of marketing and promotion to induce physicians to prescribe [its drug]."
- "Abbott, through its sales representatives, allegedly provided physicians with improper gift baskets, gift cards, and other items to induce prescriptions of [its drug].  Abbott also engaged health care providers for consulting services and speaking engagements, where one purpose of the remuneration for the programs was to induce or reward physicians [its drug prescriptions]."

https://www.justice.gov/usao-edpa/pr/abbott-laboratories-and-abbvie-inc-pay-25-million-resolve-false-claims-act-allegations

374.   In 2017, Shire Pharmaceuticals LLC and a company it acquired paid a $350 million settlement for False Claims Act allegations that included: "salespersons unlawfully induced clinics and physicians with lavish dinners, drinks, entertainment and travel; medical equipment and supplies; unwarranted payments for purported speaking engagements and bogus case studies."

FIRST AMENDED COMPLAINT

150

https://www.justice.gov/opa/pr/shire-plc-subsidiaries-pay-350-million-settle-false-claims-act-allegations

375.   In 2016, Forest Laboratories paid a $38 million  settlement for False Claims Act allegations that included: "the payments and meals were intended as improper inducements because Forest provided these benefits even when the programs were cancelled (and Forest provided no evidence of a bona fide reason for the cancellation), when no licensed health care professionals attended the programs, when the same attendees had attended multiple programs over a short period of time, or when the meals associated with the programs exceeded Forest's internal cost limitations."

https://www.justice.gov/opa/pr/forest-laboratories-and-forest-pharmaceuticals-pay-38-million-resolve-kickback-allegations

376.   In 2016, Salix Pharmaceuticals, Inc., paid a $54 million settlement for False Claims Act allegations that included:

- "Salix violated the federal Anti-Kickback Statute and False Claims Act by using its 'speaker programs' as a mechanism to pay kickbacks to doctors to induce them prescribe Salix drugs and medical devices that were reimbursed by federal health care programs."

FIRST AMENDED COMPLAINT

- "Salix held many speaker programs that were primarily social in nature, including events where it repeatedly invited the same doctors, who frequently were from the same practice or otherwise knew each other, to attend the same exact program on the same exact topic."

- "The doctors whom SALIX paid to be speakers and whom Salix invited to its events were often the high prescribers of its products or were viewed as having the potential to be high prescribers.  Many of these doctors increased their prescription-writing for the [Salix drugs] after becoming speakers and/or repeatedly attending sham speaker programs."

https://www.justice.gov/usao-sdny/pr/manhattan-us-attorney-announces-54-million-settlement-against-salix-pharmaceuticals

377.   In 2015, Warner Chilcott paid $125 million for False Claims Act allegations of "enlist[ing] high-prescribing physicians as "speakers" for the company.  In fact, the "speakers" often did not actually speak about any clinical or scientific topics, and instead, the payments were primarily intended to induce prescriptions." Further, the allegations settled included these:

- "Warner Chilcott employees knowingly and willfully submitted false, inaccurate, or misleading prior authorization requests and other coverage

requests…[] to overcome formulary restrictions that favored less expensive [] drugs."

- "Warner Chilcott sales representatives filled out numerous prior authorizations for [the drug], using "canned" medical justifications which often were inconsistent with the patients' medical conditions."

- "In other cases, sales representatives coached physicians and staff about which medical justifications would result in an approved prior authorization, whether or not the justification was true for a particular patient."

https://www.justice.gov/opa/pr/warner-chilcott-agrees-plead-guilty-felony-health-care-fraud-scheme-and-pay-125-million

378.   In October 2014, CareMed Pharmaceutical Services paid a $9.5 million settlement for False Claims Act allegations that included:

- "CareMed admits and acknowledges that company representatives made false statements to insurance companies when seeking prior authorization of coverage for costly drugs."

- CareMed "made false statements to insurance companies to secure prior authorization for the coverage of drugs by, among other things, fabricating

FIRST AMENDED COMPLAINT

Medicare beneficiaries' medical information and posing as representatives of prescribing physicians' offices when calling insurers."

- "[W]hen contacting insurance companies to obtain prior authorization for drug coverage, some representatives of the company had falsely stated that they were calling from the prescribing physicians' offices and, in some instances, responded to questions seeking the patient's clinical information based on their understanding of the prior authorization criteria for the particular drug, instead of obtaining the patient's actual clinical information."

- CareMed "failed to adequately oversee and train staff responsible for the prior authorization process."

- CareMed "had inadequate procedures and auditing processes to ensure that some claims submitted to third-party payors for [their drugs] were reversed or credited when necessary."

https://www.justice.gov/usao-sdny/pr/manhattan-us-attorney-settles-civil-fraud-claims-against-caremed-pharmaceutical

379.   These cases demonstrate that Defendants' same or similar conduct alleged in this Complaint was material to the Government's decision to pay claims.

380.   The facts alleged in this Complaint show that Defendants were well aware of the statutory and regulatory requirements of the Anti-Kickback Statute and the prior authorization rules, and that the violations alleged in this Complaint were material to the Government's decision to pay.

381.   Defendants also well knew that the unlawful conduct alleged in this Complaint went to the very heart of the bargain under for the payment of claims for the Covered Drugs.  CMS expects and requires that claims be paid only for accurate and truthful claims and claims that are not tainted by unlawful kickbacks.

382.   CMS's statutory and programmatic requirements for complete, accurate and truthful reporting during the claims submission process and its insistence that claims not be tainted by unlawful kickback arrangements go directly to the "essence of the bargain."  These requirements are neither "minor nor insubstantial."

383.   Defendants' violations of the statutory, regulatory, and programmatic requirements were serious and material, leading to actual or potential harm, and were made with at least reckless disregard of the seriousness of their violations.

384.   Numerous court cases, of which Defendants are or should have been aware, have also confirmed the materiality of any kickback violation in relation to the government's decision to pay a claim. *See, e.g.*, *United States ex rel. Macias v.*

FIRST AMENDED COMPLAINT

*Pac. Health Corp.*, No. CV-12-00960 RSWL-JC, 2019 WL 2396305, at *7 (C.D.
Cal. June 5, 2019) ("[C]ompliance with the AKS is material to the Government
providing Medicare payments."); *United States ex rel. Pasqua v. Kan-Di-Ki LLC*,
No. CV 10-965-JST (RZX), 2012 WL 12895229, at *9 (C.D. Cal. June 18, 2012)
("[T]he AKS and [22 C.C.R. § 51501] . . . require compliance as a condition to
payment [from Medicare and Medi-Cal]."); *United States ex. rel. Jacobs v. CDS,
P.A.*, No. 4:14-CV-00301-BLW, 2015 WL 5698395, at *10 (D. Idaho Sept. 28,
2015) ("[I]n 2010 Congress eliminated any doubt that compliance with the AKS is
a precondition to the payment of Medicare and Medicaid claims."); *United States
v. TEVA Pharms. USA, Inc.*, No. 13 CIV. 3702 (CM), 2016 WL 750720, at *20
(S.D.N.Y. Feb. 22, 2016) ("[C]ompliance with the AKS is a precondition to the
payment of claims submitted to these [federal health care] programs, and not
merely a condition of participation in the programs."); *United States ex rel.
Westmoreland v. Amgen, Inc.*, 812 F. Supp. 2d 39, 54 (D. Mass. 2011) ("Moreover,
courts, without exception, agree that compliance with the Anti–Kickback Statute is
a precondition of Medicare payment, such that liability under the False Claims Act
can be predicated on a violation of the Anti–Kickback Statute."); *Guilfoile v.
Shields*, 913 F.3d 178, 190-91 (1st Cir. 2019) ("Moreover, [the Affordable Care
Act's] obviation of the 'materiality' inquiry essentially codifies the long-standing

view that AKS violations are 'material' in the FCA context."); *United States ex rel. Lutz v. United States*, 853 F.3d 131, 135 (4th Cir. 2017) ("An AKS violation that results in a federal health care payment is a per se false claim under the FCA.").

385.   Defendants' violations were not immaterial or inadvertent technical mistakes in processing paperwork, or simple and honest misunderstanding of the rules, terms and conditions, or certification requirements.  Rather, Defendants knowingly failed to comply with material legal obligations and certifications.

386.   Defendants knew that they were submitting or causing to submit false or fraudulent claims for the Covered Drugs, including tainted claims, and false or fraudulent statements, records, and tainted claims for government health care funds; and the government (the taxpayer) paid these claims tainted by the unlawful kickbacks.

387.   Further, the Department of Justice has repeatedly and publicly stated its intention to use the False Claims Act to remedy knowing violations of the Anti-Kickback Statute.

388.   In short, there is ample evidence to show that Defendants knew or should have known that their violations had the natural tendency to influence the Government's decision to pay the claims for the Covered Drugs and that any reasonable person would attach importance to Defendants' choice of action.

## VI.   COUNTS

### COUNT I
### Federal False Claims Act:
### 31 U.S.C. § 3729(a)(1)(A)

389.   The allegations in the preceding paragraphs are incorporated by reference.

390.   By virtue of the acts described above, Defendants knowingly presented or caused to be presented materially false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A); that is, Defendants knowing made or presented, or caused to be made or presented, to the United States claims for payment for the Covered Drugs that were tainted by the illegal kickbacks.

391.   Defendants have knowingly caused physicians, health care providers, pharmacies, pharmacy benefits managers (PBMs), Part D sponsors, and state Medicaid agencies to submit claim forms for payment, knowing that such false claims would be submitted to federal and state healthcare programs for reimbursement, and knowing that such government health care programs were unaware that they were reimbursing for prescriptions induced by kickbacks and, therefore, false claims.

392.   Defendants caused false claims to be submitted, resulting in government health care reimbursement to physicians, health care providers, pharmacies, pharmacy benefits managers (PBMs), Part D sponsors, and state Medicaid agencies in the millions of dollars, in violation of the FCA, 31 U.S.C. § 3729, et seq. and the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)(2)(A).

393.   Payment of the false and fraudulent claims was a reasonable and foreseeable consequence of Defendants' conduct.

394.   The United States paid for claims that otherwise would not have been allowed.

395.   Because of these false or fraudulent claims, Defendants are jointly and severally liable to the United States for incurred damages resulting from such false claims, trebled, plus civil penalties for each violation of the Act, and liable for all other relief authorized by the statute.

396.   As a result of Defendants' violations of the Anti-Kickback Statute, the United States has suffered damages in an amount to be determined at trial.

397.   WHEREFORE, Plaintiffs-Relators respectfully request this Court enter judgment against Defendants as follows:

          i.   That the United States be awarded damages in the amount of three times the damages sustained by the United States

because of the false claims alleged within this Complaint, as the FCA, 31 U.S.C. § 3729, et seq. provides;

    ii.  That civil penalties of $11,000, or the maximum amount allowed by law, be imposed for each and every false claim that Defendants presented or caused to be presented to the government healthcare programs under the FCA;

    iii.  That pre- and post-judgment interest be awarded, along with reasonable attorneys' fees, costs, and expenses which Relators necessarily incurred in bringing and prosecuting this case;

    iv.  That Relators be awarded the maximum amount allowed pursuant to the FCA; and

    v.  That the Court award such other and further relief as it deems proper.

**COUNT II**
**Federal False Claims Act:**
**31 U.S.C. § 3729(a)(1)(B)**

398.  The allegations in the preceding paragraphs are incorporated by reference.

FIRST AMENDED COMPLAINT

399.   By virtue of the acts described above, Defendants knowingly made, used or caused to be made or used, false records or statements about compliance with the Anti-Kickback Statute, all of which were material to false or fraudulent claims for the Covered Drugs that were submitted to the United States, paid and approved by the Medicare program, and tainted by illegal kickbacks, in violation of 31 U.S.C. § 3729 (a)(1)(B).

400.   Defendants have knowingly caused physicians, health care providers, pharmacies, pharmacy benefits managers (PBMs), Part D sponsors, and state Medicaid agencies to submit claim forms for payment, knowing that such false claims would be submitted to federal and state healthcare programs for reimbursement, and knowing that such government healthcare programs were unaware that they were reimbursing for prescriptions induced by kickbacks and, therefore, false claims.

401.   Defendant has violated 31 U.S.C. § 3729(a)(1)(B) by causing the States to submit false claims to the United States Government on Form CMS-64 (Quarterly Medicaid Statement of Expenditures for the Medical Assistance Program), which falsely certified that all drugs for which federal reimbursement was sought, including the Covered Drugs, were paid for in compliance with federal

FIRST AMENDED COMPLAINT

laws, including the AKA, yet the States sought reimbursement from the United States Government for all Covered Drugs expenditures.

402.   Defendant caused false claims to be submitted, resulting in government healthcare reimbursement to healthcare providers in the millions of dollars, in violation of the FCA, 31 U.S.C. § 3729, et seq. and the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)(2)(A).

403.   Payment of the false or fraudulent claims was a reasonable and foreseeable consequence of Defendants' statements and actions.

404.   The United States paid for claims that otherwise would not have been allowed.

405.   Because of these false or fraudulent claims, Defendants are jointly and severally liable to the United States for incurred damages resulting from such false claims, trebled, plus civil penalties for each violation of the Act, and liable for all other relief authorized by the statute.

406.   As a result of Defendants' violations of the Anti-Kickback Statute, the United States has suffered damages in an amount to be determined at trial.

407.   WHEREFORE, Plaintiffs-Relators respectfully request this Court enter judgment against Defendants as follows:

vi.   That the United States be awarded damages in the amount of three times the damages sustained by the United States because of the false claims alleged within this Complaint, as the FCA, 31 U.S.C. § 3729, et seq. provides;

vii.   That civil penalties of $11,000, or the maximum amount allowed by law, be imposed for each and every false claim that Defendants presented or caused to be presented to the government healthcare programs under the FCA;

viii.   That pre- and post-judgment interest be awarded, along with reasonable attorneys' fees, costs, and expenses which Relators necessarily incurred in bringing and prosecuting this case;

ix.   That Relators be awarded the maximum amount allowed pursuant to the FCA; and

x.   That the Court award such other and further relief as it deems proper.

**COUNT III**
**Federal False Claims Act:**
**31 U.S.C. § 3729(a)(1)(C)**
**Conspiracy**

408.   The allegations in the preceding paragraphs are incorporated by reference.

409.   By virtue of the acts described above, Defendants knowingly conspired to commit a violation of the False Claims Act, namely to violate the Anti-Kickback Statute, in violation of 31 U.S.C. § 3729 (a)(1)(C).

410.   Payment of the false or fraudulent claims was a reasonable and foreseeable consequence of Defendants' conspiracy.

411.   The United States paid for claims that otherwise would not have been allowed.

412.   Because of these false or fraudulent claims, Defendants are jointly and severally liable to the United States for incurred damages resulting from such false claims, trebled, plus civil penalties for each violation of the Act, and liable for all other relief authorized by the statute.

413.   As a result of Defendants' violations of the Anti-Kickback Statute, the United States has suffered damages in an amount to be determined at trial.

414.   WHEREFORE, Plaintiffs-Relators respectfully request this Court enter judgment against Defendants as follows:

xi.   That the United States be awarded damages in the amount of three times the damages sustained by the United States

because of the false claims alleged within this Complaint, as the FCA, 31 U.S.C. § 3729, et seq. provides;

xii.  That civil penalties of $11,000, or the maximum amount allowed by law, be imposed for each and every false claim that Defendants presented or caused to be presented to the government healthcare programs under the FCA;

xiii.  That pre- and post-judgment interest be awarded, along with reasonable attorneys' fees, costs, and expenses which Relators necessarily incurred in bringing and prosecuting this case;

xiv.  That Relators be awarded the maximum amount allowed pursuant to the FCA; and

xv.  That the Court award such other and further relief as it deems proper.

## COUNT IV
## Federal False Claims Act for Knowing Violations
## of Corporate Integrity Agreement
## 31 U.S.C. § 3729(a)(1)(G)

415.  The allegations in the preceding paragraphs are incorporated by reference.

416.   Sanofi knowingly made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government, in violation of 31 U.S.C. § 3729 (a)(1)(G); Sanofi made false statements on its certifications of compliance, which it submitted to the government to attest (annually) that it was in compliance with the terms of its corporate integrity agreement (CIA) and the Anti-Kickback Statute, while knowingly failing to report and refund false or fraudulent claims tainted by unlawful kickbacks,

https://oig.hhs.gov/fraud/cia/agreements/Aventis_Inc_Sanofi_US_Services_Inc_Sanofi-Aventis_US_LLC_and_Genzyme_Corporation_02282020.pdf

417.   The United States paid for claims that otherwise would not have been allowed.

418.   Because of these false or fraudulent claims, Sanofi is liable to the United States for incurred damages resulting from such false claims, trebled, plus civil penalties for each violation of the Act, and liable for all other relief authorized by the statute.

FIRST AMENDED COMPLAINT

419.   As a result of Sanofi's violations, the United States has suffered damages in an amount to be determined at trial.

## COUNT V
**California False Claims Act,**
**Cal. Gov't Code § 12650, et seq.**

420.   The allegations in the preceding paragraphs are incorporated by reference.

421.   Relators also bring this action on behalf of the State of California, against Defendants to recover treble damages and civil penalties under the California False Claims Act ("FCA"), Cal. Gov't Code § 12650, et seq-.

422.   Defendants violated the provision of the California FCA, Cal. Gov't Code § 12651(a)(1), which creates liability for any person who "[k]nowingly presents or causes to be presented a false or fraudulent claim for payment or approval."

423.   Defendants violated the provision of the California FCA, Cal. Gov't Code § 12651(a)(2), which creates liability for any person who "[k]nowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim."

424.   Defendants violated the provision of the California FCA, Cal. Gov't Code § 12651(a)(3), which creates liability for any person who "[c]onspires to commit a violation of this subdivision."

425.   Defendants violated the provision of the California FCA, Cal. Gov't Code § 12651(a)(7), which creates liability for any person who "[k]nowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit money or property to the state or to any political subdivision, or knowingly conceals or knowingly and improperly avoids, or decreases an obligation to pay or transmit money or property to the state or to any political subdivision."

426.   In addition, the payment or receipt of bribes or kickbacks is prohibited under Cal. Bus. & Prof. Code § 650 and 650.1 and is also specifically prohibited in treatment of Medi-Cal patients pursuant to Cal. Welf. & Inst. Code §14107.2.

427.   Defendants violated Cal. Bus. & Prof. Code § 650 and 650.1 and Cal. Welf. & Inst. Code §14107.2 by engaging in the conduct alleged in this Complaint.

428.   Defendants violated the California FCA and knowingly caused false claims to be made, used and presented to the State of California by their deliberate and systematic violation of federal and state laws, including the FCA, federal Anti-Kickback Statute (AKS or AKA), Cal. Bus. & Prof. Code § 650-650.1 and Cal.

Welf. & Inst. Code § 14107.2, and by virtue of the fact that because of their conduct alleged in this Complaint none of the claims submitted were eligible for reimbursement by the Government Healthcare Programs.

429.   The State of California, by and through the California Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third-party payers.

430.   Compliance with applicable Medicare, Medi-Cal and the various other federal and state laws cited in this Complaint was an implied and, upon information and belief, also an express condition of payment of claims submitted to the State of California in connection with Defendants' conduct alleged in this Complaint. Compliance with applicable California statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of California.

431.   Had the State of California known that Defendants were violating the federal and state laws cited in this Complaint and/or that the claims submitted in connection with Defendants' conduct alleged in this Complaint failed to meet the reimbursement criteria of the Government Healthcare Programs or were premised on false and/or misleading information, it would not have paid the claims

submitted by healthcare providers and third-party payers in connection with that conduct.

432. Pursuant to the California FCA, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. Cal. Gov't Code § 12651(a)(1).

433. As a direct and proximate result of Defendants' violations, the State of California has suffered damages in an amount to be determined at trial.

434. During and by virtue of Relators' employment with Defendants, Relators obtained direct and independent knowledge of Defendants' unlawful conduct alleged in this Complaint.

435. This Court is requested to accept supplemental jurisdiction over this related state claim as it is predicated upon the same exact facts as the federal claim, and merely asserts separate damages to the State of California in the operation of its Medicaid program.

436. WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

To the STATE OF CALIFORNIA:

(1)     Three times the amount of actual damages which the State of California has sustained as a result of Defendants' conduct;

(2)   A civil penalty of up to $10,000, or the maximum amount allowed by law, for each false claim which Defendants presented or caused to be presented to the State of California;

(3)   Prejudgment interest; and

(4)   All costs incurred in bringing this action.

To Relators:

(1)   The maximum amount allowed pursuant to California FCA and/or any other applicable provision of law;

(2)   Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3)   An award of reasonable attorneys' fees and costs; and

(4)   Such further relief as this Court deems equitable and just.

**COUNT VI**
**Colorado Medicaid False Claims Act,**
**Colo. Rev. Stat. §§ 25.5-4-303.5, et seq.**

437.   The allegations in the preceding paragraphs are incorporated by reference.

438.   Relators also bring this action in the name of the State of Colorado, against Defendants to recover treble damages and civil penalties pursuant to the Colorado Medicaid False Claims Act, Colo. Rev. Stat. § 25.5-4-306.

439.   Defendants violated the provision of the Colorado FCA, Colo. Rev. Stat. § 25.5-4-305(1)(a), which creates liability for any person who "[k]nowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval."

440.   Defendants violated the provision of the Colorado FCA, Colo. Rev. Stat. § 25.5-4-305(1)(b), which creates liability for any person who "[k]nowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim."

441.   Defendants violated the provision of the Colorado FCA, Colo. Rev. Stat. § 25.5-4-305(1)(f), which creates liability for any person who "[k]nowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state in connection with the 'Colorado Medical Assistance Act,' or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state in connection with the 'Colorado Medical Assistance Act.'"

442.   Defendants violated the provision of the Colorado FCA, Colo. Rev. Stat. § 25.5-4-305(1)(5), which creates liability for any person who "[c]onspires to commit a violation of paragraphs (a) to (f) of this subsection (1)."

443.   Defendants violated the Colorado FCA and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Colorado by their deliberate and systematic violation of federal and state laws, including the FCA and the federal AKA, and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the Government Healthcare Programs.

444.   The State of Colorado, by and through the Colorado Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third-party payers in connection therewith.

445.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited in this Complaint was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Colorado in connection with Defendants' conduct. Compliance with applicable Colorado statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Colorado.

446.   Had the State of Colorado known that Defendants were violating the federal and state laws cited in this Complaint and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of

the Government Healthcare Programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third-party payers in connection with that conduct.

447.   As a direct and proximate result of Defendants' violations, the State of Colorado has suffered damages in an amount to be determined at trial.

448.   Pursuant to the Colorado FCA, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law.  Colo. Rev. Stat. § 25.5-4-305(1).

449.   During and by virtue of Relators' employment with Defendants, Relators obtained direct and independent knowledge of Defendants' unlawful conduct alleged in this Complaint.

450.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damages to the State of Colorado, in the operation of its Medicaid program.

451.   WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

To the STATE OF COLORADO:

FIRST AMENDED COMPLAINT

(1)    Three times the amount of actual damages which the State of Colorado has sustained as a result of Defendants' conduct;

(2)    A civil penalty of not less than $5,000 and not more than $10,000, or the maximum amount allowed by law, for each false claim which Defendants presented or caused to be presented to the State of Colorado;

(3)    Prejudgment interest; and

(4)    All costs incurred in bringing this action.

To Relators:

(1)    The maximum amount allowed pursuant to the Colorado FCA and/or any other applicable provision of law;

(2)    Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3)    An award of reasonable attorneys' fees and costs; and

(4)    Such further relief as this Court deems equitable and just.

**COUNT VII**
**Connecticut False Claims Act,**
**Conn. Gen. Stat. §§ 4-274, et seq.**

452.   The allegations in the preceding paragraphs are incorporated by reference.

FIRST AMENDED COMPLAINT

453.    Relators also bring this action in the name of the State of Connecticut, against Defendants to recover treble damages and civil penalties pursuant to the Connecticut False Claims Act, Conn. Gen. Stat. § 4-277.

454.    Defendants violated the Connecticut FCA, Conn. Gen. Stat. § 4-275(a)(1), which provides that no person shall "[k]nowingly present, or cause to be presented, a false or fraudulent claim for payment or approval under a state-administered health or human services program."

455.    Defendants violated the provision of the Connecticut FCA, Conn. Gen. Stat. § 4-275(a)(2), which provides that no person shall "[k]nowingly make, use or cause to be made or used, a false record or statement material to a false or fraudulent claim under a state-administered health or human services program."

456.    Defendants violated the provisions of the Connecticut FCA, Conn. Gen. Stat. § 4/275(a)(7), which provides that no person shall "[k]nowingly make, use or cause to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state under a state-administered health or human services program."

457.    Defendants violated the provision of the Connecticut FCA, Conn. Gen. Stat. § 4-275(a)(8), which provides that no person shall "[k]nowingly conceal or knowingly and improperly avoid or decrease an obligation to pay or transmit

money or property to the state under a state-administered health or human services

program."

458.   Defendants violated the provision of the Connecticut FCA, Conn.
Gen. Stat. § 4-275(a)(8), which provides that no person shall "[c]onspire to commit
a violation of this section."

459.   In addition, Conn. Gen. Stat. §§ 53a-161c & 53a-161d prohibit the
solicitation, receipt, or payment of any remuneration, including any kickback,
bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind, in
return for furnishing any item or service for which payment may be made, in whole
or in part, under the Connecticut Medicaid program.

460.   Defendants violated Conn. Gen. Stat. § 53a-161d by engaging in the
conduct alleged in the Complaint.

461.   Defendants further violated the Connecticut FCA and knowingly
caused hundreds of thousands of false claims to be made, used and presented to the
State of Connecticut by its deliberate and systematic violation of federal and state
laws, including the FCA, federal AKA, and Conn. Gen. Stat. § 53a-161d, and by
virtue of the fact that none of the claims submitted in connection with their conduct
were even eligible for reimbursement by the Government Healthcare Programs.

FIRST AMENDED COMPLAINT

462. The State of Connecticut, by and through the Connecticut Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third-party payers.

463. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited in this Complaint was an implied, and, upon information and belief, also an express condition of payment of claims submitted to the State of Connecticut in connection with Defendants' conduct. Compliance with applicable Connecticut statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Connecticut.

464. Had the State of Connecticut known that Defendants were violating the federal and state laws cited in this Complaint and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the Government Healthcare Programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third-party payers in connection with that conduct.

465. As a direct and proximate result of Defendants' violations, the State of Connecticut has suffered damages in an amount to be determined at trial.

FIRST AMENDED COMPLAINT

466.   Pursuant to the Connecticut FCA, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by the law. Conn. Gen. Stat. § 4-275(b).

467.   During and by virtue of Relators' employment with Defendants, Relators obtained direct and independent knowledge of Defendants' unlawful conduct alleged in this Complaint.

468.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damages to the State of Connecticut, in the operation of its Medicaid program.

469.   WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

To the STATE OF CONNECTICUT:

(1)   Three times the amount of actual damages which the State of Connecticut has sustained as a result of Defendants' conduct;

(2)   A civil penalty of not less than $5,000 and not more than $10,000, or the maximum amount allowed by law, for each false claim which Defendants presented or caused to be presented to the State of Connecticut;

FIRST AMENDED COMPLAINT

(3)     Prejudgment interest; and

(4)     All costs incurred in bringing this action.

To Relators:

(5)     The maximum amount allowed pursuant to the Connecticut FCA

and/or any other applicable provision of law;

(6)     Reimbursement for reasonable expenses which Relators incurred in

connection with this action;

(7)     An award of reasonable attorneys' fees and costs; and

(8)     Such further relief as this Court deems equitable and just.

## COUNT VIII
### Delaware False Claims and Reporting Act,
### 6 Del. C. § 1201, et seq.

470.   The allegations in the preceding paragraphs are incorporated by

reference.

471.    Relators also bring this action in the name of the State of Delaware,

against Defendants to recover treble damages and civil penalties pursuant to the

Delaware False Claims and Reporting Act ("FCA"), 6 Del. C. § 1201, et seq.

472.    Defendants violated the provision of the Delaware FCA, 6 Del. C. §

1201(a)(1), which creates liability for any person who "[k]nowingly presents, or

causes to be presented a false or fraudulent claim for payment or approval."

FIRST AMENDED COMPLAINT

473.   Defendants violated the provision of the Delaware FCA, 6 Del. C. § 1201(a)(2), which creates liability for any person who "[k]nowingly makes, uses or causes to be made or used a false record or statement material to a false or fraudulent claim."

474.   Defendants violated the provision of the Delaware FCA, 6 Del. C. § 1201(a)(3), which creates liability for any person who "[c]onspires to commit a violation of paragraph (a)(1), (2), (4), (5), (6), or (7) of this section."

475.   Defendants violated the provision of the Delaware FCA, 6 Del. C. § 1201(a)(7), which creates liability for any person who "[k]nowingly makes, uses or causes to be made or used a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government."

476.   In addition, 31 Del. C. § 1005 prohibits the solicitation, receipt, offering, or payment of any remuneration (including kickbacks, bribes or rebates) directly or indirectly, overtly or covertly, in cash or in kind, in return for the furnishing of any medical care or services for which payment may be made, in whole or in part, under any public assistance program.

477. Defendants violated 31 Del. C. § 1005 by engaging in the conduct alleged in this Complaint.

478. Defendants further violated the Delaware FCA and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Delaware by its deliberate and systematic violation of federal and state laws, including the FCA, federal AKA, and 31 Del. C. § 1005, and by virtue of the fact that none of the claims submitted in connection with their conduct were even eligible for reimbursement by the Government Healthcare Programs.

479. The State of Delaware, by and through the Delaware Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third-party payers.

480. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited in this Complaint was an implied, and, upon information and belief, also an express condition of payment of claims submitted to the State of Delaware in connection with Defendants' conduct. Compliance with applicable Delaware statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Delaware.

481. Had the State of Delaware known that Defendants were violating the federal and state laws cited in this Complaint and/or that the claims submitted in

connection with Defendants' conduct failed to meet the reimbursement criteria of the Government Healthcare Programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third-party payers in connection with that conduct.

482.   As a direct and proximate result of Defendants' violations, the State of Delaware has suffered damages in an amount to be determined at trial.

483.    Pursuant to the Delaware FCA, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by the law.  31 Del. C. § 1008.

484.   During and by virtue of Relators' employment with Defendants, Relators obtained direct and independent knowledge of Defendants' unlawful conduct alleged in this Complaint.

485.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damages to the State of Delaware, in the operation of its Medicaid program.

486.   WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

To the STATE OF DELAWARE:

(1)     Three times the amount of actual damages which the State of Delaware has sustained as a result of Defendants' conduct;

(2)     A civil penalty of not less than $5,000 and not more than $11,000, or the maximum amount allowed by law, for each false claim which Defendants presented or caused to be presented to the State of Delaware;

(3)     Prejudgment interest; and

(4)     All costs incurred in bringing this action.

To Relators:

(1)     The maximum amount allowed pursuant to the Delaware FCA and/or any other applicable provision of law;

(2)     Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3)     An award of reasonable attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

**COUNT VIX**
**District of Columbia False Claims Act,**
**D.C. Code Ann. §§ 2.381.01, et seq.**

487.    The allegations in the preceding paragraphs are incorporated by reference.

488.    Relators also bring this action in the name of the District of Columbia, against Defendants to recover treble damages and civil penalties under the District of Columbia False Claims Act, D.C. Code Ann. § 2-381.03(b)(1).

489.    Defendants violated the provision of the D.C. FCA, D.C. Code Ann. § 2-381.02(a)(1), which creates liability for any person who "[k]nowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval."

490.    Defendants violated the provision of the D.C. FCA, D.C. Code Ann. § 2-381.02(a)(2), which creates liability for any person who "[k]nowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."

491.    Defendants violated the provision of the D.C. FCA, D.C. Code Ann. § 2-381.02(a)(6), which creates liability for any person who "[k]nowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the District, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the District."

FIRST AMENDED COMPLAINT

492.   Defendants violated the provision of the D.C. FCA, D.C. Code Ann. § 2-381.02(a)(7), which creates liability for any person who "[c]onspires to commit a violation of paragraph (1), (2), (3), (4), (5), or (6) of this subsection."

493.   Defendants violated the D.C. FCA by engaging in the conduct alleged in this Complaint.

494.   Defendants further violated the D.C. FCA and knowingly caused hundreds of thousands of false claims to be made, used and presented to District of Columbia by their deliberate and systematic violation of federal and state laws, including the FCA and the federal AKA, and by virtue of the fact that none of the claims submitted in connection with their conduct were even eligible for reimbursement by the Government Healthcare Programs.

495.   The District of Columbia, by and through the District of Columbia Medicaid program and other District healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third-party payers.

496.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited in this Complaint was an implied, and, upon information and belief, also an express condition of payment of claims submitted to the District of Columbia in connection with Defendants' conduct. Compliance

FIRST AMENDED COMPLAINT

with applicable District of Columbia statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the District.

497.   Had the District known that Defendants were violating the federal and District laws cited in this Complaint and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the Government Healthcare Programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third-party payers in connection with that conduct.

498.   As a direct and proximate result of Defendants' violations, the District of Columbia has suffered damages in an amount to be determined at trial.

499.   Pursuant to the D.C. FCA, Defendants are liable to the District for treble damages, civil penalties, and all other relief authorized by law.  Defendants are thus liable to the District for statutorily defined damages sustained because of the acts of Defendants and civil penalties. D.C. Code Ann. § 2-381.02(a).

500.   During and by virtue of Relators employment with Defendants, Relators obtained direct and independent knowledge of Defendants' unlawful conduct alleged in this Complaint.

501.   This Court is requested to accept supplemental jurisdiction of this related district claim as it is predicated upon the exact same facts as the federal

FIRST AMENDED COMPLAINT

claim, and merely asserts separate damages to the District of Columbia, in the operation of its Medicaid program.

502.   WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

To the DISTRICT OF COLUMBIA:

(1)   Three times the amount of actual damages which the District of Columbia has sustained as a result of Defendants' conduct;

(2)   A civil penalty of not less than $5,000 and not more than $11,000, or the maximum amount allowed by law, for each false claim which Defendants presented or caused to be presented to the District of Columbia;

(3)   Prejudgment interest; and

(4)   All costs incurred in bringing this action.

To Relators:

(1)   The maximum amount allowed pursuant to the D.C. FCA and/or any other applicable provision of law;

(2)   Reimbursement for reasonable expenses which Relators incurred in connection with this action;

FIRST AMENDED COMPLAINT

(3)     An award of reasonable attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

## COUNT X
### Florida False Claims Act,
### Fla. Stat. § 68.081, et seq.

503.   The allegations in the preceding paragraphs are incorporated by reference.

504.   Relators also bring this action on behalf of the State of Florida, against Defendants to recover treble damages and civil penalties under the State of Florida's False Claims Act ("FCA"), Fla. Stat. § 68.083(2).

505.   Defendants violated the provision of the Florida FCA, Fla. Stat. § 68.082(2)(a), which creates liability for any person who "[k]nowingly presents or causes to be presented a false or fraudulent claim for payment or approval."

506.   Defendants violated the provision of the Florida FCA, Fla. Stat. § 68.082(2)(b), which creates liability for any person who "[k]nowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim."

507.   Defendants violated the provision of the Florida FCA, Fla. Stat. § 68.082(2)(g), which creates liability for any person who "[k]nowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to

pay or transmit money or property to the state, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state."

508.   Defendants violated the provision of the Florida FCA, Fla. Stat. § 68.082(2)(c), which creates liability for any person who "[c]onspires to commit a violation of this subsection."

509.   In addition, Fla. Stat. § 409.920(2)(a) makes it a crime to:

> (3) knowingly charge, solicit, accept, or receive anything of value, other than an authorized copayment from a Medicaid recipient, from any source in addition to the amount legally payable for an item or service provided to a Medicaid recipient under the Medicaid program or knowingly fail to credit the agency or its fiscal agent for any payment received from a third-party source; or
>
> * * *
>
> (5) knowingly, solicit, offer, pay or receive any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind, in return for referring an individual to a person for the furnishing of any item or service for which payment may be made, in whole or in part, under the Medicaid program, or in return for obtaining, purchasing, leasing, ordering, or arranging, for or recommending, obtaining, purchasing, leasing, or ordering any goods, facility, item, or service, for which payment may be made, in whole or in part, under the Medicaid program.

510.   Fla. Stat. §456.054(2) also prohibits the offering, payment, solicitation, or receipt of a kickback to a healthcare provider, whether directly or

indirectly, overtly or covertly, in cash or in kind, in exchange for referring or soliciting patients.

511.   Defendants violated Fla. Stat. § 409.920(2)(a) and §456.054(2) by engaging in the conduct alleged in this Complaint.

512.   Defendant further violated the Florida FCA and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Florida by their deliberate and systematic violation of federal and state laws, including the FCA, the federal AKA, Fla. Stat. § 409.920(2)(a) and §456.054(2) and by virtue of the fact that none of the claims submitted in connection with their conduct were even eligible for reimbursement by the Government Healthcare Programs.

513.   The State of Florida, by and through the Florida Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third-party payers.

514.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited in this Complaint was an implied, and, upon information and belief, also an express condition of payment of claims submitted to the State of Florida in connection with Defendants' conduct. Compliance with

applicable Florida statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Florida.

515.   Had the State of Florida known that Defendants were violating the federal and state laws cited in this Complaint and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the Government Healthcare Programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third-party payers in connection with that conduct.

516.   Pursuant to the Florida FCA, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. Fla. Stat. § 68.082(2).

517.   As a direct and proximate result of Defendants' violations, the State has suffered damages in an amount to be determined at trial.

518.   During and by virtue of Relators' employment with Defendants, Relators obtained direct and independent knowledge of Defendants' unlawful conduct alleged in this Complaint.

519.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim,

and merely asserts separate damages to the State of Florida, in the operation of its Medicaid program.

520.   WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

To the STATE OF FLORIDA:

(1)   Three times the amount of actual damages which the State of Florida has sustained as a result of Defendants' conduct;

(2)   A civil penalty of not less than $5,000 and not more than $10,000, or the maximum amount allowed by law, for each false claim which Defendants presented or caused to be presented to the State of Florida;

(3)   Prejudgment interest; and

(4)   All costs incurred in bringing this action.

To Relators:

(1)   The maximum amount allowed pursuant to the Florida FCA and/or any other applicable provision of law;

(2)   Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3)   An award of reasonable attorneys' fees and costs; and

FIRST AMENDED COMPLAINT

(4)    Such further relief as this Court deems equitable and just.

## COUNT XI
## Georgia False Medicaid Claims Act,
## O.C.G.A. § 49-4-168, et seq.

521.   The allegations in the preceding paragraphs are incorporated by reference.

522.   Relators also bring this action in the name of the State of Georgia, against Defendants to recover treble damages and civil penalties pursuant to the State of Georgia False Medicaid Claims Act ("FMCA"), O.C.G.A. § 49-4-168 et seq.

523.   Defendants violated the provision of the Georgia FMCA, O.C.G.A. § 49-4-168.1(a)(1), which creates liability for any person who "[k]nowingly presents or causes to be presented to the Georgia Medicaid program a false or fraudulent claim for payment or approval."

524.   Defendants violated the provision of the Georgia FMCA, O.C.G.A. § 49-4-168.1(a)(2), which creates liability for any person who "[k]nowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim."

525.   Defendants violated the provision of the Georgia FMCA, O.C.G.A. § 49-4-168.1(a)(7), which creates liability for any person who "[k]nowingly makes,

uses, or causes to be made or used a false record or statement material to an

obligation to pay or transmit property or money to the Georgia Medicaid program,

or knowingly conceals or knowingly and improperly avoids or decreases an

obligation to pay or transmit property or money to the Georgia Medicaid program."

526.   Defendants violated the provision of the Georgia FMCA, O.C.G.A. §

49-4-168.1(a)(3), which creates liability for any person who "[c]onspires to

commit a violation of paragraph (1), (2), (4), (5), (6), or (7) of this subsection."

527.   Defendants violated the Georgia FMCA by engaging in the conduct

alleged in this Complaint.

528.   Defendants further violated the Georgia FMCA and knowingly caused

hundreds of thousands of false claims to be made, used and presented to the State

of Georgia by their deliberate and systematic violation of federal and state laws,

including the FCA and the federal AKA, and by virtue of the fact that none of the

claims submitted in connection with their conduct were even eligible for

reimbursement by the Government Healthcare Programs.

529.   The State of Georgia, by and through the Georgia Medicaid program

and other state healthcare programs, and unaware of Defendants' conduct, paid the

claims submitted by healthcare providers and third-party payers.

530.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited in this Complaint was an implied and, upon information and belief, also an express condition of payment of claims submitted to the State of Georgia in connection with Defendants' conduct. Compliance with applicable Georgia statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Georgia.

531.   Had the State of Georgia known that Defendants were violating the federal and state laws cited in this Complaint and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government Healthcare Programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third-party payers in connection with that conduct.

532.   Pursuant to the Georgia FMCA, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law.  O.C.G.A. § 49-4-168.1(a).

533.   As a direct and proximate result of Defendants' violations, the State has suffered damages in an amount to be determined at trial.

FIRST AMENDED COMPLAINT

534.   During and by virtue of Relators' employment with Defendants, Relators obtained direct and independent knowledge of Defendants' unlawful conduct alleged in this Complaint.

535.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damages to the State of Georgia, in the operation of its Medicaid program.

536.   WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

To the STATE OF GEORGIA:

(1)   Three times the amount of actual damages which the State of Georgia has sustained as a result of Defendants' conduct;

(2)   A civil penalty of not less than $5,000 and not more than $11,000, or the maximum amount allowed by law, for each false claim which Defendants presented or caused to be presented to the State of Georgia;

(3)   Prejudgment interest; and

(4)   All costs incurred in bringing this action.

FIRST AMENDED COMPLAINT

To Relators:

(1)     The maximum amount allowed pursuant to the Georgia FMCA and/or any other applicable provision of law;

(2)     Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3)     An award of reasonable attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

## COUNT XII
### Hawaii False Claims Act,
### Haw. Rev. Stat. § 661-21, et seq.

537.   The allegations in the preceding paragraphs are incorporated by reference.

538.   Relators also bring this action on behalf of the State of Hawaii, against Defendants to recover treble damages and civil penalties under the Hawaii False Claims Act ("FCA"), Haw. Rev. Stat. § 661-21, et seq.

539.   Defendants violated the provision of the Hawaii FCA, Haw. Rev. Stat. § 661-21(a)(1), which creates liability for any person who "[k]nowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval."

540.   Defendants violated the provision of the Hawaii FCA, Haw. Rev. Stat. § 661-21(a)(2), which creates liability for any person who "[k]nowingly makes,

FIRST AMENDED COMPLAINT

198

uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."

541.  Defendants violated the provision of the Hawaii FCA, Haw. Rev. Stat. § 661-21(a)(6), which creates liability for any person who "[k]nowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the State, or knowingly conceals, or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the State."

542.  Defendants violated the provision of the Hawaii FCA, Haw. Rev. Stat. § 661-21(a)(8), which creates liability for any person who "[c]onspires to commit any of the conduct described in this subsection."

543.  Defendants violated the Hawaii FCA by engaging in the conduct alleged in this Complaint.

544.  Defendants furthermore violated the Hawaii FCA and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Hawaii by their deliberate and systematic violation of federal and state laws, including the FCA and the federal AKA, and by virtue of the fact that none of the claims submitted in connection with their conduct were even eligible for reimbursement by the Government Healthcare Programs.

FIRST AMENDED COMPLAINT

199

545.   The State of Hawaii, by and through the Hawaii Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third-party payers in connection therewith.

546.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited in this Complaint was an implied, and, upon information and belief, also an express condition of payment of claims submitted to the State of Hawaii in connection with Defendants' conduct. Compliance with applicable Hawaii statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Hawaii.

547.   Had the State of Hawaii known that Defendants were violating the federal and state laws cited in this Complaint and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the Government Healthcare Programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third-party payers in connection with that conduct.

548.   Pursuant to the Hawaii FCA, based on Defendants' material non-disclosures and other wrongful acts and omissions set forth above, Defendants are

FIRST AMENDED COMPLAINT

liable to the State for treble damages, civil penalties, and all other relief authorized by law. Haw. Rev. Stat. § 661-21(a).

549.   As a direct and proximate result of Defendants' violations, the State has suffered damages in an amount to be determined at trial.

550.   During and by virtue of Relators' employment with Defendants, Relators obtained direct and independent knowledge of Defendants' unlawful conduct alleged in this Complaint.

551.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damages to the State of Hawaii, in the operation of its Medicaid program.

552.   WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

To the STATE OF HAWAII:

(1)   Three times the amount of actual damages which the State of Hawaii has sustained as a result of Defendants' conduct;

(2)   A civil penalty of not less than $5,000 and not more than $10,000, or the maximum amount allowed by law, for each false claim which Defendants presented or caused to be presented to the State of Hawaii;

FIRST AMENDED COMPLAINT

(3)     Prejudgment interest; and

(4)     All costs incurred in bringing this action.

To Relators:

(1)     The maximum amount allowed pursuant to the Hawaii FCA and/or any other applicable provision of law;

(2)     Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3)     An award of reasonable attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

## COUNT XIII
### Illinois False Claims Act,
### 740 Ill. Comp. Stat. 175/1, et seq.

553.    The allegations in the preceding paragraphs are incorporated by reference.

554.    Relators also bring this action on behalf of the State of Illinois, against Defendants to recover treble damages and civil penalties under the Illinois False Claims Act ("FCA"), 740 Ill. Comp. Stat. 175/4(b).

555.    Defendants violated the provision of the Illinois FCA, 740 Ill. Comp. Stat. 175/3(a)(1)(A), which creates liability for any person who "knowingly

FIRST AMENDED COMPLAINT

202

presents, or causes to be presented, a false or fraudulent claim for payment or approval."

556.   Defendants violated the provision of the Illinois FCA, 740 Ill. Comp. Stat. 175/3(a)(1)(B), which creates liability for any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."

557.   Defendants violated the provision of the Illinois FCA, 740 Ill. Comp. Stat. 175/3(a)(1)(G), which creates liability for any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the State, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the State."

558.   Defendants violated the provision of the Illinois FCA, 740 Ill. Comp. Stat. 175/3(a)(1)(C), which creates liability for any person who "conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G)."

559.   In addition, 305 Ill. Comp. Stat. 5/8A-3(b) & (c) of the Illinois Public Aid Code (Vendor Fraud and Kickbacks) prohibits the solicitation, receipt, or payment of any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind, in return for furnishing any item

or service for which payment may be made, in whole or in part, under the Illinois Medicaid program.

560.   Defendants violated Ill. Comp. Stat. 5/8A-3(b) & (c) by engaging in the conduct alleged in this Complaint.

561.   Defendants furthermore violated the Illinois FCA and knowingly caused false claims to be made, used and presented to the State of Illinois by their deliberate and systematic violation of federal and state laws, including the FCA, federal AKA, and the Illinois Vendor Fraud and Kickback statute, and by virtue of the fact that none of the claims submitted in connection with their conduct were even eligible for reimbursement by the Government Healthcare Programs.

562.   The State of Illinois, by and through the Illinois Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third-party payers in connection therewith.

563.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited in this Complaint was an implied, and, upon information and belief, also an express condition of payment of claims submitted to the State of Illinois in connection with Defendants' conduct. Compliance with

applicable Illinois statutes, regulations and Pharmacy Manuals was also an express

condition of payment of claims submitted to the State of Illinois.

564.   Had the State of Illinois known that Defendants were violating the

federal and state laws cited in this Complaint and/or that the claims submitted in

connection with Defendants' conduct failed to meet the reimbursement criteria of

the Government Healthcare Programs or were premised on false and/or misleading

information, it would not have paid the claims submitted by healthcare providers

and third-party payers in connection with that conduct.

565.   Pursuant to the Illinois FCA, based on Defendants' material non-

disclosures and other wrongful acts and omissions set forth above, Defendants are

liable to the State for treble damages, civil penalties, and all other relief authorized

by law. 740 Ill. Comp. Stat. 175/3(a).

566.   As a direct and proximate result of Defendants' violations, the State

has suffered damages in an amount to be determined at trial.

567.   During and by virtue of Relators' employment with Defendants,

Relators obtained direct and independent knowledge of Defendants' unlawful

conduct alleged in this Complaint.

568.   This Court is requested to accept supplemental jurisdiction of this

related state claim as it is predicated upon the exact same facts as the federal claim,

FIRST AMENDED COMPLAINT

and merely asserts separate damages to the State of Illinois, in the operation of its Medicaid program.

569.   WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

To the STATE OF ILLINOIS:

(1)   Three times the amount of actual damages which the State of Illinois has sustained as a result of Defendants' conduct;

(2)   A civil penalty of not less than $5,000 and not more than $10,000, or the maximum amount allowed by law, for each false claim which Defendants presented or caused to be presented to the State of Illinois;

(3)   Prejudgment interest; and

(4)   All costs incurred in bringing this action.

To Relators:

(1)   The maximum amount allowed pursuant to the Illinois FCA and/or any other applicable provision of law;

(2)   Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3)   An award of reasonable attorneys' fees and costs; and

FIRST AMENDED COMPLAINT

(4)     Such further relief as this Court deems equitable and just.

**COUNT XIV**
**Indiana Medicaid False Claims and**
**Whistleblower Protection Act,**
**Ind. Code § 5-11-5.7, et seq.**

570.   The allegations in the preceding paragraphs are incorporated by reference.

571.   Relators also bring this action on behalf of the State of Indiana, against Defendants to recover treble damages and civil penalties under the State of Indiana False Claims and Whistleblower Protection Act ("FCA"), Ind. Code § 5-11-5.7-4(a).

572.   Defendants violated the provision of the Indiana FCA, Ind. Code § 5-11-5.7-2(a)(l), which creates liability for any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval."

573.   Defendants violated the provision of the Indiana FCA, Ind. Code § 5-11-5.7-2(a)(2), creates liability for any person who "knowingly makes, uses, or causes to be made or used, a false record or statement that is material to a false or fraudulent claim."

574.   Defendants violated the provision of the Indiana FCA, Ind. Code § 5-11-5.7-2(a)(6)(A)-(B), which creates liability for any person who "knowingly: (A)

FIRST AMENDED COMPLAINT

207

makes, uses, or causes to be made or used, a false record or statement concerning an obligation to pay or transmit money or property to the state; or (B) conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state."

575.   Defendants violated the provision of the Indiana FCA, Ind. Code § 5-11-5.7-2(a)(7), which creates liability for any person who "conspires with another person to perform an act described in subdivisions (1) through (6)."

576.   Defendants violated the provision of the Indiana FCA, Ind. Code § 5-11-5.7-2(a)(8), which creates liability for any person who "causes or induces another person to perform an act described in subdivisions (1) through (6)."

577.   Defendants violated the Indiana FCA by engaging in the conduct alleged in this Complaint.

578.   Defendants further violated the Indiana FCA and knowingly caused false claims to be made, used and presented to the State of Indiana by their deliberate and systematic violation of federal and state laws, including the FCA and the federal AKA, and by virtue of the fact that none of the claims submitted in connection with their conduct were even eligible for reimbursement by the Government Healthcare Programs.

579.   The State of Indiana, by and through the Indiana Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third-party payers.

580.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited in this Complaint was an implied, and, upon information and belief, also an express condition of payment of claims submitted to the State of Indiana in connection with Defendants' conduct. Compliance with applicable Indiana statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Indiana.

581.   Had the State of Indiana known that Defendants were violating the federal and state laws cited in this Complaint and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the Government Healthcare Programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third-party payers in connection with that conduct.

582.   Pursuant to the Indiana FCA, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. Ind. Code § 5-11-5.5-2(b).

583.   As a direct and proximate result of Defendants' violations, the State has suffered damages in an amount to be determined at trial.

584.   During and by virtue of Relators' employment with Defendants, Relators obtained direct and independent knowledge of Defendants' unlawful conduct alleged in this Complaint.

585.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damages to the State of Indiana, in the operation of its Medicaid program.

586.   WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

To the STATE OF INDIANA:

(1)    Three times the amount of actual damages which the State of Indiana has sustained as a result of Defendants' conduct;

(2)    A civil penalty of not less than $5,000 and not more than $10,000, or the maximum amount allowed by law, for each false claim which Defendants presented or caused to be presented to the State of Indiana;

(3)    Prejudgment interest; and

(4)     All costs incurred in bringing this action.

To Relators:

(1)     The maximum amount allowed pursuant to the Indiana FCA and/or any other applicable provision of law;

(2)     Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3)     An award of reasonable attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

**COUNT XV**
**Iowa False Claims Act,**
**Iowa Code § 685.1, et seq.**

587.   The allegations in the preceding paragraphs are incorporated by reference.

588.   Relators also bring this action on behalf of the State of Iowa, against Defendants to recover treble damages and civil penalties under the State of Iowa False Claims Act ("FCA"), Iowa Code § 685.1, et seq.

589.   Defendants violated the provision of the Iowa FCA, Iowa Code § 685.2(1))(a), which creates liability for any person who "[k]nowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval."

590.    Defendants violated the provision of the Iowa FCA, Iowa Code § 685.2(1)(b), which creates liability for any person who "[k]nowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."

591.    Defendants violated the provision of the Iowa FCA, Iowa Code § 685.2(1)(g), which creates liability for any person who "[k]nowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state."

592.    Defendants violated the provision of the Iowa FCA, Iowa Code § 685.2(1)(c), which creates liability for any person who "[c]onspires to commit a violation of paragraph 'a', 'b', 'c', 'd', 'e', 'f', or 'g'."

593.    Defendants violated the Iowa FCA by engaging in the conduct described in this Complaint.

594.    Defendants furthermore violated the Iowa FCA, and knowingly caused false claims to be made, used and presented to the State of Iowa by their deliberate and systematic violation of federal and state laws, including the FCA and the federal AKA, and by virtue of the fact that none of the claims submitted in

connection with their conduct were even eligible for reimbursement by the Government Healthcare Programs.

595.   The State of Iowa, by and through the Iowa Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third-party payers in connection therewith.

596.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited in this Complaint was an implied, and, upon information and belief, also an express condition of payment of claims submitted to the State of Iowa in connection with Defendants' conduct. Compliance with applicable Iowa statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Iowa.

597.   Had the State of Iowa known that Defendants were violating the federal and state laws cited in this Complaint and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the Government Healthcare Programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third-party payers in connection with that conduct.

FIRST AMENDED COMPLAINT

598.   Pursuant to the Iowa FCA, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. Iowa Code § 685.2(1).

599.   As a direct and proximate result of Defendants' violations, the State has suffered damages in an amount to be determined at trial.

600.   During and by virtue of Relators' employment with Defendants, Relators obtained direct and independent knowledge of Defendants' unlawful conduct alleged in this Complaint.

601.   This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damages to the State of Iowa, in the operation of its Medicaid program.

602.   WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

To the STATE OF IOWA:

(1)   Three times the amount of actual damages which the State of Iowa has sustained as a result of Defendants' conduct;

(2)    A civil penalty of not less than $5,500 and not more than $11,000, or the maximum amount allowed by law, for each false claim which Defendants presented or caused to be presented to the State of Iowa;

(3)    Prejudgment interest; and

(4)    All costs incurred in bringing this action.

To Relators:

(1)    The maximum amount allowed pursuant to the Iowa FCA and/or any other applicable provision of law;

(2)    Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3)    An award of reasonable attorneys' fees and costs; and

(4)    Such further relief as this Court deems equitable and just.

## COUNT XVI
### Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. Ann. § 46:437.1, et seq.

603.   The allegations in the preceding paragraphs are incorporated by reference.

604.   Relators also bring this action on behalf of the State of Louisiana's medical assistance programs, against Defendants to recover treble damages and

civil penalties under the under the State of Louisiana Medical Assistance Programs Integrity Law ("FCA"), La. Rev. Stat. Ann. § 46:437.1, et seq.

605.   Defendants violated the provision of the Louisiana FCA, La. Rev. Stat. Ann. § 46:438.3.A, which states that "[n]o person shall knowingly present or cause to be presented a false or fraudulent claim."

606.   Defendants violated the provision of the Louisiana FCA, La. Rev. Stat. Ann. § 46:438.3.B, which states that "[n]o person shall knowingly engage in misrepresentation or make, use, or cause to be made or used, a false record or statement material to a false or fraudulent claim."

607.   Defendants violated the provision of the Louisiana FCA, La. Rev. Stat. Ann. § 46:438.3.C, which states that "[n]o person shall knowingly make, use, or cause to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the medical assistance programs, or to knowingly conceal, avoid, or decrease an obligation to pay or transmit money or property to the medical assistance programs."

608.   Defendants violated the provision of the Louisiana FCA, La. Rev. Stat. Ann. § 46:438.3.D, which states that "[n]o person shall conspire to defraud, or attempt to defraud, the medical assistance programs through misrepresentation or by obtaining, or attempting to obtain, payment for a false or fraudulent claim."

FIRST AMENDED COMPLAINT

609.   In addition, La. Rev. Stat. Ann. § 46:438.2(A) prohibits the

solicitation, receipt, offering or payment of any financial inducements, including

kickbacks, bribes and/or rebates, directly or indirectly, overtly or covertly, in cash

or in kind, for furnishing healthcare goods or services paid for, in whole or in part,

by the Louisiana medical assistance programs.

610.   Defendants violated La. Rev. Stat. Ann. § 46:438.2(A) by engaging in

the conduct alleged in this Complaint.

611.   Defendants further violated the Louisiana FCA and knowingly caused

false claims to be made, used and presented to the State of Louisiana by their

deliberate and systematic violation of federal and state laws, including the FCA,

federal AKA, and Rev. Stat. Ann. § 46:438.2(A), and by virtue of the fact that

none of the claims submitted in connection with their conduct were even eligible

for reimbursement by the Government Healthcare Programs.

612.   The State of Louisiana, by and through the Louisiana Medicaid

program and other state healthcare programs, and unaware of Defendants' conduct,

paid the claims submitted by healthcare providers and third-party payers.

613.   Compliance with applicable Medicare, Medicaid and the various other

federal and state laws cited in this Complaint was an implied, and, upon

information and belief, also an express condition of payment of claims submitted

FIRST AMENDED COMPLAINT

to the State of Louisiana in connection with Defendants' conduct. Compliance with applicable Louisiana statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Louisiana.

614.   Had the State of Louisiana known that Defendants were violating the federal and state laws cited in this Complaint and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the Government Healthcare Programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third-party payers in connection with that conduct.

615.   Pursuant to the Louisiana FCA, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. La. Rev. Stat. Ann. § 46:438.6.

616.   As a direct and proximate result of Defendants' violations, the State has suffered damages in an amount to be determined at trial.

617.   During and by virtue of Relators' employment with Defendants, Relators obtained direct and independent knowledge of Defendants' unlawful conduct alleged in this Complaint.

618.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim,

and merely asserts separate damages to the State of Louisiana, in the operation of its Medicaid program.

619.   WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

To the STATE OF LOUISIANA:

(1)   Three times the amount of actual damages which the State of Louisiana has sustained as a result of Defendants' conduct;

(2)   A civil penalty of not less than $5,000 and not more than $10,000, or the maximum amount allowed by law, for each false claim which Defendants presented or caused to be presented to the State of Louisiana;

(3)   Prejudgment interest; and

(4)   All costs incurred in bringing this action.

To Relators:

(1)   The maximum amount allowed pursuant to the Louisiana FCA and/or any other applicable provision of law;

(2)   Reimbursement for reasonable expenses which Relators incurred in connection with this action;

FIRST AMENDED COMPLAINT

(3)    An award of reasonable attorneys' fees and costs; and

(4)    Such further relief as this Court deems equitable and just.

## COUNT XVII
### The Commonwealth of Massachusetts False Claims Act, Mass. Ann. Laws Ch. 12, § 5A, et seq.

620.    The allegations in the preceding paragraphs are incorporated by reference.

621.    Relators also bring this action on behalf of the Commonwealth of Massachusetts, against Defendants to recover treble damages and civil penalties under the Massachusetts False Claims Act ("FCA"), Mass. Ann. Laws ch. 12, § 5A, et seq.

622.    Defendants violated the provision of the Massachusetts FCA, Mass. Ann. Laws ch. 12, § 5B(a)(1), which creates liability for any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval."

623.    Defendants violated the provision of the Massachusetts FCA, Mass. Ann. Laws ch. 12, § 5B(a)(2), creates liability for any person who "knowingly makes, uses or causes to be made or used a false record or statement material to a false or fraudulent claim."

FIRST AMENDED COMPLAINT

624.   Defendants violated the provision of the Massachusetts FCA, Mass. Ann. Laws ch. 12, § 5B(a)(9), which creates liability for any person who "knowingly makes, uses or causes to be made or used a false record or statement material to an obligation to pay or to transmit money or property to the commonwealth or a political subdivision thereof, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the commonwealth or a political subdivision thereof."

625.   Defendants violated the provision of the Massachusetts FCA, Mass. Ann. Laws ch. 12, § 5B(a)(3), which creates liability for any person who "conspires to commit a violation of this subsection."

626.   In addition, Mass. Ann. Laws ch. 118E § 41 prohibits the solicitation, receipt, offering, or payment of any remuneration, including any bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind, in return for furnishing any good, service or item for which payment may be made, in whole or in part, under the Massachusetts Medicaid program.

627.   Defendants violated Mass. Ann. Laws ch. 118E § 41 by engaging in the conduct alleged in this Complaint.

628.   Defendants further violated the Massachusetts FCA and knowingly caused false claims to be made, used and presented to the Commonwealth of

FIRST AMENDED COMPLAINT

Massachusetts by their deliberate and systematic violation of federal and state laws, including the FCA, the federal AKA, Mass. Ann. Laws ch. 118E § 41, and by virtue of the fact that none of the claims submitted in connection with their conduct were even eligible for reimbursement by the Government Healthcare Programs.

629.   The Commonwealth of Massachusetts, by and through the Massachusetts Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third-party payers.

630.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited in this Complaint was an implied, and upon information and belief, also an express condition of payment of claims submitted to the Commonwealth of Massachusetts in connection with Defendants' conduct. Compliance with applicable Massachusetts statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the Commonwealth of Massachusetts.

631.   Had the Commonwealth of Massachusetts known that Defendants were violating the federal and state laws cited in this Complaint and/or that the claims submitted in connection with Defendants' conduct failed to meet the

FIRST AMENDED COMPLAINT

reimbursement criteria of the Government Healthcare Programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third-party payers in connection with that conduct.

632.    Pursuant to the Massachusetts FCA, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. Mass. Ann. Laws ch. 12, § 5B(a).

633.    As a direct and proximate result of Defendants' violations, the State has suffered damages in an amount to be determined at trial.

634.    During and by virtue of Relators' employment with Defendants, Relators obtained direct and independent knowledge of Defendants' unlawful conduct alleged in this Complaint.

635.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damages to the Commonwealth of Massachusetts, in the operation of its Medicaid program.

636.    WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

To the COMMONWEALTH OF MASSACHUSETTS:

(1)    Three times the amount of actual damages which the Commonwealth of Massachusetts has sustained as a result of Defendants' conduct;

(2)    A civil penalty of not less than $5,000 and not more than $10,000, or the maximum amount allowed by law, for each false claim which Defendants presented or caused to be presented to the Commonwealth of Massachusetts;

(3)    Prejudgment interest; and

(4)    All costs incurred in bringing this action.

To Relators:

(1)    The maximum amount allowed pursuant to the Massachusetts FCA and/or any other applicable provision of law;

(2)    Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3)    An award of reasonable attorneys' fees and costs; and

(4)    Such further relief as this Court deems equitable and just.

FIRST AMENDED COMPLAINT

**COUNT XVIII**
**Michigan Medicaid False Claims Act,**
**Mich. Comp. Laws Serv. § 400.601, et seq.**

637.   The allegations in the preceding paragraphs are incorporated by reference.

638.   Relators also bring this action in the name of the State of Michigan, against Defendants to recover treble damages and civil penalties under the State of Michigan Medicaid False Claims Act ("FCA"), Mich. Comp. Laws Ann. § 400.603, et seq.

639.   Defendants violated each of the following provisions of the Michigan FCA, Mich. Comp. Laws Ann. § 400.603(1)-(3):

640.   "(1)   A person shall not knowingly make or cause to be made a false statement or false representation of a material fact in an application for [M]edicaid benefits.

641.   A person shall not knowingly make or cause to be made a false statement or false representation of a material fact for use in determining rights to a [M]edicaid benefit.

642.   A person, who having knowledge of the occurrence of an event affecting his initial or continued right to receive a [M]edicaid benefit or the initial or continued right of any other person on whose behalf he has applied for or is

FIRST AMENDED COMPLAINT

receiving a benefit, shall not conceal or fail to disclose that event with intent to obtain a benefit to which the person or any other person is not entitled or in an amount greater than that to which the person or any other person is entitled."

643.   Defendants violated the provision of  Michigan FCA, Mich. Comp. Laws Ann. § 400.604,  which states: "A person who solicits, offers, or receives a kickback or bribe in connection with the furnishing of goods or services for which payment is or may be made in whole or in part pursuant to a program established under Act No. 280 of the Public Acts of 1939, as amended, who makes or receives the payment, or who receives a rebate of a fee or charge for referring an individual to another person for the furnishing of the goods and services is guilty of a felony, punishable by imprisonment for not more than 4 years, or by a fine of not more than $30,000.00, or both."

644.   Defendants violated the provision of the Michigan FCA, Mich. Comp. Laws Ann. § 400.607(1), which states that "[a] person shall not make or present or cause to be made or presented to an employee or officer of this state a claim under the social welfare act, 1939 PA 280, MCL 400.1 to 400.119b, upon or against the state, knowing the claim to be false."

645.   Defendants violated the provision of the Michigan FCA, Mich. Comp. Laws Serv. § 400.607(3), which states that "[a] person shall not knowingly make,

use, or cause to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the state pertaining to a claim presented under the social welfare act."

646.  Defendants violated the Michigan FCA by engaging in the conduct alleged in this Complaint.

647.  Defendants further violated Michigan law and knowingly caused false claims to be made, used and presented to the State of Michigan by their deliberate and systematic violation of federal and state laws, including the FCA and federal AKA, and by virtue of the fact that none of the claims submitted in connection with their conduct were even eligible for reimbursement by the Government Healthcare Programs.

648.  The State of Michigan, by and through the Michigan Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third-party payers.

649.  Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited in this Complaint was an implied, and, upon information and belief, also an express condition of payment of claims submitted to the State of Michigan in connection with Defendants' conduct. Compliance with

FIRST AMENDED COMPLAINT

applicable Michigan statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Michigan.

650.   Had the State of Michigan known that Defendants were violating the federal and state laws cited in this Complaint and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the Government Healthcare Programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third-party payers in connection with that conduct.

651.   Pursuant to the Michigan FCA, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. Mich. Comp. Laws. Serv. § 400.612.

652.   As a direct and proximate result of Defendants' violations, the State has suffered damages in an amount to be determined at trial.

653.   During and by virtue of Relators' employment with Defendants, Relators obtained direct and independent knowledge of Defendants' unlawful conduct alleged in this Complaint.

654.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim,

and merely asserts separate damages to the State of Michigan, in the operation of its Medicaid program.

655.   WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

To the STATE OF MICHIGAN:

(1)   Three times the amount of actual damages which the State of Michigan has sustained as a result of Defendants' conduct;

(2)   A civil penalty of not less than $5,000 and not more than $10,000, or the maximum amount allowed by law, for each false claim which Defendants presented or caused to be presented to the State of Michigan;

(3)   Prejudgment interest; and

(4)   All costs incurred in bringing this action.

To Relators:

(1)   The maximum amount allowed pursuant to the Michigan FCA and/or any other applicable provision of law;

(2)   Reimbursement for reasonable expenses which Relators incurred in connection with this action;

FIRST AMENDED COMPLAINT

(3)     An award of reasonable attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

## COUNT XIX
### Minnesota False Claims Act,
### Minn. Stat. §§ 15C.01, et seq.

656.   The allegations in the preceding paragraphs are incorporated by reference.

657.   Relators also bring this action on behalf of the State of Minnesota and its political subdivisions, against Defendants to recover treble damages and civil penalties under the State of Minnesota False Claims Act, Minn. Stat. § 15C.01, et seq.

658.   Defendants violated each of the following provisions of the Minnesota FCA, Minn. Stat. § 15C.02(a), which create liability for any person who:

"(1)     knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(2)     knowingly makes or uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(3)     knowingly conspires to commit a violation of clause (1), (2), (4), (5), (6), or (7); [and/or]

FIRST AMENDED COMPLAINT

…

(7)     knowingly makes or uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state or a political subdivision, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state or a political subdivision."

659.   Defendants violated the Minnesota FCA by engaging in the conduct alleged in this Complaint.

660.   Defendants further violated the Minnesota FCA and knowingly caused false claims to be made, used and presented to the State of Minnesota by their deliberate and systematic violation of federal and state laws, including the FCA and the federal AKA, and by virtue of the fact that none of the claims submitted in connection with their conduct were even eligible for reimbursement by the Government Healthcare Programs.

661.   The State of Minnesota, by and through the Minnesota Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third-party payers.

662.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited in this Complaint was an implied, and, upon

information and belief, also an express condition of payment of claims submitted to the State of Minnesota in connection with Defendants' conduct. Compliance with applicable Minnesota statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Minnesota.

663.   Had the State of Minnesota known that Defendants were violating the federal and state laws cited in this Complaint and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the Government Healthcare Programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third-party payers in connection with that conduct.

664.   Pursuant to the Minnesota FCA, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. Minn. Stat. § 15C.02(a).

665.   As a direct and proximate result of Defendants' violations, the State has suffered damages in an amount to be determined at trial.

666.   During and by virtue of Relators' employment with Defendants, Relators obtained direct and independent knowledge of Defendants' unlawful conduct alleged in this Complaint.

FIRST AMENDED COMPLAINT

667.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damages to the State of Minnesota, in the operation of its Medicaid program.

668.   WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

To the STATE OF MINNESOTA:

(1)   Three times the amount of actual damages which the State of Minnesota has sustained as a result of Defendants' conduct;

(2)   A civil penalty of not less than $5,000 and not more than $11,000, or the maximum amount allowed by law, for each false claim which Defendants presented or caused to be presented to the State of Minnesota;

(3)   Prejudgment interest; and

(4)   All costs incurred in bringing this action.

To Relators:

(1)   The maximum amount allowed pursuant to the Minnesota FCA and/or any other applicable provision of law;

FIRST AMENDED COMPLAINT

(2)     Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3)     An award of reasonable attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

**COUNT XX**
**Montana False Claims Act,**
**Mont. Code Ann. § 17-8-401, et seq.**

669.   The allegations in the preceding paragraphs are incorporated by reference.

670.   Relators also bring this action on behalf of the State of Montana, against Defendants to recover treble damages and civil penalties under the State of Montana False Claims Act ("FCA"), Mont. Code Ann. § 17-8-401, et seq..

671.   Defendants violated each of the following provisions of the Montana FCA, Mont. Code Ann. § 17-8-403(1), which create liability for any person who:

"(a)   knowingly presents or causes to be presented a false or fraudulent claim for payment or approval;

(b)   knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim;

(c)   conspires to commit a violation of this subsection (1) [and/or]

…

(g)   knowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or

---

FIRST AMENDED COMPLAINT

transmit money or property to a governmental entity or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to a governmental entity."

672.   In addition, Mont. Code Ann. § 45-6-313 prohibits the solicitation, receipt, offering, or payment of any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind, in return for furnishing any item or service for which payment may be made, in whole or in part, under the Montana Medicaid program.

673.   Defendants violated Mont. Code Ann. § 45-6-313 by engaging in the conduct alleged in this Complaint.

674.   Defendants furthermore violated the Montana FCA and knowingly caused false claims to be made, used and presented to the State of Montana by their deliberate and systematic violation of federal and state laws, including the FCA, the federal AKA, Mont. Code Ann. § 45-6-313, and by virtue of the fact that none of the claims submitted in connection with their conduct were even eligible for reimbursement by the Government Healthcare Programs.

675.   The State of Montana, by and through the Montana Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third-party payers.

FIRST AMENDED COMPLAINT

676.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited in this Complaint was an implied, and, upon information and belief, also an express condition of payment of claims submitted to the State of Montana in connection with Defendants' conduct. Compliance with applicable Montana statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Montana.

677.   Had the State of Montana known that Defendants were violating the federal and state laws cited in this Complaint and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the Government Healthcare Programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third-party payers in connection with that conduct.

678.   Pursuant to the Montana FCA, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. Mont. Code Ann. § 17-8-403(2).

679.   As a direct and proximate result of Defendants' violations, the State has suffered damages in an amount to be determined at trial.

680.    During and by virtue of Relators' employment with Defendants, Relators obtained direct and independent knowledge of Defendants' unlawful conduct alleged in this Complaint.

681.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damages to the State of Montana, in the operation of its Medicaid program.

682.    WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

To the STATE OF MONTANA:

(1)    Three times the amount of actual damages which the State of Montana has sustained as a result of Defendants' conduct;

(2)    A civil penalty of not less than $5,000 and not more than $10,000, or the maximum amount allowed by law, for each false claim which Defendants presented or caused to be presented to the State of Montana;

(3)    Prejudgment interest; and

(4)    All costs incurred in bringing this action.

FIRST AMENDED COMPLAINT

To Relators:

(1)      The maximum amount allowed pursuant to the Montana FCA and/or any other applicable provision of law;

(2)      Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3)      An award of reasonable attorneys' fees and costs; and

(4)      Such further relief as this Court deems equitable and just.

## COUNT XXI
### Nevada Submission of False Claims to State or Local Government Act, Nev. Rev. Stat. § 357.010, et seq.

683.    The allegations in the preceding paragraphs are incorporated by reference.

684.    Relators also bring this action on behalf of the State of Nevada, against Defendants to recover treble damages and civil penalties under the State of Nevada Submission of False Claims to State or Local Government Act ("FCA"), Nev. Rev. Stat. § 357.010, et seq.

685.    Defendants violated each of the following provisions of the Nevada FCA, Nev. Rev. Stat. § 357.040(1), which create liability for any person who:

"(a)   Knowingly presents or causes to be presented a false or fraudulent claim for payment or approval[;]

FIRST AMENDED COMPLAINT

238

(b)      Knowingly makes or uses, or causes to be made or used, a false record or statement that is material to a false or fraudulent claim[;]

…

(f)      Knowingly makes or uses, or causes to be made or used, a false record or statement that is material to an obligation to pay or transmit money or property to the State or a political subdivision[;]

(g)      Knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the State or a political subdivision[; or]

…

(i)      Conspires to commit any of the acts set forth in this subsection.

686.   In addition, Nev. Rev. Stat. § 422.560 prohibits the solicitation, acceptance, receipt, offering, or payment of anything of value in connection with the provision of medical goods or services for which payment may be made, in whole or in part, under the Nevada Medicaid program.

687.   Defendants violated Nev. Rev. Stat. § 422.560 by engaging in the conduct alleged in this Complaint.

688.   Defendants further violated the Nevada FCA and knowingly caused false claims to be made, used and presented to the State of Nevada by their deliberate and systematic violation of federal and state laws, including the FCA, the federal AKA, and Nev. Rev. Stat. § 422.560, and by virtue of the fact that none of the claims submitted in connection with their conduct were even eligible for reimbursement by the Government Healthcare Programs.

689. The State of Nevada, by and through the Nevada Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third-party payers.

690. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited in this Complaint was an implied, and, upon information and belief, also an express condition of payment of claims submitted to the State of Nevada in connection with Defendants' conduct. Compliance with applicable Nevada statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Nevada.

691. Had the State of Nevada known that Defendants were violating the federal and state laws cited in this Complaint and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the Government Healthcare Programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third-party payers in connection with that conduct.

692. Pursuant to the Nevada FCA, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. Nev. Rev. Stat. § 357.040(2).

693.   As a direct and proximate result of Defendants' violations, the State has suffered damages in an amount to be determined at trial.

694.   During and by virtue of Relators' employment with Defendants, Relators obtained direct and independent knowledge of Defendants' unlawful conduct alleged in this Complaint.

695.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Nevada in the operation of its Medicaid program.

696.   WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

To the STATE OF NEVADA:

(1)   Three times the amount of actual damages which the State of Nevada has sustained as a result of Defendants' conduct;

(2)   A civil penalty of not less than $5,500 and not more than $11,000, or the maximum amount allowed by law, for each false claim which Defendants presented or caused to be presented to the State of Nevada;

(3)   Prejudgment interest; and

FIRST AMENDED COMPLAINT

(4)    All costs incurred in bringing this action.

To Relators:

(1)    The maximum amount allowed pursuant to the Nevada FCA and/or any other applicable provision of law;

(2)    Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3)    An award of reasonable attorneys' fees and costs; and

(4)    Such further relief as this Court deems equitable and just.

## COUNT XXII
### New Jersey False Claims Act,
### N.J. Stat. Ann. § 2A:32C-1, et seq.

697.    The allegations in the preceding paragraphs are incorporated by reference.

698.    Relators also bring this action in the name of the State of New Jersey, against Defendants to recover treble damages and civil penalties pursuant to the State of New Jersey False Claims Act ("FCA"), N.J. Stat. Ann. § 2A:32C-1, et seq.

699.    Defendants violated each of the following provisions of The New Jersey FCA, N.J. Stat. Ann. § 2A:32C-3, which create liability for any person who:

"a.     Knowingly presents or causes to be presented to an employee, officer or agent of the State, or to any contractor, grantee, or other recipient of State funds, a false or fraudulent claim for payment or approval;

b.     Knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the State;

c.     Conspires to defraud the State by getting a false or fraudulent claim allowed or paid by the State; [and/or]

…

g.     Knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the State."

700.   In addition, N.J. Stat. Ann. § 30:4D-17 prohibits the solicitation, receipt, or offering of any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind, in return for furnishing any item or service for which payment may be made in whole or in part under the New Jersey Medicaid program.

701.   Defendants violated N.J. Stat. Ann. § 30:4D-17 by engaging in the conduct alleged in this Complaint.

702.   Defendants further violated the New Jersey FCA and knowingly caused false claims to be made, used and presented to the State of New Jersey by their deliberate and systematic violation of federal and state laws, including the FCA, the federal AKA, and N.J. Stat. Ann. § 30:4D-17, and by virtue of the fact

FIRST AMENDED COMPLAINT

that none of the claims submitted in connection with their conduct were even eligible for reimbursement by the Government Healthcare Programs.

703.   The State of New Jersey, by and through the New Jersey Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third-party payers.

704.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited in this Complaint was an implied, and, upon information and belief, also an express condition of payment of claims submitted to the State of New Jersey in connection with Defendants' conduct. Compliance with applicable New Jersey statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of New Jersey.

705.   Had the State of New Jersey known that Defendants were violating the federal and state laws cited in this Complaint and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the Government Healthcare Programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third-party payers in connection with that conduct.

FIRST AMENDED COMPLAINT

706.   Pursuant to the New Jersey FCA, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. N.J. Stat. Ann. § 2A:32C-3.

707.   As a direct and proximate result of Defendants' violations, the State has suffered damages in an amount to be determined at trial.

708.   During and by virtue of Relators' employment with Defendants, Relators obtained direct and independent knowledge of Defendants' unlawful conduct alleged in this Complaint.

709.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damages to the State of New Jersey, in the operation of its Medicaid program.

710.   WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

To the STATE OF NEW JERSEY:

(1)   Three times the amount of actual damages which the State of New Jersey has sustained as a result of Defendants' conduct;

(2)   A civil penalty of not less than $5,000 and not more than $11,000, or the maximum amount allowed by law, for each false claim which

FIRST AMENDED COMPLAINT

245

Defendants presented or caused to be presented to the State of New Jersey;

(3)    Prejudgment interest; and

(4)    All costs incurred in bringing this action.

To Relators:

(1)    The maximum amount allowed pursuant to the New Jersey FCA and/or any other applicable provision of law;

(2)    Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3)    An award of reasonable attorneys' fees and costs; and

(4)    Such further relief as this Court deems equitable and just.

## COUNT XXIII
### New Mexico Medicaid False Claims Act,
### N.M. Stat. Ann. § 27-14-1, et seq.

711.   The allegations in the preceding paragraphs are incorporated by reference.

712.   Relators also bring this action on behalf of the State of New Mexico, against Defendants to recover treble damages and civil penalties under the State of

New Mexico Medicaid False Claims Act ("FCA"), N.M. Stat. Ann. § 27-14-1, et seq.

713.   Defendants violated each of the following provisions of the New Mexico FCA, N.M. Stat. Ann. § 27-14-4, which create liability for any person who:

> "A.    presents, or causes to be presented, to the state a claim for payment under the Medicaid program knowing that such claim is false or fraudulent;
>
> B.    presents, or causes to be presented, to the state a claim for payment under the [M]edicaid program knowing that the person receiving a [M]edicaid benefit or payment is not authorized or is not eligible for a benefit under the [M]edicaid program;
>
> C.    makes, uses or causes to be made or used a record or statement to obtain a false or fraudulent claim under the [M]edicaid program paid for or approved by the state knowing such record or statement is false;
>
> D.    conspires to defraud the state by getting a claim allowed or paid under the [M]edicaid program knowing that such claim is false or fraudulent; [and/or]
> …
> E.    makes, uses or causes to be made or used a record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the state, relative to the Medicaid program, knowing that such record or statement is false."

714.   In addition, N.M. Stat. Ann. § 30-44-7, prohibits the solicitation, receipt, offering, or payment of any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind, in return for

furnishing any item or service for which payment may be made, in whole or in part, under the New Mexico Medicaid program.

715.   Defendants violated N.M. Stat. Ann. § 30-44-7, by engaging in the conduct alleged in the Complaint.

716.   Defendants further violated the New Mexico FCA and knowingly caused false claims to be made, used and presented to the State of New Mexico by their deliberate and systematic violation of federal and state laws, including the FCA, the federal AKA, and  N.M. Stat. Ann. § 30-44-7, and by virtue of the fact that none of the claims submitted in connection with their conduct were even eligible for reimbursement by the Government Healthcare Programs.

717.   The State of New Mexico, by and through the New Mexico Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third-party payers.

718.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited in this Complaint was an implied, and, upon information and belief, also an express condition of payment of claims submitted to the State of New Mexico in connection with Defendants' conduct. Compliance with applicable New Mexico statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of New Mexico.

FIRST AMENDED COMPLAINT

719.   Had the State of New Mexico known that Defendants were violating the federal and state laws cited in this Complaint and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the Government Healthcare Programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third-party payers in connection with that conduct.

720.   Pursuant to the New Mexico FCA, Defendants are thus liable to the State for statutorily defined damages sustained because of the acts of Defendants and such other relief as authorized. N.M. Stat. Ann. § 27-14-4.

721.   As a direct and proximate result of Defendants' violations, the State has suffered damages in an amount to be determined at trial.

722.   During and by virtue of Relators' employment with Defendants, Relators obtained direct and independent knowledge of Defendants' unlawful conduct alleged in this Complaint.

723.   This Court is requested to accept supplemental jurisdiction of this related state claim, as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damages to the State of New Mexico, in the operation of its Medicaid program.

FIRST AMENDED COMPLAINT

724.   WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

To the STATE OF NEW MEXICO:

(1)   Three times the amount of actual damages which the State of New Mexico has sustained as a result of Defendants' conduct;

(2)   A civil penalty of not less than $5,000 and not more than $10,000, or the maximum amount allowed by law, for each false claim which Defendants presented or caused to be presented to the State of New Mexico;

(3)   Prejudgment interest; and

(4)   All costs incurred in bringing this action.

To Relators:

(1)   The maximum amount allowed pursuant to the New Mexico FCA and/or any other applicable provision of law;

(2)   Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3)   An award of reasonable attorneys' fees and costs; and

(4)   Such further relief as this Court deems equitable and just.

FIRST AMENDED COMPLAINT

**COUNT XXIV**
**New Mexico Fraud Against Taxpayers Act,**
**N.M. Stat. Ann. § 44-9-1, et seq.**

725.   The allegations in the preceding paragraphs are incorporated by reference.

726.   Relators also bring this action on behalf of the State of New Mexico, against Defendants to recover treble damages and civil penalties under the State of New Mexico Fraud Against Taxpayers Act ("FATA"), N.M. Stat. Ann. § 44-9-1, et seq.

727.   Defendants violated each of the following provisions of the New Mexico FATA, N.M. Stat. Ann. § 44-9-3.A, which create liability for any person who:

> "(1) knowingly presents, or cause to be presented, to an employee, officer or agent of the state or a political subdivision or to a contractor, grantee or other recipient of state or political subdivision funds a false or fraudulent claim for payment or approval;
>
> (2) knowingly makes or uses, or causes to be made or used, a false, misleading or fraudulent record or statement to obtain or support the approval of or the payment on a false or fraudulent claim;
>
> (3) conspires to defraud the state or a political subdivision by obtaining approval or payment on a false or fraudulent claim;
>
> (4) conspires to make, use or cause to be made or used, a false, misleading or fraudulent record or statement to conceal, avoid or

FIRST AMENDED COMPLAINT

decrease an obligation to pay or transmit money or property to the state or a political subdivision; [or]

. . .

(8) knowingly makes or uses, or causes to be made or used, a false, misleading or fraudulent record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the state or a political subdivision."

728.   Defendants violated the New Mexico FATA and knowingly caused false claims to be made, used and presented to the State of New Mexico by their deliberate and systematic violation of federal and state laws, including the FCA and the federal AKA, and by virtue of the fact that none of the claims submitted in connection with their conduct were even eligible for reimbursement by the Government Healthcare Programs.

729.   The State of New Mexico, by and through the New Mexico Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third-party payers.

730.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited in this Complaint was an implied, and, upon information and belief, also an express condition of payment of claims submitted to the State of New Mexico in connection with Defendants' conduct. Compliance

FIRST AMENDED COMPLAINT

with applicable New Mexico statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of New Mexico.

731.   Had the State of New Mexico known that Defendants were violating the federal and state laws cited in this Complaint and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the Government Healthcare Programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third-party payers in connection with that conduct.

732.   Pursuant to the New Mexico FATA, Defendants are thus liable to the State for statutorily defined treble damages sustained because of the acts of Defendants and such other relief as authorized. N.M. Stat. Ann. § 44-9-3.

733.   As a direct and proximate result of Defendants' violations, the State has suffered damages in an amount to be determined at trial.

734.   During and by virtue of Relators' employment with Defendants, Relators obtained direct and independent knowledge of Defendants' unlawful conduct alleged in this Complaint.

735.   This Court is requested to accept supplemental jurisdiction of this related state claim, as it is predicated upon the exact same facts as the federal

claim, and merely asserts separate damages to the State of New Mexico, in the operation of its Medicaid program.

736. WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

To the STATE OF NEW MEXICO:

(1) Three times the amount of actual damages which the State of New Mexico has sustained as a result of Defendants' conduct;

(2) A civil penalty of not less than $5,000 and not more than $10,000, or the maximum amount allowed by law, for each false claim which Defendants presented or caused to be presented to the State of New Mexico;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To Relators:

(1) The maximum amount allowed pursuant to the New Mexico FATA and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3)     An award of reasonable attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

## COUNT XXV
## New York False Claims Act,
## N.Y. State Fin. Law § 187 et seq.

737.   The allegations in the preceding paragraphs are incorporated by reference.

738.   Relators also bring this action on behalf of the State of New York, against Defendants to recover treble damages and civil penalties under the State of New York False Claims Act ("FCA"), N.Y. State Fin. Law § 187 et seq.

739.   Defendants violated each of the following provisions of the New York FCA, N.Y. State Fin. Law § 189, which create liability for any person who:

> "(a) knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval;
>
> (b) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;
>
> (c) conspires to commit a violation of paragraph (a), (b), (d), (e), (f) or (g) of this subdivision;
>
> . . .
>
> (g) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state or a local government; or

(h) knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state or a local government, or conspires to do the same."

740.   In addition, New York law prohibits the solicitation, receipt, offering or payment of any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind, in return for furnishing any item or service for which payment may be made, in whole or in part, under the New York Medicaid program.

741.   Defendants violated New York law by engaging in the conduct alleged in this Complaint.

742.   Defendants further violated the New York FCA, and knowingly caused false claims to be made, used and presented to the State of New York, by their deliberate and systematic violation of federal and state laws, including the FCA and the federal AKA, and by virtue of the fact that none of the claims submitted in connection with their conduct were even eligible for reimbursement by the Government Healthcare Programs.

743.   The State of New York, by and through the New York Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third-party payers.

FIRST AMENDED COMPLAINT

744.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited in this Complaint was an implied, and, upon information and belief, also an express condition of payment of claims submitted to the State of New York in connection with Defendants' conduct. Compliance with applicable New York statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of New York.

745.   Had the State of New York known that Defendants were violating the federal and state laws cited in this Complaint and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the Government Healthcare Programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third-party payers in connection with that conduct.

746.   Pursuant to the New York FCA, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. N.Y. State Fin. Law § 189.

747.   As a direct and proximate result of Defendants' violations, the State has suffered damages in an amount to be determined at trial.

FIRST AMENDED COMPLAINT

748.   During and by virtue of Relators' employment with Defendants, Relators obtained direct and independent knowledge of Defendants' unlawful conduct alleged in this Complaint.

749.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damages to the State of New York, in the operation of its Medicaid program.

750.   WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

To the STATE OF NEW YORK:

(1)   Three times the amount of actual damages which the State of New York has sustained as a result of Defendants' conduct;

(2)   A civil penalty of not less than $5,000 and not more than $10,000, or the maximum amount allowed by law, for each false claim which Defendants presented or caused to be presented to the State of New York;

(3)   Prejudgment interest; and

(4)   All costs incurred in bringing this action.

FIRST AMENDED COMPLAINT

To Relators:

(1)    The maximum amount allowed pursuant to the New York FCA and/or any other applicable provision of law;

(2)    Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3)    An award of reasonable attorneys' fees and costs; and

(4)    Such further relief as this Court deems equitable and just.

## COUNT XXVI
### North Carolina False Claims Act,
### N.C. Gen. Stat. § 1-605, et seq.

751.   The allegations in the preceding paragraphs are incorporated by reference.

752.   Relators also bring this action on behalf of the State of North Carolina, against Defendants to recover treble damages and civil penalties under the State of North Carolina False Claims Act ("FCA"), N.C. Gen. Stat. § 1-605, et seq.

753.   Defendants violated each of the following provisions of the North Carolina FCA, N.C. Gen. Stat. § 1-607(a), which create liability for any person who:

FIRST AMENDED COMPLAINT

"(1)   Knowingly presents or causes to be presented a false or fraudulent claim for payment or approval[;]

(2)   Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim[;]

(3)   Conspires to commit a violation of subdivision (1), (2), (4), (5), (6), or (7) of this section[; and/or]

…

(7)   Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the State, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the State."

754.   In addition, N.C. Gen. Stat. § 108A-63 prohibits the solicitation, receipt, offering, or payment of any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind, in return for furnishing any item or service for which payment may be made, in whole or in part, under the North Carolina Medicaid program.

755.   Defendants violated N.C. Gen. Stat. § 108A-63 by engaging in the conduct alleged in this Complaint.

756.   Defendants further violated the North Carolina FCA, and knowingly caused false claims to be made, used and presented to the State of North Carolina, by their deliberate and systematic violation of federal and state laws, including the FCA, the federal AKA, and N.C. Gen. Stat. § 108A-63, and by virtue of the fact

FIRST AMENDED COMPLAINT

that none of the claims submitted in connection with their conduct were even eligible for reimbursement by the Government Healthcare Programs.

757.   The State of North Carolina, by and through the North Carolina Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third-party payers.

758.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited in this Complaint was an implied, and, upon information and belief, also an express condition of payment of claims submitted to the State of North Carolina in connection with Defendants' conduct. Compliance with applicable North Carolina statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of North Carolina.

759.   Had the State of North Carolina known that Defendants were violating the federal and state laws cited in this Complaint and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the Government Healthcare Programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third-party payers in connection with that conduct.

760.   Pursuant to the North Carolina FCA, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. N.C. Gen. Stat. § 1-607(a).

761.   As a direct and proximate result of Defendants' violations, the State has suffered damages in an amount to be determined at trial.

762.   During and by virtue of Relators' employment with Defendants, Relators obtained direct and independent knowledge of Defendants' unlawful conduct alleged in this Complaint.

763.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damages to the State of North Carolina, in the operation of its Medicaid program.

764.   WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

765.   To the STATE OF NORTH CAROLINA:

(1)   Three times the amount of actual damages which the State of North Carolina has sustained as a result of Defendants' conduct;

(2)   A civil penalty of not less than $5,500 and not more than $11,000, or the maximum amount allowed by law, for each false claim which

Defendants presented or caused to be presented to the State of North Carolina;

(3)     Prejudgment interest; and

(4)     All costs incurred in bringing this action.

To Relators:

(1)     The maximum amount allowed pursuant to the North Carolina FCA and/or any other applicable provision of law;

(2)     Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3)     An award of reasonable attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

## COUNT XXVII
### Oklahoma Medicaid False Claims Act,
### Okla. Stat. Tit. § 63-5053, et seq.

766.    The allegations in the preceding paragraphs are incorporated by reference.

767.    Relators also bring this action in the name of the State of Oklahoma, against Defendants to recover treble damages and civil penalties pursuant to the State of Oklahoma Medicaid False Claims Act ("FCA"), 63 Okla. Stat.Ann. § 5053, et seq..

FIRST AMENDED COMPLAINT

768.   Defendants violated each of the following provisions of the Oklahoma FCA, 63 Okla. Stat.Ann. § 5053.1(B), which create liability for any person who:

"1.   Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

2.   Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

3.   Conspires to commit a violation of the Oklahoma Medicaid False Claims Act;

… or

7.   Knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the state."

769.   In addition, 56 Okl. St. Ann. § 1005 prohibits the solicitation or receipt of any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind, in return for furnishing any item or service for which payment may be made in whole or in part, under the Oklahoma Medicaid program.

770.   Defendants violated the Oklahoma FCA by engaging in the conduct alleged in this Complaint.

771.   Defendants furthermore violated the Oklahoma FCA and knowingly caused false claims to be made, used and presented to the State of Oklahoma by their deliberate and systematic violation of federal and state laws, including the FCA, the federal AKA, and 56 Okl. St. Ann. § 1005, and by virtue of the fact that

FIRST AMENDED COMPLAINT

none of the claims submitted in connection with their conduct were even eligible for reimbursement by the Government Healthcare Programs.

772.   The State of Oklahoma, by and through the Oklahoma Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third-party payers.

773.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited in this Complaint was an implied, and, upon information and belief, also an express condition of payment of claims submitted to the State of Oklahoma in connection with Defendants' conduct. Compliance with applicable Oklahoma statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Oklahoma.

774.   Had the State of Oklahoma known that Defendants were violating the federal and state laws cited in this Complaint and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the Government Healthcare Programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third-party payers in connection with that conduct.

775.   Pursuant to the Oklahoma FCA, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized under the statute.

776.   As a direct and proximate result of Defendants' violations, the State has suffered damages in an amount to be determined at trial.

777.   During and by virtue of Relators' employment with Defendants, Relators obtained direct and independent knowledge of Defendants' unlawful conduct alleged in this Complaint.

778.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damages to the State of Oklahoma, in the operation of its Medicaid program.

779.   WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

To the STATE OF OKLAHOMA:

(1)    Three times the amount of actual damages which the State of Oklahoma has sustained as a result of Defendants' conduct;

(2)    A civil penalty of not less than $5,000 and not more than $10,000, or the maximum amount allowed by law, for each false claim which Defendants presented or caused to be presented to the State of Oklahoma;

(3)    Prejudgment interest; and

FIRST AMENDED COMPLAINT

(4)   All costs incurred in bringing this action.

To Relators:

(1)   The maximum amount allowed pursuant to the Oklahoma FCA and/or any other applicable provision of law;

(2)   Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3)   An award of reasonable attorneys' fees and costs; and

(4)   Such further relief as this Court deems equitable and just.

## COUNT XXVIII
### Rhode Island False Claims Act,
### Gen. Laws 1956, § 9-1.1-1, et seq.

780.   The allegations in the preceding paragraphs are incorporated by reference.

781.   Relators also bring this action in the name of the State of Rhode Island, against Defendants to recover treble damages and civil penalties under the Rhode Island False Claims Act ("FCA"), Gen. Laws 1956, § 9-1.1-1, et seq.

782.   Defendants violated each of the following provisions of the Rhode Island FCA, Gen. Laws 1956, § 9-1.1-3, which create liability for any person who:

"(1) Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(2) Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(3) Conspires to commit a violation of subsection (a)(1), (a)(2), (a)(4), (a)(5), (a)(6), or (a)(7); [or]

. . .

(7) Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state."

783.   Defendants violated the Rhode Island FCA and knowingly caused false claims to be made, used and presented to the State of Rhode Island by their deliberate and systematic violation of federal and state laws, including the FCA and the federal AKA, and by virtue of the fact that none of the claims submitted in connection with their conduct were even eligible for reimbursement by Government Healthcare Programs.

784.   The State of Rhode Island, by and through the Rhode Island Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third-party payers.

785.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited in this Complaint was an implied, and, upon information and belief, also an express condition of payment of claims submitted to the State of Rhode Island in connection with Defendants' conduct. Compliance with applicable Rhode Island statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Rhode Island.

786.   Had the State of Rhode Island known that Defendants were violating the federal and state laws cited in this Complaint and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the Government Healthcare Programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third-party payers in connection with that conduct.

787.   Pursuant to the Rhode Island FCA, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. Gen. Laws 1956, § 9-1.1-3.

788.   As a direct and proximate result of Defendants' violations, the State has suffered damages in an amount to be determined at trial.

FIRST AMENDED COMPLAINT

789.   During and by virtue of Relators' employment with Defendants, Relators obtained direct and independent knowledge of Defendants' unlawful conduct alleged in this Complaint.

790.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damaged to the State of Rhode Island, in the operation of its Medicaid program.

791.   WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

792.   To the STATE OF RHODE ISLAND:

(1)   Three times the amount of actual damages which the State of Rhode Island has sustained as a result of Defendants' conduct;

(2)   A civil penalty of not less than $5,000 and not more than $10,000, or the maximum amount allowed by law, for each false claim which Defendants presented or caused to be presented to the State of Rhode Island;

(3)   Prejudgment interest; and

(4)   All costs incurred in bringing this action.

FIRST AMENDED COMPLAINT

To Relators:

(1)     The maximum amount allowed pursuant to the Rhode Island FCA

and/or any other applicable provision of law;

(2)     Reimbursement for reasonable expenses which Relators incurred in

connection with this action;

(3)     An award of reasonable attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

**COUNT XXIX**
**Tennessee Medicaid False Claims Act,**
**Tenn. Code Ann. § 71-5-181, et seq.**

793.   The allegations in the preceding paragraphs are incorporated by

reference.

794.   Relators also bring this action in the name of the State of Tennessee,

against Defendants to recover treble damages and civil penalties under the

Tennessee Medicaid False Claims Act ("FCA"), Tenn. Code Ann. § 71-5-181, et

seq..

795.   Defendants violated each of the following provisions of the Tennessee

FCA, Tenn. Code Ann. § 71-5-182(a)(l), which create liability for any person who:

FIRST AMENDED COMPLAINT

271

"(A)   Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval under the [M]edicaid program;

(B)   Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim under the [M]edicaid program;

(C)   Conspires to commit a violation of subdivision (a)(1)A), (a)(1)(B), or (a)(1)(D); or

(D)   Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money, or property to the state, or knowingly conceals, or knowingly and improperly, avoids, or decreases an obligation to pay or transmit money or property to the state, relative to the [M]edicaid program."

796.   Defendants violated the Tennessee FCA and knowingly caused false claims to be made, used and presented to the State of Tennessee by their deliberate and systematic violation of federal and state laws, including the FCA and the federal AKA, and by virtue of the fact that none of the claims submitted in connection with their conduct were even eligible for reimbursement by Government Healthcare Programs.

797.   The State of Tennessee, by and through the Tennessee Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third-party payers.

FIRST AMENDED COMPLAINT

272

798.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited in this Complaint was an implied, and, upon information and belief, also an express condition of payment of claims submitted to the State of Tennessee in connection with Defendants' conduct. Compliance with applicable Tennessee statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Tennessee.

799.   Had the State of Tennessee known that Defendants were violating the federal and state laws cited in this Complaint and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the Government Healthcare Programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third-party payers in connection with that conduct.

800.   Pursuant to the Tennessee FCA, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. Tenn. Code Ann. § 71-5-182(a).

801.   As a direct and proximate result of Defendants' violations, the State has suffered damages in an amount to be determined at trial.

FIRST AMENDED COMPLAINT

802.   During and by virtue of Relators' employment with Defendants, Relators obtained direct and independent knowledge of Defendants' unlawful conduct alleged in this Complaint.

803.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damaged to the State of Tennessee, in the operation of its Medicaid program.

804.   WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

To the STATE OF TENNESSEE:

(1)   Three times the amount of actual damages which the State of Tennessee has sustained as a result of Defendants' conduct;

(2)   A civil penalty of not less than $5,000 and not more than $10,000, or the maximum amount allowed by law, for each false claim which Defendants presented or caused to be presented to the State of Tennessee;

(3)   Prejudgment interest; and

(4)   All costs incurred in bringing this action.

FIRST AMENDED COMPLAINT

To Relators:

(1)     The maximum amount allowed pursuant to the Tennessee FCA and/or any other applicable provision of law;

(2)     Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3)     An award of reasonable attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

**COUNT XXX**
**Texas Medicaid Fraud Prevention Act,**
**Tex. Hum. Res. Code § 36.001, et seq.**

805.   The allegations in the preceding paragraphs are incorporated by reference.

806.   Relators also bring this action in the name of the State of Texas, against Defendants to recover double damages and civil penalties under the State of Texas Medicaid Fraud Prevention Act ("FCA"), Tex. Hum. Res. Code § 36.001, et seq.

807.   Defendants violated each of the following provisions of the Texas FCA, Tex. Hum. Res. Code § 36.002, which create liability for any person who, *inter alia*:

---

FIRST AMENDED COMPLAINT

"(1)   knowingly makes or causes to be made a false statement or misrepresentation of a material fact to permit a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized;

(2)   knowingly conceals or fails to disclose information that permits a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized;

(3)   knowingly applies for and receives a benefit or payment on behalf of another person under the Medicaid program and converts any part of the benefit or payment to a use other than for the benefit of the person on whose behalf it was received; …

(12)   knowingly makes, uses, or causes the making or use of a false record or statement material to an obligation to pay or transmit money or property to this state under the Medicaid program, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to this state under the Medicaid program; or

(13)   knowingly engages in conduct that constitutes a violation under Section 32.039(b)."

808.   Defendants violated the Texas FCA and knowingly caused false claims to be made, used and presented to the State of Texas by their deliberate and systematic violation of federal and state laws, including the FCA and the federal AKA, and by virtue of the fact that none of the claims submitted in connection

FIRST AMENDED COMPLAINT

1  with their conduct were even eligible for reimbursement by the Government

2  Healthcare Programs.

3      809.   The State of Texas, by and through the Texas Medicaid program and

4  other state healthcare programs, and unaware of Defendants' conduct, paid the

5  claims submitted by healthcare providers and third-party payers.

6      810.   Compliance with applicable Medicare, Medicaid and the various other

7  federal and state laws cited in this Complaint was an implied, and, upon

8  information and belief, also an express condition of payment of claims submitted

9  to the State of Texas in connection with Defendants' conduct. Compliance with

10  applicable Texas statutes, regulations and Pharmacy Manuals was also an express

11  condition of payment of claims submitted to the State of Texas.

12      811.   Had the State of Texas known that Defendants were violating the

13  federal and state laws cited in this Complaint and/or that the claims submitted in

14  connection with Defendants' conduct failed to meet the reimbursement criteria of

15  the Government Healthcare Programs or were premised on false and/or misleading

16  information, it would not have paid the claims submitted by healthcare providers

17  and third-party payers in connection with that conduct.

18      812.   Defendants did not, within 30 days after they first obtained

19  information as to such violations, furnish such information to officials of the State

20

FIRST AMENDED COMPLAINT

277

of Texas responsible for investigating false claims violations, did not otherwise fully cooperate with any investigation of the violations, and have not otherwise furnished information to the State of Texas regarding the claims for reimbursement at issue.

813.   Pursuant to the Texas FCA, Defendants are liable to the State for double damages, civil penalties, and all other relief authorized by law. Tex. Hum. Res. Code § 36.052.

814.   As a direct and proximate result of Defendants' violations, the State has suffered damages in an amount to be determined at trial.

815.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damages to the State of Texas, in the operation of its Medicaid program.

816.   WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

To the STATE OF TEXAS:

(1)    Two times the amount of actual damages which the State of Texas has sustained as a result of Defendants' conduct;

(2)    A civil penalty of not less than $10,000, or the maximum amount allowed by law, for each false claim which Defendants presented or caused to be presented to the State of Texas;

(3)    Prejudgment interest; and

(4)    All costs incurred in bringing this action.

To Relators:

(1)    The maximum amount allowed pursuant to the Texas FCA and/or any other applicable provision of law;

(2)    Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3)    An award of reasonable attorneys' fees and costs; and

(4)    Such further relief as this Court deems equitable and just.

## COUNT XXXI
**Vermont False Claims Act,**
**Vt. Stat. Tit. 32, 630, et seq.**

817.    The allegations in the preceding paragraphs are incorporated by reference.

FIRST AMENDED COMPLAINT

818.   Relators also bring this action in the name of the State of Vermont, against Defendants to recover treble damages and civil penalties under the State of Vermont False Claims Act ("FCA"), Vt. Stat. Ann. tit. 32, § 630, et seq.

819.   Defendants violated each of the following provisions of the Vermont FCA, Vt. Stat. Ann. tit. 32, § 631, which state that no person shall:

> "(1)      knowingly present, or cause to be presented, a false or fraudulent claim for payment or approval;
>
> (2)      knowingly make, use, or cause to be made or used, a false record or statement material to a false or fraudulent claim;
>
> …
>
> (8)      enter into a written agreement or contract with an official of the State or its agent knowing the information contained therein is false;
>
> (9)      knowingly make, use or cause to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the State;
>
> (10) knowingly conceal or knowingly and improperly avoid or decrease an obligation to pay or transmit money or property to the State; [or]
> (12) conspire to commit a violation of this subsection.

820.   Defendants violated the Vermont FCA and knowingly caused false claims to be made, used and presented to the State of Vermont by their deliberate and systematic violation of federal and state laws, including the FCA and the federal AKA, and by virtue of the fact that none of the claims submitted in

FIRST AMENDED COMPLAINT

connection with their conduct were even eligible for reimbursement by

Government Healthcare Programs.

821.   The State of Vermont, by and through the Vermont Medicaid program

and other state healthcare programs, and unaware of Defendants' conduct, paid the

claims submitted by healthcare providers and third-party payers.

822.   Compliance with applicable Medicare, Medicaid and the various other

federal and state laws cited in this Complaint was an implied, and, upon

information and belief, also an express condition of payment of claims submitted

to the State of Vermont in connection with Defendants' conduct. Compliance with

applicable Vermont statutes, regulations and Pharmacy Manuals was also an

express condition of payment of claims submitted to the State of Vermont.

823.   Had the State of Vermont known that Defendants were violating the

federal and state laws cited in this Complaint and/or that the claims submitted in

connection with Defendants' conduct failed to meet the reimbursement criteria of

the Government Healthcare Programs or were premised on false and/or misleading

information, it would not have paid the claims submitted by healthcare providers

and third-party payers in connection with that conduct.

FIRST AMENDED COMPLAINT

824.   Pursuant to the Vermont FCA, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. Vt. Stat. Ann. tit. 32, § 631(b).

825.   As a direct and proximate result of Defendants' violations, the State has suffered damages in an amount to be determined at trial.

826.   During and by virtue of Relators' employment with Defendants, Relators obtained direct and independent knowledge of Defendants' unlawful conduct alleged in this Complaint.

827.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damages to the State of Vermont, in the operation of its Medicaid program.

828.   WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

To the STATE OF VERMONT:

(1)   Three times the amount of actual damages which the State of Vermont has sustained as a result of Defendants' conduct;

(2)   A civil penalty of not less than $5,500 and not more than $11,000, or the maximum amount allowed by law, for each false claim which

FIRST AMENDED COMPLAINT

Defendants presented or caused to be presented to the State of Vermont;

(3)     Prejudgment interest; and

(4)     All costs incurred in bringing this action.

To Relators:

(1)     The maximum amount allowed pursuant to the Vermont FCA and/or any other applicable provision of law;

(2)     Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3)     An award of reasonable attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

## COUNT XXXII
### The Commonwealth of Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.1, et seq.

829.   The allegations in the preceding paragraphs are incorporated by reference.

830.   Relators also bring this action on behalf of the Commonwealth of Virginia, against Defendants to recover treble damages and civil penalties under

the Commonwealth of Virginia Fraud Against Taxpayers Act ("FCA"), Va. Code Ann. § 8.01-216.1, et seq.

831.   Defendants violated each of the following provisions of the Virginia FCA, Va. Code Ann. § 8.01-216.3(A), which create liability for any person who:

> "1. Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>
> 2.     Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;
>
> 3.     Conspires to commit a violation of subdivision 1, 2, 4, 5, 6, 7, or 8; [or]
>
> …
>
> 8. Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Commonwealth or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Commonwealth."

832.   In addition, Va. Code Ann. § 32.1-315 prohibits the solicitation, receipt or offering of any remuneration, including any bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind, in return for furnishing any good, service or item for which payment may be made, in whole or in part, under the Virginia Medicaid program.

833.   Defendants violated Va. Code Ann. § 32.1-315 by engaging in the conduct alleged in this Complaint.

834.   Defendants furthermore violated the Virginia FCA and knowingly caused false claims to be made, used and presented to the Commonwealth of Virginia by their deliberate and systematic violation of federal and state laws, including the FCA, the federal AKA, and Va. Code Ann. § 32.1-315 and by virtue of the fact that none of the claims submitted in connection with their conduct were even eligible for reimbursement by the Government Healthcare Programs.

835.   The Commonwealth of Virginia, by and through the Virginia Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third-party payers.

836.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited in this Complaint was an implied, and, upon information and belief, also an express condition of payment of claims submitted to the Commonwealth of Virginia in connection with Defendants' conduct. Compliance with applicable Virginia statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the Commonwealth of Virginia.

837.   Had the Commonwealth of Virginia known that Defendants were violating the federal and state laws cited in this Complaint and/or that the claims

submitted in connection with Defendants' conduct failed to meet the

reimbursement criteria of the Government Healthcare Programs or were premised

on false and/or misleading information, it would not have paid the claims

submitted by healthcare providers and third-party payers in connection with that

conduct.

838.   Pursuant to the Virginia FCA, Defendants are liable to the

Commonwealth for treble damages, civil penalties, and all other relief authorized

by law. Va. Code Ann. § 8.01-216.3(A).

839.   As a direct and proximate result of Defendants' violations, the

Commonwealth has suffered damages in an amount to be determined at trial.

840.   During and by virtue of Relators' employment with Defendants,

Relators obtained direct and independent knowledge of Defendants' unlawful

conduct alleged in this Complaint.

841.   This Court is requested to accept supplemental jurisdiction of this

related state claim as it is predicated upon the exact same facts as the federal claim,

and merely asserts separate damages to the Commonwealth of Virginia, in the

operation of its Medicaid program.

842.   WHEREFORE, Relators respectfully request this Court to award the

following damages to the following parties and against Defendants:

To the COMMONWEALTH OF VIRGINIA:

(1)     Three times the amount of actual damages which the Commonwealth of Virginia has sustained as a result of Defendants' conduct;

(2)     A civil penalty of not less than $5,000 and not more than $10,000, or the maximum amount allowed by law, for each false claim which Defendants presented or caused to be presented to the Commonwealth of Virginia;

(3)     Prejudgment interest; and

(4)     All costs incurred in bringing this action.

To Relators:

(1)     The maximum amount allowed pursuant to the Virginia FCA and/or any other applicable provision of law;

(2)     Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3)     An award of reasonable attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

FIRST AMENDED COMPLAINT

## COUNT XXXIII
### Washington State Medicaid Fraud False Claims Act, Wash. Rev. Code § 74.66.005, et seq.

843.   The allegations in the preceding paragraphs are incorporated by reference.

844.   Relators also bring this action on behalf of the State of Washington, against Defendants to recover treble damages and civil penalties under the Washington State Medicaid Fraud False Claims Act ("FCA"), Wash. Rev. Code § 74.66.005, et seq.

845.   Defendants violated each of the following provisions of the Washington FCA, Wash. Rev. Code § 74.66.020(1), which create liability for any person who:

> "(a)   Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>
> (b)   Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;
>
> (c)   Conspires to commit one or more of the violations in this subsection (1); [or]
>
> …
>
> (g)   Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the government entity, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the government entity."

FIRST AMENDED COMPLAINT

288

846.   In addition, Wash. Rev. Code § 74.09.240 prohibits the solicitation, receipt, or offering of any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind, in return for furnishing any item or service for which payment may be made, in whole or in part, under the Washington Medicaid program.

847.   Defendants violated Wash. Rev. Code § 74.09.240 by engaging in the conduct alleged in this Complaint.

848.   Defendants furthermore violated the Washington FCA and knowingly caused false claims to be made, used and presented to the State of Washington by their deliberate and systematic violation of federal and state laws, including the FCA, the federal AKA, and Wash. Rev. Code § 74.09.240, and by virtue of the fact that none of the claims submitted in connection with their conduct were even eligible for reimbursement by Government Healthcare Programs.

849.   The State of Washington, by and through the Washington Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third-party payers.

850.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited in this Complaint was an implied, and, upon information and belief, also an express condition of payment of claims submitted

to the State of Washington in connection with Defendants' conduct. Compliance with applicable Washington statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Washington.

851.   Had the State of Washington known that Defendants were violating the federal and state laws cited in this Complaint and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the Government Healthcare Programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third-party payers in connection with that conduct.

852.   Pursuant to the Washington FCA, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. Wash. Rev. Code § 74.66.020(1).

853.   As a direct and proximate result of Defendants' violations, the State has suffered damages in an amount to be determined at trial.

854.   During and by virtue of Relators' employment with Defendants, Relators obtained direct and independent knowledge of Defendants' unlawful conduct alleged in this Complaint.

855.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim,

FIRST AMENDED COMPLAINT

and merely asserts separate damages to the State of Washington, in the operation of its Medicaid program.

856.   WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

To the STATE OF WASHINGTON:

(1)   Three times the amount of actual damages which the State of Washington has sustained as a result of Defendants' conduct;

(2)   A civil penalty of not less than $5,500 and not more than $11,000, or the maximum amount allowed by law, for each false claim which Defendants presented or caused to be presented to the State of Washington;

(3)   Prejudgment interest; and

(4)   All costs incurred in bringing this action.

To Relators:

(1)   The maximum amount allowed pursuant to the Washington FCA and/or any other applicable provision of law;

(2)   Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3)     An award of reasonable attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

**COUNT XXXIV**
**California Insurance Frauds Prevention Act,**
**Cal. Ins. Code § 1871.7 et seq.**

857.   The allegations in the preceding paragraphs are incorporated by reference.

858.   Relators also bring this action on behalf of the State of California against Defendants to recover treble damages and penalties under the California Insurance Frauds Prevention Act, Cal. Ins. Code § 1871.7 et seq.

859.   By virtue of the acts described above, Defendants knowingly utilized a scheme by which they improperly procured "runners, cappers, steerers, and other persons" to procure patients who held private insurance contracts and against whom Defendants could cause the filing of claims for payment. Cal. Ins. Code § 1871.7(a).

860.   Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the private insurers in California, or for patients in California those insurers covered, for payment or approval in violation of each patient's private health insurance contract.

FIRST AMENDED COMPLAINT

861.   By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements and omitted material facts to induce the private insurers in California, or for patients in California covered by those insurers, to approve or pay such false and fraudulent claims.

862.   By virtue of the acts described above, the Defendants conspired to violate the California Insurance Fraud Prevention Act and each patient's private health insurance contract.

863.   The private insurers in California, or those insurers that covered patients in California, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be presented by Defendants, paid and continue to pay the claims that are non-payable as a result of Defendants' illegal conduct.

864.   By reason of Defendants' acts, these private insurance companies have been damaged, and continue to be damaged, in a substantial amount to be determined at trial.

865.   Each claim for reimbursement that was a result of the Defendants' scheme represents a false or fraudulent record or statement and a false or fraudulent claim for payment.

866.   The State of California is entitled to the maximum penalty of $10,000.00 for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used, or presented by Defendants.

867.   WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

To the STATE of CALIFORNIA:

(1)     Three times the amount of damages that the private insurance companies have sustained because of Defendants' actions, plus a civil penalty of not less than $5,000.00 and not more than $10,000.00 for each violation of Cal. Ins. Code § 1871.7(a) and (b);

(2)     At least thirty percent (30%) and up to forty percent (40%) of the proceeds of this action to the Relators if the State of California elects to intervene, and forty percent (40%) to fifty percent (50%) if it does not;

(3)     Relator's'' attorneys' fees, litigation and investigation costs, and other related expenses; and

(4)     Such other relief as the Court deems just and appropriate.

## COUNT XXXV
### Illinois Insurance Claims Fraud Prevention Act,
### ILCS 92/1 et seq.

868.   The allegations in the preceding paragraphs are incorporate by reference.

869.   Relators also bring this action on behalf of the State of Illinois against Defendants to recover treble damages and civil penalties under the Illinois Insurance Claims Fraud Prevention Act, ILCS 92/1, et seq.

870.   By virtue of the acts described above, Defendants knowingly offered and/or paid remuneration to physicians to induce the procurement of patients for Defendants' drugs for which Defendant could cause the filing of claims for payment from the patients' insurers. 740 Ill. Comp. Stat. § 92/5(a).

871.   Defendants knowingly presented or caused to be presented false or fraudulent claims to the private insurers in Illinois, or for patients in Illinois those insurers covered, for payment or approval in violation of each patient's private health insurance contract.

872.   By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements and omitted material facts to induce the private insurers in Illinois, or for patients in Illinois covered by those insurers, to approve or pay such false and fraudulent claims.

FIRST AMENDED COMPLAINT

873.   By virtue of the acts described above, the Defendants conspired to violate the Illinois Insurance Claims Fraud Prevention Act and each patient's private health insurance contract.

874.   The private insurers in Illinois, or those insurers that covered patients In Illinois, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be presented by Defendants, paid and continue to pay the claims that are non-payable as a result of Defendants' illegal conduct.

875.   By reason of Defendants' acts, these private insurance companies have been damaged, and continue to be damaged, in a substantial amount to be determined at trial.

876.   Each claim for reimbursement that was a result of the Defendants' unlawful kickback scheme represents a false or fraudulent record or statement and a false or fraudulent claim for payment.

877.   The State of Illinois is entitled to the maximum penalty of $10,000.00 for each and every false or fraudulent claim, record, or statement made, 'used, presented, or caused to be made, used, or presented by Defendants.

878.   WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

To the STATE of ILLINOIS:

FIRST AMENDED COMPLAINT

necessarily limited to the civil penalties and damages, on behalf of the United States, which, pursuant to the False Claims Act, shall be not less than 25 percent nor more than 30 percent of the proceeds because the Government did not intervene;

(c) That judgment be entered against Defendants jointly and severally, in the amounts to be determined at trial; and

(d) That Relators be awarded all costs and expenses incurred, including reasonable attorneys' fees; and

(e) That the Court order such other relief as is appropriate.

Trial by jury is hereby requested.

FIRST AMENDED COMPLAINT

1    Dated:  October  29, 2021                    Respectfully submitted,

2

3    /s/ C. Brooks Cutter
     C. BROOKS CUTTER (SBN: 121407)

4    John R. Parker, JR.
     Celine E. Cutter

5    Cutter Law P.C.
     401 Watt Avenue

6    Sacramento, CA 95864
     Tel. 916-448-9800

7    Fax. 916-669-4499
     bcutter@cutterlaw.com

8    /s/ Mychal Wilson
     MYCHAL WILSON (SBN: 236189)

9    The Law Office of Mychal Wilson
     401 Wilshire Blvd.,

10   12th Floor
     Santa Monica, CA 90401

11   T: (424) 252-4232
     F: (310) 424-7116

12   mychal@mychalwilsonesq.com

13   Renee Brooker
     RENÉE BROOKER (*Pro hac vice pending*)

14   DC Bar No. 430159
     Eva Gunasekera

15   Mark A. Clifford
     Tycko & Zavareei LLP

16   1828 L Street NW
     Suite 1000

17   Washington, DC 20036
     Phone: (202) 417-3664

18   Fax: (202) 973-0950
     reneebrooker@tzlegal.com

19

20

FIRST AMENDED COMPLAINT